IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-1581 (LPS) |
| | ) | |
| TREND MICRO INCORPORATED, and | ) | REDACTED - |
| TREND MICRO, INC. (USA), | ) | PUBLIC VERSION |
| | ) | |
| Defendants. | ) | |

**BRIEF OF DEFENDANTS TREND MICRO INCORPORATED AND TREND MICRO INC. (USA) IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs Louden (#2881)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
klouden@mnat.com
mflynn@mnat.com

*Attorneys for Trend Micro Incorporated and Trend Micro, Inc. (USA)*

OF COUNSEL:

Yar R. Chaikovsky
MCDERMOTT, WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025
(650) 815-7400

David M. Beckwith
MCDERMOTT, WILL & EMERY LLP
4 Park Plaza, Suite 1700
Irvine, CA  92614-2559
(949) 851-0633

Original Filing Date: June 14, 2013
Redacted Filing Date: June 21, 2013

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

I.  NATURE AND STAGE OF PROCEEDINGS ............................................................. 1

II.  SUMMARY OF ARGUMENT ..................................................................................... 1

III.  STATEMENT OF FACTS ............................................................................................ 2

IV.  APPLICABLE LAW ..................................................................................................... 3

  A.  Summary Judgment in Patent Cases ................................................................. 3

  B.  Anticipation ...................................................................................................... 3

  C.  A Patent Claim Is Invalid If the Claimed Invention Was On Sale in the
      United States More Than One Year Before the Patent Filing Date ..................... 3

  D.  A Claim Is Not Infringed Unless Every Limitation Is Met ................................. 4

  E.  Willful Infringement Requires "Clear and Convincing Evidence" ..................... 4

  F.  When A Patentee's Damages Expert Does Not Meet The *Daubert*
      Standard, Summary Judgment Of No Damages Is Proper ................................... 4

V.  ARGUMENT ................................................................................................................ 5

  A.  The Asserted Claims of the '050 Patent Are Invalid ........................................ 5

    1.  '050 Patent Background ...................................................................... 5

    2.  Townshend Is Prior Art To The '050 Patent And Discloses The
        Same Problems And Solutions .............................................................. 5

    3.  The PTO Found That Townshend Anticipates The '050 Patent .............. 6

    4.  Townshend Anticipates Claims 9, 16, and 22 of the '050 Patent .......... 6

    5.  Even if IV Were Able to Incorrectly Convince the Court That
        Townshend Does Not Anticipate the Asserted Claims of the '050
        Patent, It Renders those Claims Obvious ............................................. 20

  B.  The Asserted Claims of the '142 Patent are Invalid Due to the On-Sale Bar ...... 21

    1.  Gatekeeper Was Offered for Sale and Sold More Than One Year
        Prior to the Filing Date of the '142 Patent ......................................... 22

    2.  Substantial Activity Prefatory to the Sale Occurred in the United
        States .................................................................................................. 23

    3.  The Gatekeeper Product Embodied the Purported Inventions
        Claimed in the '142 Patent ................................................................. 25

i

4. Uncontested Expert Testimony Establishes That Gatekeeper Was Ready for Patenting More Than One Year Prior to the Critical Date ...... 25

C. Trend Does Not Infringe the '142 Patent ........................................................ 27

1. The '142 Accused Products Do Not Have a "Destination Post Office" ................................................................................................. 27

2. The '142 Accused Products Do Not Combine the E-Mail Message [Data Object] With A New Distribution List and a Rule History For Delivery Together ............................................................................ 31

3. ScanMail Does Not Receive Messages or Data Objects From A Sender ................................................................................................. 33

4. The '142 Accused Products Do Not Have an Organizational Hierarchy (Claims 18 and 25) ................................................................ 34

D. Trend Does Not Infringe the '610 Patent ........................................................ 35

1. '610 Patent Background ........................................................................ 35

2. The Accused '610 Products Are Located On Private Networks That Use IP Addresses In The Range 10.x.x.x And Thus Are Never "Within The Telephone Network" ........................................................ 35

3. Dr. McDaniel's Attempt to Disavow His Own Unequivocal Opinion Does not Create a Triable Issue of Material Fact ..................... 37

E. Trend Cannot Be Found To Have Willfully Infringed Any of the Patents-In-Suit ............................................................................................................. 38

1. IV's Complaint Fails to Allege Trend Has Willfully Infringed Any Asserted Patent ..................................................................................... 38

2. IV Fails to Allege or Prove That Trend Had Pre-Suit Knowledge of the Asserted Patents ........................................................................... 38

3. IV Failed to Seek Any Relief From Post-Suit Infringement .................. 39

4. Trend Has Legitimate Defenses to IV's Claims of Infringement, And Creditable Invalidity Arguments, Precluding A Claim For Willful Infringement Based Solely On Post-Lawsuit Conduct ................ 39

F. The Court Should Grant Summary Judgment of No Damages ........................... 40

VI. CONCLUSION ...................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
299 F.3d 1336 (Fed. Cir. 2002)............................................................3, 22, 25

*B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*,
825 F.Supp. 65 (D. Del. 1993)........................................................................24

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
682 F.3d 1003 (Fed. Cir. 2012)................................................................4, 39, 40

*Becton Dickinson and Co. v. Tyco healthcare Group*,
616 F.3d 1249 (Fed. Cir. 2010)......................................................................30

*Golden Bridge Tech, Inc. v. Nokia, Inc.*,
527 F.3d 1318 (Fed. Cir. 2008)........................................................................3

*In re Seagate Tech., LLC*,
497 F.3d 1360 (Fed. Cir. 2007)..............................................................4, 38, 39

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)..............................................................................3, 20, 21

*Leader Techs., Inc. v. Facebook, Inc.*,
770 F. Supp. 2d 686 (D. Del. 2011)............................................................22, 25

*Monolithic Power Sys. v. 02 Micro Int'l Ltd.*,
2007 U.S. Dist. LEXIS 84755 (N.D. Cal. Oct. 30, 2007).........................................23

*NTP, Inc. v. Research In Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005)......................................................................35

*Pfaff v. Wells Elecs., Inc.*,
525 U.S. 55 (1998)..............................................................................3, 25, 27

*Pivonka v. Cent. Garden & Pet co.*,
2008 U.S. Dist. LEXIS 12022 (D. Colo. Feb. 19, 2008) .................................. 39-40

*Playtex Prods., Inc. v. Proctor & Gamble Co.*,
400 F.3d 901 (Fed. Cir. 2005)..........................................................................4

*Riles v. Shell Exploration & Prod. Co.*,
298 F.3d 1302 (Fed. Cir. 2002)..........................................................................4

*Robotic Vision Sys., Inc. v. View Eng'g, Inc.*,
112 F.3d 1163 (Fed. Cir. 1997)........................................................................26

*Schering Corp. v. Geneva Pharms., Inc.*,
339 F.3d 1373 (Fed. Cir. 2003)..................................................................................................3

*Sentry Protection Prods., Inc. v. Eagle Mfg. Co.*,
400 F.3d 910 (Fed. Cir. 2005)................................................................................................38

*Solvay v. Honeywell Specialty Materials LLC*,
827 F. Supp. 2d 358 (D. Del. 2011)........................................................................................4

*Tarkus Imaging, Inc. v. Adobe Sys.*,
867 F. Supp. 2d 534 (D. Del. 2012)........................................................................................4

## STATUTES

35 U.S.C. § 102(b) .............................................................................................................3, 23

35 U.S.C. § 102(e) ......................................................................................................................5

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(c)(2)...............................................................................................................3

## I.      NATURE AND STAGE OF PROCEEDINGS

This patent infringement action was originally part of a case brought by Intellectual

Ventures I LLC ("IV") against Trend Micro Incorporated, Trend Micro, Inc. (USA) (collectively

"Trend"), and three other defendants, No. 10-1067 (LPS).  The Court severed the claims against

Trend into the present action on November 8, 2012.  IV currently asserts three patents against

Trend:  U.S. Patent Nos. 5,987,610 ("'610 patent"), 6,073,142 ("'142 patent"), and 6,460,050

("'050 patent").[1]  At present, the Court has issued a claim construction order, and fact and expert

discovery are complete.  No trial date has been set.

## II.     SUMMARY OF ARGUMENT

1.      Each asserted claim of the '050 patent is invalid because it was anticipated by

U.S. Patent No. 6,829,635, issued to Townshend ("Townshend").  Townshend is directed to the

same problem as the '050 patent and teaches the solution claimed in the '050 patent.  Townshend

discloses every element of each asserted claim of the '050 patent.  The United States Patent and

Trademark Office ("PTO") agrees:  based on Townshend, the PTO has rejected each asserted

claim in the pending *inter partes* reexamination of the '050 patent.  Alternatively, each claim

was obvious in light of Townshend at the time of invention.

2.      Each asserted claim of the '142 patent is invalid because the original owner of the

patent, Park City Group, offered a product embodying each claim for sale in the United States

more than one year before filing the application that led to the issuance of the '142 patent.

3.      Trend does not infringe any asserted claim of the '142 patent.  With respect to

asserted claims 1, 7, 17, 21, 22, 24, 26, IV has failed to identify any "distribution list" that is

combined with the message and rule history "for delivery together" to a "post office," as required

---

[1]   IV previously asserted a fourth patent against Trend—U.S. Patent No. 7,506,155 ("'155
patent").  These allegations have been withdrawn.

by the Court's claim construction.  With respect to asserted claims 18 and 25, IV has failed to show that the accused products meet the "organizational hierarchy" limitation.

4.      Trend does not infringe any asserted claim of the '610 patent.  None of the accused Trend products detects viruses "within the telephone network," as required by the claims.  IV's expert conceded that "private networks" utilizing IP addresses that cannot be accessed from the public Internet ***can never be*** "within the telephone network" under the Court's construction of that claim term.  The accused Trend products detect viruses only using private networks with such IP addresses.

5.      Trend has not willfully infringed any of the patents-in-suit.  The record conclusively shows that Trend was not "objectively reckless" in light of its reasonable defenses, including an invalidity defense concerning the '050 patent that has now been confirmed by the PTO.  Moreover, Trend had no pre-suit notice of any the patents, and there is no evidence that Trend had any subjective intent to infringe any of the patents-in-suit.

6.      The Court should grant summary judgment of no damages.  IV's damages case is based entirely upon the opinions of its damages expert, Michael Wagner.  As set forth in Trend's contemporaneously filed *Daubert* motion concerning Mr. Wagner, his methodologies and opinions are inadmissible because they are unreliable and unfounded.[2]

## III.      STATEMENT OF FACTS

For clarity, the relevant facts are set forth in the Argument sections as appropriate.

---

[2]      Sections III-V(B) that follow are substantively the same as in Symantec Corporation's Opening Brief in Support of Motion for Summary Judgment, submitted on the same date as the present brief in Case No. 10-1067 (LPS).

## IV.    APPLICABLE LAW

### A.    Summary Judgment in Patent Cases

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment is particularly appropriate in complex patent infringement actions because it is a useful tool to secure a just and speedy determination of the action and to simplify and pare down the issues.  *See KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 427 (2007).

### B.    A Prior Art Reference That Discloses Every Limitation of a Claimed Invention Invalidates the Patent Claim

A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention.  *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Anticipation may be decided on summary judgment if there is no genuine dispute of material fact.  *See Golden Bridge Tech. Inc. v. Nokia, Inc.,* 527 F.3d 1318, 1321 (Fed. Cir. 2008).

### C.    A Patent Claim Is Invalid If the Claimed Invention Was On Sale in the United States More Than One Year Before the Patent Filing Date

A patent is invalid if "the invention was . . . on sale in this country, more than one year prior to the date of application for patent in the United States."  35 U.S.C. § 102(b).  To trigger the on-sale bar, the product must anticipate or render obvious the asserted claims in light of the prior art.  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002).  The product must have been (1) the subject of a commercial offer for sale and (2) ready for patenting. *See Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998).

### D.      A Claim Is Not Infringed Unless Every Limitation Is Met

An accused product does not infringe unless it meets every limitation of the claim, either literally or under the doctrine of equivalents.  *Playtex Prods., Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005); *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1308 (Fed. Cir. 2002).

### E.      Willful Infringement Requires "Clear and Convincing Evidence"

A patentee must prove willful infringement through "clear and convincing evidence" that (1) "the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent," and (2) "this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer."  *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  The first inquiry is a question of law decided by the Court. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 682 F.3d 1003, 1005-07 (Fed. Cir. 2012).  District courts routinely dispose of willful infringement claims based on this objective prong.  *See, e.g., Tarkus Imaging, Inc. v. Adobe Sys.*, 867 F. Supp. 2d 534, 537 (D. Del. 2012) (Stark, J.) (granting summary judgment of no willful infringement); *Solvay v. Honeywell Specialty Materials LLC*, 827 F. Supp. 2d 358, 366 (D. Del. 2011) (Robinson, J.) (same).

### F.      When A Patentee's Damages Expert Does Not Meet The *Daubert* Standard, Summary Judgment Of No Damages Is Proper

Where a patentee's expert witness relies upon a faulty damages methodology, summary judgment of no damages is proper.  *See, e.g.*, *Monolithic Power Sys. v. O2 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143, 1154-56 (N.D. Cal. 2007); *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 924 (N.D. Ill. 2012) ("[A] failure of proof, whether with respect to liability or to remedy . . . ends a case").

## V.     ARGUMENT

### A.     The Asserted Claims Of The '050 Patent Are Invalid

#### 1.     '050 Patent Background

The '050 patent is directed towards a distributed file classification system.  Ex. 1,[3] '050 patent at 1:5-7, Abstract.  Within the system, client computers generate identifiers for files and submit the identifiers to a central server.  The patent specification largely focuses on a system for determining whether email messages are spam or junk.  *See, e.g.*, *id*. at Fig. 2.  IV asserts claims 9, 13, 16, 22 and 24 of the '050 patent against Trend.[4]

#### 2.     Townshend Is Prior Art To The '050 Patent And Discloses The Same Problems And Solutions

The original '050 patent application was filed on December 22, 1999.  *Id*.  IV alleges a conception date of November 13, 1998.  Ex. 2, Pl.'s Third Supp. Resp. Defs.' Interrog. No. 2. The Townshend patent is prior art because its original application was filed on July 1, 1998.  Ex. 3, Townshend; 35 U.S.C. § 102(e).  The Townshend patent issued on December 7, 2004.  *Id*. Like the '050 patent, Townshend describes a distributed system for determining whether email messages are bulk/junk.[5]  *Id.*, Fig. 1.  As discussed below, Townshend alone invalidates all the asserted claims.

---

[3]   All citations to exhibits herein, unless otherwise noted, refer to exhibits to the Declaration of Michael J. Flynn in Support of Trend Micro Incorporated and Trend Micro Inc. (USA)'s Motions for Summary Judgment ("Flynn Decl.").

[4]   IV previously had asserted Claim 15 of the '050 patent against Trend, but withdrew its allegations based on that claim on Feb. 24, 2013.  Ex. 48, Email from J. Lahad to S. Bartow et al., dated Feb. 24, 2013.

[5]   IV's expert agreed that "bulk email" and "junk email" are synonyms.  Ex. 4, McDaniel Dep. at 57:3-6.

### 3. The PTO Found That Townshend Anticipates The '050 Patent

On September 12, 2012, Symantec filed a request with the PTO for *Inter Partes* reexamination of the '050 patent.  On December 11, 2012, the PTO granted the request and issued an office action rejecting all 25 claims of the '050 patent.  Ex. 5, 12/11/12 Office Action in '050 Reexam at 2.  The PTO concluded that Townshend anticipates all of the claims IV is asserting against the Defendants.  *Id.* at 4.  On February 11, 2013, IV filed a response to this office action, making arguments attempting to distinguish Townshend and other prior art.  Ex. 6, 2/11/13 Amendment in '050 Reexam.  As discussed below, IV's attempts to distinguish Townshend have no merit.

### 4. Townshend Anticipates Claims 9, 13, 16, 22, and 24 of the '050 Patent

#### a. Comparison of Townshend to the '050 Patent

Both Townshend and the '050 patent describe a system for detecting spam or bulk email, as illustrated in the figures shown on the front cover of each patent (letters in brackets added):



Ex. 3, Townshend, Fig. 1



Ex. 1, '050 patent, Fig. 2

The systems disclosed in both patents are directed toward detecting spam emails. The '050 patent describes spam email as "unsolicited e-mail which is usually sent out in large volumes over a short period of time with the intent of inducing the recipient into availing themselves of sales opportunities or 'get rich quick' schemes." Ex. 1, '050 patent at 1:17-20. Townshend uses the term "bulk" email, rather than the terms "spam" and "junk" used in the '050 patent, but all three terms refer to the same thing. *Compare id.* at 1:10-20 *with* Ex. 3 at 1:13-33. In particular, Townshend is directed to email that is "unsolicited" (Ex. 3 at 1:16), "undesired" (*id.* at 1:27), and fraudulent (*id.* at 1:48-52). This is exactly the type of email that the '050 patent calls "spam."

In both the '050 patent and Townshend, computers send and receive emails. These computers are labeled "[A]" in the figures above. *Id.* at 4:66-5:2; Ex. 4 at 60:3-61:2. In both the '050 patent and Townshend, the computers send emails to, and receive emails from, an email server, labeled "[B]" in the figures above. In the '050 patent, the email server is called the "First Tier System." Ex. 1, '050 patent at 3:32-40; Ex. 4 at 61:4-18. In Townshend, it is called the "Email Server" or "Electronic Mail Server." Ex. 3 at 4:66-5:2. In both the '050 patent and Townshend, this Email Server / First Tier System communicates with a central server, labeled

"[C]" in the figures above, to identify spam/bulk emails.  In the '050 patent, the central server is called the "Second Tier System."  Ex. 1, '050 patent, Fig. 2.  In Townshend, it is called the "Central Server."  Ex. 3 Fig. 1.  Although both Townshend Fig. 1 and '050 patent Fig. 2 show only a single Email Server / First Tier System, each patent explains that there are actually multiple First Tier Systems that communicate with the same Second Tier System.  Ex. 1, '050 patent at 7:18-23; Ex. 3 at 3:53-55, 5:25-27.

### b.  Steps Performed by the Townshend Second Tier System

The asserted independent claims of the '050 patent each claim a method consisting of three steps.  Each of these steps is performed by the Second Tier system.  IV's expert concedes that Townshend discloses the first two steps.  IV incorrectly disputes whether Townshend clearly discloses the third step.  It does.

The steps performed by the Central Server in Townshend (the Second Tier System in the '050 patent) are summarized in Townshend Figs. 3 and 4.



**Fig. 3**

Ex. 3, Townshend, Fig. 3

In Townshend Fig. 3, the steps on the left-hand side of the figure, plus step 342, are performed by the "Email Server"/"Electronic Mail Server" (corresponding to the "First Tier System" in the '050 patent). The steps on the right-hand side, except for step 342, are performed by the "Central Server" (corresponding to the "Second Tier System" in the '050 patent).

9



Ex. 3, Townshend, Fig. 4

Townshend Fig. 4 shows the steps performed by another version of the Townshend

"Central Server."  This Central Server / Second Tier System performs every step performed by

that depicted in Fig. 3, as well as the two additional steps 420 and 424.  Ex. 4 at 119:19-120:8.

### c. Townshend Discloses the '050 Patent "Receiving" / "Collecting" First Step

The first step in each asserted claim requires "receiving" or "collecting" identifiers from

a plurality of other computers.  Ex. 1, '050 patent at 8:15-19, 8:46-50, 9:20-24.  Fig. 2 of the

'050 patent, reproduced above, shows this as an arrow labeled "Digital ID" going from the First

10

Tier System to the Second Tier System.  Likewise, Fig. 1 of Townsend, also reproduced above, shows this as an arrow labeled "Message Signature generated [from] email message" going from the "Email Server" (corresponding to the "First Tier") to the "Central Server" (corresponding to the "Second Tier").  Both the "Digital ID" in the '050 patent and the "Message Signature" in Townshend can be generated from the email message by the plurality of Email Servers / First Tier Systems, using a mathematical algorithm known as a "hash function."  *Id.* at 3:65-4:3; Ex. 3, Townshend at 6:40-57.[6]

In Townshend, after the identifier/signature/hash is generated, it is transmitted to and received by the Central Server / Second Tier System.  Ex. 3, Townshend, Fig. 3 element 364, Fig. 4 element 404.  This satisfies the first step of each asserted claim of the '050 patent.  Ex. 8, Rubin Decl., Ex. B, Rubin Invalid. Rpt. at ¶¶ 382-90, Exhibit 050-A.  Dr. McDaniel agrees that Townshend discloses this first step of each of asserted claims 9, 16 and 22.  Ex. 4, McDaniel Dep. at 66:17-68:3; Ex. 9, McDaniel Valid. Rpt. at ¶ 88.

### d.   Townshend Discloses the '050 Patent "Determining" / "Comparing" / "Characterizing" Second Step

The second step in each asserted claim requires comparing the received identifiers with other identifiers that have been collected at the Second Tier System.  For two of the asserted claims, the Court has construed the second step as a whole (D.I. 425 at 6, 13):

| Claim | Second Step | Construction |
|---|---|---|
| 9 | determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers | determining, on the processing system, whether each received content identifier has the same characteristic as other content identifiers |

---

[6]   A "hash function" is a mathematical algorithm that takes a long string of data, such as an email message, and computes a short numerical value—a "hash" or "identifier"—which represents that larger string of data.  Ex. 7, McDaniel Infring. Rpt. at ¶ 183.  Hashing algorithms are designed such that, while identical messages will generate the same identifier/hash, it is extremely unlikely that two different messages will produce the same identifier/hash.  *Id.* ¶ 184.

| 16 | comparing, on the second computer, the digital content identifier to a characteristic database of digital content identifiers received from said plurality of first computers to determine whether the message has a characteristic | N/A |
| 22 | characterizing the files on the server system based on said digital content identifiers received relative to other digital content identifiers collected in the database | classifying the files on the server system by comparing their digital content identifiers to other digital identifiers collected in the database |

In the system shown in '050 patent Fig. 2, the identifiers are collected in a database that is part of the Second Tier System. Ex. 1, '050 patent at 3:1-2, 5:17-19, Fig. 3. Likewise, as shown in Townshend Fig. 1, Townshend discloses storing the identifiers in a "Received Signature Store" database that is part of the Central Server / Second Tier System. Dr. McDaniel agrees that Townshend discloses a database of identifiers and that Townshend's Central Server / Second Tier System compares the received identifiers with other identifiers collected in that database (just like the '050 patent). *See* Ex. 4, McDaniel Dep. at 62:11-64:7, 69:6-18.

### (1) Determining the "Count" in Townshend Meets the '050 Second Step

When the Townshend Central Server / Second Tier System compares the received identifiers with other identifiers collected in the "Received Signature Store" database, it generates a "count" of the number of times that the identifier has been seen by the Second Tier System.[7] This is shown as step 370 of Townshend Fig. 3 and step 408 of Townshend Fig. 4. Townsend explains that one way to generate this count is to compare the identifier against each

---

[7]   Both Townshend and the '050 patent make clear that the number of times the Central Server / Second Tier System sees a particular identifier determines whether the associated email file is bulk/junk/spam. Ex. 1, '050 patent at 6:2-10; Ex. 3 at 3:55-67, 7:9-17, 10:19-24. This is because identical, mass-distributed emails will have the same identifier, whereas unique, individual emails will have unique identifiers (and thus have a "count" or "frequency" of just one). *See* note 6, *supra*.

of the other identifiers collected in the Signature Store and determine how many matching

identifiers have been received within a threshold period of time.  *Id.* at 8:18-21.

Townshend's generation of counts satisfies the "determining" / "comparing" /

"characterizing" step of the asserted claims.  Indeed, Townshend describes the generation of

counts by the Central Server / Second Tier System as "a set of one or more computer processes

that operates upon received message signatures to generate and transmit ***data indicating which***

***signatures represent bulk electronic mail***."  *Id*. at 3:55-58 (emphasis added).  By generating the

count – data that "indicat[es]" whether an identifier for a message represents bulk email – the

Townshend Central Server / Second Tier System is "determin[ing] whether the message has a

characteristic" of being bulk/junk email and is "classifying" the message as either bulk/junk

email or not.  Thus, it satisfies the second step of the '050 patent claims.

The language of the '050 patent claims further confirms that Townshend's count is

sufficient to meet the "determining" / "comparing" / "characterizing" limitations.  For example,

dependent claim 8 contains the limitation "wherein said characteristic comprises junk e-mail ***and***

***said characteristic is defined by a frequency of appearance of a file content ID***."  Ex. 1, '050

patent at 8:9-12 (emphasis added).  Dr. McDaniel agreed that the count in Townshend is a

frequency of appearance. Ex. 4, McDaniel Dep. at 70:15-23, 151:24-152:7.  By computing that

frequency/count – a quantity that claim 8 expressly notes "***define[s]***" the characteristic of junk

email – the Townshend Central Server / Second Tier System "determines" that characteristic and

"classifies" the corresponding message.  Similarly, claim 14, which depends from asserted claim

9, states that "said step of determining identifies said e-mail as SPAM by tracing the rate per unit

time a digital ID is generated." Ex. 1, '050 patent at 8:38-40.  This is another explicit statement

13

that the "determining" step of the '050 patent can be performed by tracing the frequency for an identifier, which Townshend explicitly discloses.

In sum, by comparing the received identifier with other identifiers in the "Received Signature Store" database and thereby determining the frequency of the identifier – the count that "indicates" whether the message is bulk (Ex. 3, Townshend at 3:55-58) and that "defines" the characteristic of junk email (Ex. 1, '050 patent at 8:9-12) – Townshend satisfies the second step of each asserted claim.  Ex. 8, Rubin Decl., Ex. B, Rubin Invalid. Rpt. at ¶¶ 391-98, Exhibit 050-A; *id.*, Ex. C, Rubin Invalid. Reply at ¶¶ 117-27.

### (2) Generating the "Bulk Signature Element" as Shown in Townshend Fig. 4 Independently Meets the '050 Second Step

While the count shown in Townshend Fig. 3 is sufficient, by itself, to satisfy the second step limitation in each of the asserted claims, Townshend Fig. 4 goes even further.  In particular, in the Townshend Fig. 4 embodiment, after the Central Server / Second Tier System compares the received identifiers with other identifiers collected in the "Received Signature Store" database and determines the count, it generates a second result.  First, it compares the count against a predetermined threshold value, such as 10.  Ex. 3, Townshend at 10:19-27, Fig. 4, element 420.  Then, if the count exceeds the predetermined threshold, it broadcasts a "bulk signature element" to the Email Servers / First Tier Systems, indicating that the email corresponding to the identifier is bulk/junk email.  *Id.* at 10:20-24, 10:64-11:5.  Even Dr. McDaniel concedes that this comparison of the count to the predetermined threshold value satisfies the second limitation of each asserted claim.  Ex. 4, McDaniel Dep. at 124:6-125:15; Ex. 8, Rubin Decl., Ex. B, Rubin Invalid. Rpt. at ¶ 397, Exhibit 050-A and Ex. C, Rubin Invalid. Reply at ¶ 128.

14

**e.      Townshend Discloses the '050 Patent "Outputting" /
"Responding" / "Transmitting" Third Step**

The third step in each asserted claim requires sending an indication of a characteristic of

the data file (*i.e.*, an indication of whether the email is bulk/junk or not) from the Second Tier

System back to the First Tier System.  As shown in Townshend Fig. 1 and as discussed above,

the Townshend Central Server / Second Tier System sends back two results to the Email

Server/First Tier System, each of which independently satisfies this element.  The first result is

the "count," which is described in Townshend as "indicat[ing]" whether the email is bulk/junk

(Ex. 3, Townshend at 3:55-58), and which is described in '050 patent claim 8 as "defin[ing]"

whether the email is junk (Ex. 1, '050 patent at 8:9-12).  The second result is the bulk email

signatures shown in Fig. 4 that result when the Second Tier Server performs the threshold

comparison and determines that the count exceeds the threshold.

In the Townshend Fig. 3 embodiment, when the Email Server / First Tier System receives

the count from the Central Server/Second Tier System, it compares the value to a predetermined

threshold value, such as 10.  Ex. 3, Townshend at 8:54-61.  If the count exceeds the threshold,

the email is marked as bulk; if the count is less than or equal to the threshold, the email is not

marked as bulk.  *Id.*  The count itself, therefore (and as per the language of both Townshend and

the '050 patent), indicates *and* defines whether the email has the characteristic of being

bulk/junk.

In the Townshend Fig. 4 embodiment, the threshold value comparison is performed at the

Central Server / Second Tier System.  The Townshend specification explains that the bulk email

signatures can be broadcast to the same Email Servers / First Tier Systems that initially

transmitted the identifiers to the Central Server / Second Tier System, as well as to other Email

15

Servers / First Tier Systems.  *Id.* at 10:64-11:5; *see* Ex. 4, McDaniel Dep. at 126:17-25.  Any

email whose signature/hash matches one of these bulk signatures is treated as bulk email.[8]

The dispute between the parties concerning whether Townshend discloses the third step

of the asserted claims centers, in part, on a set of related phrases that the Court has construed.  IV

incorrectly argues that neither the "count" nor the "bulk email signatures" of Townshend

satisfies these phrases, as they have been construed by the Court (D.I. 425 at 11):

| Claim | Third Step | Construction of Underlined Phrase |
|---|---|---|
| 9 | outputting, to at least one of the source systems responsive to a request from said source system, <u>an indication of the characteristic</u> of the data file based on said step of determining. | a descriptor of the content (e.g., spam, virus, junk email, copyrighted) |
| 16 | responding to a query from at least one of said plurality of computers to <u>identify the existence or absence of said characteristic</u> of the message based on said comparing. | identify whether or not the message is of a certain type or classification |
| 22 | transmitting a substance identifier from the server to the client agent <u>indicating the presence or absence of a characteristic</u> in the file. | indicating the presence or absence of a characteristic (e.g., spam, virus, copyright, bulk email) |

### (1)     Sending the "Count" in Townshend Meets the '050 Third Step

As noted above, Townshend expressly states that its count "indicat[es] which signatures

represent bulk electronic email."  Ex. 3, Townshend at 3:55-58.  Indeed, knowing only the count

and the "predetermined threshold" value, the Townshend Email Server / First Tier System knows

whether an email is bulk or not.  *Id.* at 8:54-61.  Dr. McDaniel admitted that Townshend

---

[8]    The idea behind this embodiment is that, if a particular identifier is known to correspond to junk email, it can be more efficient to give advance notice of that identifier to all First Tier Systems, thereby allowing them to screen out the corresponding junk email without having to communicate with the Second Tier System. This, of course, requires that there be an initial determination of whether an identifier corresponds to a junk email, in response to requests from one or more First Tier Systems.

explicitly states that the count indicates whether a message has the characteristic of being bulk email:

> Q: So the Townshend patent says that the count indicates which signatures represent bulk email, right?
> A: Yes.
> Q: And bulk email, that's a characteristic, right?
> A: The bulk email is a characteristic.
> Q: So Townshend says that its counts indicate a characteristic.
> A: Well, what Townshend says, this was written, again, without the benefit of the Court's claim construction.
> Q: **So Townshend says that its counts indicate the presence of something that the Court says is a characteristic, right?**
> A: **Yes.**

Ex. 4, McDaniel Dep. at 105:12-106:3 (emphasis added).

To avoid Townshend's clear language and its expert's concession, IV argues that Townshend does not mean what it says – *i.e.*, that Townshend must have used "indicating" in a way that is inconsistent with the way the Court used the word.  In this manner, IV tries to argue that the third step is not met because the "count" does not satisfy the "indication of the characteristic" and related constructions given above.  *Id.* at 136:12-22, 140:7-142:3, 150:18-151:23.

IV's transparent attempt to avoid a finding of anticipation is without merit.  The Court did not ascribe any special or non-standard meaning to the word "indicating" when construing the patent claims.  Indeed, the Court's construction for the phrase in claim 22 that starts with the word "indicating" also begins with the word "indicating."  The Court's construction and Townshend both reflect the plain and ordinary meaning of "indicating."  Moreover, as discussed above, Townshend's statement that its count "indicat[es]" whether an email is bulk is entirely consistent with, and bolstered by, claim 8 of the '050 patent, which specifies that a frequency (such as the Townshend count) "*define[s]*" the characteristic of being junk email.  Ex. 1, '050 patent at 8:9-12.

17

A number that "define[s]" a characteristic plainly: (1) "descri[bes]" that characteristic, (2) "identif[ies]" whether the message has that characteristic, and (3) "indicat[es]" the presence or absence of that characteristic.  Thus, Townshend meets the Court's constructions as to the third limitation of each asserted claim.  Ex. 8, Rubin Decl., Ex. B, Rubin Invalid. Rpt. at ¶¶ 491-95, Exhibit 050-A and Ex. C, Rubin Invalid. Reply at ¶¶ 117-27.

### (2)    Sending the "Bulk Email Signatures" in Townshend Independently Meets the '050 Third Step

IV makes two arguments regarding the bulk email signatures, neither of which has any merit.  First, IV argues that the "responding" portion of the third step in claims 9 and 16 (there is no similar requirement in claim 22) is not met by Townshend's sending of "bulk email signatures."  According to IV, the bulk signatures in Townshend are not sent "in response" to a request or query from the Email Server / First Tier System but rather their transmission is just "triggered" by the request or query.  Ex. 4, McDaniel Dep. at 136:12-22, 140:7-142:3.  The '050 patent provides absolutely no support for this imaginary, and meritless, distinction.

As shown in Townshend Fig. 4, when the Central Server / Second Tier System receives an identifier (a.k.a. "signature"), a series of steps is set in motion – including step 416 ("transmit counts") and step 424 ("transmit bulk signature elements . . . .")  Each of these steps is done in response to the signature arriving.  Dr. McDaniel concedes that step 416 is done in response to the query, but he argues that step 424 somehow is not.  *Id.* at 141:24-142:10.  Rather, he argues that step 424 is "triggered" by the query (*id.* at 128:18-23) and then attempts to draw an imaginary distinction between actions that are "triggered by a request" and those that are "responsive to a request."  Yet Dr. McDaniel did concede that:

> Q: If the Court were to determine that something that is triggered by a request is responsive to a request, would that mean, in your opinion, that Townshend Figure 4 meets the requirement of clam 9 that the output be responsive to a request?
> * * *

A: May I have a moment?
(Witness reviews document(s).)
A: I would have to say yes.

*Id.* at 138:7-16.  Since there is nothing in the '050 patent that supports IV's purported distinction, the Court should reject it.

IV's second argument is much like its argument against Townshend's "count," namely, it claims that Townshend's bulk email signature does not satisfy the "indication of the characteristic" because it is sent in the form of a hash value.  *Id.* at 139:15-22.  Here again, IV's position has no merit.  Dr. McDaniel agrees that in the system described in Townshend, the Central Server / Second Tier System will send out a bulk email signature if and only if the corresponding message is a bulk email.  He also agrees that by sending out a bulk email signature, the Central Server / Second Tier System is saying that the signature / hash corresponds to a bulk email.  *Id.* at 130:15-24, 131:13-16.

A signature that is sent if and only if the email message has the characteristic of being bulk email, and that is interpreted by the recipient to mean that an email is bulk, plainly: (1) "descri[bes]" the characteristic of the message, (2) "identif[ies]" whether the message has that characteristic, and (3) "indicat[es]" the presence or absence of that characteristic in the message, and thus satisfies each of the Court's constructions in the table above.  Townshend thus meets the third limitation of each asserted claim.  Ex. 8, Rubin Decl., Ex. B, Rubin Invalid. Rpt. at ¶ 496, Exhibit 050-A and Ex. C, Rubin Invalid. Reply ¶ 128.

Because Townshend discloses each element of claims 9, 13, 16, 22, and 24 of the '050 patent, the Court should grant summary judgment that each claim is invalid. [9,10]

---

[9]   Claim 13 depends from Claim 9 and requires further that "each said data file is an email message and said step of determining comprises determining whether said email is SPAM." Claim 24 depends from Claim 23, which in turn depends from Claim 22, requires further that

> **5.      Even if IV Were Able to Incorrectly Convince the Court That Townshend Does Not Anticipate the Asserted Claims of the '050 Patent, It Renders those Claims Obvious**

Even if IV could succeed in its attempt to create some razor-thin distinction between the asserted '050 patent claims and the Townshend prior art, Townshend would still render the '050 patent obvious as a matter of law.  "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (U.S. 2007).  In this case, Dr. McDaniel testified that, even in his view, a trivial modification to Townshend Fig. 3 would satisfy every asserted claim.[11]

Dr. McDaniel testified that, in his opinion, the Central Server / Second Tier System's actions depicted in Fig. 3 of Townshend – computing the count and sending it to the Email Server/First Tier System – do not satisfy the '050 patent claims because what he calls the "intelligence" is performed in Fig. 3 in the First Tier System rather than the Second Tier System. *See* Ex. 4, McDaniel Dep. at 83:13-21.  The "intelligence" that Dr. McDaniel refers to is the most trivial sort of intelligence imaginable: taking a number and determining whether it exceeds some fixed, predetermined threshold value, *e.g.*, is it greater than 10 or not.  *Id.* at 83:22-84:4,

---

"said file content is an e-mail."  Because Townshend relates specifically to the processing of email and detection of SPAM, each of dependent Claims 13 and 24 are also anticipated.

[10]   As noted above, the PTO has rejected each of the asserted claims based upon Townshend. IV has responded to those rejections by arguing, incorrectly, that Townshend does not anticipate because it returns a number (count) from the Second Tier System to the First Tier System, which the First Tier System must interpret and that a number that must be interpreted by the recipient is not an "indication" of a characteristic. *See, e.g.*, Ex. 6, 2/11/13 Amendment in '050 Reexam. at 22; Ex. 38, Wenke Lee Decl. at ¶¶ 15, 19, 26.  In the unlikely event that the Court were to agree with this position, then the Court should grant summary judgment of non-infringement because it is undisputed that ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

[11]   Dr. Rubin also characterized such a modification as "trivial."  Ex. 8, Rubin Decl. at Ex. B at ¶ 53.  And Dr. Atul Prakash opined that such a modification could be implemented in one line of computer code.  Ex. 39 Prakash Non-Infring. Rpt. at Ex. B at ¶ 65.

97:8-11.  As set forth above, Dr. McDaniel's assumption that  the claims require this comparison to be made at the Second Tier System is contrary to the Court's claim constructions and to dependent claims 8 and 14 of the '050 patent.  (Furthermore, as set forth above, Fig. 4 of Townshend shows precisely this intelligence—the comparison of the count to a predetermined threshold—present at the Second Tier System.)  But even ignoring his erroneous assumption and Fig. 4, Dr. McDaniel's testimony about Fig. 3 is a concession that the asserted claims at a minimum are invalid as obvious.

In particular, Dr. McDaniel testified that if the threshold and the count comparison step of Townshend Fig. 3 were moved from the First Tier System to the Second Tier System, the resulting system would be functional and would satisfy every asserted claim.  Ex. 4, McDaniel Dep. at 80:21-82:24.  He further testified that emails would be treated in exactly the same way by a system that did the threshold comparison on the Second Tier System as by a system that did the threshold comparison on the First Tier System.  *Id.* at 95:13-97:14.  In other words, Dr. McDaniel testified that one could take the "familiar elements" from Townshend (count and threshold), combine them according to "known methods" from Townshend (comparison), performed at a location that Townshend itself teaches (on the Second Tier System, as disclosed by Townshend Figure 4), yielding "predictable results" (treating emails in exactly the same way as the system disclosed in Townshend Figure 3) in a manner that satisfied the asserted claims of the '050 patent.  *See KSR*, 550 U.S. at 416.  Townshend, therefore, both anticipates and renders obvious all of the asserted claims.

### B.     The Asserted Claims Of The '142 Patent Are Invalid Due To The On-Sale Bar

Park City Group, Inc. ("PCG") is the original assignee and prior owner of the '142 patent.  PCG's corporate witness testified under oath that PCG sold a product called Action Gatekeeper

(a/k/a "Gatekeeper") to an entity called The Boots Company PLC ("Boots") more than one year before the filing date of the '142 patent.  Although Boots – which runs a chain of pharmacies called "Boots the Chemists" – was based in the United Kingdom, testimony from PCG's CEO and numerous other witnesses (including the inventors) demonstrates that substantial activity related to that first sale occurred in the United States.  The same witnesses confirmed, and IV has admitted, that Gatekeeper embodied the inventions claimed in the '142 patent.  Furthermore, ***uncontested*** expert testimony establishes that Gatekeeper was "ready for patenting" more than one year prior to the filing date of the '142 patent.  Accordingly, the asserted claims of the '142 patent are invalid.

### 1.     Gatekeeper Was Offered for Sale and Sold More Than One Year Prior to the Filing Date of the '142 Patent

The filing date of the '142 patent is June 23, 1997.  To determine whether a product was commercially offered for sale prior to June 23, 1996 (the "critical date"), the Court applies "traditional contract law principles."  *Allen Eng'g,* 299 F.3d at 1352.  The Federal Circuit has instructed courts to look to the language used by the parties to determine whether an offer was intended, and also to "consider the circumstances surrounding the making of the offer," including, *inter alia*, "the context of any prior communications or course of dealing between the parties" and "whether the communication contains detailed terms."  *Leader Techs., Inc. v. Facebook, Inc.*, 770 F. Supp. 2d 686, 723-24 (D. Del. 2011) (finding patent invalid under the on-sale bar).

On or about September 29, 1995 – nine months before the critical date – PCG sent Boots a letter ███████████████████████████████████████████ ███████████████████████████████████████████ Ex. 10, PARKCITY_6236-46 (emphasis added) (the "Letter Agreement").  The Letter Agreement

identified commercial terms relating to pricing and payment for the software licensing deal.  *Id.*

A Boots representative executed the Letter Agreement no later than October 18, 1995.  *Id.*

PCG's corporate representative confirmed that the Letter Agreement concerned the sale of

Gatekeeper product.  Ex. 11, Fields Dep. at 52:9-54:21.

 Exhibit A to the Letter Agreement ███████████████████████████████

██████████████████████████ Ex. 10, PARKCITY_6236-46 at PARKCITY_6239.  It

also included a "Functional Definition" for Gatekeeper that accurately described the product.

Ex. 11, Fields Dep. at 56:18-57:3.  As set forth in Exhibit A, ████████████████████

████████████████████████████████████████████████ Ex.

10, PARKCITY_6236-46 at PARKCITY_6240.

 PCG and Boots also entered into an end user license agreement (EULA), a maintenance

agreement, and a software escrow agreement, each with an effective date of September 29, 1995.

Ex. 12, PARKCITY_6247-57; Ex. 13, PARKCITY_6258-64; Ex. 14, PARKCITY_6265-77.

Testimony of PCG's corporate witness, along with contemporaneous documentary evidence,

confirms that these materials reflect a sale of the Gatekeeper product to Boots.  Ex. 11, Fields

Dep. at 52:9-57:3; Ex. 15, PARKCITY_6353; Ex. 16, PARKCITY_6358; Ex. 17,

PARKCITY_6972; Ex. 18, PARKCITY_7055; Ex. 19, PARKCITY_7058.

## 2. Substantial Activity Prefatory To The Sale Occurred In The United States

 While PCG's EULA with Boots stated that it was governed by the laws of England,

courts including this Court apply the principle that "substantial activity prefatory to a sale" that

takes place in the United States—whether or not the actual sale is consummated here or an offer

is made here—is sufficient to render the invention "on sale" in the United States within the

meaning of 35 U.S.C. § 102(b).  *See Monolithic Power Sys. v. 02 Micro Int'l Ltd.*, 2007 U.S.

Dist. LEXIS 84755 at *14 (N.D. Cal. Oct. 30, 2007), *citing Robbins Co. v. Lawrence Mfg. Co.*, 482 F.2d 426 (9th Cir. 1973); *see also B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 825 F.Supp. 65, 71-72 (D. Del. 1993) (citing *Robbins*).  While the *Aircraft Braking* case found mere "telephone communications and preparation of proposals" in the United States to be insufficient to trigger the on-sale bar (825 F.Supp. at 72), the activity here was far more extensive.

First, PCG and Boots personnel met in Park City, Utah on multiple occasions between January 1995 and March 1996. They discussed the development of the PCG products as well as the business requirements, integration, and account management of those products, including Gatekeeper.  Ex. 20, Bennion Dep. at 51:1-52:14; Ex. 11, Fields Dep. at 125:17-20; Ex. 21, Geiger Dep. at 83:16-84:16; Ex. 22, Tondevold Dep. at 20:23-27:7; Ex. 23, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

Second, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Third, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

### 3.    The Gatekeeper Product Embodied The Purported Inventions Claimed In The '142 Patent

To trigger the on-sale bar, the product sold must anticipate or render obvious the asserted claims in light of the prior art.  *Allen Eng'g*, 299 F.3d at 1352.  IV confirmed in an interrogatory response that Gatekeeper embodied the asserted claims of the '142 patent.  Specifically, citing only documents that describe Gatekeeper, IV stated that each asserted claim of the '142 patent was conceived at least as early as May 1996.  *See* Ex. 2, Pl.'s Third Supp. Resp. Defs.' Interrog No. 2 at 6-7.  This admission is sufficient on its own to prove that the patented invention was the subject of the sale.  *See Leader Techs*., 770 F. Supp. 2d at 716 (*citing Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000)).  Moreover, PCG's corporate witness and numerous other individuals associated with PCG in the 1995-96 time frame confirmed that Gatekeeper embodied the claims of the '142 patent.  Ex. 11, Fields Dep. at 100:17-101:1; Ex. 20, Bennion Dep. at 63:9-13; Ex. 21, Geiger Dep. at 16:21-17:7, 19:14-21:13; Ex. 22, Tondevold Dep. at 61:24-62:1; Ex. 23, Wood Dep. at 93:11-13.

### 4.    Uncontested Expert Testimony Establishes That Gatekeeper Was Ready for Patenting More Than One Year Prior to the Critical Date

The requirement that a product be "ready for patenting" may be satisfied "in at least two ways:  by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention."  *Pfaff*, 525 U.S. at 67-68.  The product need not be "ready for patenting" at the time of the offer for sale, so

long as it subsequently becomes ready for patenting prior to the critical date. *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 112 F.3d 1163, 1168 (Fed. Cir. 1997).

Defendants' invalidity expert, Professor Aviel Rubin, has opined that "the Action Gatekeeper product was sufficiently described such that one having ordinary skill in the field of the technology could have made and used the claimed inventions of the '142 patent more than one year before the June 23, 1997 filing date of the '142 patent, and in particular no later than January 9, 1996." Ex. 8, Rubin Decl., Ex. B, Rubin Invalid. Rpt. at ¶¶ 1235-39. In reaching this conclusion, Dr. Rubin relied on PCG documentation for Gatekeeper created more than one year prior to the '142 patent's June 23, 1997 filing date. *See id.* at Ex. 142-G. Dr. Rubin showed how each limitation of each asserted claim was described in the prior art Gatekeeper documentation. *Id.* at ¶¶ 2000-2116.

The responsive expert report of IV's expert, Dr. McDaniel, did not dispute Dr. Rubin's conclusion that the prior art Gatekeeper documentation provided an enabling description of the claimed inventions of the '142 patent. Nor did Dr. McDaniel offer any opinion that any limitation of the asserted claims was not described in the Gatekeeper documentation as of January 9, 1996, much less by the June 23, 1996 critical date. To the contrary, Dr. McDaniel embraced – and even adopted – Dr. Rubin's conclusion. *See* Ex. 9, McDaniel Valid. Rpt. at ¶ 257 ("Dr. Rubin **concedes** that the Action Gatekeeper product that embodied the claims of the '142 Patent was sufficiently described no later than January 9, 1996.") (emphasis added).

To the extent that Dr. McDaniel quarreled with Dr. Rubin's analysis supporting the conclusion that the Gatekeeper product was "ready for patenting" prior to the critical date, his sole criticism was based on a legal irrelevancy: that the claims of the '142 patent were not reduced to practice by January 9, 1996. *See id.* at ¶ 255 ("***I disagree*** that the claimed inventions

26

of the '142 Patent *were reduced to practice by January 9, 1996*.") (emphasis added).  Leaving

aside that Dr. McDaniel's statement mischaracterized Dr. Rubin's opinion, the Supreme Court

has held that reduction to practice is not a necessary requirement of the on-sale bar, but is simply

one way of showing that an invention is "ready for patenting."  *See Pfaff*, 525 U.S. at 66 ("[J]ust

because reduction to practice is sufficient evidence of completion, it does not follow that proof of

reduction to practice is necessary in every case.").  An enabling description prior to the critical

date (which Dr. McDaniel did not dispute) is all that is required.  *Id.* at 67-68.

For the foregoing reasons, the '142 patent is invalid by virtue of the offer for sale and sale

of the Action Gatekeeper product more than one year prior to the '142 patent's filing date.

### C.    Trend Does Not Infringe Any Asserted Claim Of The '142 Patent

For the reasons set forth below, the Trend products accused of infringing the '142 patent

(the "'142 Accused Products") do not meet each and every limitation of the asserted claims of

the '142 patent.  Accordingly, the Court should grant summary judgment of non-infringement.

### 1.    The '142 Accused Products Do Not Have A "Destination Post Office"

IV contends that the "quarantine" feature in the '142 Accused Products meets the

limitation of "destination post office."  *See* Ex. 7, McDaniel Infring. Rpt. at ¶¶ 126-129; Ex. 29,

McDaniel Infring. Reply at ¶ 24.  IV's contention is flawed in at least two ways.  First, IV

identifies the same code as performing two mutually exclusive functions:  a) as the receiving

post office/distribution engine, and b) as the destination post office.  Second, IV tries to gloss

over the fact that the quarantine is not a program or piece of software, but rather just static

storage.  Accordingly, the '142 Accused Products cannot meet this limitation.

27

### a. Storing A Message In The Quarantine Is Part Of The Distribution Mechanism Or Step

Claims 1, 7, 17, 21, 22, 24, and 26 of the '142 patent require that, after determining that delivery of a message or data object should be deferred, the system or method combines the received e-mail message or data object and the rule history with a new distribution list that specifies at least one "destination post office," and then delivers the e-mail message or data object to the destination post office, or, in the case of claim 22, to an administrator at the destination post office. For example, claim 1 recites in part:

> the distribution engine automatically combines the e-mail message with a new distribution list specifying at least one **destination post office** for receiving the e-mail message for review by an administrator associated with the destination post office, and a rule history specifying the business rules that were determined to be applicable to the e-mail message by at least one rule engine, and automatically delivers the e-mail message to a first **destination post office** on the distribution list instead of a specified recipient of the e-mail message

Ex. 30, '142 patent at 27:17-32 (emphasis added).

Claim 17 recites similar exemplary method steps:

> automatically combining the e-mail message with a new distribution list specifying at least one destination post office for receiving the e-mail message for review by an administrator associated with the destination post office and a rule history specifying at least one business rule determined to be applicable to the e-mail message; and
>
> **automatically delivering the e-mail message to a destination post office** on the distribution list instead of a specified recipient of the e-mail message.

*Id.* at 29:51-60 (emphasis added).

As is clear from the claim language, the "destination post office" is separate and distinct from the mechanism or process (*e.g.*, the "distribution engine" of the first "post office") that combines the message with the rule history and distribution list and delivers the message. The destination post office is even explicitly characterized in certain claims as a "*new* destination

post office" (claims 21, 24, 26) or as a "*second* destination post office" (claim 22).  However, IV

identifies the exact same source code as being *both* "post offices."  This cannot be correct.

IV asserts that the quarantine feature in the '142 Accused Products, which segregates

messages deemed to be infected, constitutes the destination post office.  Ex. 9, McDaniel Valid.

Rpt. at ¶ 127.  For example, ██████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████   ██   ████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

The code Dr. McDaniel identifies cannot satisfy all the limitations of the claims.  Dr.

McDaniel explicitly noted that the ██████████████████ is part of the code that delivers the e-

mail message to the "destination post office."  Ex. 4, McDaniel Dep. at 426:8-428:2.  It cannot,

---

[12]   Dr. McDaniel also points to screenshots of interfaces that allow administrators to access
documents *already stored in the quarantine* as alleged evidence that the quarantine is a post
office.  Ex. 29, McDaniel Infring. Reply at ¶ 23; *see also* Ex. 4, McDaniel Dep. at 351:10-
352:24.  However, the administrative interface is no evidence of how the messages are received
and stored in the quarantine directory or database.  Ex. 31, Tygar Decl., Ex. B at ¶ 150.  Further,
Dr. McDaniel provided no references to any source code related to the interfaces.  Ex. 4,
McDaniel Dep. at 353:9-354:3.

at the same time, be the destination post office itself.  *See Becton, Dickinson and Co. v. Tyco Healthcare Group*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("assertion that the spring means and the hinged arm can be the same structure renders the asserted claims nonsensical").  There is no evidence of a separate and distinct program or code that performs the function of receiving, storing and redistributing messages within the quarantine, as is required to constitute a "post office."  Accordingly, IV cannot prove that the '142 Accused Products meet this limitation.[13]

### b.     The Quarantine Is Not An Independent Program Or Code

Further, and more fundamentally, the quarantine is not a "post office."  The parties agreed that a "post office" should be construed as "an agent for receiving, storing, and distributing email messages or data objects."  Joint Claim Construction Chart, D.I. 214-1 at 1 (May 25, 2012).  Dr. McDaniel stated that "a person of ordinary skill in the art at the time would understand that an agent is ***a program or other piece of software*** running on a computer or server that performs a particular function or set of functions."  Ex. 7, McDaniel Infring. Rpt. at ¶ 99 (emphasis added); *see also* Ex. 4, McDaniel Dep. at 310:19-311:15; 335:2-12.

The quarantines in the '142 Accused Products are static storage locations, not programs or other pieces of software.  Ex. 31, Tygar Decl., Ex. B at ¶¶ 132-140.  Dr. McDaniel has admitted that a file directory cannot be an "agent" as required to be destination post office.  Ex. 4, McDaniel Dep. at 335:2-12 ("it's just a storage location"), 397:19-24 ("Q. So the directory itself is not the agent, right  A. No.").  Nor can a database file, such as that in Lotus Domino.  *Id.*

---

[13]    In deposition, Dr. McDaniel references a "quarantine agent," *i.e*., the software that performed the functions of receiving, storing, and redistributing messages in the quarantine. Ex. 4, McDaniel Dep. at 351:10-354:3; 397:11-21.  This concept was never described or even mentioned in his expert report.  *Id.* at 352:6-9.  Nonetheless, IV can point to no code or modules distinct from the code used by the first, receiving "post office" to allegedly combine the message with the rule history and store the message in the quarantine directory or database.  *Id*.; *see also id.*, 397:22-398:15. There is only one set of code.

at 357:19-358:4 ("Q.  So let me see if I understand.  So the NSF file could do the storing

function, right?  A. It could be the vehicle for storing.  Q. But it wouldn't provide the receiving

or distributing functions.  Is that right?  A. Well, you need an agent to do the receiving and

storing.").  Nor is Dr. McDaniel able to identify any code of a destination post office that

allegedly stores messages.  *Id.* at 445:25-447:6.  Accordingly, the quarantines are not agents and

are thus not post offices.

Because the quarantine database or file directory cannot be a "destination post office,"

the  '142 Accused Products cannot meet the limitation of (1) combining the message with a new

distribution list specifying a destination post office and (2) delivering the message to the

destination post office.

    **2.**    **The '142 Accused Products Do Not Combine The E-Mail Message [Data Object] With A New Distribution List And A Rule History For Delivery Together**

Claims 1, 7, 17, 21, 22, 24, and 26 of the '142 patent require that when the system or

method determines that delivery of a message should be deferred, it must combine the e-mail

message or data object with the rule history and a new distribution list.  The Court has ruled that

the term "combining the email message with a new distribution list … and a rule history

specifying the business rules that were determined to be applicable to email message by at least

one rule engine" means "combining the e-mail message, a new distribution list, and a rule

history, *for delivery together*, where a rule history identifies each of the [at least one] business

rule(s) whose antecedent condition was satisfied by the e-mail message."  D.I. 425 at 16

(emphasis added).

Dr. McDaniel opines that the distribution list is the "name of the quarantine."  Ex. 4,

McDaniel Dep. at 379:11-16; 440:9-14; 582:21-24.  The quarantine itself is allegedly the

destination post office.  *Id.* at 392:11-393:7.  For Dr. McDaniel, simply using the name of the

quarantine database or directory when calling the code that stores the infected messages satisfies the limitation of combining the new distribution list with the message and rule history *for delivery together*. *Id.* at 379:11-21; 380:3-18; 392:12-25; 440:15-441:16. This is nonsensical.

The '142 patent specification describes that when a message is determined to violate a rule and should be diverted from its intended recipient, the distribution engine creates a "wrapper" which includes the message object, the distribution list containing the distribution list of all the gatekeepers and gatekeeper post offices the message will be sent to, and the rule history showing why the message was to be diverted. Ex. 30, '142 patent, 20:43-64; *see* Ex. 31, Tygar Decl., Ex. B at ¶¶ 145-147. It was this combined package of information that was then *delivered* to the new destination post office for further distribution to an administrator of that destination post office for review. *Id.* The Court recognized in its construction the importance of combining these three elements for delivery together.

Dr. McDaniel has provided no evidence that the '142 Accused Products *deliver* the distribution list to a destination post office. *Id.* at ¶¶ 150-160. First, as discussed above, the quarantine cannot constitute a "destination post office." Second, a distribution list specifying a destination post office is not delivered. *Id.* Dr. McDaniel argues that simply "directing" a message to the quarantine instead of to an intended recipient satisfies this limitation of combining the message, rule history and distribution list for delivery together. Ex. 7, McDaniel Infring. Rpt. at ¶ 127. However, simply *directing* a message to a location is not the same as *delivering* a distribution list, *i.e.*, a new recipient of the message, that itself specifies a destination post office, *i.e.*, software for receiving, storing and distributing a message. Moreover, even under Dr. McDaniel's flawed interpretation of the quarantine as a destination post office, he

admitted that he had seen no evidence that the distribution list is itself stored along with the message in the quarantine database or directory.  Ex. 4, McDaniel Dep. at 396:22-397:3.

For these reasons, the Court should grant summary judgment of non-infringement of claims 1, 7, 17, 21, 22, 24, and 26 of the '142 patent.

### 3. ScanMail Does Not Receive Messages or Data Objects From A Sender

Two of Trend's accused products—ScanMail for Microsoft Exchange ("SMEX") and ScanMail for Lotus Domino ("SMLD")—cannot infringe claims 1, 7, and 24 of the '142 patent because they do not receive email messages or data objects from a sender.  Ex. 31, Tygar Decl., Ex. B at ¶ 117-122.  Rather, SMEX and SMLD are add-on modules installed on a mail server to provide virus scanning features.  *Id.* at ¶ 119.  They scan messages received by another software program running on the same machine; they do not, themselves, receive messages from a sender.

Claims 1 and 7 of the '142 patent require "a receipt mechanism that ***receives an e-mail message from a sender***."  Similarly, claim 24 of the '142 patent requires a post office comprising "a receipt mechanism ***that receives a data object from a sender***."  The parties stipulated that "receipt mechanism" means "a mechanism for receiving."  D.I. 214-1 at 1.

IV does not dispute that the ScanMail products do not receive e-mail messages or data objects directly from the sender.  Ex. 4, McDaniel Dep. at 323:18-324:2; 391:9-392:3.  Rather, the mail server, such as Microsoft Exchange or Lotus Domino, provides the functionality for receiving e-mail messages over the Internet.  *Id.* at 324:3-24.  ScanMail is installed on the mail server and scans messages received by the mail server.  *Id.*; *see also id.* at 393:23-394:3; 403:19-404:25.  The mail server can then redistribute the messages if necessary.  *Id.* at 424:15-23.  Further, a document cited by Dr. McDaniel himself shows that SMEX never receives ***messages*** from Exchange; rather, ████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████ SMEX never "receives" the

message at all, much less from a sender.  *Id.*

The claimed post office must comprise a receipt mechanism that receives an e-mail

message or data object *from a sender*, but ScanMail does not do that.  Accordingly, the Court

should grant summary judgment of non-infringement of claims 1, 7, and 22 of the '142 patent by

ScanMail for Microsoft Exchange and ScanMail for Lotus Domino.

### 4.  The '142 Accused Products Do Not Have An Organizational Hierarchy (Claims 18 and 25)

None of the '142 Accused Products "stor[e] a database including an organizational

hierarc[h]y of a business, the hierarchy including a plurality of roles, each role associated with a

user," which is required by claims 18 and 25 of the '142 patent.  Rather, the products allow

administrators to designate roles within the application, and to assign permissions for those roles.

Ex. 31, Tygar Decl., Ex. B at ¶¶ 179-181.  IV is unable to provide any evidence that the '142

Accused Products store "a business's *rankings* of its roles, containing multiple levels and each

level comprising at least one organization role to which at least one individual is assigned," as

required by the Court's construction, and therefore cannot prove that the '142 Accused Products

meet this limitation.  *See* D.I. 425 at 17.

Dr. McDaniel opined that Trend products meet the limitation of storing an organizational

hierarchy simply because it is *possible* to assign certain rights to multiple system administrator

roles.  Ex. 4, McDaniel Dep. at 498:8-12.  However, he also concedes that the existence of

different roles in a business or positions with different duties does not necessarily imply a

ranking.  *Id.* at 519:13-520:10.  Even having different levels of a role, such as an administrator

role in a system, does not necessarily imply a ranking. *Id.* at 518:10-20. A business must rank the roles in order for the roles to indicate a hierarchy. *Id.* at 508:9-18. However, Dr. McDaniel cannot show that this ranking is stored within a system, stating instead that that there is no requirement a system must exhibit a ranking somewhere in the source code to meet the limitation. *Id.* at 505:16-22. Dr. McDaniel admitted that he did not identify the location of any such ranking in his report. *Id.* at 511:7-512:3.

Moreover, claims 18 and 25 of the '142 patent are method claims, which require a showing that each method step has been performed in order to prove infringement. *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317-18 (Fed. Cir. 2005). Neither IV nor Dr. McDaniel has provided any evidence that any customer or user has actually performed this step. Ex. 31, Tygar Decl., Ex. B, Tygar Non-Infring. Rpt. at ¶ 183. Thus, IV is unable to satisfy its burden of proof regarding infringement of these claims and summary judgment is appropriate.

**D.      Trend Does Not Infringe The '610 Patent**

Trend does not infringe the '610 patent because its products do not detect viruses "within the telephone network," as required by the sole asserted claim.

**1.      '610 Patent Background**

The '610 patent relates to a method for detecting computer viruses within a telephone network. IV asserts dependent claim 7, which depends from claim 1 and thus requires detecting viruses "within the telephone network." *See* Ex. 32, '610 patent at 14:40-41, 66.

**2.      The '610 Accused Products Are Located On Private Networks That *Can Never Be* "Within The Telephone Network"**

Every computer that communicates using the Internet Protocol (IP) is assigned an IP address, which takes the form x.x.x.x, where each "x" is a number between 0 and 255. Certain IP addresses are assigned for special purposes. For example, addresses whose first number is

equal to 10, *i.e.*, any address in the range 10.0.0.0 to 10.255.255.255, are assigned for use by "private internets."  Ex. 31, Tygar Decl., Ex. C, Tygar Supp. Rpt. at ¶¶ 10-12 and Ex. D, RFC 1918:  Address Allocation for Private Internets at 4-5.

IP addresses in the 10.x.x.x range are "often used by corporations and homes to create private, secure networks that, by definition, cannot be accessed from the public Internet."  Ex. 9, McDaniel Valid. Rpt. at ¶ 44.  These private networks cannot be accessed from the public Internet because routers operated by Internet service providers (ISPs) are configured to drop or reject any packets that are sent to 10.x.x.x addresses.  *Id.*; Ex. 4, McDaniel Dep. at 667:12-668:23; Ex. 31, Tygar Decl., Ex. C, Tygar Supp. Rpt. at ¶ 10.

The Court construed the phrase "within the telephone network" to mean "in the voice or data network connecting the calling party and called party, exclusive of the networks and gateway nodes of the called party and calling party."  D.I. 425 at 24.  A private network that is outside of the calling and called parties' networks and that utilizes the 10.x.x.x IP address range cannot be accessed from a public Internet connection.  As a result, this private network is not a part of the "network connecting" the calling and called party, when those parties are connected via the Internet.  Ex. 31, Tygar Decl., Ex. C, Tygar Supp. Rpt. at ¶¶ 7-12, 14-15 and Ex. D at 4-5; *see id.*, Ex. B, Tygar Non-Infring. Rpt. at ¶¶ 69-70.[14]

The '610 Accused Products do not detect viruses "within the telephone network," as required by the claims.  All servers that detect viruses for the accused HES and IMHS services are located on private networks with the IP addresses in the 10.x.x.x range.  ███████████ ███████████  *see* Ex. 31, Tygar Decl., Ex. C, Tygar Supp. Rpt. at ¶¶ 13-14.  Dr. McDaniel does not dispute these facts.  *See* Ex. 33, McDaniel Supp. Rpt.

---

[14]   This result follows whether or not Defendant's motion for clarification, D.I. 438, is granted, because Defendants' proposed clarification is narrower than the Court's existing construction.

Moreover, Dr. McDaniel has admitted that private networks with such 10.x.x.x IP addresses can never be "within the telephone network." Ex. 9, McDaniel Valid. Rpt. at ¶ 44. Thus, the '610 Accused Products do not infringe asserted claim 7 because they do not detect viruses "within the telephone network" as required by the claim.

### 3. Dr. McDaniel's Attempt To Disavow His Own Unequivocal Opinion Does Not Create A Disputed Issue Of Material Fact

In his Validity Report, Dr. McDaniel unequivocally states that a network using the IP address range of "10.x.x.x" *can never be* "within the telephone network" because such a network is private and cannot be accessed from the public Internet:

> All IP addresses visible in Dr. Rubin's screenshots are part of private, unroutable networks that belong to the well-known IP address ranges 192.168.x.x and 10.x.x.x. These two ranges are often used by corporations and homes to create private, secure networks that, by definition, cannot be accessed from the public Internet. In other words, no Internet service provider (ISP) will route to private networks using the address ranges of 192.168.x.x or 10.x.x.x, and these private networks *can never be* "within the telephone network."

Ex. 9, McDaniel Valid. Rpt. at ¶ 44 (emphasis added). Dr. McDaniel's statement is correct. Ex. 31, Tygar Decl., Ex. C, Tygar Supp. Rpt. at ¶¶ 8-12 and Supp. Rpt. Ex. D at 4-5.

Dr. McDaniel offered his opinion that 10.x.x.x private networks *can never be* "within the telephone network" in his Validity Report in an attempt to distinguish prior art. *Id.* After defendants' experts pointed out the implications of his statement, he served a "supplemental" report. Ex. 33, McDaniel Supp. Rpt. There, he claimed the defendants had taken the statements of his validity report "out of context" by applying them to IV's infringement theory. *Id.* at ¶ 3. However, Dr. McDaniel offered no explanation as to why a statement made in an attempt to preserve validity should not be applicable in the "context" of analyzing IV's infringement theory. *Id.*; Ex. 4, McDaniel Dep. at 675:21-676:16. Dr. McDaniel's attempt to disavow his own unequivocal statement does not create a legitimate disputed issue of material fact.

**E.      Trend Cannot Be Found To Have Willfully Infringed Any Of The Patents-In-Suit**

IV did not plead willful infringement by Trend and does not allege any pre-lawsuit knowledge of the '050, '142 or '610 patents, but IV's boilerplate prayer for relief nonetheless seeks enhanced damages.  IV's claim is spurious.  IV cannot satisfy the "objective recklessness" prong required by *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  Summary judgment is therefore appropriate.

**1.      IV's Complaint Fails to Allege Trend Has Willfully Infringed Any Asserted Patent**

To recover enhanced damages for willful infringement, a patent holder must at least plead a right to such a recovery, including a factual basis for "knowledge of the patent and of [its] infringement."  *Sentry Protection Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005).  With respect to knowledge of the risk of infringement, the patentee needs to plead facts giving rise to "at least a showing of objective recklessness" as to that risk.  *Seagate*, 497 F.3d at 1371.  IV fails this pleading requirement, as it has not pleaded knowledge of the asserted patents, or any factual basis giving rise to a showing of objective recklessness.  *See* D.I. 2.

**2.      IV Failed to Allege or Prove That Trend Had Pre-Suit Knowledge of the Asserted Patents**

In order to recover enhanced damages for willful infringement based on pre-lawsuit activities, IV must show by clear and convincing evidence that Trend had knowledge of the three asserted patents, and was objectively reckless in its actions in making and selling the accused products.  As previously noted, there are no allegations in the pleadings that Trend possessed any pre-suit knowledge.  IV failed to identify any evidence of specific pre-suit knowledge of the '610, '050 or '142 patents in response to interrogatories served by Trend.  Ex. 35, IV Resp. to

38

Trend Micro Interrog. No. 2 at 6; *see also* Ex. 53, Harris Dep. At 142:23-143:8, 151:7-152:4. Summary judgment is therefore proper.

### 3.    IV Failed to Seek Any Relief From Post-Suit Infringement

The Federal Circuit decision in *Seagate* expressly noted that a patent owner relying solely on post-lawsuit actions to support a claim for enhanced damages should seek injunctive relief if the evidence of recklessness truly reaches the clear and convincing evidentiary hurdle.  *Seagate*, 497 F.3d  at 1374.  Here, IV's Complaint asserts a right to injunctive relief, yet IV never pursued a preliminary injunction.  The failure to seek injunctive relief, after pleading a supposed right to such relief, demonstrates under the *Seagate* analysis that objective evidence of reckless infringement simply does not exist in this case.  *Id*. ("A patentee who does not attempt to stop an accused infringer's activities [through a preliminary injunction] should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct.").

### 4.    Trend Has Legitimate Defenses To IV's Claims, Precluding A Finding Of Willful Infringement

As the Federal Circuit recently explained in *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, the "'objective' prong of *Seagate* tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement."  *Bard Peripheral Vascular, Inc. v. W.L. Gore  & Assocs., Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012).  The objective determination of recklessness, even though predicated on underlying mixed questions of law and fact, is a question of law for the court to determine in the first instance.  *Id*. at 1006-07.

The undisputed facts demonstrate that Trend has reasonable defenses to the asserted claims.  *See* Sections A-D, *supra*.  The reexamination of the '050 patent provides further evidence that Trend's defenses are reasonable.  *See* Ex. 5, Dec. 11, 2012 Office Action in '050 Reexam. at 2, 4.  Courts have consistently held that an adverse decision by the PTO concerning

asserted patents precludes a finding of willfulness.  *See, e.g.*, *Pivonka v. Cent. Garden & Pet Co*., 2008 U.S. Dist. LEXIS 12022, at *6 (D. Colo. Feb. 19, 2008) (granting summary judgment of no willful infringement based on PTO reexamination order).

Under controlling Federal Circuit law these reasonable defenses, even if ultimately unsuccessful, preclude a finding of objectively reckless behavior necessary to support a clear and convincing willfulness determination.  *See Bard Peripheral*, 682 F.3d at 1008 ("If, in view of the facts, the asserted defenses were not reasonable, only then can the jury's subjective willfulness finding be reviewed for substantial evidence.").  IV did not plead, and cannot establish, a willful infringement case against Trend.  Summary judgment should be granted.

### F.      The Court Should Grant Summary Judgment of No Damages

IV relies exclusively on the theories of its expert, Michael Wagner, to quantify its damages for alleged infringement of the three patents asserted against Trend.  Concurrently with this Motion, Trend has filed a *Daubert* motion to exclude the testimony of Mr. Wagner with respect to the asserted patents.  The Court should grant summary judgment of no damages as to each patent for which the Court sustains the *Daubert* challenge to Mr. Wagner's unreliable and unfounded opinions.

## VI.    CONCLUSION

Based on the undisputed facts and for the foregoing reasons, Trend respectfully requests that the Court grant summary judgment:  (1) that claims 9, 13, 16, 22, and 24 of the '050 patent are invalid; (2) claims 1, 7, 17, 18, 21, 22, and 24-26 of the '142 patent are invalid; (3) that Trend has not infringed any claim of the '142 patent; (4) that Trend has not infringed any claim of the '610 patent; (5) that Trend has not willfully infringed any claim of the '050, '142, or '610 patents; and (6) that IV is not entitled to damages for which expert opinion is stricken.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Karen Jacobs Louden (#2881)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
klouden@mnat.com
mflynn@mnat.com

*Attorneys for Trend Micro Incorporated and Trend Micro, Inc. (USA)*

OF COUNSEL:

Yar R. Chaikovsky
MCDERMOTT, WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025
(650) 815-7400

David M. Beckwith
MCDERMOTT, WILL & EMERY LLP
4 Park Plaza, Suite 1700
Irvine, CA  92614-2559
(949) 851-0633

June 14, 2013
7292168.1

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on June 14, 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

    Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on June 14, 2013, upon the following individuals in the manner indicated:

Joseph J. Farnan, III           *VIA ELECTRONIC MAIL*
Brian E. Farnan
FARNAN LLP
919 N. Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiff*

Parker C. Folse III            *VIA ELECTRONIC MAIL*
Brooke A.M. Taylor
Lindsey N. Godfrey
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA  98101-3000
*Attorneys for Plaintiff*

John P. Lahad             *VIA ELECTRONIC MAIL*
Weston O'Black
Richard W. Hess
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002
*Attorneys for Plaintiff*

          */s/ Michael J. Flynn*
          _____
          Michael J. Flynn (#5333)