IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 12-1581 (LPS) |
| v. | ) | |
| | ) | REDACTED - |
| TREND MICRO INCORPORATED, and | ) | PUBLIC VERSION |
| TREND MICRO, INC. (USA), | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF OF DEFENDANTS TREND MICRO INCORPORATED AND TREND
MICRO, INC. (USA) IN SUPPORT OF THEIR *DAUBERT* MOTION TO EXCLUDE
THE OPINIONS AND TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs Louden (#2881)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
klouden@mnat.com
mflynn@mnat.com

*Attorneys for Trend Micro Incorporated and
Trend Micro, Inc. (USA)*

OF COUNSEL:

Yar R. Chaikovsky
MCDERMOTT, WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
(650) 815-7400

David M. Beckwith
MCDERMOTT, WILL & EMERY LLP
4 Park Plaza, Suite 1700
Irvine, CA 92614-2559
(949) 851-0633

Original Filing Date: June 14, 2013
Redacted Filing Date: June 21, 2013

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

I.      NATURE AND STAGE OF PROCEEDINGS ................................................1

II.     SUMMARY OF ARGUMENTS ......................................................................1

III.    STATEMENT OF FACTS ...............................................................................2

        A.      U.S. Patent No. 6,460,050 ....................................................................3

        B.      U.S. Patent Nos. 6,073,142 and 6,987,610 ..........................................4

        C.      The ██ Agreement ........................................................................5

IV.     LEGAL STANDARDS ....................................................................................5

        A.      A Reasonable Royalty Is Intended to Be Compensatory Only ..............5

        B.      Expert Testimony Must Meet Threshold Standards of Reliability
                And Must Not Be Unfairly Prejudicial ..................................................6

        C.      Opinions Relying On Prior Agreements Must Be Closely
                Scrutinized ............................................................................................7

V.      ARGUMENT ...................................................................................................7

        A.      Mr. Wagner's Opinion Concerning The '050 Patent Must Be
                Excluded ................................................................................................7

                1.      Mr. Wagner's Reliance On The ██ ██ Bundling
                        Agreement Is Flawed And Impermissible In View Of
                        ResQNet .......................................................................................8

                2.      Mr. Wagner's Opinion Is Unreliable For Additional
                        Reasons ......................................................................................10

                        a.      Even Mr. Wagner's Own Report Shows That His
                                Use of the Bundling Agreement Is Unreliable ..............10

                        b.      Mr. Wagner's Conclusions Further Evidence A
                                Flawed Methodology .....................................................11

                        c.      Mr. Wagner's Opinion Is Unreliable Because The
                                ██ Bundling Agreement Does Not Reflect
                                "Market" Royalty Rates For A Patent License ...............11

B.     Mr. Wagner's Opinion Concerning The '142 Patent Must Be Excluded ....................................................................................................13

C.     Mr. Wagner's Opinion Concerning The '610 Patent Must Be Excluded ....................................................................................................15

D.     ██████████ As A "Reasonableness Check" Is Inadmissible.........................15

     1.     ██████████ As Reasonableness Check Is Unfairly Prejudicial ....................................................................................................16

     2.     ██████████ As A Reasonableness Check Fails Rule 702.........................................................................................................................18

E.     Cross-Examination Cannot Cure the Defects With Mr. Wagner's Opinions ....................................................................................................19

VI.     CONCLUSION ..........................................................................................19

## TABLE OF AUTHORITIES

Page(s)

CASES

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)....................................................................................1, 2, 6, 14

*General Electric Co. v. Joiner*,
  522 U.S. 136 (1997)..............................................................................................6, 11

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
  318 F.Supp. 1116 (S.D.N.Y. 1970) ...............................................................3, 11, 13

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983)................................................................................11

*In re MSTG, Inc.*,
  675 F.3d 1337 (Fed. Cir. 2012)................................................................................18

*In re Paoli R.R. PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994)..........................................................................................6

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................................2, 6, 8

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)............................................................................ Passim

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010)........................................................................... Passim

*Riles v. Shell Exploration & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002)................................................................................11

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)......................................................................... Passim

*WordTech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010)................................................................................14

**RULES AND STATUTES**

35 U.S.C. § 284 ........................................................................................................... 5, 6

Fed. R. Evid. 401 ............................................................................................................ 9

Fed. R. Evid. 403 .................................................................................................... *passim*

Fed. R. Evid. 702 .................................................................................................... *passim*

# I. NATURE AND STAGE OF PROCEEDINGS

Plaintiff Intellectual Ventures I, LLC ("IV") asserts three patents against defendants Trend Micro, Inc. (USA) and Trend Micro Incorporated (collectively, "Trend"). IV's damages expert, Michael Wagner, opines that Trend would owe IV almost ███████ for its alleged infringement. This is Trend's *Daubert* motion to exclude Mr. Wagner's testimony.

# II. SUMMARY OF ARGUMENTS

1. Mr. Wagner's ███████ damages opinion concerning the '050 patent should be excluded because it is based entirely on a product bundling agreement under which a non-party computer hardware vendor paid Trend a ██████████████ to bundle and resell fully developed Trend software with its own products. The product bundling agreement is not a patent license. It has nothing to do with any of the patents-in-suit or the hypothetical negotiation between Trend and IV, a conclusion reinforced by the irrational results Mr. Wagner's methodology produces. Accordingly, Mr. Wagner's '050 patent damages opinion is wholly unreliable and irredeemably flawed, particularly in view of *ResQNet.com, Inc. v. Lansa, Inc,*. 594 F.3d 860, 869-870 (Fed. Cir. 2010).

2. Mr. Wagner's '142 patent damages opinion is unreliable and flawed because it is based entirely on vague and nonspecific statements from a third party presentation that Mr. Wagner has not connected to either Trend, Park City Group, or to the specific technology covered by the '142 patent. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1313-18 (Fed. Cir. 2011).

3. Mr. Wagner's '610 patent damages opinion is unreliable and flawed because it is based on settlement agreements having nothing to do the '610 patent. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012); *ResQNet*, 594 F.3d at 869-72.

4.     Mr. Wagner's reliance on an ███████████████████████████

████████████████████████████████████████████████████████████

a "reasonableness check" on his opinions is a thinly-veiled attempt to put a large damages

number before the jury, in the hopes that his damages total for Trend Micro ███████ will

somehow look "reasonable" by comparison.  This testimony is unfairly prejudicial and should be

excluded. *See* Fed. R. Evid. 403.  Moreover, Mr. Wagner's attribution of the entire ███████

value of that license to these four patents-in-suit is contrary to the evidence and is simply not

credible.

5.     None of the foregoing defects can be cured either by cross-examination or the

presentation of contrary evidence. The Federal Circuit regularly rejects unreliable expert

testimony even though such testimony would be subject to challenge by cross-examination or

presentation of contrary evidence. Mr. Wagner's opinions in this case are so lacking that the

Court should exclude them in their entirety pursuant to its "gatekeeper" role.  *See Kumho Tire*

*Co., Ltd. v. Carmichael*, 526 U.S. 137, 137-38 (1999).

## III.    STATEMENT OF FACTS

IV has accused Trend of infringing three of the four patents-in-suit: U.S. Patent Nos.

6,460,050 (the "'050 patent"), 6,073,142 (the "'142 patent") and 6,987,610 (the "'610 patent").[1]

Ex. 40[2] (Expert Report of Michael J. Wagner (Feb. 15, 2013)) ¶ 646.  In Mr. Wagner's opinion,

Trend should pay IV ███████████████████████████ respectively, as damages for

alleged infringement of those patents. Ex. 41 (Reply Expert Report of Michael J. Wagner (Apr.

---

[1]     Mr. Wagner does not provide a damages opinion concerning U.S. Patent No. 7,506,155, and
IV has withdrawn its contentions against Trend based on this patent.

[2]     All exhibits cited herein are attached to the Declaration of Michael J. Flynn in support of
Trend Micro Incorporated and Trend Micro Inc. (USA)'s Motions for Summary Judgment and
*Daubert* Motion to Exclude the Opinions and Testimony of Plaintiff's Damages Expert.

3, 2013)) ¶ 167. Mr. Wagner applies the same methodology to all three asserted patents: he determines a "baseline" royalty rate which he purports to adjust according to the well-established factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970). Ex. 40 ¶¶ 80-82.

### A. U.S. Patent No. 6,460,050

For his '050 patent damages opinion, Mr. Wagner relies on a bundling/reseller agreement between Trend and ████████████████████ dated August 28, 2009 ("the ████ ██ Bundling Agreement"), an "OEM Agreement" under which Trend provided ██████ with fully-developed Trend software which ██████ integrated with its own hardware product and sold as a "bundled product." Ex. 42 (Trend Micro Incorporated OEM Agreement (Aug. 28, 2009)) at TMIVA0045747 ("Bundled Products"). Mr. Wagner derives a "baseline royalty rate" by starting with the 50% royalty rates ██████ was obligated to pay (but never actually paid) under the license and multiplying those 50% royalty rates by Trend's sales of products accused of infringing the '050 patent. Ex. 40 ¶¶ 176-192.

It is undisputed that this reseller/bundling agreement:

- was not a patent license (Ex. 40 ¶ 177; Ex. 43 (Excerpts From Transcript of Deposition of Michael J. Wagner, Case Nos. 10-cv-1067, 12-cv-1581 (May 2, 2013)) at 82:15-20);

- required Trend to provide to ██████ fully-developed software and other services, such as support, upgrades, the right to use Trend's trademarks and other related services (Ex. 40 ¶ 177; Ex. 43 at 95:24-97:9);

- required Trend to provide indisputably noninfringing (and unaccused) software from August 2009 through the end of December 2010, after which time Trend was required to provide essentially the same software with accused functionality added, (Ex. 42 at TMIVA0045759);

- required ██████ to pay Trend royalties based on a rate of 50% from August 2009 through March 1, 2011, after which the royalty rate decreased to 40%, (Ex. 42 at TMIVA0045761-762); Ex. 44 (First Amendment to OEM License and Distribution Agreement (March 3, 2011)) at TMIVA0051111-112);

- resulted in ▮▮▮▮▮ paying royalties for the product bundling only at a 40% rate (*i.e.*, ▮▮▮▮▮ paid a lower rate for the product with the accused functionality than it agreed to pay for the product without the accused functionality), (Ex. 41 ¶ 103);

- resulted in total revenue of ▮▮▮▮▮ before the license was cancelled, (*id.*);

- permitted ▮▮▮▮▮ to sell the bundled product only to "enterprise" customers, (Ex. 40 ¶ 186); and

- was executed three years after the date of the hypothetical negotiation, after (by Mr. Wagner's own admission) the technological and financial landscapes had changed dramatically. Ex. 40 ¶ 177; Ex. 41 ¶ 165 (adopting Dr. Leonard's hypothetical negotiation date); Ex. 45 (Expert Rebuttal Report of Dr. Gregory K. Leonard, Case No. 12-cv-1581 (March 20, 2013)) ¶ 22 (setting date of first alleged infringement of February 2007).

The hypothetical negotiation for a license to the '050 patent would have taken place in February 2007 between IV and Trend. Ex. 40 ¶ 70.

### B. U.S. Patent Nos. 6,073,142 and 6,987,610

For the '142 patent, Mr. Wagner relies on statements in a valuation performed by third party ▮▮▮▮▮ in connection with ▮▮▮▮▮ acquisition of ▮▮▮▮▮ Ex. 40 ¶¶ 497-507. As part of that valuation, ▮▮▮▮▮ stated that the ▮▮▮▮▮ patents ▮▮▮▮▮ would acquire could be licensed at a rate of ▮▮▮▮▮ and also referenced indications ▮▮▮▮▮ that royalties in areas "similar" to the ▮▮▮▮▮ patents averaged between one and two percent of revenue. *Id.* ¶ 502. Mr. Wagner does not, however, analyze the critical details of those licenses such as: duration; geographic scope; subject matter; exclusivity; whether the licenses are naked patent licenses or include other technologies; which party is paying the royalties; or whether the licenses referred to were entered into as a result of actual or threatened litigation. For the '610 patent, Mr. Wagner relies on settlement agreements involving a Trend patent – not the '610 patent – where Trend was the licensor, not the licensee. Ex. 40 ¶¶ 337-393.

The hypothetical negotiation for a license to the '142 patent would have taken place in September 2007 between Trend and Park City Group, IV's predecessor-in-interest. *Id.* ¶ 71. The hypothetical negotiation for a license to the '610 patent would have taken place in October 2006 between Trend and IV. *Id.* ¶ 70.

**C.** ███████████████

Mr. Wagner determines that his damages calculations are "reasonable" in light of an agreement executed by ███████████████████████████████████████, a former defendant in this action  Ex. 40 ¶¶ 665-679; Ex. 41 ¶ 89.  Pursuant to that agreement ████████ ██████████████████ ████████████████ paid ████████ dollars for a license to ████████ patents, including the four patents-in-suit. Ex. 46 (Excerpts From the Transcript of Deposition of Michael J. Wagner, Case Nos. 10-cv-1067, 12-cv-1581 (May 3, 2013)) at 373:13-18; Ex. 45 ¶ 50. Mr. Wagner conveniently ignores the ████████other patents, and to support his opinions against Trend (and Symantec) concludes that the four patents-in-suit alone are worth the ████████████ fee paid by ████ Ex. 40 ¶¶ 665-679; Ex. 41 ¶ 89.

## IV.  LEGAL STANDARDS

### A.  <u>A Reasonable Royalty Is Intended to Be Compensatory Only</u>

If Trend were found liable for infringement of any of the patents-in-suit, IV would be entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. The analysis for assessing reasonable royalty damages to compensate for alleged patent infringement can be conducted by looking at a "hypothetical negotiation" in which  a willing licensor (IV) and willing licensee (Trend) voluntarily enter into a license agreement for the patent-in-suit just before the date of first alleged infringement. *See, e.g., Lucent*, 580 F.3d at 1324-25. The hypothetical negotiators are said to assume the asserted patents are valid and infringed, and the

reasonable royalty the parties would have negotiated can be determined by flexibly applying the factors set forth in *Georgia-Pacific. Id.*

### B. Expert Testimony Must Meet Threshold Standards of Reliability And Must Not Be Unfairly Prejudicial

As the proponent of Mr. Wagner's testimony, IV must show that he complied with *Daubert v. Merrell Dow Pharms., Inc.*, (509 U.S. 579 (1993)) as extended by *Kumho,* 526 U.S. at 138, binding cases applying *Daubert*, and the Federal Rules of Evidence. *See, e.g.*, *Uniloc*, 632 F.3d at 1315. Mr. Wagner's analyses must be reliable and based on "sufficient facts or data," (Fed. R. Evid. 702), which may include inadmissible facts only if they are of the type on which experts would reasonably rely in forming an opinion on the subject. Fed. R. Evid. 703; Fed. R. Evid. 702 Advisory Committee Note ¶ 16 (2000) (Rule 702 governs "the question of whether the expert is relying on a sufficient basis of information – whether admissible or not."). Each and every step of the analysis must be reliable to be admissible. *In re Paoli R.R. PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("[A]ny step that renders the analysis unreliable…renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."). Although the focus of the *Daubert* inquiry is "solely on principles and methodology, not on the conclusions they generate," (509 U.S. at 595), an expert's conclusions can be informative of the reliability of the methodology applied. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another….A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.").

In addition, because of the power of expert testimony and the risk of misleading the jury, courts "exercise[] more control over experts than lay witnesses" and may exclude expert testimony under Rule 403. *See Daubert*, 509 U.S. at 595 ("Expert evidence can be both

powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.").

### C. Opinions Relying On Prior Agreements Must Be Closely Scrutinized

A patentee "must sufficiently [tie the expert testimony on damages] to the facts of the case." *Uniloc*, 632 F.3d at 1315 (insertion in original). To this end, the Federal Circuit has set forth clear guidelines for using other licenses in the reasonable royalty analysis, reflecting its skepticism of their reliability. District courts have long been required to "exercise vigilance when considering past licenses to technologies <u>other</u> than the patent in suit" when conducting reasonable royalty analyses. *ResQNet*, 594 F.3d at 869 (emphasis in original). And expert opinions are inadmissible if based on agreements that are "radically different from the hypothetical negotiation under consideration." *Lucent*, 580 F.3d. at 1327.

## V. ARGUMENT

### A. Mr. Wagner's Opinion Concerning The '050 Patent Must Be Excluded

Mr. Wagner's '050 patent damages opinion is that Trend would "willingly" have agreed to pay IV a ▮▮▮ per user-year royalty for sales of allegedly infringing consumer products ▮▮▮ ▮▮▮▮▮▮▮▮▮▮ and a ▮▮▮ per user-year royalty for sales of allegedly infringing enterprise products ▮▮▮▮▮▮ for a total of ▮▮▮▮▮▮ Ex. 41 ¶ 167. The sole foundation on which this nine-figure, ▮▮▮ royalty (as a percentage of gross revenues, *see* Ex. 5 ¶ 70), rests is a single OEM bundling/reseller agreement that is not comparable and has no connection whatsoever to the hypothetical negotiation between Trend and IV for a license to the '050 patent. Accordingly, Mr. Wagner's '050 patent damages opinion is analytically flawed, is contrary to Federal Circuit precedent, is squarely at odds with economic principles, logic, and

common sense, and is the type of contrived and unreliable opinion that this Court, in its role as gatekeeper to the jury, must exclude. *See Kumho,* 526 U.S. at 137-38.

### 1. Mr. Wagner's Reliance On The ▮▮▮ ▮▮▮ Bundling Agreement Is Flawed And Impermissible In View Of *ResQNet*

In *ResQNet*, the Federal Circuit soundly rejected the use of software bundling agreements in a reasonable royalty analysis. 594 F.3d at 868-873. There, the plaintiff's expert determined a royalty based on seven agreements, including five bundling agreements (with royalty ranges between 25% and 40% and which did not confer patent rights) and two naked patent licenses for the patents-in-suit ("substantially less" than the 12.5% applied royalty rate). *Id.* at 870. The court thoroughly analyzed the differences between software bundling agreements and naked patent license agreements, found the software bundling agreements to be "radically different from the hypothetical negotiation under consideration," and came to the "inescapable conclusion" that ResQNet's expert "used unrelated licenses on marketing and other services to push the royalty rate up into double figures." *Id.* at 869-873.

The Court should reach the same conclusion here as the Federal Circuit reached in *ResQNet* based on a comparison of these important aspects of the ▮▮▮▮ Bundling Agreement with the ResQNet software bundling agreements:

| ▮▮▮▮ Bundling Agreement | ResQNet Bundling Agreements |
|---|---|
| Not a patent license. Ex. 40 ¶ 177; Ex. 43 at 82:15-20. | Not a patent license. 594 F.3d at 870-71. |
| Trend provided fully-developed software and other services, such as support, upgrades, the right to use Trend's trademarks and other related services. Ex. 40 ¶ 177; Ex. 43 at 95:24-97:9. | Included "software products, source code, training, maintenance, marketing and upgrades." *Id.* at 870. |

| ████████████ Bundling Agreement | ResQNet Bundling Agreements |
|---|---|
| Royalty rates of 50% (from August 2009 through March 2, 2011) and 40% (after March 2, 2011). Ex. 41 ¶ 104; Ex. 42 at TMIVA0045761-762; Ex. 44 at TMIVA0051111-112. | Royalty rates of between 25% and 40%. Id. |

Indeed, the bundling agreement here is even further removed from the circumstances of the hypothetical negotiation between IV and Trend compared to the bundling agreements in *ResQNet*. Whereas ResQNet received royalty payments in connection with software bundling agreements and also would have received payments in connection with a license agreed to during a hypothetical negotiation with defendant Lansa, Inc., (594 F.3d at 870), Trend received payments in connection with the ████████ Bundling Agreement but would be **making** payments pursuant to an agreement reached during a hypothetical negotiation with IV.

Mr. Wagner's opinion clearly fails to satisfy Rule 702 and Rule 403 in view of *ResQNet* for at least two reasons.  <u>First</u>, the holding of *ResQNet* precludes a finding that Mr. Wagner reliably applied reliable principles to the facts of this case when he started his damages opinion with the ████████ Bundling Agreement.  *See* Fed. R. Evid. 702 (c), (d); *see also Uniloc*, 632 F.3d at 1317 ("[b]eginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion.").  It is highly likely that this testimony will mislead the jury, and the Court should also exclude it under Rule 403. <u>Second</u>, in view of *ResQNet*, the ████████ Bundling Agreement itself is irrelevant and unfairly prejudicial (*see* Fed. R. Evid. 401, 403), and is not the type of agreement on which an expert could reasonably rely in forming an opinion as to the royalty Trend would agree to as a willing licensee for a patent license during a hypothetical negotiation.  *See* Fed. R. Evid. 703.  Because these are the only facts on which Mr. Wagner bases

his '050 patent damages opinion, the requirement of Rule 702(b) that opinions be based on sufficient facts or data is not met.

In view of these clear and irresolvable deficiencies, Mr. Wagner's damages opinion for the '050 patent should be stricken in its entirety.

### 2. <u>Mr. Wagner's Opinion Is Unreliable For Additional Reasons</u>

Mr. Wagner's '050 patent damages opinion is inadmissible for the following reasons in addition to his violation of the principles set forth in *ResQNet*.

### a. Even Mr. Wagner's Own Report Shows That His Use of the Bundling Agreement Is Unreliable

Mr. Wagner's own reports undercut his reliance on the ███████ Bundling Agreement. Mr. Wagner goes to great lengths to explain his view that the changes in the malware threat landscape since February 2007 have been "dramatic," (Ex. 40 ¶ 99) and "rapidly growing." *Id.* ¶ 100. Mr. Wagner quotes several Trend and Symantec documents that post-date the date of first infringement to support this view. *E.g.*, *id.* ¶ 101 (quoting Trend document explaining that unique malware threats increased by 39,000% from 2006 (500,000 threats) through 2010 (more than 20,000,000)). Because Mr. Wagner concedes that the technological landscape in February 2007 (the date of the hypothetical negotiation) was very different from August 2009 or in March 2011, when the ███████ Bundling Agreement was entered into and amended, the agreement is all the more irrelevant. *See LaserDynamics*, 694 F.3d at 79 (license agreement entered into three years after the hypothetical negotiation was "in many ways not relevant to the hypothetical negotiation analysis" because of the "changing technological and financial landscape."). For this additional reason, Mr. Wagner's use of the ███████ Bundling Agreement is unreliable and inadmissible. *See* Fed. R. Evid. 702, 403.

### b. Mr. Wagner's Conclusions Further Evidence A Flawed Methodology

According to Mr. Wagner, Trend would owe IV nearly ███████ in damages based on alleged infringement of the '050 patent. Ex. 41 ¶ 167. These damages would translate to an implied absolute return of ██████ on the ████████ IV spent in 2006 to acquire the '050 patent and two international patent applications. Ex. 45 ¶¶ 44, 92. When this staggering implied rate of return is considered in light of the hypothetical negotiation Mr. Wagner purports to analyze, (Ex. 40 ¶ 58), it becomes clear that this methodology is unreliable and irredeemably flawed: the jury would have to believe that at the hypothetical negotiation Trend, the <u>willing licensor</u>, would <u>voluntarily</u> agree during an <u>arm's length transaction</u> to license the '050 patent at a rate that results in such an astronomical rate of return.[3] *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) (describing the hypothetical negotiation as one "resulting from arm's length negotiations between a willing licensor and a willing licensee").

Something clearly is amiss in Mr. Wagner's methodology, as reflected by this illogical and unjustifiable result. *See Joiner*, 522 U.S. at 146; *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1313-14 (Fed. Cir. 2002) (rejecting damages opinion that did not reflect royalty rates to which the parties would have agreed at a hypothetical negotiation).

### c. Mr. Wagner's Opinion Is Unreliable Because The ████ ███ Bundling Agreement Does Not Reflect "Market" Royalty Rates For A Patent License

From August 2009 through March 2, 2011, ████████ was obligated to pay Trend royalties based on a 50% royalty rate. Ex. 40 ¶¶ 176-192. After March 2, 2011, the royalty rate

---

[3] According to Mr. Wagner's application of the "Book of Wisdom," the hypothetical negotiators would know Dr. Leonard's calculations. *See* Ex. 43 at 144:6-12 (admitting under his interpretation of Book of Wisdom hypothetical negotiators would know "all of the salient facts").

decreased to 40%. Ex. 44 at TMIVA0051111-112.  Yet, Mr. Wagner multiplies the number of

user years of the accused Trend products by the royalties provided in the original agreement

(50%) and determines a blended rate which he "adjusts" according to the *Georgia-Pacific*

factors, even though he acknowledges that the evidence shows that ███████ never actually paid

royalties at the 50% royalty rate.  Ex. 41 ¶ 103 ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ …."[4]) Moreover, the ███████ Bundling

Agreement, which was characterized by the Trend signatory as a "██████ license" that was not

"very successful."  Ex. 42 at TMIVA0045757; Ex. 51 (Transcript of Deposition of John

Maddison (Jan. 25, 2013)) at 52:5-53:1.   Common sense dictates that if these rates were never

paid, then these are not "market rates" for fully developed software, much less for a license to

the '050 patent.  *See* Ex. 41 ¶ 103.  In addition, ████████ was permitted to sell the bundled

product only to enterprise customers, (Ex. 40 ¶ 186); thus, the royalties in the ████████

Bundling Agreement and its amendment do not bear whatsoever on the market rates for

consumer products or a license to the '050 patent.

   The total revenues paid to Trend pursuant to the ████████ Bundling Agreement further

demonstrate that the royalties provided therein were not market rates for a license to the '050

patent, either in 2009 or 2011, much less in 2007, the date of the hypothetical negotiation.  The

████████████████ paid Trend pursuant to the amended ████████ Bundling Agreement could

---

[4]   From August 2009 through the end of December 2010, Trend was obligated to provide ████████████████████████ the core "scan engine" in Trend's anti-virus products.  Ex. 42 at TMIVA0045759.  ███████does not practice the '050 patent because all of the signature files are stored on the customer's server, and it is not accused.  Ex. 40 ¶ 181.  After the end of December 2010, Trend was obligated to provide ████████ an add-on to ████████ which has the exact same functionalities as ████████ except that some of the signature files are stored "in the cloud."  *Id.* ¶ 182.

purchase at most one year licenses for between ████ and ████ users: the lowest rate for a one year license was ████ (educational/government entity with between 100,000 and 199,999 users), and the highest rate for a one year license was ████ (enterprise entity with between 15-99 users).  Ex. 44 at TMIVA0051111.  In contrast, Mr. Wagner calculates that the user base for his '050 patent damages opinion is ██████████ (Ex. 40 ¶ 646), a number orders of magnitude higher than the number of users and years contemplated by the bundling agreement (and reflected by the ████ in revenues paid to Trend under its terms).  Mr. Wagner does not – and cannot – justify his extrapolation of royalty rates set for at most tens of thousands of users, to tens of *millions* of users.  Both the evidence and common sense dictate that the royalty rates in the ████ Bundling Agreement would not apply to more than 130 million user-years when the agreement was entered.

For these additional reasons, Mr. Wagner's '050 patent damages opinion is unreliable.  *See* Fed. R. Evid. 702, 403.

### B.    Mr. Wagner's Opinion Concerning The '142 Patent Must Be Excluded

According to Mr. Wagner's analyses, Trend owes IV ████ for its alleged infringement of the '142 patent, based on a royalty rate of ████.  Ex. 40 ¶ 646.  Mr. Wagner determines a baseline royalty rate of ████ (*id.* ¶ 507), finds all *Georgia-Pacific* factors are neutral, (*id.* at 179-180), and applies a ████ royalty rate, bumping the baseline royalty rate by ████ to account for the presumptions of validity and infringement.  Ex. 43 at 193:17-198:14.

Mr. Wagner derives the baseline royalty rate of ████ from the following two statements in the ██████, which addressed royalty rates for patents that have no link whatsoever to either Trend or the '142 patent, specifically:



Exh. 47 (Excerpts from ███████████████████████████████████████

██████████████████████████ at SYM00806733, *quoted in* Ex. 40 ¶ 502.

Mr. Wagner admits that there is no reason to believe that any information pertaining to Trend (such as licenses) was used in determining the royalty rates discussed by ████. Ex. 43 at 253:2-16, 254:16-19, 254:20-256:6. And, as pointed out above, (*see* Section III(B), *supra*), absolutely nothing is known about any aspect of these licenses or the circumstances or negotiations that led to their execution.

Mr. Wagner's use of these vague, non-specific statements do not withstand the close scrutiny the Federal Circuit requires for the admissible use of license agreements in a reasonable royalty analysis. Mr. Wagner has not tied the statements in the ███████████ to the facts of the case, Trend's accused products, or the '142 patent. Thus Mr. Wagner's opinion amounts to no more than speculation and guesswork and should be excluded under Rules 702 and 403. *See LaserDynamics*, 694 F.3d at 80 ("The district court correctly recognized that LaserDynamics' reliance on the two DVD-related patent licensing programs was problematic, but its [denial of a *Daubert* motion] erroneously permitted continued reliance on this evidence where comparability between it and the [patent-in-suit] was absent."); *WordTech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319-22 (Fed. Cir. 2010) (reversing and remanding for new trial on damages because "verdict was clearly not supported by the evidence and based only on speculation or guesswork.").

## C. Mr. Wagner's Opinion Concerning The '610 Patent Must Be Excluded

According to Mr. Wagner, Trend owes IV ▇▇▇▇ for infringement of the '610 patent, based on a royalty rate of ▇▇▇. Ex. 40 ¶ 646. As the anchor for this opinion, Mr. Wagner first computes a baseline royalty rate based on two licenses arising from litigation of **Trend's own** '600 patent. *Id.* ¶ 392. Those licenses are between Trend as licensor and ▇▇▇ as licensee, (Ex. 40 ¶¶ 342-361), and Trend as licensor and ▇▇▇▇▇▇▇▇▇▇▇▇ as licensees. *Id.* ¶¶ 362-375; Ex. 43 at 134:19-135:2.

As the Federal Circuit has cautioned, there has been "long standing disapproval of relying on settlement agreements to establish reasonable royalty damages." *See LaserDynamics*, 694 F.3d at 77. In *ResQNet*, the court made an exception to this rule in the "limited circumstances" where in the record was a license from a prior litigation <u>for the patent-in-suit in *ResQNet* where the licensor to the prior licenses also would have been the willing licensor in the hypothetical negotiation</u>. 594 F.3d at 869-72. These circumstances are not present here: neither of the two licenses on which Mr. Wagner relies are licenses for the '610 patent-in-suit, and the licensor in those agreements (Trend) would be the **licensee** in the hypothetical negotiation under consideration here. *See Lucent*, 580 F.3d at 1327-28.

The licenses Mr. Wagner selected to determine a baseline royalty rate shed no light whatsoever on what Trend would pay for a license to the '610 patent, and, as a result, Mr. Wagner's '610 patent damages opinion does not satisfy Rules 702 and 403.

## D. ▇▇▇▇▇▇▇▇ As A "Reasonableness Check" Is Inadmissible

Mr. Wagner ostensibly uses as a "check" on the "reasonableness" of his damages calculations the ▇▇▇▇▇▇▇ paid ▇▇▇▇▇▇ for a license to over ▇▇▇ patents, including the four patents-in-suit, pursuant to the ▇▇▇▇▇▇▇. Ex. 40 ¶¶ 665-679.

Mr. Wagner attributes all ███████ to the four-patents-in-suit,[5] and, in fact, may seek to testify that ████████ understates the value of the patents because the parties to the ███ ████ did not assume validity and infringement when executing that license agreement. *Id.* ¶ 677. The Court should recognize Mr. Wagner's tactics for exactly what they are: a vehicle to put before the jury a large number (*i.e.*, at least ████████) so his lower damages figures against Trend ██████ look like a bargain. This approach clearly is unfairly prejudicial and unreliable, and this testimony should be excluded.

### 1. ███ ████████ As Reasonableness Check Is Unfairly Prejudicial

This testimony is unfairly prejudicial for a number of reasons. <u>First</u>, the Federal Circuit in *Uniloc* rejected this very same approach for reasons unfair prejudice, and the Court should do the same here. *See* 632 F.3d at 1320 (rejecting testimony of a "$19 billion check" that exceeded the expert's damages opinion because the "$19 billion cat was never put back in the bag").

<u>Second</u>, Mr. Wagner's testimony on this issue is pure conjecture. Mr. Wagner contends – without any support whatsoever – that ████ specifically requested a license to just the four patents-in-suit, suggesting that the █████ patents ████ licensed in addition to the patents-in-suit are essentially useless and were just thrown in by IV. *See* Ex. 40 ¶ 218 ███████████

████████████████████████████████████████████████████

██████████████████████ Mr. Wagner attributes all ███████████ to the four patents-in-suit based on the fact that IV sued the defendants on only those four patents which were ███████

████████████████████████████████████████████████ (*id.* ¶ 676);

---

[5] In his reply report Mr. Wagner confirmed the truth of defendants' experts' contentions that Mr. Wagner attributed all ███████████ to the four-patents-in-suit: ████████████████████████████████████████████████████████ ██████████████████████████ Ex. 41 ¶ 89.

however, Mr. Wagner does not describe any analyses of the other ███ patents necessary to substantiate this assertion.

Third, this testimony also is unfairly prejudicial because ████████████████ ████████████, settled with IV and obtained ███████████ a license to all four patents-in-suit, or less than ██ of what ██ paid. Wagner Supplemental Reply Report ¶¶ 5-6. Importantly, Trend has not had the opportunity to take discovery from IV on communications leading to the ██████████████████████████████████ or the ██████ settlement.  As a result, Trend has not had the opportunity to test – through discovery of IV itself – Mr. Wagner's unfounded theory that all ████████ is attributable to the four patents-in-suit.  It would be manifestly unfair for the jury to hear Mr. Wagner's unsupported testimony on the ████████ without also receiving evidence that shows why the two amounts differ so widely.

Fourth, IV is asserting against Trend only three of the four patents-in-suit; thus Mr. Wagner's testimony that the **four** patents-in-suit are worth ████████ can only serve to confuse and mislead the jury.

Fifth, the ████████ has absolutely no relationship to the hypothetical negotiations that would have resulted in licenses to the patents-in-suit. Most importantly, whereas ███ acquired a license to ██████ patents all at once, Trend would have engaged in a separate hypothetical negotiation for a license to each patent-in-suit:  with IV for licenses to the '610 and '050 patents, and with Park City Group for a license to the '142 patent.  Ex. 40 ¶¶ 69-71 (confirming separate negotiation dates and parties).  The lack of a tenable connection between the ████████ figure and the value of the patents-in-suit is illustrated by the testimony of Park City Group's 30(b)(6) representative, who testified that at the time Park City Group sold the '142

patent to IV Park City Group would have sold Trend a █████████████████ for ████████

Ex. 52 (excerpts from and errata to Transcript of Deposition of Randall K. Fields (Oct. 18,

2012)) at 91:14-24, errata ████████████████████████████████████████████

████████████████████████████. Moreover, the ██████████████ was executed in 2012,

years after the hypothetical negotiation dates, (*id.* ¶¶ 69-71, 666), rendering it irrelevant because

it was executed after the technological landscape had significantly changed. *See LaserDynamics*,

694 F.3d at 78 ("Additionally, in light of the changing technological and financial landscape in

the market for ODDs, the BenQ settlement, entered into a full three years after the hypothetical

negotiation date, is in many ways not relevant to the hypothetical negotiation analysis.").

2. ██████████████ **As A Reasonableness Check Fails Rule 702**

This testimony does not exemplify the reliable application of reliable principles to the

facts of the case as required by Rule 702(c) and (d), for the same reasons as just articulated for

why the ██████████████ is unfairly prejudicial. In addition, this use of the ██████████████ also

violates Rule 702(b)'s requirement that opinions be based on "sufficient facts or data."  Mr.

Wagner may base his opinions on inadmissible facts so long as they are of the type on which an

expert would reasonably rely in forming his opinions. *See* Fed. R. Evid. 703.  The ████████

██████████ itself is plainly inadmissible in view of Rule 408. *See In re MSTG, Inc.*, 675 F.3d

1337, 1344 (Fed. Cir. 2012) ("[Rule 408] is clear by its text and history that it covers not only

settlements and negotiations between the parties to the lawsuit, but also settlements and

negotiations involving a third party…."). Again, for the reasons articulated above in Section

V(D)(1), an expert would not rely on the ██████████████ in forming an opinion about the

reasonableness of his or her damages calculations, and thus Rule 703 is not satisfied. *See* Fed. R.

Evid. 703. Accordingly, Mr. Wagner's "reasonableness" opinion is not based on any facts and

thus falls far short of satisfying the requirements of Rule 702.

### E. Cross-Examination Cannot Cure the Defects with Mr. Wagner's Opinions

Many of the Federal Circuit cases discussed above demonstrate that cross-examination and presentation of contrary evidence do not suffice to cure the prejudice caused by admitting such unreliable and prejudicial testimony. In those cases where improper expert testimony was admitted by the district court and challenged by cross-examination and/or the presentation of contrary evidence, the Federal Circuit found that the defects had not been cured. *See, e.g.*, *Power Integrations*, 711 F.3d at 1374; *LaserDynamics*, 694 F.3d at 78-81; *Uniloc*, 632 F.3d at 1315-21; *ResQNet*, 594 F.3d at 869-872. Similarly, the nature of the defects with Mr. Wagner's unreliable opinions require exclusion because "[s]uch unreliable [damages] testimony frustrates a primary goal of expert testimony in any case, which is meant to place experience from a professional specialization at the jury's disposal, not muddle the jury's fact-finding with unreliability and speculation." *See Power Integrations*, 711 F.3d at 1374.

## VI. CONCLUSION

For the foregoing reasons, Trend respectfully requests the Court exclude the opinions and testimony of Mr. Wagner in their entirety.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Karen Jacobs Louden (#2881)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
klouden@mnat.com
mflynn@mnat.com

*Attorneys for Trend Micro Incorporated and
Trend Micro, Inc. (USA)*

OF COUNSEL:

Yar R. Chaikovsky
MCDERMOTT, WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025
(650) 815-7400

David M. Beckwith
MCDERMOTT, WILL & EMERY LLP
4 Park Plaza, Suite 1700
Irvine, CA  92614-2559
(949) 851-0633

June 14, 2013
7292299.2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 14, 2013, I caused the foregoing to be electronically

filed with the Clerk of the Court using CM/ECF which will send electronic notification of such

filing to all registered participants.

Additionally, I hereby certify that true and correct copies of the foregoing were

caused to be served on June 14, 2013, upon the following individuals in the manner indicated:

| | |
|---|---|
| Joseph J. Farnan, III | *VIA ELECTRONIC MAIL* |
| Brian E. Farnan | |
| FARNAN LLP | |
| 919 N. Market Street, 12th Floor | |
| Wilmington, DE 19801 | |
| *Attorneys for Plaintiff* | |

| | |
|---|---|
| Parker C. Folse III | *VIA ELECTRONIC MAIL* |
| Brooke A.M. Taylor | |
| Lindsey N. Godfrey | |
| SUSMAN GODFREY L.L.P. | |
| 1201 Third Avenue, Suite 3800 | |
| Seattle, WA 98101-3000 | |
| *Attorneys for Plaintiff* | |

| | |
|---|---|
| John P. Lahad | *VIA ELECTRONIC MAIL* |
| Weston O'Black | |
| Richard W. Hess | |
| SUSMAN GODFREY L.L.P. | |
| 1000 Louisiana Street, Suite 5100 | |
| Houston, TX 77002 | |
| *Attorneys for Plaintiff* | |

*/s/ Michael J. Flynn*
_____
Michael J. Flynn (#5333)