IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, | § | |
| | § | |
| Plaintiff, | § | Case No. 12-1581-LPS |
| | § | |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| TREND MICRO INCORPORATED and | § | |
| TREND MICRO, INC. (USA), | § | **FILED UNDER SEAL** |
| | § | |
| Defendants. | § | |

## IV1'S RESPONSIVE BRIEF TO TREND MICRO'S
## MOTION FOR SUMMARY JUDGMENT

Joseph J. Farnan, III (Bar No. 3945)
Brian E. Farnan (Bar No. 4089)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com

Parker C. Folse III *(admitted pro hac vice)*
Brooke A.M. Taylor *(admitted pro hac vice)*
Lindsey N. Godfrey *(admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone:    (206) 516-3880
Facsimile:    (206) 516-3883

Richard W. Hess (admitted pro hac vice)
Weston O'Black *(admitted pro hac vice)*
John P. Lahad *(admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone:    (713) 653-7859
Facsimile:    (713) 654-3386

Dated: July 12, 2013                         *Counsel for Plaintiff*

## Table of Contents

I.     Statement of the Nature and Stage of Proceedings ............................................. 1

II.    Summary of Argument ...................................................................................... 1

III.   Statement of Facts .......................................................................................... 2

IV.    Applicable Law .............................................................................................. 2

V.     Argument ...................................................................................................... 4

    A.     The Asserted Claims of the '050 Patent are Not Invalid as a Matter of Law ............................................................................................... 4

        1.     The '050 Patent's Reexamination Proceedings Are Irrelevant ................... 5

        2.     Multiple Genuine Disputes Preclude Summary Judgment of Anticipation ........................................................................... 5

            i.     Townshend Does Not Disclose the '050 Patent's Second Claimed Step .............................................................. 5

                a.     Generating a "Count" Does Not Meet the Second Step .................................................................... 6

                b.     Generating "Bulk Signature Elements" Does Not Meet the Second Step ................................................. 8

            ii.    Townshend Does Not Disclose the '050 Patent's Third Claimed Step ................................................................. 9

                a.     Townshend's "Counts" Do Not Describe the Content ................................................................................. 9

                b.     Townshend's "Bulk Email Signatures" Are Not Responses to Queries and Do Not Describe the Content ................................................................................. 12

        3.     The Asserted Claims of the '050 Patent are Not Obvious as a Matter of Law .................................................................... 13

    B.     The Asserted Claims of the '142 Patent are Not Invalid Under the On-Sale Bar ........................................................................... 15

        1.     The Gatekeeper Product was Not "On Sale in this Country" Before June 23, 1996 ....................................................... 16

i

2.     Gatekeeper was Not *Offered* for Sale in the U.S. Before June 23, 1996..................................................................................................17

     i.     Trend Applies the Wrong Test for "Substantial Prefatory Activity"..........................................................................18

     ii.     Trend's Evidence Falls Well Short of Establishing "Clear and Convincing" of Substantial Prefatory Activity in the U.S. ...............................................................20

C.     Fact Issues Preclude Summary Judgment of No Infringement of the '142 Patent .........................................................................................................23

     1.     The Quarantines in Trend's Accused Products are Post Offices ...............23

     2.     Trend's Accused Products Combine Emails with a New Distribution List and Rule History.............................................27

     3.     ScanMail Receives Email Messages or Data Objects from Senders...................................................................................31

     4.     IV1 Withdraws Claims 18 and 25 of the '142 Patent ...............................33

D.     Fact Issues Preclude Summary Judgment of No Infringement of the '610 Patent .........................................................................................................33

E.     IV1 Does Not Allege that Trend Willfully Infringed ...........................................38

F.     Trend is Not Entitled to Summary Judgment of No Damages .............................39

# Table of Authorities

**Cases**

*Abaxis, Inc. v. Cepheid*,
    2012 WL 3255602 (N.D. Cal. Aug. 8, 2012) .......................................... 19, 21

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
    659 F.3d 1121 (Fed. Cir. 2011) ............................................................ 3

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................... 2

*Asahi Glass Co. Ltd. v. Gaurdian Indus. Corp.*,
    813 F. Supp. 2d 602 (D. Del. 2011) ................................................... 14

*B. Braun Melsungen AG v. Terumo Med. Corp.*,
    749 F. Supp. 2d 210 (D. Del. 2010) ..................................................... 2

*B.F. Goodrich Co. v. Aircraft Braking System Corp.*,
    825 F. Supp. 65 (D. Del. 1993) .................................................... passim

*Becton, Dickinson and Co. v. Tyco Healthcare Group*,
    616 F.3d 1249 (Fed. Cir. 2010) .......................................................... 24

*Boston Scientific Corp. v. Johnson & Johnson Inc.*,
    679 F. Supp. 2d 539 (D. Del. 2010) ............................................. 14, 15

*Brocade Commc'ns Sys. v. A10 Networks, Inc.*,
    2012 WL 2326064 (N.D. Cal. June 18, 2012) ...................................... 5

*Carpenter Tech. Corp. v. Allegheny Techs. Inc.*,
    2011 WL 3296202 (E.D. Pa. Aug. 2, 2011) ......................................... 15

*Cellectis S.A. v. Precision Biosciences, Inc.*,
    2013 WL 1415609 (D. Del. Apr. 9, 2013) .................................. 3, 13, 38

*Chimie v. PPG Indus., Inc.*
    402 F.3d 1371 (Fed. Cir. 2005) ............................................................ 3

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*,
    635 F.3d 1373 (Fed. Cir. 2011) ............................................. 2, 4, 9, 27

*Eli Lilly and Co. v. Barr Labs., Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) ...................................................... 4, 13

*Encyclopedia Britannica, Inc. v. Alpine Electronics of America, Inc.*,
    609 F.3d 1345 (Fed. Cir. 2010) ............................................................ 3

*Gandy v. Main Belting Co.*,
    143 U.S. 587 (1892)...................................................................................... 16

*Gart v. Logitech, Inc.*,
    254 F.3d 1334 (Fed. Cir. 2001).................................................................... 3

*INVISTA N. Am. S.a.r.l v. M & G USA Corp.*,
    2013 WL 3196817 (D. Del. June 25, 2013).................................... 3, 13, 14

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007).................................................................................... 14

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...................................................................................... 2

*MobileMedia Ideas, LLC v. Apple, Inc.*,
    907 F. Supp. 2d 570 (D. Del. 2012).......................................................... 5, 15

*Monolithic Power Systems, Inc. v. O2 Micro International Ltd.*,
    2007 WL 3231709 (N.D. Cal. Oct. 30, 2007)............................................ 18

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    763 F. Supp. 2d 671 (D. Del. 2010)...................................................... 13, 35

*S.O.I.Tec Silicon On Insulator Techs., S.A. v. MEMC Elec. Materials, Inc.*,
    745 F. Supp. 2d 489 (D. Del. 2010)........................................................... 14

*Source Search Technologies, LLC v. LendingTree, LLC*,
    588 F.3d 1063 (Fed. Cir. 2009)............................................................ 25, 33

*Synair Corp. v. Am. Indus. Tire, Inc.*,
    1983 WL 52362 (S.D. Tex. July 30, 1983).................................................. 21

*TriMed, Inc. v. Stryker Corp.*,
    608 F.3d 1333 (Fed. Cir. 2010)............................................................ 3, 4, 15

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011).................................................................... 3

*Volterra Semiconductor Corp. v. Primarion, Inc.*,
    796 F. Supp. 2d 1025 (N.D. Cal. 2011) ...................................................... 5

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997)........................................................................................ 3

**Statutes**

35 U.S.C. § 102(b) .......................................................................................... 16

## I.     Statement of the Nature and Stage of Proceedings

On June 14, 2013, Defendants Trend Micro Incorporated and Trend Micro, Inc. (USA) ("Trend") moved for summary judgment of invalidity of U.S. Patent Nos. 6,460,050 ("the '050 patent") and 6,073,142 ("the '142 patent"), non-infringement of U.S. Patent Nos. 5,987,610 ("the '610 Patent") as well as the '142 Patent, no willful infringement, and no damages. D.I. 71. This is Intellectual Ventures I, LLC's ("IV1") answering brief.

## II.     Summary of Argument

1.    Trend cannot to show that the asserted claims of the '050 Patent are invalid as a matter of law. Genuine issues of material fact exist as to whether the Townshend patent describes every element of the claimed invention, as required for anticipation. As to obviousness, there is a material dispute regarding the content of the prior art and the differences between the Townshend patent and the asserted claims. These factual disputes preclude summary judgment.

2.    Trend has not met its burden to show that the '142 Patent is invalid under the on-sale bar. No material evidence–*much less clear and convincing evidence*–exists that products embodying the '142 Patent were "on sale in this country" before the critical date. Not only does Trend's motion cite bad law, but it also omits critical facts that establish the license of the Gatekeeper product to Boots UK (1) limited Boots's use of Gatekeeper to the UK, Ireland, and the Channel Islands, (2) required confidentiality, (3) prohibited Boots from re-selling or transferring the Gatekeeper product, (4) provided that payment would be made in British pounds, (5) provided that English law and jurisdiction would exclusively control the license, and (6) was executed by Boots in Nottingham, England. Thus, because there was no "sale in this country," the "on-sale" bar inapplicable.

3.    Trend cannot meet its burden to show that it does not infringe the asserted claims of the '142 Patent as a matter of law. Trend's scattershot attempts to rewrite the claim language of the

'142 Patent ignore the overwhelming evidence cited by Dr. McDaniel, and contradict both Trend's sworn interrogatory responses and the conclusions of its own experts.

4.      Trend has not met its burden to show that it does not infringe the asserted claims of the '610 Patent as a matter of law.  Trend's only support for its motion is a single statement taken out of context that is inconsistent with the substantial evidence of infringement offered by Dr. McDaniel.  Even if the Court credits this statement, genuine issues of material fact exist regarding multiple claim limitations, which preclude summary judgment.

5.      Trend moves against IV1's claims of willful infringement, but IV1 has not alleged willful infringement by Trend.

6.       Because the Court should deny Trend's pending motion to exclude the opinions and testimony of IV1's damages expert, Mr. Wagner, and because Trend offers no other arguments in support, Trend is not entitled to summary judgment of no damages.

### III.      Statement of Facts

For clarity, the facts are set forth in the remaining sections as appropriate.

### IV.      Applicable Law

In summary judgment, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *B. Braun Melsungen AG v. Terumo Med. Corp.*, 749 F. Supp. 2d 210, 213 (D. Del. 2010) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986)).  All evidence cited by the non-moving party must be credited, and all justifiable inferences from that evidence must be drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A conflict between the parties' experts on a material issue presents a fact question that defeats summary judgment.  *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011).

Infringement is a pure question of fact. *Absolute Software, Inc. v. Stealth Signal, Inc.,* 659 F.3d 1121, 1130–31, 1135 (Fed. Cir. 2011). To determine infringement, the fact-finder compares the construed claims to the allegedly infringing device and determines whether every limitation or its equivalent is present. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29 (1997). When an accused infringer moves for summary judgment of non-infringement, such relief may be granted <u>only if</u> one or more limitations of the claim in question does not read on an element of the accused product. *Cellectis S.A. v. Precision Biosciences, Inc.,* 2013 WL 1415609, at *7 (D. Del. Apr. 9, 2013) (citing *Chimie v. PPG Indus., Inc.* 402 F.3d 1371, 1376 (Fed. Cir. 2005)). Summary judgment is appropriate only if no reasonable jury could find infringement. *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1339 (Fed. Cir. 2001). The application of the Court's constructions to the accused product is a fact question for the jury, even where the parties agree on how the accused product works. *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1301–02 (Fed. Cir. 2011) (rejecting claim that infringement is a question of law where "there is no dispute about how the accused products work").

Whether a prior art reference anticipates a patent claim is likewise a question of fact. *TriMed, Inc. v. Stryker Corp.,* 608 F.3d 1333, 1343 (Fed. Cir. 2010). Invalidity through anticipation requires clear and convincing evidence that a single prior art document describes every element of the claimed invention. *Id.* Anticipation "may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Encyclopedia Britannica, Inc. v. Alpine Electronics of America, Inc.,* 609 F.3d 1345, 1349 (Fed. Cir. 2010).

Like anticipation, obviousness requires clear and convincing evidence. *See INVISTA N. Am. S.a.r.l v. M & G USA Corp.,* 2013 WL 3196817, at *7 (D. Del. June 25, 2013). Whether claimed subject matter would have been obvious requires examination of (1) the scope and

content of the prior art, (2) the differences between the claimed invention and the prior art, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations. *TriMed*, 608 F.3d at 1341. Summary judgment of obviousness is appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art not in material dispute, and the obviousness of the claim is apparent in light of these factors." *Id.* "[A] moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidate so that <u>no reasonable jury could find otherwise</u>. *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) (emphasis added).

V. <u>Argument</u>

A.    <u>The Asserted Claims of the '050 Patent are Not Invalid as a Matter of Law</u>

To argue that the Townshend patent anticipates the '050 Patent as a matter of law, Trend ignores the factual disputes between the parties and their experts regarding Townshend's disclosure. For example, Trend contends that Townshend discloses the second step of the claimed methods. IV1 and Dr. McDaniel disagree. Likewise, Trend contends that Townshend's "count" or "bulk email signature" qualify as "an indication of the characteristic" as construed by the Court. IV1 and Dr. McDaniel disagree. These conflicts alone warrant denying summary judgment. *Crown Packaging*, 635 F.3d at 1384.

Trend's request for summary judgment that the '050 Patent is obvious fares no better. Obviousness is not a consolation prize awarded when an accused infringer cannot demonstrate anticipation. First, Trend's perfunctory and unsupported argument assumes that the parties do not dispute the scope of the prior art or the differences between the claimed invention and the prior art. They do. Moreover, secondary considerations of non-obviousness—ignored by Trend in its motion—weigh heavily against a finding of obviousness as a matter of law. Thus, summary judgment of obviousness is inappropriate. *MobileMedia Ideas, LLC v. Apple, Inc.*, 907

F. Supp. 2d 570, 596 (D. Del. 2012) (denying summary judgment of obviousness when "the parties' experts dispute whether a person of ordinary skill in the art would have found the asserted claims … obvious in light of [the prior art]").

1.    The '050 Patent's Reexamination Proceedings Are Irrelevant

Trend begins with an attempt to bias the Court's view of the '050 Patent by citing non-final, infringer-instigated reexamination proceedings in support of its motion. D.I. 72 at 5–6.  But as several courts have previously held, "preliminary decisions and actions by the PTO in the course of a reexamination proceeding are not probative of invalidity." *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1042 (N.D. Cal. 2011); *see also Brocade Commc'ns Sys. v. A10 Networks, Inc*., 2012 WL 2326064, at *4 (N.D. Cal. June 18, 2012) (citing *Volterra*).   Accordingly, the non-final reexamination proceedings do not bear on the issues of anticipation or obviousness before the Court.

2.    Multiple Genuine Disputes Preclude Summary Judgment of Anticipation

Trend argues that Townshend meets the second and third steps of the '050 Patent's asserted methods.  This is disputed.  Townshend discloses neither step.

i.    Townshend Does Not Disclose the '050 Patent's Second Claimed Step

The second step of the '050 Patent's asserted methods requires:

determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers (claim 9)

comparing, on the second computer, the digital content identifier to a characteristic database of digital content identifiers received from said plurality of first computers to determine whether the message has a characteristic (claim 16)

characterizing the files on the server system based on said digital content identifiers received relative to other digital content identifiers collected in the database (claim 22)

<u>Generating a "Count" Does Not Meet the Second Step</u>

Trend argues that Townshend's creation of a "count" meets this step. D.I. 72 at 12–14. Townshend's count does not characterize the content or determine whether the message has a characteristic, as required by the claims.

Townshend's specification states:  "At step 370, the central server generates a count reflecting the number of times the next signature data element is matched by signature elements of previously received message signatures."  Townshend at c. 8 ll. 1–4.  Townshend's "central server," to which Trend equates the "processing system" of claim 9, the "second computer" of claim 16, and the "server system" of claim 22, does not characterize the files received. Townshend's central server contains <u>no</u> information regarding characteristics of messages or data files.  Exh. 1, McDaniel Validity Report, at ¶¶89, 91–94; *see also* Townsend at Abstract ("The central server generates a count of how many other previously received signatures match the just generated message signature.").  An email is not marked as bulk until after the count reaches the email server, and even then, the email server, not the central server, marks the email. Exh. 1 at ¶94; *see also* Townshend at c. 8 ll. 55–58 ("At step 336, the electronic mail server 110 determines whether or not the just received count exceeds a predetermined threshold.").

Trend latches on to a single line in the specification and overlooks the remaining description of how Townshend actually works.  In particular, Trend points to the following statement: "a set of one or more computer processes that operates upon received message signatures to generate and transmit ***data indicating which signatures represent bulk electronic mail***."  D.I. 72 at 13 (emphasis in original).   Trend's reliance on this statement is misplaced because, in the very next paragraph, Townshend states:

> When a central server receives a message signature, the central server generates a
> count of how many times a matching signature elements [sic] in the message have
> been previously received.  The central server transmits the count of the most

frequently matched signature element to the electronic mail server that transmitted the just received message signature. If the count meets a predetermined threshold, ***the electronic mail server marks the electronic mail message as bulk electronic mail***.

Townshend at c. 3 ll. 59–65 (emphasis added); *see also* Exh. 2, McDaniel Dep. Tr., at 104:3–17, 105:2–11. Thus, Townshend's so-called "indicating" count does not actually indicate whether the message is bulk. *See* Exh. 1 at ¶91 ("The central server of Townshend contains no information regarding characteristics of messages or data files."); *see also id.* at ¶¶89, 92–94.

Trend also looks to the language of non–asserted claims, D.I. 72 at 13–14, to argue that the second step is met by Townshend. But Trend imparts Townshend's central server with functionality that it does not have. Contrary to Trend's argument, Townshend cannot and does not teach determining whether a content identifier matches a characteristic by tracing the frequency because *its central server performs no determination or characterization*. As Dr. McDaniel explained in his report:



Exh. 1 at ¶93. Put another way, Townshend's central server characterizes nothing, and Trend has not adduced clear and convincing evidence to the contrary.

In fact, Trend's own non-infringement expert, Dr. Atul Prakash, testified that a central server does not perform this second "determining" step by looking for a property of the message (*e.g.*, message size). At his deposition, Dr. Prakash testified that a central server that checked for the size of an email (*e.g.*, 4,000 bytes) would not perform the '050 Patent's ' ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮. Exh. 3, Prakash Dep. Tr., at 182:9–194:6. He gave the same opinion about a system

where the central server checked the age of an email and output that age to the client computer, which would then use the age to "█████████████████████████████ ████████████ *Id.* at 199:20–200:25. Thus, not only is there disagreement between Dr. McDaniel and Rubin, there is disagreement between Trend's own experts about whether Townshend's count performs the second step of the asserted claims. This dispute must be resolved by a jury.

        b.    <u>Generating "Bulk Signature Elements" Does Not Meet the Second Step</u>

Trend also contends that Figure 4 of Townshend meets the second step of the claimed methods. Trend errs here, too. It rests its argument on the erroneous conclusion that Townshend's "bulk signature elements "indicat[e] that the email corresponding to the identifier is bulk/junk email." D.I. 72 at 14. But the "bulk signature elements"—like the "counts"—are generated at the central server and sent to the listening email servers. And just as before, the listening email server marks the message as bulk:

> A listening electronic mail server is an electronic mail server that is not transmitting signatures of received electronic mail messages to the central server 140, but which receives bulk electronic signature elements. ***When a listening electronic mail server receives a bulk signature element from a central server, the listening e-mail server then compares of the bulk signature element to signature elements generated for an electronic mail message.***

Townshend at c. 9 ll. 39–50 (emphasis added); *see also* Exh. 1, McDaniel Validity Report, at ¶¶94–95. This is likewise the case when the central server sends bulk signature elements to typical (as opposed to listening) email servers:

> In addition to broadcasting bulk electronic mail signatures to listening electronic mail servers, the bulk electronic mail signatures may be broadcast to electronic mail servers that do transmit message signatures to a central server. In the manner similar to that previously described, ***these electronic mail servers compare the broadcasted bulk signature element to any signature elements of any received electronic mail messages***.

Townshend at c. 10 ll. 64–c. 11 ll. 5 (emphasis added); *see also* Exh. 2, McDaniel Dep. Tr., at 115:17 –116:4, 116:8–18.

In sum, Townshend does not disclose the second steps of claims 9, 16, and 22 of the '050 Patent, and Trend's arguments do not rise to the level of clear and convincing evidence. At the very least, the experts' conflicting views preclude summary judgment. *Crown Packaging*, 635 F.3d at 1384.

      ii.      <u>Townshend Does Not Disclose the '050 Patent's Third Claimed Step</u>

The third step of the '050 Patent's claimed methods requires:

> outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining (claim 9)

> responding to a query from at least one of said plurality of computers to identify the existence or absence of said characteristic of the message based on said comparing (claim 16)

> transmitting a substance identifier from the server to the client agent indicating the presence or absence of a characteristic in the file (claim 22)

In arguing that Townshend meets the third claimed step of the asserted claims, Trend echoes the same arguments made regarding the second step. Namely, Trend again points to Townshend's "count" and "bulk signature elements." Trend falls short on both fronts.

      a.      <u>Townshend's "Counts" Do Not Describe the Content</u>

Townshend's counts do not meet this claimed step by any standard, clear and convincing or otherwise. Taking claim 9 as an example, the count is not "an indication of the characteristic" as construed by the Court. The Court construed "an indication of the characteristic" to mean "descriptor of the content (*e.g.*, spam, virus, junk email, copyrighted)." D.I. 425 at 13. Much like the count does not characterize a message, Townshend's count does not describe the content. In his report, Dr. McDaniel explained:



Exh. 1, McDaniel Validity Report, at ¶89.

The exemplary count provided by Townshend is "11." Townshend at c. 8 ll. 59–61. Simply knowing that an email has been seen 11 times does not describe the content; it does not indicate whether a message is spam; it does not indicate whether a message has a virus; it does not indicate whether an email is junk or contains information protected by copyright.

The Court's construction of "an indication of the characteristic" requires more than providing a property of the message. For example, during Dr. McDaniel's deposition, counsel for Defendant Symantec Corp. attempted to elicit testimony that the size of the file constituted a "descriptor of the content." Dr. McDaniel rightly disagreed:



Exh. 2, McDaniel Dep. Tr., at 31:9–13. Dr. Rubin, Trend's expert, conceded that size would not be an indication of the characteristic as construed by the Court:





Exh. 4, Rubin Dep. Tr., at 144:23–145:20. Like size, the "count" says nothing about the content, as required by the Court's construction.

Trend again retreats to a single line in the specification that uses the word "indicating." D.I. 72 at 17. Trend dedicates multiple paragraphs to this "argument," but as discussed above, this is a red herring. The specification repeatedly describes how, in each of Townshend's embodiments, the local email server—not the central server—marks the email. In other words, the count has no intrinsic meaning. It not does not "indicate" that the message is bulk—only that it has been encountered a number of times before. Townshend at c. 9 ll. 39–50 (emphasis added); *see also* Exh. 1, McDaniel Validity Report, at ¶¶89, 91–94. In sum, Townshend's word choice does not overcome its deficient functionality, and Trend cannot meet its burden to show

no material fact issues when it overlooks the bulk of Townshend's disclosure in favor of a single line.

> **b.** Townshend's "Bulk Email Signatures" Are Not Responses to Queries and Do Not Describe the Content

As Trend concedes, the parties dispute whether the bulk email signature is transmitted in response to a query or request as required by asserted claims 9 and 16. D.I. 72 at 18. The parties also dispute whether the bulk signature elements constitute "an indication of the characteristic" or related terms as required by claims 9, 16, and 22. *Id*. at 18. These factual disputes warrant denying summary judgment.

Claims 9 and 16 explicitly require "outputting . . . responsive to a request" and "responding to a query," respectively. Trend tries to transform Townshend's broadcasting email signatures into the required "response," but the bulk email signatures or bulk signature elements are not sent in response to a query or request as the '050 Patent requires. Exh. 2, McDaniel Dep. Tr., at 141:24–142:17; *see also* Exh. 1, McDaniel Validity Report, at ¶95 ("██████████

████████████████████████████████████████████████████████

███████████████████████████████████

Trend relies exclusively on Figure 4 of Townshend in arguing that the bulk email signatures are sent in response to a query, but the specification explains that the <u>count</u>, not the bulk email signatures, are transmitted in response to a query: "At step 416, the central server 140 transmits the highest count among the received signature elements ***to the electronic mail server that transmitted the received signature***." Townshend at c. 10 ll. 14–16 (emphasis added). As discussed above, the "count" is not "an indication of the characteristic" as construed by the Court. Thus, contrary to Trend's argument, broadcasting the bulk email signatures does not meet this step of the claims.

Finally, a dispute exists as to whether Townshend's "bulk email signature" constitutes an indication of the characteristic," as construed by the Court. As Dr. McDaniel explained, the bulk signature element is " ███████████████████████████████████████████

███████████████████████████████ ████████████████ " Exh. 2, McDaniel Dep. Tr., at 130:10–13; *see also id.* at 131:6–8 (" ███████████████████████████████████████████

███████ "). In this embodiment of Townshend—as in all of its embodiments—the email server, not the central server or its count, marks an email as bulk. Townshend at c. 9 ll. 39–50.

For anticipation to lie, "there must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the art." *Cellectis*, 2013 WL 1415609, at *8). In this case, Trend ignores the differences between the claimed invention and Townshend. Whether Trend can show by clear and convincing evidence that Townshend teaches each of the steps of claimed methods is a question of fact for the jury, and resolution of these disputes by the Court is not appropriate. *Eli Lilly*, 251 F.3d at 962; *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc*., 763 F. Supp. 2d 671, 684–685 (D. Del. 2010).

### 3. The Asserted Claims of the '050 Patent are Not Obvious as a Matter of Law

In a last ditch effort to demonstrate invalidity, Trend offers three paragraphs of unsupported attorney argument that, according to Trend, establish by clear and convincing evidence that the '050 Patent is obvious as a matter of law. But Trend's brief fails to even mention the standard for obviousness, let alone meet it.

Conspicuously absent from Trend's brief is an opinion from its invalidity expert, Dr. Rubin, that Townshend alone renders the '050 Patent obvious. That is because he did not offer such an opinion. This Court has repeatedly found held that an accused infringer cannot meet its burden of clear and convincing evidence of obviousness without expert testimony. *See, e.g., INVISTA*, 2013 WL 3196817 at *18; *Asahi Glass Co. Ltd. v. Gaurdian Indus. Corp*., 813 F.

Supp. 2d 602, 620 (D. Del. 2011) (finding no *prima facie* case of obviousness when accused infringer failed to offer expert testimony related to obviousness); *see also Boston Scientific Corp. v. Johnson & Johnson Inc*., 679 F. Supp. 2d 539, 551 (D. Del. 2010) (denying summary judgment in a case where accused infringer's expert did not provide any obviousness opinion); *Cf. S.O.I.Tec Silicon On Insulator Techs., S.A. v. MEMC Elec. Materials, Inc*., 745 F. Supp. 2d 489, 513 (D. Del. 2010) (granting summary judgment of *no anticipation* when accused infringer did not offer expert testimony on anticipation).

Unable to leverage expert opinion, Trend's position, essentially, is that the plain reading of Townshend renders the asserted claims of the '050 Patent obvious as a matter of law. D.I. 72 at 20–21. This type of evidence cannot rise to the level of clear and convincing. *Boston Scientific*, 679 F. Supp. 2d at 551. For one thing, the parties disagree as to the scope of Townshend's disclosure, as discussed above. The parties also dispute the differences between the claimed invention and the prior art. For example, Trend baldly contends that the difference between the '050 Patent and Townshend amounts to a "trivial modification." D.I. 72 at 20. But as Dr. McDaniel described in his infringement report, the '050 Patent represents a significant advancement over conventional malware screening and provided Trend and others with the solution to one of the most serious problems they face: handling the increasing number of threats. Exh. 5, McDaniel Inf. Report (Trend), at ¶¶63–72. A jury should decide who is right.

Secondary considerations of non-obviousness, which "might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented" also weigh against summary judgment. *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007). These objective indicia <u>must</u> be considered. *See INVISTA*, 2013 WL 3196817 at *7 ("A Court is required to consider secondary considerations, or objective indicia of nonobviousness, before

reaching an obviousness determination, as a check against hindsight bias.") (internal quotations omitted). In this case, Dr. McDaniel points to several secondary considerations of non-obviousness, including long-felt need, industry acceptance, and taking of licenses by others. Exh. 1, McDaniel Validity Report at ¶¶119–127. Trend's motion ignores them.

The conflicting interpretations of Townshend, the dispute regarding Townshend's shortcomings, and Trend's failure to address secondary considerations preclude summary judgment of obviousness. *TriMed*, 608 F.3d at 1341; *Boston Scientific*, 679 F. Supp. 2d at 551; *see also MobileMedia,* 907 F. Supp. 2d at 596 (denying summary judgment of obviousness when "the parties' experts dispute whether a person of ordinary skill in the art would have found the asserted claims . . . obvious in light of [the prior art]"); *Carpenter Tech. Corp. v. Allegheny Techs. Inc*., 2011 WL 3296202, at *12 (E.D. Pa. Aug. 2, 2011) (denying summary judgment on obviousness in light of genuine disputes regarding the scope of the prior art).

B.    The Asserted Claims of the '142 Patent are Not Invalid Under the On-Sale Bar

Trend fails to meet its burden to establish, with clear and convincing evidence, that Park City Group, Inc. ("PCG") put products embodying the '142 Patent "on sale in this country" more than one year before the patent's filing. Trend's only evidence for its "on sale" defense is that PCG licensed its Gatekeeper product to Boots UK, a British pharmacy that had no operations in the United States. That license arrangement was carefully and explicitly structured to be a license executed by Boots in the UK, paid in British pounds, governed by UK law, and that limited Boots's use of the Gatekeeper product to the UK, Ireland, and the Channel Islands. Trend's motion overlooks these critical facts and misstates the legal test for the on-sale bar.

1. <u>The Gatekeeper Product was Not "On Sale in this Country" Before June 23, 1996</u>

The '142 Patent cannot be invalid under the plain language of the applicable version of 35 U.S.C. § 102(b).[1] Section 102(b) denies patent protection if:

> [T]he invention was patented or described in a printed publication in this or a foreign country or in public use or *on sale in this country*, more than one year prior to the date of the application for patent in the United States.

35 U.S.C. § 102(b) (2002) (emphasis added). The Federal Circuit has not directly addressed what it means for an invention to be offered for sale or on sale "in this country." But the plain language of §102(b) mandates that the invention must be sold, or offered to be sold, to a buyer *in the United States* more than one year before filing of the patent.[2]

It is undisputed that PCG, the original assignee of the '142 Patent, did not sell or offer to sell Gatekeeper to a buyer in the United States. PCG developed the Gatekeeper product pursuant to a Letter Agreement signed by Boots in England on October 18, 1995. Exh. 6, PARKCITY_0006236–6246 (the "Letter Agreement"). That Letter Agreement was subject to PCG's and Boots's End User License Agreement (EULA), which specified the terms under which Boots would license PCG's software. Exh. 7, PARKCITY_0006258–6264 ("▮▮▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬"). Under the EULA and Letter

---

[1] Section 102(b) was amended by the America Invents Act to remove the "in this country" limitation to the on-sale and public-use bars for applications filed after March 16, 2013. 35 U.S.C. § 102(b) (2011).

[2] *See Gandy v. Main Belting Co.*, 143 U.S. 587, 592–93 (1892) ("[W]e think it was manifestly the intention of congress that the right of the patentee to his invention should not be denied by reason of the fact that he had made use of it, or put it on sale abroad, more than two years before the application, provided it were not so used or sold in this country.").

Agreement, PCG exclusively licensed Boots to use the Gatekeeper program *only outside the United States* (once PCG finished developing the product):



Exh. 7 at 6259 (emphasis added). ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████ *Id.* at 6259, 6264. The parties' Maintenance Agreement required PCG to travel to the UK to install software and to "████████████████████████████████████████████

████ Exh. 8, PARKCITY_0006247–6257, at 6257 (Maintenance Agreement at Attachment A). In other words, the entire deal was structured so that Gatekeeper was not "sold in this country," according to the plain language of § 102(b).

2.      Gatekeeper was Not *Offered* for Sale in the U.S. Before June 23, 1996

Trend relies on the "prefatory activity" test that was created by the Ninth Circuit in *Robbins Co. v. Lawrence Manufacturing Co.*, 482 F.2d 426 (9th Cir. 1973), before the Federal Circuit existed. The Court need not apply the "prefatory activity" test because neither the Federal Circuit nor the Third Circuit have recognized it as the appropriate test for determining if an invention is "on sale in this country." The plain requirement that an invention be "on sale in this country" mandates that the invention must be sold, or offered to be sold, *to a buyer in the United States*, which never happened here.

17

But even if that were the proper test, Trend has not established by clear and convincing evidence that substantial "prefatory activity" for the Gatekeeper license happened in the U.S. before June 23, 1996.

i.      Trend Applies the Wrong Test for "Substantial Prefatory Activity"

Trend misstates the "prefatory activity" test and attempts to apply a standard that has never applied by courts in this jurisdiction. Indeed, courts in the Northern District of California—which decided Trend's principal *Monolithic* case—appear not to follow it.

Trend ignores the majority of cases and commentators by arguing that the "substantial prefatory activity" test can be satisfied "whether or not the actual sale is consummated here or an offer is made here." D.I. 72 at 21. Trend's only legal authority for that proposition is the unpublished decision in *Monolithic Power Systems, Inc. v. O2 Micro International Ltd.*, which has not been cited for its "on sale" test by a single court. 2007 WL 3231709 (N.D. Cal. Oct. 30, 2007). For good reason—*Monolithic* is directly contradicted by multiple cases—including one from this Court. Moreover, the court in *Monolithic* was <u>not</u> deciding whether an invention was on sale in this country at summary judgment. In *Monolithic*, the on-sale issues had already been tried to the jury and the Court had to defer to the jury's verdict unless "no reasonable jury could have found" on offer for sale in the U.S. *Id.* at *1-4. That situation is completely different from our case and the following cases that address on-sale issues *at summary judgment*.

In *B.F. Goodrich Co. v. Aircraft Braking System Corp.* ("*B.F. Goodrich*"), this Court held that B.F. Goodrich's ("BFG") patented inventions were not placed on sale in the U.S. when BFG made offers to Airbus and Swissair during sales presentations in Europe, but conducted the following U.S. activities related to the offer:

- BFG built and tested a full scale prototype of the invention in the U.S.
- Airbus's original request for proposal was communicated to BFG in Ohio.

- BFG generated extensive commercial, technical, and financial proposal volumes comprising hundreds of pages at its Ohio offices, which were sent to Airbus and Swissair in Europe.

- BFG fielded customer questions from its United States offices.

- Airbus and Swissair communicated with BFG in the U.S.

825 F. Supp. 65, 68-73 (D. Del. 1993). The court disregarded that the product was developed and built in the U.S. and focused instead on the location of the _sales activities_. Contrary to the decision in _Monolithic_, the court reasoned that the law surely could not require all sales activities to occur outside the U.S., because, if that were the test, then the bar would apply to virtually all international sales by U.S.-based sellers. _Id._

More recently-decided cases from the district that decided _Monolithic_ appear not to follow it. For example, _Abaxis, Inc. v. Cepheid_ further undermines _Monolithic_ and Trend's argument. 2012 WL 3255602 (N.D. Cal. Aug. 8, 2012). In _Abaxis_, the U.S.-based plaintiff executed a sales contract to sell its invention to Teramecs, a Japanese company, before the critical date. The facts are as follows:

- Abaxis developed and manufactured its invention in the United States;
- Dr. Ostoich, Abaxis's 30(b)(6) witness, could not recall where the Teramecs agreement was signed but he guessed that it was signed in the U.S. because Teramaces's President visited Abaxis's U.S. offices "very, very often."
- There was no evidence about the nature of the U.S. visits by Teramecs's President, or whether those visits involved substantial negotiations for the Teramecs agreement.
- There was no evidence about the frequency with which Abaxis's signatory to the agreement, Mr. Leute, traveled to Japan.

_Id._ at *5-8. In denying summary judgment, the court in _Abaxis_ focused on where the sales activities occurred and disregarded that Abaxis developed and manufactured the invention in the U.S. _See id._ (citing _B.F. Goodrich_). The court held that the evidence indicating that an offer was made in the U.S. or that the sales contract was signed in the U.S. did not rise to the level of "clear and convincing." _See id._

Thus, even if the Court applies the "prefatory activity" test (which improperly expands the plain text of § 102(b) and has not been adopted by the Federal Circuit), it should follow the well-reasoned opinions in *B.F. Goodrich* and *Abaxis*, instead of *Monolithic*.

        ii.    <u>Trend's Evidence Falls Well Short of Establishing "Clear and Convincing" of Substantial Prefatory Activity in the U.S.</u>

Trend cites only three pieces of evidence to support its argument that substantial prefatory activity related to PCG's license of Gatekeeper to Boots occurred in the U.S.

First, Trend misleadingly asserts that Boots made many trips to the U.S. to discuss the "business requirements, integration, and account management" of the Gatekeeper product. D.I. 72 at 22. But many of the documents that Trend cites relate to U.S. meetings *that had nothing to do with Gatekeeper*, and instead relate to other PCG products. *See id.* at 24 (citing PARKCITY_0006422–6423; PARKCITY_0007307–7314). PCG had a commercial relationship with Boots before the Gatekeeper product was discussed or was even "a gleam" in the inventors' minds. Exh. 9 (Geiger Dep. Tr. at 98:1-3). Because of that relationship, Fred Geiger (an inventor on the '142 Patent) met with Boots <u>*in England*</u> in June 1995 to discuss Boots's requirements for other products. At that meeting, Mr. Geiger came up with the term "Gatekeeper" to describe a new product that PCG could try to create and sell to Boots. *Id.* at 96:25–97:21; *see also* Exh. 10 (minutes from June 13, 1995 meeting, PARKCITY_0007175–7179). Trend's cited summary judgment evidence pre-dating that meeting could not relate to Gatekeeper because it did not yet exist. *See* D.I. 72 at 24 (citing PARKCITY_0007309–7314).

Trend's only other support for their argument that Boots discussed Gatekeeper while in the U.S. are documents describing Gatekeeper's <u>*technical product development*</u> after the Letter Agreement and EULA were executed.[3] That evidence is irrelevant because "[t]he 'substantial

---

[3] *See* D.I. 72 at 24 (citing PARKCITY_0006985–6987; PARKCITY_0006454–6456).

activity' test of *Robbins* refers to <u>*sales activity*</u>, rather than <u>*product development*</u>." *Synair Corp. v. Am. Indus. Tire, Inc.*, 1983 WL 52362 (S.D. Tex. July 30, 1983) (emphasis added).[4] Trend cannot point to a single document showing that PCG performed sales activity for the Gatekeeper license while Boots was in the U.S.[5] To the contrary, Trend simply ignores the substantial evidence indicating that (1) PCG offered to sell Gatekeeper while in England and (2) the contracts concerning Gatekeeper were signed in England. For example:

- Inventor Frederick Geiger was at Boots's UK headquarters in June 1996 to discuss Boots's software requirements when he first used the term "Gatekeeper" to describe the new product that PCG could try to create and sell to Boots. *See* Exh. 9 at 97:10–98:3, 245:16–24, 263:11–20, 304:24–305:17.

- Later that month, PCG's Jeff West traveled to Boots's UK headquarters to discuss Gatekeeper and other projects. Exh. 12 (PARKCITY_0007175–79). ██████████████████████
  ███████████████████████████████████████████████████" *Id.*

- Boots executed three agreements with PCG dated September 29, 1995: (1) the EULA, Exh. 7, (2) the Source Code Escrow Agreement, Exhibit 13, PARKCITY_0006265–77, and (3) the Maintenance Agreement, Exh. 8, PARKCITY_0006247–57. ██████████
  ████████████████████████████████████████████████████████████████████
  ████████ ██ ██ ███████████ ████████ ██████████ ████████
  █████████████

- About two weeks later, Boots executed the Letter Agreement which covers the development of the Gatekeeper product. Here again, Boots executed the agreement in the UK. Exh. 6, PARKCITY_0006236–46.

---

[4] *See also B.F. Goodrich*, 825 F. Supp. at 68–73 ("Pursuant to the holding in *Synair*, the Court will not consider the product development activities which occurred in Troy, Ohio."); *Abaxis*, 2012 WL 3255602, at *5 ("[T]his prefatory activity must be related to the offer for sale." (citing *B.F. Goodrich*)).

[5] Trend's evidence of Gatekeeper's technical development is also incomplete. For instance, Trend failed to mention that inventors Sunjay Tandon and William Wood traveled to Boots's UK headquarters to discuss a high-level overview of the user interface for the Gatekeeper product in December 1995. Exh. 11, PARKCITY_0006964. William Wood visited again in December 1996. Exh. 22, PARKCITY_0006940.

As demonstrated, the substantial prefatory activity relating to PCG's license of Gatekeeper to Boots happened in Nottingham, UK—not in the U.S.

Second, Trend points to PCG and Boots's Source Code Escrow Agreement as somehow establishing U.S. prefatory activity. The Escrow Agreement, which Boots signed in the UK, shows that *if* PCG wrote and installed a functional Gatekeeper product at Boots's UK facilities, and *if* PCG actually contracted with an escrow agent to store that code, and *if* PCG defaulted on certain obligations to support Gatekeeper under its Maintenance Agreement governed by English law and jurisdiction, *then* Boots could temporarily obtain another copy of Gatekeeper's code from that agent. Exh. 13, Source Code Escrow Agreement, at §3.1. But even then, Boots's use of the escrowed code was still subject to the confidentiality and geographic restrictions of the EULA, so the Escrow Agreement does nothing to change the license of Gatekeeper to a "sale in this country." *Id.* §§3.3 & 3.4.

Third, Trend points to a Maintenance Agreement–governed by English law and jurisdiction–that provides PCG will supply technical support and training for other PCG products: ActionBase™ and ActionForms™/ActionMail™. Exh. 8 Maintenance Agreement at Attachment A. The Agreement provides that PCG would travel to the UK to install software and to " █████████████████████████████████████ " *Id.* at §2.d. The Agreement also provides that PCG would conduct "training classes in the implementation and support of the Software" for three days "at Park City, Utah, USA., *or at other sites as agreed between Boots and PCG*." *Id.* at §2.b, 2.c., Att. A (emphasis added). Of course, no evidence exists that PCG actually held training classes for Gatekeeper in the U.S. (or if any were held at all). And even if PCG provided phone support for the Gatekeeper software from its U.S. office, such support would be irrelevant. *See B.F. Goodrich*, 825 F. Supp. at 72 (finding that

developing product in the U.S. and fielding customer questions from its U.S. office is not substantial prefatory activity in the U.S.).

The determination of whether an invention is on sale is highly fact specific. *See B.F. Goodrich*, 825 F. Supp. at 68-69. Here, Trend cannot provide clear and convincing evidence that substantial prefatory activity leading to the license of Gatekeeper happened in the U.S. And any U.S. connections to PCG's license of Gatekeeper fall far short of the "clear and convincing" connections to the U.S. that were found lacking in *B.F. Goodrich* and *Abaxis*.

C.    Fact Issues Preclude Summary Judgment of No Infringement of the '142 Patent

     1.    The Quarantines in Trend's Accused Products are Post Offices

Trend argues that its products do not infringe the '142 patent because the claims require discrete source code files for *delivering emails to* the quarantine and *receiving emails in* the quarantine. The argument is so confused, so contrived, and so convoluted that Trend dedicates over a page just to setting it up before it begins discussing evidence. To be clear, Trend is *not* arguing that its quarantines do not receive emails as required by the claims—that is indisputable because the quarantines contain emails that were processed by Trend's rule engines.[6] Instead, Trend is arguing that IV1 cannot raise a fact issue regarding infringement unless it identifies separate source code for (1) *delivering messages to* the quarantine and (2) *receiving messages in* the quarantine. Trend cites no case law to support that position,[7] and its argument fails for multiple reasons.

---

[6] Dr. McDaniel provided extensive evidence that Trend's accused products contain business rules that are applied against email messages with rule engines. Trend's non-infringement expert, Dr. Tygar, has refused to rebut that opinion. Therefore, it is undisputed that Trend's accused products have rule engines as claimed by the '142 Patent.

[7] The one case Trend does cite in this section of its motion interprets a means-plus function claim involving a mechanical spring and hinge, which is completely inapposite to the software method

First, Trend's argument finds no support in the claims themselves. There is nothing in the claims that require separate software to (1) deliver the message to and (2) receive the message in the quarantine. Claim 1 provides, in part, that the first post office will "automatically deliver" emails to the quarantine:

> [T]he distribution engine . . . automatically delivers the email message to a first destination post office . . . .

'142 Patent at 27:17-32. Claims 7, 17, 22 and 24 are similar. IV1 has provided substantial source code evidence showing how the accused products' first post office "automatically delivers" messages with a rule history and distribution list to Trend's quarantines. Exh. 5, McDaniel Inf. Report (Trend), at ¶¶128–45. The source code evidence itself satisfies the requirement that "[t]he distribution engine . . . automatically delivers the email message to a first destination post office." Trend is trying to rewrite that unambiguous claim language to say that the "[t]he distribution engine . . . automatically delivers the email message to a first destination post office [which receives the email message with separate software]."

Trend's new argument completely contradicts its sworn interrogatory responses and the opinions of its invalidity expert. In its interrogatory responses, Trend claimed that earlier versions of its ScanMail and Interscan VirusWall products anticipated each element the '142 Patent's asserted claims because they "moved" files to the quarantine. Exh. 15, Defs.' 11/21/12 Invalidity Contentions, at Exhs. 142-O & 142-N. Trend cited no source code to support that invalidity position. Likewise, Trend's invalidity expert, Dr. Rubin, opines that its ScanMail and VirusWall products anticipate the '142 Patent without citing separate source code showing how those products (1) delivered messages to the quarantine and (2) received messages in the

---

claims here. D.I. 72 at 30 (citing *Becton, Dickinson and Co. v. Tyco Healthcare Group*, 616 F.3d 1249, 1255 (Fed. Cir. 2010)).

quarantine. Exh. 16, Rubin Invalidity Report, at 372–420. Equal standards must be used for evaluating infringement and invalidity. *See, e.g., Source Search Technologies, LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009) (stating that claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses).

Second, even if Trend's interpretation of the claims is correct (which it is not), then there is still a material fact issue that precludes summary judgment. Dr. McDaniel has provided uncontested and overwhelming evidence that Trend's quarantines *are* post offices as construed by the Court because they have their own software "agent[s] for receiving, storing, and distributing email messages." D.I. 214-1 at 1; Exh. 17, McDaniel Reply Report (Trend), at ¶¶22-25. As explained in his reports, Dr. McDaniel tested Trend's accused products and demonstrated that Trend's quarantines have software allowing them to receive messages, store messages, display messages to administrators, delete messages, and distribute messages (*i.e.*, "deliver" them) to recipients based on actions selected by the administrator. *See id*. These features are shown in the screenshot below for Trend's Interscan Messaging Security Suite, for example:



*Id.* at ¶23.

Trend ignores this evidence and argues that its quarantines are merely "file directories" that are "static storage locations, not programs or other pieces of software." D.I. 72 at 30–31. That is nonsense. As demonstrated in the screenshot above and in Dr. McDaniel's reports, Trend's quarantines are not just "static" file folders on a computer's desktop. Trend's quarantines are based on software agents that enable quarantines' repositories to receive and store the email messages shown above, and they also allow administrators to delete and deliver those stored emails. Exh. 17, McDaniel Reply Report (Trend), at ¶¶22-24; Exh. 2, McDaniel Dep. Tr., at 351:19–354:3. Indeed, when discussing the screenshot of Trend's quarantine, Dr. Tygar conceded that the quarantine above is not merely static file directory because it has *software* that puts the email in the quarantine, stores the email in the quarantine, and allows administrators to release emails from the quarantine. Exh. 18, Tygar Dep. Tr., at 195:12–197:5.

After Trend's convoluted non-infringement argument is unpacked, its argument essentially is this: a software agent that receives, stores, and distributes email messages cannot be a "post office" if it uses a file directory to store email messages. That position leads to results absurd to anyone who has used an email program. Under Trend's skewed view, ***not even an Inbox in the commonly-used Microsoft Exchange email program constitutes a "post office."*** Exh. 18, Tygar Dep. Tr., at 183:20–185:18.

The Court should deny summary judgment because ample evidence demonstrates that Trend's quarantines are "post offices" under the claim construction because they have software agents allowing the quarantines to "receiv[e], stor[e], and distribut[e] email messages"and because Trend's application of the Court's construction leads to absurd results. At a minimum, the parties have conflicting views that must be resolved by a jury. *See Crown Packaging*, 635 F.3d at 1384.

>   2.    Trend's Accused Products Combine Emails with a New Distribution List and Rule History

Trend's arguments that its accused products do not combine email messages with a rule history and a new distribution list contradicts its own expert's analysis and the testimony of its witnesses.

First, Trend's accused products combine emails with their "rule history" by adding X-headers with "Rule IDs" into the emails. X-headers are custom fields that can be added to an email in addition to standard email headers, which include the "TO," "FROM," "CC," and "SUBJECT" headers. Under the Court's claim construction, a "rule history *identifies* each of the [at least one] business rule(s) whose antecedent condition was satisfied by the e-mail message." D.I.. 425 at 16. Dr. McDaniel explains in detail how Trend adds X-headers to emails that identify the particular rule that was triggered (*i.e*., "Rule ID"). Exh. 5, McDaniel Inf. Report

(Trend), at ¶¶132–38, 140–43, Exh. G.[8]  Below is a screenshot showing some X-headers for a

quarantined message, including the message's rule history:



*Id.* at App'x 4 at 16 (IMSS 7.1).  The fact that Trend's "Rule *IDs*" serve to "*identif[y]* each of the

[at least one] business rule(s) whose antecedent condition was satisfied" is so clear that Trend's

expert, Dr. Tygar, will not offer an opinion to contradict it.  Exh. 18, Tygar Dep. Tr., at 218:7–

219:8.

Trend's accused products also combine emails with their "new distribution list."  They do

so in two ways.  First, Trend's products combine emails with a new distribution list by

combining the email with the path name or location of the quarantine (i.e., address) in order to

deliver the email to the quarantine.  Exh. 2, McDaniel Dep. Tr., at 379:3–380:18, 394:16–396:12

---

[8] Exh. G to Dr. McDaniel's Infringement Report has dozens of pages that describe how Trend's accused products add X-headers with "Rule IDs" to email messages that will be quarantined. *See* Exhibit 5, McDaniel Inf. Report (Trend), at Exh. G.

& 440:9–441:16.  Second, Trend's accused products combine emails with their "new distribution list" by adding X-headers to the emails stating that the email is being sent to the "quarantine." *See* Exh. 17, McDaniel Reply Report (Trend), at ¶¶25–29.  The screenshot above labels the new distribution list as "X-imss-reprocess-type: quarantine."  In its motion, Trend asserts for the first time that it is "nonsensical" for the name "quarantine" to constitute a "new distribution list." D.I. 72 at 32.  That is a surprising position considering that Trend has *no evidence to support it*. Indeed, Trend's own non-infringement expert will not agree with it.  When asked, Dr. Tygar refused to rebut Dr. McDaniel's conclusion that Trend's quarantine X-header is a "new distribution list" under the Court's claim construction.  Exh. 18, Tygar Dep. Tr., at 252:4–20. ██

██████████████████████████████████████████████████████████████████████████

█████████████████████████

IV1 has also provided substantial evidence that, after adding Rule IDs and quarantine X-headers to emails, Trend's accused products then deliver the messages with their X-headers together to the quarantine.  Dr. McDaniel's report cites pages of explanation of source code showing this process for all accused products.  *See, e.g.,* Exh. 5, McDaniel Inf. Report (Trend), at Exh. G.  For example, Dr. McDaniel explained that Trend's accused products—like Interscan Messaging Security Suite—call a source code file██████████████████████████████████



. . . .



*Id.* at 27–29.[9]  ▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮ ▮ ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮  And Trend's statement in its motion that there is "no

evidence that the distribution list is itself stored along with the message in the quarantine

database or directory" is false. The screenshot above (which is reproduced below), displays a

message *that is in the quarantine* and shows how that message has been combined with its

quarantine X-headers.

**Appendix 4 to McDaniel Report**
**Testing: InterScan Messaging Security Suite (IMSS) Version 7.1**

==Viewing details of headers for quarantined email,== spam message, including X-headers.

![Screenshot of Trend Micro InterScan Messaging Security Suite Quarantine Query showing message details and X-headers, with "X-imss-reprocess-type: quarantine" highlighted]

---

[9] Dr. McDaniel's report also explains how Trend's accused products add numerous other X-headers, including other Rule ID headers, while processing the message. *See, e.g.*, Exh. 5, McDaniel Inf. Report, at Exh. G at 25–35.

*Id.*, App'x 4 at 16.

Accordingly, material fact issues exist as to whether Trend's accused products combine email messages with a rule history and new distribution list for delivery together to the quarantine.

### 3. ScanMail Receives Email Messages or Data Objects from Senders

Trend's argument that its ScanMail products do not infringe Claims 1, 7, and 24 of the '142 Patent belies the claims' language, misinterprets its own design documents, and contradicts the conclusions of its own expert.

First, Trend's argument that its ScanMail products must "receive e-mail messages or data objects ***directly*** from the sender," D.I. 72 at 33, finds no support in claims 1, 4, or 24. Claims 1, 7, and 24 require "a receipt mechanism that *receives* an e-mail message from a sender." Trend cannot rewrite those claims to require that the a receipt mechanism "receive[] an email message [*directly*] from a sender." Indeed, that requirement would make no sense. When an email is sent from one network to another, it can pass through multiple nodes and routers before it arrives at the intended recipient. *See* Exh. 18, Tygar Dep. Tr., at 130:12–131:10. Any of these inevitable intermediate stops would prevent the email from being received "directly" from the sender under Trend's interpretation of claims 1, 4, and 24. The fact that an email first arrives at a Microsoft Exchange server before being delivered to the ScanMail program does not prevent ScanMail from receiving the email from the sender. *See* Exh. 17, McDaniel Reply Report (Trend), at ¶¶17–19.

Second, Trend's argument that its ScanMail products do not "receive[] an e-mail message from a sender" misconstrues its own design documents. In its motion, Trend says that its design document named "SMEX 7.0 SMTP Scan Module.doc" shows that ScanMail "never receives messages from Exchange; rather, SMEX is passed a 'pointer' to a message received and stored

by Exchange." D.I. 72 at 33. To be clear, even if ScanMail retrieves a pointer from Exchange, ScanMail still "receives" the email data that is being pointed to and scans it. The pointer itself is just a reference to a memory address or a location of email data where the email's raw data resides. Indeed, the "SMEX 7.0 SMTP Scan Module.doc" design document clearly describes how the pointer is used to extract the email content from the Exchange server. Pages 14-15 of that document shows a figure in which ScanMail's software extracts the email message from the Exchange server in order to scan the message. The text along with the figure explains:



D.I. 75-37 (Trend's Exh. 37 at 14-15). There can be no doubt that ScanMail receives the email from Exchange. Here, the pointer is just a vehicle for the Exchange server to communicate the existence and location of an email to ScanMail so ScanMail can receive it in order to scan it.

Third, Trend's argument that its ScanMail products do not "receive[] an e-mail message from a sender" because they receive the emails from Microsoft Exchange or Lotus Domino mail servers contradicts the conclusions of its invalidity expert—Dr. Rubin. In his report, Dr. Rubin opines that the limitation of "receiving the e-mail message" is satisfied by U.S. Patent No. 5,832,208 ("Chen"). Dr. Rubin states that Chen contains an agent that scans messages sent from or received by mail servers using Lotus Notes or Microsoft Exchange, which is exactly how ScanMail receives emails.



Fig. 2

Exh. 16, Rubin Invalidity Report, at ¶¶782–83. Trend has created its own fact issue by taking one position for infringement purposes and the opposite position for invalidity purposes. *See, e.g., Source Search*, 588 F.3d at 1075 (stating that claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses).

Accordingly, material fact issues exist as to whether Trend's ScanMail products "receive[] an e-mail message from a sender."

4. IV1 Withdraws Claims 18 and 25 of the '142 Patent

IV1 will no longer assert Claims 18 and 25 of the '142 Patent against Trend.

D. Fact Issues Preclude Summary Judgment of No Infringement of the '610 Patent

In arguing that its products do not infringe the '610 Patent, Trend takes Dr. McDaniel's criticism of a purported prior art demonstrative and contends that it conclusively establishes that the accused products do not infringe as a matter of law. This shoddy foundation cannot support summary judgment in light of the genuine material fact issues that exist.

In his February 15, 2013 invalidity expert report, Dr. Rubin described a demonstrative of a purported prior art product, the Norton Antivirus Internet Email Gateway ("NAV-IEG"). *See*

Exh. 16, Rubin Invalidity Report, at Appx. 3. According to Dr. Rubin, he installed the NAV-IEG software on one virtual computer and standard Simple Mail Transfer Protocol ("SMTP") server software on another virtual computer "on the same virtual network as the NAV-IEG virtual machine." *Id*. at Appx. ¶4–7. Dr. Rubin claimed this demonstrative showed that NAV-IEG performed virus screening "within the telephone network." *Id*. at ¶¶258, 268.

In his rebuttal report, Dr. McDaniel criticized Dr. Rubin's demonstrative because it was completely isolated from the public Internet and thus did not reflect a real-world implementation of the products. Exh. 1, McDaniel Validity Report, at ¶44. Dr. McDaniel explained that Dr. Rubin's computers used private IP addresses that could not be accessed from the Internet, which meant that a user could not access those networks through its own Internet Service Provider. *Id*. Dr. Rubin conceded in his reply report that his demonstrative network could not be accessed from the public internet. Exh. 19, Rubin Reply Report, at ¶60 ("The demonstration used virtual computers on a private network that could not be accessed from the public Internet.").

Trend considers Dr. McDaniel's criticism of Dr. Rubin's NAV-IEG demonstrative conclusive proof that its accused products do not infringe. Trend contends that because the accused products reside on private networks, they cannot be "within the telephone network" as required by the Court's construction. This is incorrect. The Court construed "within the telephone network" to mean "in the voice or data network connecting the calling party and called party, exclusive of the networks and gateway nodes of called or calling party." D.I. 425 at 24. Dr. McDaniel points to substantial evidence from which a reasonable factfinder could conclude that Trend's accused products screen for viruses in networks and gateway nodes outside those of the calling or called party. For example, Dr. McDaniel explains in his report:

> Upon receipt of the computer data, the Accused Products perform the step of "detecting, within the telephone network, a virus in the computer data." I

understand the parties disputed the boundaries of the telephone network and asked the Court to construe this term. Under the Court's construction, Trend's Accused Products infringe because they perform virus screening outside of the calling or called party's networks. In other words, virus screening is performed "in the cloud." For example, in Trend's Hosted Email Security product, email is routed through the Hosted Email Security servers during which message filtering is performed, as shown by the "cloud" in the figure below:



TMIVA00000293; *see also id.* ("Hosted Email Security servers accept the message and perform message filtering and policy matching on your behalf."). While in the cloud, data—email in the case of Hosted Email Security—is screened for viruses and other potentially malicious files or programs. The other Accused Products also perform this detection step. *See* TMIVA0043659–60 (Figure 1-1. Email Security Platform overview); TMIVA00148412 ("Cloud Pre-Filter is a hybrid Software as a Service (SaaS) solution, where inbound email messages are routed through Trend's datacenters for scanning 'in the cloud' before they are delivered to IMSVA."). In each of the Accused Products, the data is not screened at the calling or called party's network, but within the telephone network.

Exh. 5, McDaniel Inf. Report (Trend), at ¶82. Dr. McDaniel likewise provides evidence establishing how the accused products perform the remaining steps of the claims method. *Id.* at ¶¶ 78–81, 83–94. For this reason alone, summary judgment is not appropriate. *Power Integrations*, 763 F. Supp. 2d at 684.

Moreover, Trend's motion wrongly leaves the impression that its accused products sit isolated from the public Internet, which makes them incapable of infringement. D.I. 72 at 32 ("A

private network that is outside the calling and called parties' networks and that utilizes the 10.x.x.x IP address range cannot be accessed from a public Internet connection."). False. Trend's accused products <u>are</u> connected to the public Internet and receive data from the public Internet, as the following figures demonstrate:





Exh. 5, McDaniel Inf. Report (Trend), at Exh. D at 2–3. This must be the case. If the accused products were disconnected or inaccessible from the public Internet, how would the subscribers transmit their data to Trend's accused products for screening?

The supplemental report of Trend's non-infringement expert, Dr. Tygar, demonstrates that he relies more on Dr. McDaniel's statement than on evidence or the Court's construction:



Exh. 20, Tygar Supp. Report, at ¶14.

The jury will have to decide whether the "private networks" of Trend's accused products exist "within the telephone network" as construed by the Court. It will weigh Dr. McDaniel's evidence and opinions against Trend's "private networks" argument and the opinions of Dr. Tygar. Thus, summary judgment is inappropriate for this reason, too.

Finally, there is material fact issue regarding the claimed step of "routing a call between a calling party and a called party of the telephone network." The Court construed this step to mean transmitting a voice or data transmission between a party initiating a voice or data transmission and a party receiving a voice or data transmission." D.I. 425 at 22. Dr. McDaniel opines that each of the accused products performs this step. Dr. McDaniel explains:



Exh. 5, McDaniel Inf. Report (Trend), at ¶80.

Dr. Tygar, by contrast, opines that the accused products, regardless of their location, do not perform the claimed step because, according to Dr. Tygar, none of the accused products transmit data. Exh. 21, Tygar Report, at ¶91–92. Dr. Tygar states that because "Trend Micro clients change their MX information such that messages intended for the Trend Micro customer will be addressed to a Trend Micro data center" and that "originating mail servers transmit messages" to the Trend Micro data center, and not to the called party." *Id*. at ¶92.

"[S]ummary judgment of non-infringement can only be granted if, after viewing the facts in the light most favorable to the non-movant, there is no genuine issue as to whether the accused product is covered by the claims (as construed by the court)." *Cellectis*, 2013 WL 1415609, at *7; *see also Gart*, 254 F.3d at 1339 (summary judgment appropriate only where no reasonably could find infringement). Here, several genuine issues exist as to whether the accused products infringe the '610 Patent, and Trend has not met its burden to show otherwise. Accordingly, the Court should deny Trend's request for summary judgment of no infringement of the '610 Patent.

E.    IV1 Does Not Allege that Trend Willfully Infringed

At trial, IV1 will demonstrate that Trend infringes the asserted claims of the patents-in-suit; however, IV1 does not allege that Trend willfully infringed those claims. Accordingly, Trend moves against a non-existent claim. With respect to claims actually the subject of litigation, Trend's motion concedes that Trend did <u>not</u> have pre-suit discussions with IV1 or any of the previous assignees regarding the patents-in-suit. D.I. 72 at 38. This lack of interaction confirms that Trend's affirmative defense of equitable estoppel should be dismissed on summary judgment. *See* D.I. 81, Opening Brief in Support of IV1's Motion for Partial Summary Judgment on Eight Trend Micro Affirmative Defenses, at 13–14.

F.    Trend is Not Entitled to Summary Judgment of No Damages

As discussed in IV1's Brief in Response to Trend's *Daubert* motion, incorporated herein by reference, Trend's complaints regarding Mr. Wagner's opinions and testimony lack merit. Because the Court should deny that *Daubert* motion in full and because Trend offers no other arguments, Trend is not entitled to summary judgment of no damages.

Dated: July 12, 2013                                  Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Joseph J. Farnan, III (Bar No. 3945)
Brian E. Farnan (Bar No. 4089)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com

Parker C. Folse III (admitted  *pro hac vice*)
Brooke A.M. Taylor (admitted  *pro hac vice*)
Lindsey N. Godfrey (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone:     (206) 516-3880
pfolse@susmangodfrey.com
btaylor@susmangodfrey.com
lgodfrey@susmangodfrey.com

Richard W. Hess (admitted *pro hac vice*)
Weston O'Black (admitted *pro hac vice*)
John P. Lahad (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone:     (713) 653-7859
rhess@susmangodfrey.com
woblack@susmangodfrey.com
jlahad@susmangodfrey.com

*Attorneys for Plaintiff*