# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTELLECTUAL VENTURES I LLC,      )
                                  )
            Plaintiff,            )
                                  )
      v.                          )      C.A. No. 12-1581 (LPS)
                                  )
TREND MICRO INCORPORATED, and     )
TREND MICRO, INC. (USA),          )
                                  )
            Defendants.           )

**OPENING BRIEF IN SUPPORT OF
TREND MICRO INCORPORATED AND TREND MICRO, INC. (USA)'S
MOTION FOR JUDGMENT ON THE PLEADINGS THAT THE ASSERTED
CLAIMS OF U.S. PATENT NO. 6,460,050 ARE INVALID UNDER 35 U.S.C. § 101**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
kjacobs@mnat.com
mflynn@mnat.com

*Attorneys for Trend Micro Incorporated
and Trend Micro, Inc. (USA)*

OF COUNSEL:

Yar R. Chaikovsky
D. Stuart Bartow
MCDERMOTT, WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025
(650) 815-7400

November 6, 2014

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................ii

I.     NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II.    SUMMARY OF THE ARGUMENT ............................................................................... 2

III.   STATEMENT OF FACTS ............................................................................................... 2

IV.    ARGUMENT .................................................................................................................... 4

       A.     Legal Standard ....................................................................................................... 4

              1.     Judgment on the Pleadings........................................................................... 4

              2.     Patent Ineligible Subject Matter.................................................................. 4

       B.     The '050 Patent Claims Are Invalid for Claiming Ineligible Subject Matter........ 5

              1.     The Asserted Claims Are Directed To An Abstract Idea .......................... 5

              2.     The Computer-Related Limitations of the '050 Patent Are Generic
                     and Are Not Transformative ................................................................. 12

V.     CONCLUSION................................................................................................................. 18

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Alice Corporation Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ................................................................................ *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
  No. 1:10-cv-910, 2014 WL 5430956 (E.D. Va. Oct. 24, 2014) .......................................15, 17

*Bancorp Svcs., L.L.C. v. Sun Life Assurance Co.*,
  687 F.3d 1266 (Fed. Cir. 2012).............................................................................18

*Bilski v. Kappos*,
  561 U.S. 593 (2010)......................................................................................16

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)...............................................................................4

*buySAFE Inc. v. Google, Inc*.,
  765 F.3d 135 (Fed. Cir. 2014)......................................................................1, 14, 15

*buySAFE, Inc. v. Google Inc.*,
  964 F. Supp. 2d 331 (D. Del. 2013) ........................................................................4

*Comcast IP Holdings I, LLC v. Sprint Commc'ns Co.*,
  C.A. No. 12–205–RGA, 2014 WL 3542055 (D. Del. July 16, 2014) .......................................2

*Cybersource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011)....................................................................8, 9, 11

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014)...........................................................................16

*Loyalty Conversion Systems Corp. v. American Airlines, Inc.*,
  No. 2:13-cv-00655, 2014 WL 4364848 (E.D. Tex. Sept. 3, 2014)..........................8, 9, 10, 11

*McRO, Inc. v. Sega of Am., Inc.*,
  No. CV 12-10327, 2014 WL4749601 (C.D. Cal. Sept. 22, 2014)............................................5

*MySpace, Inc. v. GraphOn Corp.*,
  672 F.3d 1250 (Fed. Cir. 2012).............................................................................17

*Planet Bingo, LLC v. VKGS LLC*,
  No. 2013-1663, 2014 WL 4195188 (Fed. Cir. Aug. 26, 2014) .........................................9, 11

*SmartGene, Inc. v. Advanced Bio. Labs., SA,*
    555 Fed. App'x. 950 (Fed. Cir. 2014)....................................................................................13

*Venetec Int'l, Inc. v. Nexus Med., LLC,*
    541 F. Supp. 2d 612 (D. Del. 2008)........................................................................................4

*Walker Digital, LLC, v. Google, Inc.,*
    C.A. No. 11-318-LPS, 2014 WL 4365245 (D. Del. Sept. 3, 2014).........................1, 15, 17, 18

*Wolf v. Capstone Photography, Inc.,*
    No. 2:13-cv-9573, D.I. 49 (C. D. Cal. Oct. 28, 2014) .......................................................10, 11

**Statutes**

35 U.S.C. § 101 ................................................................................................................ *passim*

**Other Authorities**

Federal Rule of Civil Procedure 12(c) .........................................................................................1, 4

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Defendants Trend Micro Incorporated and Trend Micro, Inc. (USA) (collectively, "Trend Micro") respectfully move pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings that the asserted claims of U.S. Patent No. 6,460,050 (the "'050 patent") are invalid because they are not directed to patent-eligible subject matter under 35 U.S.C. § 101.  Trend Micro brings this motion now in light of the Supreme Court's *Alice* decision and other recent case law applying that decision, which directly bears upon this issue and was not available when the parties filed their summary judgment motions.

Intellectual Ventures I, LLC ("IV") filed this case against four defendants, including Trend Micro, on December 8, 2010.  A *Markman* hearing was held on August 9, 2012, and the Court issued a claim construction order on December 12, 2012.  D.I. 426 (C.A. No. 10-1067). Thereafter, IV dropped one of the four patents asserted against Trend Micro.  The Court granted Trend Micro's motion to be severed from the other defendants.  D.I. 1 (C.A. No. 12-1581).

The Court held a hearing on summary judgment and *Daubert* motions on August 29, 2013, and issued an order regarding the motions on March 31, 2014.  D.I. 573, 574 (C.A. No. 10-1067).  Following that order, on June 19, 2014, the Supreme Court issued its opinion in *Alice Corporation Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), which addressed the standard for patentability of computer-implemented abstract ideas.

The first pretrial exchange between the parties is set for February 20, 2015, with the pretrial conference on April 24, 2015.  D.I. 155.  Trial is scheduled to begin May 11, 2015.[1]  *Id.*

---

[1]     Trend Micro's subject matter eligibility defenses and claims, which present questions of law, will need to be decided by the Court at some point during these proceedings.  Given the significant impact resolution of this issue for the '050 patent would have on further proceedings in the case, and in view of the centrality of that patent to this case, Trend Micro believes it would be most efficient to address the eligibility issue for the '050 patent at this time.

## II.    SUMMARY OF THE ARGUMENT

In *Alice*, the Supreme Court unanimously held that generic computer implementation of an abstract idea—even where particular hardware and software elements are recited—is insufficient to transform that abstract idea into a patent-eligible invention.  134 S. Ct. at 2357-58.  *Alice* and its progeny issuing from various courts—including this Court—demonstrate that the claims of the '050 patent asserted in this litigation are ineligible for patent protection.  *See buySAFE Inc. v. Google, Inc*., 765 F.3d 1350 (Fed. Cir. 2014); *Walker Digital, LLC, v. Google, Inc.*, C.A. No. 11-318-LPS, 2014 WL 4365245 (D. Del. Sept. 3, 2014); *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co*., C.A. No. 12–205–RGA, 2014 WL 3542055 (D. Del. July 16, 2014).  These claims should be held invalid as a matter of law and dismissed from the case.

The asserted claims of the '050 patent are directed to the abstract idea of receiving an "identifier" for an item, matching that identifier against previously-received identifiers to ascertain something about (*i.e.*, a characteristic of) the item, and outputting a result based on that matching.  This abstract idea is not patent eligible under 35 U.S.C. § 101.  The claims add no inventive concepts that could confer patent-eligibility, but rather merely recite conventional computer elements used to implement the abstract idea.  That is not enough to save these claims from being held invalid.  *See Alice*, 134 S. Ct. at 2357 ("A claim that recites an abstract idea must include 'additional features' to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea.") (internal quotes omitted).  The asserted claims of the '050 patent are unpatentable, and should be held invalid as a matter of law.

## III.    STATEMENT OF FACTS

This motion is concerned with one of three patents as to which IV alleges infringement.  U.S. Patent Number 6,460,050 ("the '050 patent"), entitled "Distributed Content Identification System," is directed to methods for "identifying a characteristic of a data file."  Ex. 1,

'050 patent, at Abstract.  The claimed methods therein involve receiving an identifier for a data

file, matching it against previously-received identifiers to ascertain a characteristic of the data

file, and outputting a result.  *Id.* at col. 2:22-56.  Figure 2 of the '050 patent (depicted below)

shows the basic structure for the system associated with the claimed methods:



FIG. 2

In brief, each identifier ("Digital ID") received at Second Tier Systems 30 is matched against

previously-received identifiers.  A "Reply" is output as a result of the matching.

IV asserts claims 9, 13, 16, 22, and 24—all method claims—in this lawsuit.  Claim 9,

which is exemplary, recites:

> 9.   A method for identifying characteristics of data files, comprising:
>
> receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network,
>
> determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers; and
>
> outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining.

Ex. 1, '050 patent, at col. 8:13-27.  Claims 16 and 22 are similar to claim 9, and the variations in

claim language between these independent claims do not bear upon the Section 101 analysis.

The asserted dependent claims (13 and 24) add limitations specifically requiring a "data file" to

3

be an email message, and the "characteristic of the data file" to be whether the email is "spam." These additional limitations likewise do not impact the analysis under Section 101.

## IV.   ARGUMENT

### A.   Legal Standard

#### 1.   Judgment on the Pleadings

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c); *see also buySAFE, Inc. v. Google Inc.*, 964 F. Supp. 2d 331, 334 (D. Del. 2013). Further, "a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial." Fed. R. Civ. P. 12(i).

The "purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 617 (D. Del. 2008); *see also In re Burlington Coat Factory Sec. Litig.*, 114 .3d 1410, 1426 (3d Cir. 1997) (stating that any documents integral to the pleadings may be considered in connection with a Rule 12(c) motion).

Both criteria set forth in Rule 12(c) are met here: the pleadings are closed and this motion is early enough not to delay the trial scheduled for next May. Moreover, this motion may streamline trial proceedings significantly, or perhaps even obviate the need for any trial at all, given that the '050 patent comprises 95% of IV's damages claim against Trend Micro.

#### 2.   Patent Ineligible Subject Matter

Pursuant to 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

4

However, "laws of nature, physical phenomena, and abstract ideas" are not eligible for patent protection. *Alice*, 134 S. Ct. at 2354.

In *Alice*, the Supreme Court held that abstract ideas performed by generic computer components are not eligible for patent protection. Specifically, the Court held that "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358; *see also McRO, Inc. v. Sega of Am., Inc.*, No. CV 12-10327, 2014 WL 4749601 at *5 (C.D. Cal. Sept. 22, 2014) ("*Alice* did categorically establish a clear rule that had previously been subject to debate," namely, that mere recitation of generic computer elements does not confer patentability.).

In *Alice*, the Supreme Court set forth a two-step analysis for determining eligibility for computer-implemented methods. First, the court must determine whether the claims are directed to an abstract idea. 134 S. Ct. at 2355. If they are, the court must then determine whether the computer-related limitations in each claim "transform the nature of the claim" into a patent-eligible invention. *Id.* at 2357. The Supreme Court described this second step as the search for an "inventive concept," *i.e.*, "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [idea] itself." *Id.* at 2355 (internal quotes omitted).

**B.   The '050 Patent Claims Are Invalid for Claiming Ineligible Subject Matter**

1.   The Asserted Claims Are Directed To An Abstract Idea

All of the claims of the '050 patent asserted against Trend Micro are drafted such that the method steps (*e.g.*, receiving, determining, outputting) are performed by the Second Tier Systems 30, shown in the box at the right-hand side of Figure 2 (excerpted below):

5



Identifiers for computer files ("Digital IDs") are received at the Second Tier Systems 30 from multiple sources (*i.e.*, computers on the network). There, they are matched against previously-received identifiers to ascertain something about *(i.e.*, a characteristic of) the computer file. Based on the result of the matching step, Second Tier Systems 30 output a "Reply" including an indication of the characteristic of the computer file.

In greater detail, by way of example, the '050 patent describes receiving an email at a first-tier email server on the network. *See* Ex. 1, '050 patent, Figs. 1, 2. The receiving email server generates an identifier for the email using a mathematical algorithm, such as a hash. *Id.* at col. 3:65-4:14. The email server then sends the identifier over the network to the second tier server. *Id.* at col. 4:35-40. The second tier server receives the identifier, and then compares that identifier to other, previously-received identifiers stored at the second tier. *Id.* at col. 7:18-23. In particular, the second tier server computes the frequency with which the identifier has been received—that is, the server counts the number of times this email has been received. *Id.* at col. 6:2-5; claims 14, 20. The second tier system replies to the first tier email server with an indication of a characteristic of the computer file, such as the frequency with which the email has been received, or possibly other characteristics. *Id.* at col. 7:28-31 ("the algorithm for processing digital identifiers and the data store. . . can be adjusted to look for ***other characteristics*** of the message or data which is being tested ***besides frequency.***" (emphasis added)).

When the generic computer-related limitations in the claims are filtered out, all that remains is the abstract idea of receiving an identifier for an item, matching it against previously-

received identifiers to ascertain something about (*i.e.*, a characteristic of) the item, and outputting a result based on the matching step.   The following chart demonstrates that each of the three asserted independent claims (9, 16, and 22) recites the same abstract idea:

| Asserted Independent Claims (9, 16, 22) Without Computer-Related Elements | Abstract Idea |
|---|---|
| A method for<br>(9) "identifying characteristics []"<br>(16) "filtering []"<br>(22) "providing a service []"<br>comprising: | Preamble |
| (9) "receiving [] identifiers [] from a plurality of [] agents []"<br>(16) "receiving [] a[n] [] identifier [] from at least two of a plurality of [] agents"<br>(22) "collecting data [] from a plurality of systems []" | receive an identifier for an item; |
| (9) "determining [] whether each received [] identifier matches a characteristic of other identifiers"<br>(16) "comparing [] the [] identifier to identifiers received from said plurality [] to determine whether the message has a characteristic"<br>(22) "characterizing [] based on said [] identifiers received relative to other identifiers collected []" | match the identifier against previously-received identifiers to ascertain something about (*i.e.*, a characteristic of) the item; and |
| (9) "outputting [] responsive to a request [] an indication of the characteristic [] based on said step of determining"<br>(16) "responding to a query from at least one of said plurality [] to identify the existence or absence of said characteristic [] based on said comparing"<br>(22) "transmitting a substance identifier [] indicating the presence or absence of a characteristic []" | output a result (*e.g.*, an indication of the characteristic including whether the characteristic exists). |

Such steps as those described above can be performed purely mentally, with pencil and paper, or by simple verbal interaction between humans.

In the following illustration of manual performance of the abstract idea, a car's license plate number is used as an identifier for that car:

| Abstract Idea | Abstract Idea Performed By A Human |
|---|---|
| Preamble | |
| receive an identifier for an item; | A parking enforcement dispatcher receives a radio call from one of five parking officers asking whether the car having license plate number "123456" was issued any parking tickets in the past month. |
| match the identifier against previously-received identifiers to ascertain something about (*i.e.*, a characteristic of) the item; and | The dispatcher looks down a list of all license plate numbers ticketed by any of the five parking officers in the past month, and finds that "123456" was ticketed three times during that period. |
| output a result (*e.g.*, an indication of the characteristic including whether the characteristic exists). | The dispatcher replies, "That car was ticketed three times in the past month." |

Claims that can be performed by human thought alone are abstract ideas and are unpatentable. *See Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) ("[A] method that can be performed by human thought alone is merely an abstract idea and is not patent-eligible under § 101."); *see also Loyalty Conversion Systems Corp. v. American Airlines, Inc.*, No. 2:13-cv-00655, 2014 WL 4364848 at *10 (E.D. Tex. Sept. 3, 2014) ("As confirmation of the simplicity of the functions that the claims assign to computers, it is

8

clear that each of the functions recited in the asserted claims . . . could be performed by a human being without the aid of a computer of any kind.").

In *Cybersource*, the Federal Circuit reviewed claims directed to "obtaining credit card information relating to [consumer] transactions," "verifying the credit card information . . . . based upon parameters . . . that may provide an indication whether the transaction is fraudulent," "constructing a map of credit card numbers," and then "utilizing the map of credit card numbers to determine if the credit card transaction is valid."  654 F.3d at 1368.  The claims were held invalid because all of the claimed steps could be performed in the human mind.  *Id.* at 1376. Under the same reasoning, the asserted claims of the '050 patent—which are directed to receiving an identifier for an item (*compare with* "obtaining credit card information relating to [consumer] transactions"), matching that identifier against other previously-received identifiers to ascertain a characteristic of the item (*compare with* "utilizing the map of credit card numbers to determine if the credit card transaction is valid"), and outputting an indication of the characteristic (*compare with* "verifying the credit card information…based upon parameters…that may provide an indication whether the transaction is fraudulent")—can be performed solely in the human mind, and are thus directed to an abstract idea.

In *Planet Bingo v. VKGS*, the Federal Circuit reviewed claims directed to "selecting, storing, and retrieving two sets of numbers, assigning a player identifier and a control number, and then comparing a winning set of bingo numbers with a selected set of bingo numbers." *Planet Bingo, LLC v. VKGS LLC*, No. 2013-1663, 2014 WL 4195188 at *2 (Fed. Cir. Aug. 26, 2014).  Such claims were held to be abstract, as not only could they be "carried out in existing computers long in use, but they also can be done mentally."  *Id*. (internal quotes omitted).

Similarly, in *Loyalty Conversion Systems*, Federal Circuit Judge Bryson, sitting by designation in the Eastern District of Texas, considered claims regarding conversion of loyalty award credits and online purchasing. 2014 WL 4364848 at *6-7. The claims recited "basic functions of a generic computer, including storing and displaying information, performing simple arithmetic calculations, and enabling a customer to make e-commerce purchases from a vendor." *Id*. The court held the claims invalid, reasoning that "it [was] clear that each of the functions recited in the asserted claims . . . could be performed by a human being without the aid of a computer of any kind." *Id*. at *9.

Finally, *Wolf v. Capstone Photography* is yet another case in which the district court considered and held invalid claims similar to the claims of the '050 patent. Ex. 2, *Wolf v. Capstone Photography, Inc.*, No. 2:13-cv-9573, D.I. 49 (C. D. Cal. Oct. 28, 2014). The claims at issue in *Wolf* were directed to cataloging photos of sporting event participants—such as marathon runners—on a central web server, so that such participants could search for their photos using identifying information (*e.g.*, by the number of the bib they wore during the race), and then download their photos. *See id*. at 2-5. The claims variously recited steps such as "associating identifying data [such as bib number] with each photograph taken []," "transferring the photographs to a computer network server," "cataloging each of the photographs in a web-site server according to identifying data," "storing the photographs in a database," "accessing the server [or database] and searching for a photograph [] utilizing the identifying data," "associating visual advertiser indicia [with the photograph]" and "transferring the selected photograph [] with advertiser indicia to a requestor." *Id*. The court held such steps to constitute an abstract idea, and ultimately held the claims invalid. *Id*. at 17-25.

As the *Wolf* court observed:

> [I]n the pre-internet days, an event photographer could have identified race participants in photographs by bib number, approximate time, or other identifying information and, instead of mailing thumbnail images to each participant, could have placed a physical catalog of images in a certain location—say, at a local running or photography store. This would be the analog equivalent of plaintiff's claimed process, done painstakingly with pen, paper, and similarly low-tech tools. And it would have been an abstract idea. That generic computer technology allows for a more efficient process does not confer patentability.

*Id.* at 23.

Here, the steps of "determining" characteristics of computer files, or "characterizing" them by comparing their identifiers, are similar to the simple input, comparison and output steps in *Cybersource*, *Planet Bingo*, *Loyalty Conversion Systems*, and *Wolf* that were held to be insufficient to confer patentability. The asserted claims in this case are no more directed to patentable subject matter than the claims in those cases that were held to be invalid.

The '050 patent itself confirms that the purported "inventions" claimed therein are merely generic implementations of an abstract idea. The '050 patent states the inventions are intended to identify "characteristics of data files." Ex. 1, '050 patent, at col. 2:37-38. This includes, for example, the frequency with which a file has been received, which indicates whether it is "spam." *Id.* at col. 6:2-8; col. 7:28-31; claims 8, 14. Although the '050 patent purportedly provides the benefit of identifying a file as spam based solely on its frequency of receipt, thus eliminating the need to examine the *contents* of the file (by heuristic or human analysis), *see id.* at col. 1:30-48, the claims still comprise no more than simple steps a human could perform.

In sum, the '050 patent claims are directed to the abstract idea of receiving an identifier for an item, matching it against previously-received identifiers to ascertain something about (*i.e.*, characteristic of) the item, and outputting a result. And, as discussed in detail below, the

addition of generic computer-related limitations does not transform this abstract idea into a patentable invention under *Alice*.

      2.      The Computer-Related Limitations of the '050 Patent Are Generic and Are Not Transformative

In *Alice*, the Supreme Court held that computer-related patents claiming an abstract idea must include an "inventive concept" sufficient to "transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. Simply adding conventional computer processing steps to perform the abstract idea is insufficient to yield patent-eligibility. *See id*. For example, in *Alice*, the claims at issue related to a computerized method for mitigating settlement risk, in which an intermediary creates "shadow" credit and debit records that mirror balances in the parties' real-world accounts. *Id*. at 2352. The intermediary only updates the shadow records when sufficient resources are available to meet the obligations. *Id*. At the end of the day, the intermediary instructs the financial institutions to carry out the approved transactions. *Id*.

The Supreme Court determined that the claims did no more than instruct the practitioner to implement the abstract idea of intermediated settlement on a generic computer. *Id*. at 2359. Using a computer to create the records and maintain the shadow accounts was considered "purely conventional." *Id*. The same was true with respect to the functions of obtaining data, adjusting account balances, and issuing instructions to the financial institutions after analysis. *Id*. "[A]ll of these computer functions are well-understood, routine, conventional activities previously known to the industry." *Id*. (internal quotations omitted). Because the computer-related limitations did not add an inventive concept, the claims were held invalid. *Id*. at 2360.

Although the claims here recite computer-related limitations, such as "processing system," "server," "database," "agent", "algorithm" and "network," these are merely generic computer processing elements. They are used in a completely conventional way to perform

entirely conventional, well-understood functions.  Nothing in these limitations adds an inventive concept to the abstract idea.

A summary of the computer-related elements in the asserted claims is provided in the chart below:

| Abstract Idea | Added computer-related concepts |
| --- | --- |
| Preamble | |
| receive an identifier for an item; | 1) identifiers are received on a computer, from multiple other computers, over a computer network<br><br>2) identifiers are generated on a computer using any algorithm |
| match the identifier against previously-received identifiers to ascertain something about (*i.e.*, a characteristic of) the item; and | 3) identifiers are compared using a database lookup or similar computer storage feature |
| output a result (*e.g.*, an indication of the characteristic including whether the characteristic exists). | 4) a result based on the matching step is output over the computer network |

The Supreme Court has held that the inclusion of well-understood, conventional activity does not transform an unpatentable abstract idea into a patent-eligible application.  *See, e.g., Alice*, 134 S. Ct. at 2357-58 ("Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." (citations and brackets omitted)).  Similarly, the Federal Circuit has found unpatentable computer-related claims reciting "routine input, memory, look-up, comparison, and output

capabilities." *SmartGene, Inc. v. Advanced Bio. Labs., SA*, 555 Fed. App'x. 950, 951 (Fed. Cir. 2014).  The claims of the '050 patent recite nothing more than such routine processing.

IV may try to argue that generic features such as "via a network" or "on the Internet"; "on a processing system," "on the first computer," "on the server system"; "using a mathematical algorithm"; or "database" or "characteristic database"—taken either individually or in the aggregate—provide sufficient inventiveness to establish patentability.  *Alice* and other cases confirm that such an argument has no merit.  *See Alice*, 134 S. Ct. at 2357-58 (inclusion of generic computer implementation does not make an abstract idea patentable); *buySAFE Inc. v. Google, Inc.*, 765 F.3d at 1355 (same); Ex. 2, *Wolf*, at 20 ("[T]hese [dependent] claims simply incorporate various conventional (and alternative) methods of identifying race participants.  They do not significantly limit the claims, leaving other viable applications of the abstract idea to event photography, and they do not 'improve the functioning of' any incorporated technology.").

> a.        "receiving . . . via a network" / "files on the Internet"

The requirement that the method steps be performed over a generic computer network does nothing to make the abstract idea patentable.  *Alice*, 132 S. Ct. at 2359 (characterizing "the use of a computer to obtain data" as a well-understood, routine, conventional activity previously known to the industry).  As the Federal Circuit reasoned in *buySAFE*:

> The computer functionality is generic—indeed, quite limited:  a computer receives a request for a guarantee and transmits and offer of guarantee in return.  There is no further detail.  **That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.**

765 F.3d at 1355 (emphasis added).  Such is the case here as well, where mere receipt of an input and output of a result are recited.

As yet another example, in *Comcast*, the claims-in-suit included steps of receiving a request from an application over a telephony network.  2014 WL 3542055, at *5.  The court

determined that the steps could be performed manually, and therefore were unpatentable.  The court further noted, however, that even if it were to assume that (1) the claimed method had to be performed on a computerized telephony network; (2) a computer application made the request, and (3) a computer handled and responded to the request, the claim was still unpatentable because it "merely cover[ed] the application of what has for a long time been conducted solely in the mind."  *Id*.; *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 1:10-cv-910, 2014 WL 5430956 at *8 (E.D. Va. Oct. 24, 2014) ("Collecting, filtering, aggregating, and completing network information amounts to 'electronic recordkeeping,' which is 'one of the most basic functions of a computer.'" (quoting *Alice*, 134 S. Ct. at 2359)).

Further, as this Court has noted, "to be 'a meaningful limit on the scope of a claim,' the addition of a computer 'must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly.'"  *Walker Digital*, 2014 WL 4365245 at *3 (quoting *Cybersource*, 654 F.3d at 1375).  In *Walker Digital*, the patent claims required "receiving" and "storing" information prior to processing.  *Id*. at *4.  As this Court found, "these additional steps again add no inventive element to the mental processes claimed by the . . . patent."  *Id*. at *6.

Indeed, the steps of receiving an identifier and outputting a reply over a network comprise entirely conventional, well-understood steps that do not support patentability for this abstract idea.  *See Alice*, 134 S. Ct. at 2358.  As in *Alice* and the other cases cited above, neither of these limitations adds any inventive concept to the abstract idea.

b.    "processing system" / "computer" / "server system"

The asserted claims of the '050 patent recite the use of a "processing system" for receiving identifiers and comparing them.  *See* '050 patent, claims 9, 22.  Claim 16 recites a "second computer" for performing similar steps.  *Id*., claim 16.  Claim 22 further recites a

"server system" for storing and characterizing.  Such generic components do not transform the abstract idea into patentable subject matter.

In *Alice*, the claims at issue recited a "data processing system," with a "communications controller" and "data storage unit."  As the Supreme Court observed, "[n]early every computer will include a 'communications controller' and 'data storage unit' capable of performing the basic calculation, storage, and transmission functions required by the method claims."  *Alice*, 134 S. Ct. at 2360.  The generic "processing system" recited in the '050 patent claims is no more distinctive than in *Alice*.  The claims convey only that the processing system receives the identifiers, performs a comparison with stored identifiers (*i.e.*, performs a lookup), and provides an output.  These are basic functions of a generic computer, and add no inventive concept.[2]

c.      "mathematical algorithm"

Each of the asserted claims recites the use of a "mathematical algorithm" to create the content identifiers.  *See, e.g.*, Ex. 1, '050 patent, at claims 9, 16, and 22.  This limitation, too, is insufficient to confer patentability.  A "mathematical algorithm" could be as simple as counting the number of words in the file, or swapping letters for numbers.  The '050 does not rely on any particular algorithm or process which even arguably imparts an inventive concept.  *See Bilski v. Kappos*, 561 U.S. 593, 599 (2010) (even recitation of specific mathematical algorithm does not confer patentability for an abstract idea); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is

---

[2]      The recitations of "file content identifier generator agents" (claim 9) and "client agent" (claim 22) simply describe generic functions performed by the computer or processing system.  *See, e.g.*, the Court's construction of "file content identifier generator agent(s)" as "software running on a computer that creates and transmits file content identifiers to a second tier system."  D.I. 426 at 2.  Neither term identifies specific computer equipment or particular software, or provides any inventive aspect to the performance of the claims.

not patent eligible."). The detailed description in the '050 patent states that, generally, "any hashing algorithm can be utilized." Ex. 1, '050 patent, at col. 3:65-4:3. Moreover, use of a hashing algorithm (*e.g.*, MD5) to identify the contents of a computer file is admitted prior art, so that is not inventive, either. *Id.* at col. 3:65-4:14. Thus, there is nothing inventive about the use of an unspecified "mathematical algorithm."[3] This limitation, too, supplies no inventive concept.

d.      "characteristic database" / "database"

Certain asserted claims of the '050 patent recite the use of a "database" or "characteristic database" to store the received identifiers. *See* Ex. 1, '050 patent, at claims 16, 22. This computer-related element is also insignificant to patent-eligibility. First, the use of a database for storage is no more inventive a concept than the use of a file cabinet for storage. *Walker Digital,* 2014 WL 4365245 at *8 (observing that "secure database" could indicate nothing more than a locked file-cabinet); *see also MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1255, 1257 (Fed. Cir. 2012) (stating a "database" means "a collection of data within a given structure that can be stored and retrieved," including a paper filing cabinet).

Second, as *Alice* and its progeny demonstrate, computer storage and lookup elements are entirely conventional. *See Alice*, 134 S. Ct. at 2360. Indeed, "storing and querying information in a database, and building reports based on that information, is one of the most basic functions of a computer." *Amdocs*, 2014 WL 5430956 at *8. Thus, reciting a computer storage element such as a database does nothing to transform the abstract idea into patentable subject matter.

e.      Purported advantages of computers over humans

Finally, even assuming that the use of a computer processor to match content identifiers enhanced speed or confidentiality over a human's performance of the claims, the Supreme Court,

---

[3]      *See also Walker Digital*, 2014 WL 4365245 at *8 (recitation of a cryptographic key insufficient to confer patentability).

the Federal Circuit and this Court all have found that such advantages do not serve to transform an abstract idea into a valid patent claim. *See Alice*, 134 S. Ct. at 2359 (referring to "electronic recordkeeping" as "one of the most basic functions of a computer"); *Bancorp Svcs., L.L.C. v. Sun Life Assurance Co.*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible."); *Walker Digital*, 2014 WL 4365245, at *6 ("Even accepting that the use of a computer increases speed and efficiency of performing the steps of the claims, and improves the likelihood of preserving the anonymity of the first and second parties, these characteristics do not save the claims.").

\* \* \* \*

In short, the conventional, generic computer-related limitations in the asserted claims of the '050 patent do not transform the abstract idea of receiving an identifier for an item, matching that identifier against previously-received identifiers to ascertain something about (*i.e.*, a characteristic of) the item, and outputting a result (*e.g.*, an indication of the characteristic including whether the characteristic exists), into patent-eligible subject matter.

## V.      <u>CONCLUSION</u>

Because the asserted claims of the '050 patent are directed to an abstract idea, and because the added computer-related limitations are merely generic and do not add an inventive concept beyond the abstract idea itself, the '050 patent is not eligible for patent protection. For these reasons, Trend Micro's motion should be granted and the '050 patent held invalid for failing to claim patent-eligible subject matter pursuant to 35 U.S.C. § 101.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
kjacobs@mnat.com
mflynn@mnat.com

*Attorneys for Trend Micro Incorporated*
*and Trend Micro, Inc. (USA)*

OF COUNSEL:

Yar R. Chaikovsky
D. Stuart Bartow
MCDERMOTT, WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025
(650) 815-7400

November 6, 2014

8642277.1

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-1581 (LPS) |
| | ) | |
| TREND MICRO INCORPORATED, and | ) | |
| TREND MICRO, INC. (USA), | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF MICHAEL J. FLYNN IN SUPPORT OF
TREND MICRO INCORPORATED AND TREND MICRO, INC. (USA)'S
MOTION FOR JUDGMENT ON THE PLEADINGS THAT THE ASSERTED CLAIMS
OF U.S. PATENT NO. 6,460,050 ARE INVALID UNDER 35 U.S.C. § 101**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
kjacobs@mnat.com
mflynn@mnat.com

*Attorneys for Trend Micro Incorporated
and Trend Micro, Inc. (USA)*

OF COUNSEL:

Yar R. Chaikovsky
D. Stuart Bartow
MCDERMOTT, WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025
(650) 815-7400

November 6, 2014

I, Michael J. Flynn, declare as follows:

1.      I am an attorney duly licensed to practice law in the State of Delaware and am a member of the bar of this Court.  I am an attorney with Morris, Nichols, Arsht and Tunnel LLP, counsel for Defendants Trend Micro Incorporated and Trend Micro, Inc. (USA). I have knowledge of the following and, if called as a witness, could and would testify competently to the contents of this declaration.

2.      Attached as **Exhibit 1** is a true and correct copy of U.S. Patent No. 6,460,050.

3.      Attached as **Exhibit 2** is a true and correct copy of *Wolf v. Capstone Photography, Inc.,* No. 2:13-cv-9573, D.I. No. 49 (C.D. Cal. Oct. 28, 2014).

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and ability.  Executed on November 6, 2014 in Wilmington, Delaware.

Michael J. Flynn

8644825

# EXHIBIT 1

US006460050B1

(12) **United States Patent**
Pace et al.

(10) Patent No.: **US 6,460,050 B1**
(45) **Date of Patent:** Oct. 1, 2002

(54) **DISTRIBUTED CONTENT IDENTIFICATION SYSTEM**

(76) Inventors: **Mark Raymond Pace**, 42 15th Ave., San Mateo, CA (US) 94402; **Brooks Cash Talley**, 40 15th Ave., San Mateo, CA (US) 94402

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/469,567**

(22) Filed: **Dec. 22, 1999**

(51) Int. Cl.[7] .......................... **G06F 17/00**; G06F 15/16
(52) U.S. Cl. ..................... **707/104.1**; 707/10; 709/203; 709/206
(58) Field of Search .............................. 707/9, 6, 104, 707/7, 10, 104.1; 709/201, 202, 204, 225, 203, 206

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,465,353 A | * | 11/1995 | Hull et al. | ..................... | 707/5 |
| 5,515,513 A | * | 5/1996 | Metzger et al. | ............. | 709/249 |
| 5,619,648 A | * | 4/1997 | Canale et al. | ............... | 709/206 |
| 5,884,033 A | * | 3/1999 | Duvall et al. | ............... | 709/206 |
| 5,999,932 A | * | 12/1999 | Paul | ............................. | 707/10 |
| 6,052,709 A | * | 4/2000 | Paul | ............................. | 709/202 |
| 6,044,487 A | * | 7/2000 | Butler et al. | ............... | 380/270 |
| 6,144,934 A | * | 11/2000 | Stockwell et al. | ............. | 704/1 |
| 6,167,457 A | * | 12/2000 | Fidson et al. | ............... | 709/328 |
| 6,178,417 B1 | * | 1/2001 | Syeda-Mahmood | ............ | 707/3 |
| 6,189,026 B1 | * | 2/2001 | Birrell et al. | ............... | 709/206 |
| 6,195,698 B1 | * | 2/2001 | Lillibridge et al. | ......... | 709/225 |
| 6,199,081 B1 | * | 3/2001 | Meyerzon et al. | .......... | 707/513 |
| 6,199,102 B1 | * | 3/2001 | Cobb | ........................... | 709/206 |
| 6,249,805 B1 | * | 6/2001 | Fleming, III | ................ | 709/206 |
| 6,310,966 B1 | * | 10/2001 | Dulude et al. | .............. | 382/115 |

| | | | | | |
|---|---|---|---|---|---|
| 6,321,267 B1 | * | 11/2001 | Donaldson | .................. | 709/229 |
| 6,330,590 B1 | | 12/2001 | Cotten | | |

OTHER PUBLICATIONS

Gary Boone "Concept features in Re:Agent, an intelligent email agent", Autonomous Agents 1998, pp. 141–148.*
Robert J. Hall "How to avoid unwanted email", ACM 1998, pp. 88–95.*
Cranor et al. "Spam!", ACM 1998, pp. 74–83.*
Chang et al "Knowledge–based message management system", ACM 1987, pp. 213–236.*
Ding et al "Centralized content–based web filtering and blocking: how far can it go?", IEEE 1999, pp. 115–119.*
Distributed Checksum Clearinghouse, various such pages from www.rhyolite.com/anti spam/dcc, Dec. 7, 2001.
Vipul's Razor, version such pages from razor.sourceforge.net printed Dec. 19, 2001.

* cited by examiner

Primary Examiner—Safet Metjahic
Assistant Examiner—Uyen Le
(74) Attorney, Agent, or Firm—Vierra Magen Marcus Harmon & DeNiro LLP

(57) **ABSTRACT**

A file content classification system includes a digital ID generator and an ID appearance database coupled to receive IDs from the ID generator. The system further includes a characteristic comparison routine identifying the file as having a characteristic based on ID appearance in the appearance database. In a further aspect, a method for identifying a characteristic of a data file comprises the steps of: generating a digital identifier for the data file and forwarding the identifier to a processing system; determining whether the forwarded identifier matches a characteristic of other identifiers; and processing the data file based on said step of determination.

**25 Claims, 2 Drawing Sheets**





FIG. 1

FIG. 2

FIG. 3

U.S. Patent

Oct. 1, 2002

Sheet 2 of 2

US 6,460,050 B1



FIG. 4

**1**

# DISTRIBUTED CONTENT IDENTIFICATION SYSTEM

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to the field of content identification for files on a network.

2. Description of the Related Art

With the proliferation and growth of the Internet, content transfer between systems on both public and private networks has increased exponentially. While the Internet has brought a good deal of information to a large number of people in a relatively inexpensive manner, this proliferation has certain downsides. One such downside, associated with the growth of e-mail in particular, is generally referred to as "spam" e-mail. Spam e-mail is unsolicited e-mail which is usually sent out in large volumes over a short period of time with the intent of inducing the recipient into availing themselves of sales opportunities or "get rich quick" schemes.

To rid themselves of spam, users may resort to a number of techniques. The most common is simple filtering using e-mail filtering which is built into e-mail client programs. In this type of filtering, the user will set up filters based on specific words, subject lines, source addresses, senders or other variables, and the e-mail client will process the incoming e-mail when it is received, or at the server level, and take some action depending upon the manner in which the filter is defined.

More elaborate e-mail filtering services have been established where, for a nominal fee, off-site filtering will be performed at a remote site. In one system, e-mails are forwarded offsite to a service provider and the automatic filtering occurs at the provider's location based on heuristics which are updated by the service provider. In other systems, offsite filtering occurs using actual people to read through e-mails and judge whether e-mail is spam or not. Other systems are hybrids, where heuristics are used and, periodically, real people review e-mails which are forwarded to the service to determine whether the e-mail constitutes "spam" within the aforementioned definition. In these hybrid services, personal reviews occur on a random basis and hence constitute only a spot check of the entire volume of e-mail which is received by the service. In systems where real people review e-mails, confidentiality issues arise since e-mails are reviewed by a third party who may or may not be under an obligation of confidentiality to the sender or recipient of the e-mail.

In addition, forwarding the entire e-mail including attachments to an outside service represents a high bandwidth issue since effectively this increases the bandwidth for a particular e-mail by three times: once for the initial transmission, the second time for the transmission to the service and the third time from the service back to server for redistribution to the ultimate recipient.

Further, senders of spam have become much more sophisticated at avoiding the aforementioned filters. The use of dynamic addressing schemes, very long-length subject lines and anonymous re-routing services makes it increasingly difficult for normal filtering schemes, and even the heuristics-based services discussed above, to remain constantly up-to-date with respect to the spammers' ever changing methods.

Another downside to the proliferation of the Internet is that it is a very efficient mechanism for delivering computer viruses to a great number of people. Virus identification is

**2**

generally limited to programs which run and reside on the individual computer or server in a particular enterprise and which regularly scan files and e-mail attachments for known viruses using a number of techniques.

## SUMMARY OF THE INVENTION

Hence, the object of the invention is to provide a content classification system which identifies content in an efficient, up-to-date manner.

The further object of the invention is to leverage the content received by other users of the classification system to determine the characteristic of the content.

Another object of the invention is to provide a service which quickly and efficiently identifies a characteristic of the content of a given transmission on a network at the request of the recipient.

Another object of the invention is to provide the above objects in a confidential manner.

A still further object is to provide a system which operates with low bandwidth.

These and other objects of the invention are provided in the present invention. The invention, roughly described, comprises a file content classification system. In one aspect the system includes a digital ID generator and an ID database coupled to receive IDs from the ID generator. The system further includes a characteristic comparison routine identifying the file as having a characteristic based on ID appearance in the appearance database.

In a particular embodiment, the file is an e-mail file and the system utilizes a hashing process to produce digital IDs. The IDs are forwarded to a processor via a network. The processor performs the characterization and determination steps. The processor then replies to the generator to enable further processing of the email based on the characterization reply.

In a further aspect, the invention comprises a method for identifying a characteristic of a data file. The method comprises the steps of: generating a digital identifier for the data file and forwarding the identifier to a processing system; determining whether the forwarded identifier matches a characteristic of other identifiers; and processing the e-mail based on said step of determination.

In yet another aspect, the invention comprises a method for providing a service on the Internet, comprising: collecting data from a plurality of systems having a client agent on the Internet to a server having a database; characterizing the data received relative to information collected in the database; and transmitting a content identifier to the client agent. In this aspect, said step of collecting comprises collecting a digital identifier for a data file. In addition, said step of characterizing comprises: tracking the frequency of the collection of a particular identifier; characterizing the data file based on said frequency; storing the characterization; and comparing collected identifiers to the known characterization

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described with respect to the particular embodiments thereof. Other objects, features, and advantages of the invention will become apparent with reference to the specification and drawings in which:

FIG. 1 is a block diagram indicating the system in filtering e-mail to identify content in accordance with the present invention.

FIG. 2 is a block diagram illustrating the process of the present invention.

US 6,460,050 B1

3

FIG. 3 is a block diagram illustrating in additional detail the method and apparatus of the present invention.

FIG. 4 is a block diagram illustrating a second embodiment of the method and apparatus of the present invention.

## DETAILED DESCRIPTION

The present invention provides a distributed content classification system which utilizes a digital identifier for each piece of content which is sought to be classified, and characterizes the content based on this ID. In one aspect of the system, the digital identifier is forwarded to a processing system which correlates any number of other identifiers through a processing algorithm to determine whether a particular characteristic for the content exists. In essence, the classification is a true/false test for the content based on the query for which the classification is sought. For example, a system can identify whether a piece of e-mail is or is not spam, or whether the content in a particular file matches a given criteria indicating it is or is not copyrighted material or contains or does not contain a virus.

While the present invention will be discussed with respect to classifying e-mail messages, it will be understood by those of average skill in the art that the data classification system of the present invention can be utilized to classify any sort of text or binary data which resides on or is transmitted through a system.

FIG. 1 is a high level depiction of the present invention wherein an e-mail sender 10 transmits an e-mail which is intercepted by a filtering process/system 15 before being forwarded to the sender. The system has the ability to act on the e-mail before the recipient 20 ever sees the message.

FIG. 2 illustrates the general process of the present invention in the e-mail context when an e-mail sender 10 transfers an e-mail to its intended recipient 40, the message arrives at a first tier system 20 which in this example may represent an e-mail server. Normally (in the absence of the system of the present invention), the first tier system 20 will transmit an e-mail directly to the intended recipient when the recipient's e-mail client application requests transmission of the e-mail. In the present invention, a digital identifier engine on the first tier system cooperating with the e-mail server will generate a digital identifier which comprises, in one environment, a hash of at least a portion of the e-mail. The digital identifier is then forwarded to a second tier system 30. Second tier system 30 includes a database and processor which determines, based on an algorithm which varies with the characteristic tested, whether the e-mail meets the classification of the query (e.g. is it spam or not?).

Based on the outcome of this algorithm, a reply is sent from the second tier system 30 to the first tier system 20, where the system then processes the e-mail in accordance with the regenerated description by the user based on the outcome of the filter. The result can be as shown in FIG. 2, the filtered e-mail product being forwarded to the e-mail recipient. Other options for disposition of the e-mail depending upon the outcome of the algorithm computed at second tier system 30 are described below.

It should be understood with reference to FIGS. 1 and 2 that the external e-mail sender can be any source of electronic mail or electronic data sent to the filtering process from sources outside the system. The e-mail recipients 40 represent the final destination of electronic data that passes through the filtering process.

In one aspect, the system may be implemented in executable code which runs on first tier system 20 and generates digital IDs in accordance with the MD5 hash fully described

4

at http://wwww.w3.org/TR/1998/Rec-DSig-label/MD5 1 6. It should be recognized however that any hashing algorithm can be utilized. In one embodiment, the digital ID generated by the MD5 hash is of the entire subject line up to the point where two spaces appear, the entire body, and the last 500 bytes of the body of the message. It should be further understood that the digital ID generated may be one hash, or multiple hashes, and the hashing algorithm may be performed on all or some portion of the data under consideration. For example, the hash may be of the subject line, some number of characters of the subject line, all of the body or portions of the body of the message. It should further be recognized that the digital ID is not required to be of fixed length.

The first tier executable may be run as a separate process or as a plug-in with the e-mail system running on a first tier system 20. In one embodiment, the executable interfaces with a commonly used mail server on a running system such as a first tier system 20 is known as Sendmail™. A common set of tools utilized with Sendmail™ is Procmail. (http:// www.ii.com/internet/robots/procmail). In one aspect of the system of the present invention, the executable may interface with Sendmail™ and Procmail. In such an embodiment, a configuration file (such as a sendmail.cf) includes a line of code which instructs the Procmail server program to process incoming e-mails through the first tier site e-mail executable to generate and transport digital IDs to the second tier system, receive its reply, and instruct the Procmail to process or delete the message, as a result of the reply message.

It should be understood that the executable may be written in, for example, perl script and can be designed to interact with any number of commercial or free e-mail systems, or other data transfer systems in applications other than e-mail.

The digital ID usage in this context reduces bandwidth which is required to be transported across the network to the second tier system. Typically, the ID will not only contain the hashed data, but may include versioning information which informs the second tier system 30 of the type of executable running on the first tier system 20.

In addition, the reply of the second tier system to the first tier system may be, for example, a refusal of service from the second tier system 30 to the first tier system 20 in cases where the first tier system is not authorized to make such requests. It will be recognized that revenue may be generated in accordance with the present invention by providing the filtering service (i.e. running the second tier service process and maintaining the second tier database) for a fee based on volume or other revenue criteria. In this commercial context, the reply may be a refusal of service of the user of the first tier system 20 which has exceeded their allotted filtering quota for a given period.

FIG. 3 shows a second embodiment of the system of the present invention. In FIG. 3, the first tier system is broken down into three components including a message preprocessing section 110, a message processing section 120, a configuration file DS10. In this example, the e-mail from sender 10 is first diverted to message preprocessing 110. Preprocessing algorithm is configured with rules from configuration file DS10. These rules are guidelines on how and when, for example, to generate digital IDs from the e-mail which is received. Message preprocessing receives the email from the e-mail sender 10 and generates digital IDs based on the preprocessing rules from DS10. DS10 is a configuration file which stores configuration rules (before preprocessing and postprocessing) for the first tier system 20. The message processing rules may include guidelines on how to dispose

of those e-mails classified as spam. For example, a message may be detected, and may be forwarded to a holding area for electronic mail that has been deemed to be spam by second tier system **30**, have the word "SPAM" added to the subject line, moved to a separate folder, and the like. In this example, message preprocessing rules include rules which might exempt all e-mails from a particular destination or address from filtering by the system. If a message meets such exemption criteria, the message is automatically forwarded, as shown on line **50**, directly to message processing **120** for forwarding directly onto the e-mail recipient **40**. Such rules may also comprise criteria for forwarding an e-mail directly to a rejected message depository DS20.

If a preprocessing rule does not indicate a direct passage of a particular e-mail through the system, one or more digital identifiers will be generated as shown at line **66** and transmitted to the second tier system **30'**. In the example shown at FIG. 3, second tier system **30'** includes a second tier server **210** in a third tier database **220**. In this example, the second tier server relays digital IDs and replies between preprocessing and the message processing **120**. The example shown in FIG. 3 is particularly useful in an Internet based environment where the second tier server **210** may comprise a web server which is accessible through the Internet and the third tier database **220** is shielded from the Internet by the second tier server through a series of firewalls or other security measures. This ensures that the database of digital ID information which is compiled at the third tier database **220** is free from attack from individuals desirous of compromising the security of this system.

In this case, second tier server **210** forwards the digital ID directly to the third tier database which processes the IDs based on the algorithm for testing the data in question. The third tier database generates a reply which is forwarded by the second tier server back to message processing **120**. Message processor **120** can then act on the e-mail by either sending filtered e-mail to the e-mail recipient, sending the filtered e-mail to the rejected message depository DS20 or acting on the message in accordance with user-chosen configuration settings specified in configuration file DS10.

In the environment shown in FIG. 3, the configuration file DS1 **10** on the first tier allows other decisions about the e-mail received from the e-mail sender **10** to be made, based on the reply from second tier **30**. For example, in addition to deleting spam e-mail, the subject line may be appended to indicate that the e-mail is "spam," the e-mail may be held in a quarantine zone for some period of time, an auto reply generated, and the like. In addition, the message preprocessing and message processing rules allow decisions on e-mail processing to account for situations where second tier system **30'** is inaccessible. Decisions which may be implemented in such cases may include "forward all e-mails," "forward no e-mails," "hold for further processing," and the like.

In an Internet based environment, the second tier server **30** may transmit a digital identification and other information to the third tier database **220** by means of the HTTP protocol. It should be recognized that other protocols may be used in accordance with the present invention. The third tier database **220** may be maintained on any number of different commercial database platforms. In addition the third tier database may include system management information, such as client identifier tracking, and revenue processing information. In an unique aspect of the present invention in general, the digital IDs in third tier database **22** are maintained on a global basis. That is, all first tier servers which send digital IDs to second tier servers **210** contribute data to

the database and the processing algorithm running on the third tier system. In one embodiment, where spam determination is the goal, the algorithm computes, for example, the frequency with which a message (or, in actuality, the ID for the message), is received within a particular time frame. For example, if a particular ID indicating the same message is seen some number of times per hour, the system classifies the message (and ID) as spam. All subsequent IDs matching the ID classified as spam will now cause the system **30'** to generate a reply that the e-mail is spam. Each client having a first tier system **20'** which participates in the system of the present invention benefits from the data generated by other clients. Thus, for example, if a particular client receives a number of spam e-mails meeting the frequency requirement causing the system to classify another client having a first tier system **20'** which then sees a similar message will automatically receive a reply that the message is spam.

It should be recognized that in certain cases, large reputable companies forward a large block of e-mails to a widespread number of users, such as, for example information mailing list servers specifically requested by e-mail receivers. The system accounts for such mailing list application on both the area and second tier system levels. Exceptions may be made in the algorithm running on the third tier database **220** to take into account the fact that reputable servers should be allowed to send a large number of e-mails to a large number of recipients at the destination system **20'**. Alternatively, or in conjunction with such exceptions, users may define their own exceptions via the DS10 configuration. As a service, any number of acceptable sources such as, for example, the Fortune 1000 companies' domain names may be characterized as exempted "no spam" sites, and users can choose to "trust" or "not trust" server side settings.

While the aforementioned embodiment utilizes a frequency algorithm to determine whether a message is spam, additional embodiments in the algorithm can analyze messages for the frequency of particular letters or words, and/or the relationship of the most common words to the second most common words in a particular message. Any number of variants of the algorithm may be used.

It should be further recognized that the second tier server can be utilized to interface with the value added services, such as connecting the users to additional mailing lists and reference sources, providing feedback on the recipients' characteristics to others, and the like.

FIG. 4 shows a further embodiment of the invention and details how the server side system manipulates with the digital identifiers. In FIG. 4, the embodiment includes a DS10 configuration file which provides message exemption criteria and message processing rules to both message preprocessing and routine **110** message processing **120**, respectively. Message preprocessing **110** may be considered as two components: message exemption checking **111** and digital ID creation **112**. Both of these components function as described above with respect to FIG. 3 allowing for exempt e-mails to be passed directly to an e-mail recipient **40**, or determining whether digital IDs need to be forwarded to second tier server **210**. Replies are received by message processing algorithm **120** is acted on by rule determination algorithm **121**, and e-mail filtering **123**.

At the second tier system **30'**, digital IDs transmitted from second tier processor **210** are transmitted to a digital ID processor **221**. In this embodiment, processor **221** increments counter data stored in DS30 for each digital ID per unit time. As the volume of messages processed by database

7

220 can be quite large, the frequency algorithm may be adjusted to recognize changes in the volume of individual messages seen as a percentage of the total message volume of the system.

The frequency data stored at DS30 feeds a reply generator 222 which determines, based on both the data in the DS30 and particular information for a given client, (shown as data record DS40) whether the reply generated and forwarded to second tier server 210 should indicate that the message is spam or not. Configuration file DS40 may include rules, as set forth above, indicating that the reply from the second tier server 210 is forwarded to rule determination component of message processor 120 which decides, as set forth above, how to process the rule if it is in fact determined that it is spam. The filtered e-mail distribution algorithm forwards the e-mail directly to the e-mail client 40 or to the rejected message repository as set forth above.

A key feature of the present invention is that the digital IDs utilized in the data identifier repository DS30 are drawn from a number of different first tier systems. Thus, the greater number of first tier systems which are coupled to the second tier server and subsequent database 220, the more powerful the system becomes.

It should be further recognized that other applications besides the detection of spam e-mail include the detection of viruses, and the identification of copyrighted material which are transmitted via the network.

Moreover, it should be recognized that the algorithm for processing digital identifiers and the data store DS30 are not static, but can be adjusted to look for other characteristics of the message or data which is being tested besides frequency.

Hence, the system allows for leveraging between the number of first tier systems or clients coupled to the database to provide a filtering system which utilizes a limited amount of bandwidth while still providing a confidential and powerful e-mail filter. It should be further recognized that the maintainer of the second and third tier systems may generate revenue for the service provided by charging a fee for the service of providing the second tier system process.

Still further, the system can collect and distribute anonymous statistical data about the content classified. For example, where e-mail filtering is the main application of the system, the system can identify the percentage of total e-mail filtered which constitutes spam, where such e-mail originates, and the like, and distribute it to interested parties for a fee or other compensation.

What is claimed is:

1. A file content classification system comprising:

a plurality of agents, each agent including a file content ID generator creating file content IDs using a mathematical algorithm, at least one agent provided on one of a plurality of clients;

an ID appearance database, provided on a server, coupled to receive file content IDs from the agents; and

a characteristic comparison routine on the server, identifying a characteristic of the file content based on the appearance of the file content ID in the appearance database and transmitting the characteristic to the client agents.

2. The content classification system of claim 1 wherein said ID generator comprises a hashing algorithm.

3. The content classification system of claim 2 wherein said hashing algorithm is the MD5 hashing algorithm.

4. The content classification system of claim 2 wherein said ID appearance database tracks the frequency of appearance of a digital ID.

8

5. The content classification system of claim 1 wherein said plurality of agents are coupled to said database via a combination of public and private networks.

6. The content classification system of claim 5 wherein said database is coupled to an intermediate server which is coupled to said plurality of agents.

7. The content classification system of claim 6 wherein said intermediate server is a web server.

8. The content classification system of claim 1 wherein said characteristic comprises junk e-mail and said characteristic is defined by a frequency of appearance of a file content ID.

9. A method for identifying characteristics of data files, comprising:

receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network;

determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers; and

outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining.

10. The method of claim 9 wherein said file content identifier generates an identifier by hashing at least a portion of the data file.

11. The method of claim 10 wherein said hashing comprises using the MD5 hash.

12. The method of claim 10 wherein said step of generating comprises hashing multiple portions of the data file.

13. The method of claim 9 wherein each said data file is an email message and said step of determining comprises determining whether said email is SPAM.

14. The method of claim 9 wherein said step of determining identifies said e-mail as SPAM by tracing the rate per unit time a digital ID is generated.

15. The method of claim 14 wherein said method further includes the step of instructing said plurality of source systems to perform an action with the email based on said determining step.

16. A method of filtering an email message, comprising:

receiving, on a second computer, a digital content identifier created using a mathematical algorithm unique to the message content from at least two of a plurality of first computers having digital content ID generator agents;

comparing, on the second computer, the digital content identifier to a characteristic database of digital content identifiers received from said plurality of first computers to determine whether the message has a characteristic; and

responding to a query from at least one of said plurality of computers to identify the existence or absence of said characteristic of the message based on said comparing.

17. The method of claim 16 wherein said second computer is coupled to said plurality of first computers by a combination of public and private networks.

18. The method of claim 17 wherein said step of receiving includes receiving identifiers from said plurality of first systems via an intervening Web server.

19. The method of claim 18 wherein said plurality of systems are coupled by the Internet.

20. The method of claim 16 wherein said step of comparing comprises determining the frequency of a particular ID occurring in a time period, classifying said ID as having a characteristic, and comparing digital content identifiers to said classified IDs.

21. A file content classification system for a first computer and a second computer coupled by a network, comprising:

a client agent file content identifier generator on the first computer, the file content identifier comprising a computed value of at least two non-contiguous sections of data in a file; and

a server comparison agent and data-structure on the second computer receiving identifiers from the client agent and providing replies to the client agent;

wherein the client agent processes the file based on replies from the server comparison agent.

22. A method for providing a service on the Internet, comprising:

collecting data on a processing system from a plurality of systems having a client agent generating digital content identifiers created using a mathematical algorithm for each of a plurality of files on the Internet to a server having a database;

characterizing the files on the server system based on said digital content identifiers received relative to other digital content identifiers collected in the database; and

transmitting a substance identifier from the server to the client agent indicating the presence or absence of a characteristic in the file.

23. The method of claim 22 wherein said step of collecting comprises collecting a digital identifier for a data file.

24. The method of claim 23 wherein said file content is an e-mail.

25. The method of claim 23 wherein said step of characterizing comprises:

tracking the frequency of the collection of a particular identifier,

characterizing the data file based on said frequency,

storing the characterization; and

comparing collected identifiers to the known characterization.

*   *   *   *   *

# UNITED STATES PATENT AND TRADEMARK OFFICE
# **CERTIFICATE OF CORRECTION**

PATENT NO.   : 6,460,050 B1
DATED          : October 1, 2002
INVENTOR(S) : Pace et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 7,
Line 65, after "claim" and before "wherein" delete "2" and substitute -- 1 --

Signed and Sealed this

Thirty-first Day of August, 2004

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

EXHIBIT 2

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | | Date | October 28, 2014 |
|----------|---------------|---|------|------------------|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|-------|--------------------------------------------------|

| Present: The Honorable | CHRISTINA A. SNYDER | |
|------------------------|---------------------|---|
| CATHERINE JEANG | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|-----------------------------------|-----------------------------------|
| N/A | N/A |

**Proceedings:**   (IN CHAMBERS) DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Dkt. No. 42, filed September 15, 2014)

### I.   INTRODUCTION

This case presents an issue of patent subject matter eligibility. On December 31, 2013, plaintiff Peter Wolf ("Wolf") filed this lawsuit against defendants Capstone Photography, Inc. ("Capstone"), Michael Skelps, and ten Does. Dkt. No. 1. On July 17, 2014, plaintiff filed the First Amended Complaint ("FAC"). Dkt. No. 32. In brief, the FAC alleges that defendants have infringed three patents covering methods of inspecting, selecting, distributing, and advertising on photographs taken at races and other events. Id. On September 15, 2014, defendants filed a motion for judgment on the pleadings. Dkt. No. 42. Plaintiff filed an opposition on September 29, 2014. Dkt. No. 45. Defendants replied on October 6, 2014. Dkt. No. 47. On October 20, 2014, the Court held a hearing at which counsel for both parties appeared. After considering the parties' arguments, the Court concludes that the motion should be granted for the reasons explained below.

### II.   BACKGROUND

The FAC alleges the following facts. Plaintiff is the president of PhotoCrazy, a business engaged in the business of taking and providing event photographs for inspection, selection, and distribution via a computer network. FAC ¶ 10. In 2006, plaintiff obtained U.S. Patent Numbers 7,047,214 ("the '214 patent") and 6,985,875 ("the '875 patent"). Id. ¶ 12; see id. Exs. A, B. The '214 and '875 patents, both entitled, "Process for Providing Event Photographs for Inspection, Solution and Distribution via a Computer Network," share essentially the same specification and claims.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|---|---|

Independent claim 1 of the '875 patent, practically identical to claim 1 of the '214 patent and representative of both patents' subject matter, claims:

A process providing event photographs of a sporting event for inspection, selection and distribution via a computer network, comprising the steps of:

taking photographs of at least one participant of a sporting event along at least one point of a course or field thereof;

associating identifying data with each photograph taken, wherein the identifying data is selected from at least one of: a number corresponding to a number worn by a participant, a participant's name, a code acquired from a component worn by a participant, and a date and time, including hour and minute the photograph was taken;

informing the sporting participants of the identifying data;

transferring the photographs to a computer network server;

cataloging each of the photographs in a web-site server according to identifying data;

accessing the server at a location other than the sporting event and searching for a photograph of a particular sporting event participant utilizing the identifying data; and

displaying the photograph of the sporting event participant for inspection and ordering.

'875 patent Col. 5:38-61. The dependent claims of the '214 and '875 patents largely identify variations of claim 1. For example, claims 3 through 10 pertain to different types of identifying data. See, e.g., id. Col. 5:66–6:3 ("3. The process of claim 1, wherein the identifying data comprises a code acquired from the component worn by the sporting event participant, including the step of triggering a camera to take a photograph when the component passes a predetermined point."); id. Col. 6:7-8 ("5. The process of claim 3,

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|---|---|

wherein the component comprises a passive component."). Similarly, independent claims 16, 24, and 29 are almost identical to claim 1, but limit the identifying data to particular types. See id. Col. 6:44-65, 7:29:-48, 8:4-25. Other dependent claims recite details of claim 1's steps: claim 12 recites the use of a "digital camera electronically connected to the server,"; claim 13 details "ordering a photograph of the event using the server and fulfilling the order by sending the photograph"; and claims 14 and 15 recite "mailing" and "electronically transferring" the ordered photograph, respectively. Id. Col. 6:12-42.

The specification explains that event photography traditionally relied on the bib numbers worn by event participants to identify participants and match developed photographs to listed names and addresses. Id. Col. 1:18-28. A thumbnail photographic image was then printed and mailed to each participant along with an order form, which the participant could use to order photographs by mail. Id. Col. 1:29-38. According to the specification, this method was time-consuming, costly, and too heavily reliant on visual identification. Id. 1:39-46. The claimed invention purports to solve those problems by obviating the need to rely on bib numbers through the use of other identifying details, and allowing participants to search for and order photographs without the need for multiple mailings. Id. Col. 1:58-67. Instead, photographs may be ordered online, and the order is fulfilled through electronic transmission or printing and physical mailing responsive to the online order. Id. Col. 2:42-52. The specification also includes a detailed description of preferred embodiments, id. Col. 3:1–5:31, although it stresses that "various modifications may be made without departing from the scope and spirit of the invention" and that the "invention is not to be limited, except as by the appended claims," id. Col. 5:32-36.

In 2011, plaintiff obtained U.S. Patent Number 7,870,035 ("the '035 patent"), titled, "Advertising and Distribution Method for Event Photographs." FAC ¶ 12; see id. Ex. C. The specification largely covers processes included in the two aforementioned patents, but also details a process by which participants can order a free or reduced-price photograph with "[v]isual advertiser indicia, such as the advertiser name or log, []
associated within the field" of the photograph," typically "in a corner or a margin of the photograph." '035 patent Col. 2:36-46. Independent claim 1 of the '035 patent claims

    A method for providing on-line event photographs, comprising the steps
      of:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|---|---|

capturing multiple photographs of sporting event participants during a
sporting event;

associating identifying data with each photograph taken and storing the
photographs in a database;

accessing the database and searching for a photograph utilizing the
identifying data and selecting a digital photograph;

utilizing an electronic device to create a field in the selected digital
photograph and associate visual advertiser indicia within the field; and

transferring the selected photograph containing the visual field with
advertiser indicia to a requestor.

Id. Col. 8:58–9:5. Dependent claims 2 through 13 provide additional details and
variations regarding claim 1's steps. See, e.g., id. Col. 9:6-10 ("2. The method of claim 1,
wherein the associating step comprises the step of associating at least one of: a time the
photograph was captured, a name of the individual photographed, a number worn by the
individual photographed, or a code from a device worn by the individual
photographed."); id. Col. 9:17-19 ("5. The method of claim 1, wherein the creating step
includes the step of creating a visual field in a corner or a margin of the digital
photograph."). The remaining independent claims are similar to, but more detailed than,
claim 1. For example, claim 21 recites:

A method for providing on-line event photographs, comprising the steps
of:

capturing multiple photographs of sporting event participants during a
sporting event;

associating identifying data with each photograph taken, including
associating at least one of: a time the photograph was captured, a
name of the sporting event participant photographed, a number worn
by the sporting event participant photographed or a code from a
device worn by the sporting event participant photographed;

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.  2:13-CV-09573                              Date  October 28, 2014

Title  PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL.

accessing a server and searching for a photograph utilizing the
    identifying data;

posting one or more photographs of a low quality resolution or
    containing a watermark in response to an identifying data search;

selecting and ordering a digital photograph;

creating a final digital photograph having a high resolution without a
    watermark, and including a field in a corner or margin of the digital
    photograph and associating visual advertiser indicia, including an
    advertiser name or logo within the field;

electronically transferring the final digital photograph containing the
    visual field with advertiser indicia to a user's electronic device by
    downloading the final digital photograph to the user's electronic
    device or sending the user an electronic message including the final
    digital photograph or a link to download the final digital photograph.

Id. Col. 10:26-53.

Plaintiff alleges that defendants "are engaged in the business of providing event
photographs for inspection, selection and distribution via the Internet" through
defendants' website. FAC ¶ 14. Plaintiff also contends that defendants "are offering to
provide selected digital photographs with visual advertiser indicia within the photograph
field to race participants." Id. Plaintiff avers that these activities constitute willful
infringement of the three patents, collectively referred to as the "patents in suit." See
generally FAC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|---|---|

## III.  LEGAL STANDARD

### A.  Motion for Judgment on the Pleadings

A motion for judgment on the pleadings brought pursuant to Fed. R. Civ. P. 12(c)
provides a means of disposing of cases when all material allegations of fact are admitted
in the pleadings and only questions of law remain.  See McGann v. Ernst & Young, 102
F.3d 390, 392 (9th Cir. 1996).  Such a motion may be brought "after the pleadings are
closed–but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  "Analysis under Rule
12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules,
a court must determine whether the facts alleged in the complaint, taken as true, entitle
the plaintiff to a legal remedy."  Chavez v. United States, 683 F.3d 1102, 1108 (9th Cir.
2012).  Accordingly, while the complaint "does not need detailed factual allegations, a
plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more
than labels and conclusions, and a formulaic recitation of the elements of a cause of
action will not do."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).
"[F]actual allegations must be enough to raise a right to relief above the speculative
level."  Id.

In considering a Rule 12(c) motion, as with a 12(b)(6) motion, the district court
must view the facts presented in the pleadings and the inferences to be drawn from them
in the light most favorable to the nonmoving party.  NL Indus. v. Kaplan, 792 F.2d 896,
898 (9th Cir. 1986); In re Century 21-Re/Max Real Estate Adver. Claims Litig., 882 F.
Supp. 915, 921 (C.D. Cal. 1994).  However, "[i]n keeping with these principles a court
considering a motion to dismiss can choose to begin by identifying pleadings that,
because they are no more than conclusions, are not entitled to the assumption of truth.
While legal conclusions can provide the framework of a complaint, they must be
supported by factual allegations."  Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1950
(2009); Moss v. United States Secret Service, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a
complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and
reasonable inferences from that content, must be plausibly suggestive of a claim entitling
the plaintiff to relief.") (citing Twombly and Iqbal).  Ultimately, "[d]etermining whether
a complaint states a plausible claim for relief will . . . be a context-specific task that
requires the reviewing court to draw on its judicial experience and common sense."
Iqbal, 129 S.Ct. at 1950.  For purposes of a Rule 12(c) motion, the moving party
concedes the accuracy of the factual allegations of the complaint, but does not admit

other assertions that constitute conclusions of law or matters that would not be admissible in evidence at trial. 5C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 1368 (3d ed. 2004).

Unless a court converts a Rule 12(b)(6) or 12(c) motion into a motion for summary judgment, a court generally cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 102 F.3d 1524, 1537 (9th Cir. 1996), rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998). A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999); see also Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001).

## B. Patentable Subject Matter Under 35 U.S.C. § 101

A patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. This provision "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." Alice Corp. Pty. Ltd. v. CLS Bank Int'l, --- U.S. ---, 134 S. Ct. 2347, 2354 (2014) (quoting Ass'n for Molecular Pathology v. Myriad Genetics, Inc., --- U.S. ---, 133 S. Ct. 2107, 2116 (2013)). This important limitation recognizes that "mental processes[] and abstract intellectual concepts" are among "the basic tools of scientific and technological work." Gottschalk v. Benson, 409 U.S. 63, 67 (1972). However, "the application of these concepts to new and useful ends remains eligible for patent protection." Planet Bingo, LLC v. VKGS LLC, --- Fed. App'x ---, 2014 WL 4195188, at *1 (citing Alice, 134 S. Ct. at 2355). Still, "a claim reciting an abstract idea does not become eligible merely by adding the words 'apply it.'" Digitech Image Techs., LLC v. Electronics for Imaging, Inc., 758 F.3d 1344, 1350 (Fed. Cir. 2014) (quoting Bancorp Servs., LLC v. Sun Life Assur. Co. of Can. (U.S.), 687 F.3d 1266, 1276 (Fed. Cir. 2012)). "Accordingly, the Court has described a framework for identifying patent-eligible claims, wherein a court must determine whether the claims at issue are directed to a patent-ineligible concept and, if so, whether additional elements in the claims transform the claims into a patent-eligible application." Id.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|---|---|

> First, [courts] determine whether the claims at issue are directed to
> one of those patent-ineligible concepts. If so, [courts] then ask,
> "[w]hat else is there in the claims before us?" To answer that
> question, [courts] consider the elements of each claim both
> individually and "as an ordered combination" to determine whether
> the additional elements "transform the nature of the claim" into a
> patent eligible application. [The Supreme Court] has described step
> two of this analysis as a search for an "'inventive concept'"–i.e., an
> element or combination of elements that is "sufficient to ensure that
> the patent in practice amounts to significantly more than a patent upon
> the [ineligible concept] itself."

Alice, 134 S. Ct. at 2355 (citations omitted) (some brackets in original). The underlying
"concern" behind § 101's limitations is "'that patent law not inhibit further discovery by
improperly tying up the future use' of these building blocks of human ingenuity." Id. at
2354 (quoting Mayo Collaborative Servs. v. Prometheus Labs., Inc., --- U.S. ---, 132 S.
Ct. 1289, 1301 (2012)).

    "Issues of patent-eligible subject matter are questions of law." CyberSource Corp.
v. Retail Decisions, Inc., 654 F.3d 1366, 1369 (Fed. Cir. 2011); see Accenture Global
Servs., GmbH v. Guidewire Software, Inc., 728 F.3d 1336, 1340–41 (Fed. Cir. 2013)). In
attempting to invalidate a patent on § 101 grounds, a challenger must overcome the
presumption that "every issued patent is presumed to have been issued validly absent
clear and convincing evidence to the contrary." Open Text S.A. v. Alfresco Software
Ltd., No. 13-CV-4843, 2014 WL 4684429, at *3 (N.D. Cal. Sept. 19, 2014); see State
Contracting & Eng'g Corp. v. Condotte Am., Inc., 346 F.3d 1057, 1067 (Fed. Cir. 2003)
("A party seeking to establish that particular claims are invalid must overcome the
presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence."); Lumen
View Tech. LLC v. Findthebest.com, Inc., 984 F. Supp. 2d 189, 194 (S.D.N.Y. 2013).
Put differently, prior to claim construction, "a patent claim can be found directed towards
patent ineligible subject matter if the 'only plausible reading of the patent must be that
there is clear and convincing evidence of ineligibility.'" Tuxis Techs., LLC v.
Amazon.com, Inc., No. CV 13-1771-RGA, 2014 WL 4382446 at *2 (D. Del. Sept. 3,

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|---|---|

2014) (quoting Ultramercial, Inc. v. Hulu, LLC, 722 F.3d 1335, 1339 (Fed. Cir. 2013) (emphasis in original), vacated, 134 S. Ct. 2870 (2014).[1]

¹Defendants argue that the "clear and convincing" standard is inapplicable. In support, they cite Justice Breyer's concurring opinion in Microsoft v. i4i Ltd. Partnership, which stressed that the "clear and convincing" standard "applies to questions of fact and not to questions of law." 131 S. Ct. 2238, 2253 (2011) (Breyer, J., concurring). Justice Breyer explained that "[m]any claims of invalidity rest, however, not upon factual disputes, but upon how the lap applies to facts as given." Id. The majority opinion in that case, joined by seven of the eight justices participating in the case, described and validated the longstanding view that patent ineligibility had to be proven by a high standard of proof, a view which had predated the enactment of § 282 and had been unwaveringly applied by the Federal Circuit without correction from Congress. Id. at 2242–2252 (majority opinion). The Court held that "§ 282 requires an invalidity defense to be proved by clear and convincing evidence." Id. at 2242.

Subsequently, when Alice was reheard en banc by the Federal Circuit prior to being affirmed by the Supreme Court, five judges cited Microsoft in stating that the "statutory presumption of validity" of § 282 "applies when § 101 is raised as a basis for invalidity in district court proceedings." CLS Bank Int'l v. Alice Corp. Pty. Ltd., 717 F.3d 1269, 1284 (Lourie, J., concurring). Also citing Microsoft, an opinion joined by four other judges stated that "any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence." Id. at 1304–05 (Rader, J., concurring-in-part and dissenting-in-part). In its now-vacated opinion in Ultramercial, Inc. v. Hulu, LLC, the Federal Circuit cited these Alice opinions in explaining that to invalidate a patent on § 101 grounds at the pleadings stage, "the only plausible reading of the patent must be that there is clear and convincing evidence of ineligibility." 722 F.3d 1335, 1338 (Fed. Cir. 2013) (emphasis in original), vacated, WildTangent, Inc. v. Ultramercial, LLC, 134 S. Ct. 2870 (June 30, 2014). The court explained that "the analysis under § 101, while ultimately a legal determination, is rife with underlying factual issues." Id.; see also Genetic Techs. Ltd. v. Lab. Corp. of Am. Holdings, No. 12-1736–LPS–CJB, 2014 WL 4379587, at *3 (D. Del. Sept. 3, 2014) ("Patentability under Section 101 is a threshold inquiry and a question of law, one that may be informed by subsidiary factual issues." (internal citations and quotation marks omitted)). Multiple district courts addressing § 101 issues at similar stages of litigation

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|---|---|

## IV.    ANALYSIS

The issue presented is whether the patents-in-suit are directed to patentable subject matter under 35 U.S.C. § 101. Below, the Court first determines that the § 101 issue is ripe for decision, and then turns to the merits of defendants' motion.

### A.    The Ripeness of This Motion

The parties dispute whether the patent eligibility issue should be decided at this stage of the litigation, before claim construction. As this Court has recently explained, "a District Court has broad discretion concerning the appropriate time to address § 101." Eclipse IP LLC v. McKinley Equip. Corp., No. SACV 14-742-GW(AJWx), 2014 WL 4407592, at *5 (C.D. Cal. Sept. 4, 2014).[2] The Federal Circuit has noted "that it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." Bancorp Servs.,

since the Supreme Court decided Alice and vacated Ultramercial—including a recent decision of this Court—have found that the "clear and convincing" standard applies. See, e.g., CMG Fin. Servs., Inc. v. Pac. Trust Bank, F.S.B., No. CV-11-10344 PSG (MRWx), 2014 WL 4922349, at *7 (C.D. Cal. Aug. 29, 2014); Open Text S.A. v. Alfresco Software Ltd., No. 13-CV-4843, 2014 WL 4684429, at *3 (N.D. Cal. Sept. 19, 2014); Autoform Eng'g GMBH v. Eng'g Tech. Assocs., No. 10-14141, 2014 U.S. Dist. LEXIS 123684, at *8 (E.D. Mich. Sept. 5, 2014); Data Distrib. Techs., LLC v. BRER Affiliates, Inc., Civil No. 12-4878 (JBS/KMW), 2014 WL 4162765, at *7–8 (D.N.J. Aug. 19, 2014). It is true that the Supreme Court's recent decisions on § 101 eligibility have not stated a standard of proof. But defendants have cited no case in which a court has held that the "clear and convincing" standard does not apply to this issue, and have presented no convincing reason to disagree with the courts cited above.

[2]As in Eclipse IP, "each party, according to its position, cites cases in which a court has either granted a § 101 motion to dismiss [or for judgment on the pleadings] or decided that § 101 is better considered later in the case." 2014 WL 4407592, at *5 ; see Memo. Supp. Mot. J. Pleadings (Dkt. No. 42-1) at 6–8; Opp'n (Dkt. No. 45) at 4–6.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|---|---|

L.L.C. v. Sun Life Assur. Co. of Can. (U.S.), 687 F.3d 1266, 1273–74 (Fed. Cir. 2012). However, there is no "bright line rule requiring district courts to construe claims before determining subject matter eligibility." Id. at 1273 (quoting Ultramercial, LLC v. Hulu, LLC, 657 F.3d 1323, 1325 (Fed. Cir. 2011), vacated, 132 S. Ct. 2431 (2012); see also Cyberfone Sys., LLc v. CNN Interactive Grp., Inc., 558 Fed. App'x 988, 992 n.1 (Fed. Cir. 2014) ("There is no requirement that the district court engage in claim construction before deciding § 101 eligibility.").

Indeed, as one judge on the Federal Circuit has reasoned, in certain cases, "there are clear advantages to addressing section 101's requirements at the outset of litigation. Patent eligibility issues can often be resolved without lengthy claim construction, and an early determination that the subject matter of asserted claims is patent ineligible can spare both litigants and courts years of needless litigation." I/P Engine, Inc. v. AOL Inc., --- Fed. App'x ---, 2014 WL 3973501, at *12 (Fed. Cir. Aug. 15, 2014) (Mayer, J., concurring). Thus, claim construction is a prerequisite to the § 101 inquiry "only where claim construction disputes are relevant." Eclipse IP, 2014 WL 4407592, at *5; see Lumen View Tech. v. Findthebest.com, Inc., 984 F. Supp. 2d 189, 205 (S.D.N.Y. 2013) (finding claim construction unnecessary for a § 101 analysis because the claims were straightforward, covering broad subject matter categories, and "[n]o components [were] opaque such that claim construction would be necessary to flush out its contours").

In this case, the Court finds that the "basic character of the claimed subject matter is readily ascertainable from the face of the patent," and that plaintiff's arguments for delaying the § 101 inquiry are unpersuasive. See Cardpool, Inc. v. Plastic Jungle, Inc., No. C 12-04182 WHA, 2013 WL 245026 (N.D. Cal. Jan. 22, 2013), at *4. First, plaintiff points to several of defendants' discovery responses, asserting that certain specification and claim terms are not sufficiently described, as indicating a need for construction "using the patent's extensive prosecution history." Opp'n at 5. Specifically, plaintiff avers that defendants have "asserted that the terms 'associating identifying data' and 'cataloging each of the photographs in a web-site server' . . . are not sufficiently described by the specification." Id. Plaintiff also points to discovery responses asserting that the patents "fail to adequately define the terms 'informing the sporting event competitors' and 'searching for a photograph.'" Id. at 6. But beyond the conclusory statement that these terms would "have to be construed in order to determine whether they cover an abstract idea," plaintiff offers no argument as to how claim construction would aid the court in applying § 101 to these non-technical terms. See Cyberfone, 558

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
| --- | --- | --- | --- |

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
| --- | --- |

Fed. App'x at 992 n.1 (determining that claim construction was unnecessary where the plaintiff urged claim construction but did not explain "how the analysis would change" as a result).

Plaintiff also contends that § 101 jurisprudence is not sufficiently developed to guide district courts in making an early determination of patent eligibility. Plaintiff argues that the Supreme Court's recent decisions in this area, most notably Alice, 134 S. Ct. at 2347, are vague, and that the Federal Circuit has only decided a handful of § 101 cases since Alice, all with "very different claims than the ones at issue here." Opp'n at 6–7. But plaintiff points to no pending appellate decision that would clarify the issue before this Court, or any other concrete indication that this issue would be more easily decided in several months' time. Moreover, although § 101 jurisprudence has generated significant controversy, Alice has clarified matters to some extent by making clear that the two-step test originally set forth in Mayo applies to abstract ideas, and by "categorically establish[ing] a clear rule that had previously been subject to debate: 'mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.'" Eclipse IP, 2014 WL 4407592, at *3 (quoting Alice, 134 S. Ct. at 2358). Defendants have cited several post-Alice cases in which district courts have not found it necessary to wait for claim construction or further appellate guidance before determining patent eligibility, compared to just one post-Alice case postponing that decision cited by plaintiff. Moreover, in September—just a few months after Alice was decided—the Federal Circuit affirmed a district court's grant of judgment on the pleadings on patent eligibility grounds issued without relying on claim construction. See generally buySAFE, Inc. v. Google, Inc., 765 F.3d 1350 (Fed. Cir. 2014). Accordingly, no lack of appellate guidance prevents the Court from deciding the issue of patent eligibility at this juncture.

### B.    The Subject Matter Eligibility of the Patents in Suit

Before applying Alice's two-part test to the patents in suit, it is worth examining a few of the Supreme Court's most relevant precedents.

In Diamond v. Diehr, 450 U.S. 175 (1981), the Court examined—and found patent-eligible—a patent application for a "process for curing synthetic rubber which includes in several of its steps the use of a mathematical formula and a programmed digital computer." Id. at 177. Although the process employed the well-known Arrhenius

equation, the Court found the process patentable because rather than "seek to pre-empt the use of that equation," the claims only "foreclose[d] . . . the use of that equation with all of the other steps in the[] claimed process . . . . includ[ing] installing rubber in a press, closing the mold, constantly determining the temperature of the mold, constantly recalculating the appropriate cure time through the use of the formula and a digital computer, and automatically opening the press at the proper time." Id. at 187. Thus, the claimed process was a patentable "application of a law of nature or mathematical formula." Id. (emphasis in original). The Court further explained:

> In determining the eligibility of respondents' claimed process for patent protection under § 101, their claims must be considered as a whole. It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis. This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made. The "novelty" of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter.

Id. at 188–89. Finally, the Court drew an important distinction. It cautioned that the proscription against patenting a mathematical formula "cannot be circumvented by attempting to limit the use of the formula to a particular technological environment," and "insignificant post-solution activity will not transform an unpatentable principle into a patentable process." Id. at 191–92. "On the other hand, when a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect (e. g., transforming or reducing an article to a different state or thing), then the claim satisfies the requirements of § 101." Id. at 192.

Three decades later, the court considered a patent application for "a procedure for instructing buyers and sellers how to protect against the risk of price fluctuations in a discrete sector of the economy." Bilski v. Kappos, 130 S. Ct. 3218, 3223 (2010). The first of the "key claims" consisted of:

(a) initiating a series of transactions between said commodity provider
    and consumers of said commodity wherein said consumers purchase
    said commodity at a fixed rate based upon historical averages, said
    fixed rate corresponding to a risk position of said consumers;

(b) identifying market participants for said commodity having a
    counter-risk position to said consumers; and

(c) initiating a series of transactions between said commodity provider
    and said market participants at a second fixed rate such that said series
    of market participant transactions balances the risk position of said
    series of consumer transactions.

Id. at 3223–24 (formatting altered). The other "key claim" articulated the above claim in
a mathematical formula, and the other claims explained how those methods could be
applied to hedge risk in energy markets. Id. at 3224. The Court held that these claims
impermissibly sought a monopoly over the "abstract idea" of "hedging." Id. at 3231.
That the claims were confined to the "commodities and energy markets" did not save the
patent application, for "limiting an abstract idea to one field of use or adding token
postsolution components does not make the concept patentable." Id.

    In Mayo Collaborative Servs. v. Prometheus Labs., Inc., 132 S. Ct. 1289 (2012),
the Court applied the above precedents to "claims covering processes that help doctors
who use thiopurine drugs to treat patients with autoimmune diseases determine whether a
given dosage level is too low or too high." Id. at 1294. The Court held that these claims,
which concededly "purport[ed] to apply natural laws describing the relationships between
the concentration in the blood of certain . . . metabolites" and the proper drug dosage, did
not "transform[] these unpatentable natural laws into patent-eligible applications of those
laws." Id. Rather, "the steps in the claimed processes (apart from the natural laws
themselves) involve[d] well-understood, routine, conventional activity previously
engaged in by researchers in the field. At the same time, upholding the patents would
risk disproportionately tying up the use of the underlying natural laws, inhibiting their
use in the making of further discoveries." Id. Thus, the claims failed the test that "to
transform an unpatentable law of nature into a patent-eligible application of such a law,
one must do more than simply state the law of nature while adding the words 'apply it.'"
Id.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | | Date | October 28, 2014 |
|---|---|---|---|---|
| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. | | | |

Put differently, the claims did not "add enough . . . to allow the processes they describe to qualify as patent-eligible processes that apply natural laws." Id. at 1297 (emphasis in original). The claims recited an "administering step," a "wherein" step, and a "determining" step. Id. (internal quotation marks omitted). The first step "simply refer[red] to the relevant audience, namely doctors who treat patients with certain diseases." Id. The "wherein" step "simply [told] a doctor about the relevant natural laws." Id. The "determining" step merely told the "doctor to determine the level of the relevant metabolites in the blood, through whatever process the doctor or the laboratory wishes to use." Id. Such processes were "well-known in the art," so that the step only taught "doctors to engage in well-understood, routine, conventional activity previously engaged in by scientists who work in the field." Id. at 1298; see id. at 1300 ("Simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable."). And "consider[ing] the three steps as an ordered combination add[ed] nothing to the laws of nature that is not already present when the steps are considered separately." Id. at 1298.

Finally, in Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 134 S. Ct. 2347 (2014), the Court applied the two-step test gleaned from Mayo and discussed above to a claimed abstract idea. The claims related to "a computerized scheme for mitigating . . . the risk that only one party to an agreed-upon financial exchange will satisfy its obligation" ("settlement risk"). Id. at 2352. A representative method claim recited:

- A method of exchanging obligations as between parties, each party holding a credit record and a debit record with an exchange institution, the credit records and debit records for exchange of predetermined obligations, the method comprising the steps of:

- (a) creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions;

- (b) obtaining from each exchange institution a start-of-day balance for each shadow credit record and shadow debit record;

(c) for every transaction resulting in an exchange obligation, the
supervisory institution adjusting each respective party's shadow credit
record or shadow debit record, allowing only these transactions that
do not result in the value of the shadow debit record being less than
the value of the shadow credit record at any time, each said
adjustment taking place in chronological order, and

(d) at the end-of-day, the supervisory institution instructing on[e] of the
exchange institutions to exchange credits or debits to the credit record
and debit record of the respective parties in accordance with the
adjustments of the said permitted transactions, the credits and debits
being irrevocable, time invariant obligations placed on the exchange
institutions.

Id. at 2352 n.2.

The patents claimed "(1) the foregoing method for exchanging obligations (the
method claims), (2) a computer system configured to carry out the method for
exchanging obligations (the system claims), and (3) a computer-readable medium
containing program code for performing the method of exchanging obligations (the
media claims)." Id. at 2353. "All of the claims [were] implemented using a computer"
and the "system and media claims expressly recite[d] a computer." Id.

Applying the first step of the controlling test, the Court determined that the claims
were "drawn to the abstract idea of intermediated settlement . . . . i.e., the use of a third
party to mitigate settlement risk." Id. at 2355 56. The Court reasoned that this was a
"fundamental economic practice long prevalent in our system of commerce" and could
not be meaningfully distinguished from "the concept of risk hedging in Bilski." Id. at
2357.

At the second step, the Court found that the claims did not involve sufficient
"'additional features' to ensure 'that the claim [was] more than a drafting effort designed
to monopolize the [abstract idea.]'" Id. at 2357 (brackets in original) (quoting Mayo, 132
S. Ct. at 1297). The Court first held that "[t]he introduction of a computer into the claims
does not alter the analysis at Mayo step two." Id. As in Benson, 409 U.S. at 67, "the
computer implementation did not supply the necessary inventive concept; the process

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. | | |

could be 'carried out in existing computers long in use.'" Alice, 134 S. Ct. at 2357. The Court reasoned that "[s]tating an abstract idea while adding the words 'apply it with a computer' simply combines" the steps of "adding the words 'apply it'" and "limiting the use of an abstract idea to a particular technological environment." Id. at 2358 (internal citations and quotation marks omitted). This combination did not suffice to confer patent eligibility where neither step could independently, and could not "impart patent eligibility." Id.

Analyzing the claim elements separately, the Court explained that all of the computer functions were "purely conventional." Id. at 2359 (quoting Mayo, 132 S. Ct. at 1298) (internal quotation marks and brackets omitted). Specifically, creating shadow records amounted to "electronic recordkeeping—one of the most basic functions of a computer"—and "us[ing] a computer to obtain data, adjust account balances, and issue automated instructions" were all "well-understood, routine, conventional activit[ies] previously known to the industry." Id. (quoting Mayo, 132 S. Ct. at 1294). "In short, each step [did] no more than require a generic computer to perform generic computer functions." Even considered "as an ordered combination," the computer components "simply recit[ed] the concept of intermediated settlement as performed by a generic computer." Id. (quoting Mayo, 132 S. Ct. at 1298). The claims did "not, for example, purport to improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field," and instead amounted to "'nothing significantly more' than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer." Id. (quoting Mayo, 132 S. Ct. at 1298).

Below, the Court applies these principles to the patents in suit. In following Alice's test, the Court notes that the two steps are easier to separate in recitation than in application. See Eclipse IP, 2014 WL 4407592, at *2–3 ("Describing this as a two-step test may overstate the number of steps involved.").

    1.   The '214 and '875 Patents

        a.   The Patents Are Directed to an Abstract Idea

The Court finds that the practically identical '214 and '875 patents are directed to the abstract idea of providing event photographs organized by participant, as applied using the internet. As the specification explains, event photographers traditionally

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|
| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. | | |

identified participants using bib numbers, and mailed relatively undesirable (thumbnail) versions of the matched photographs to participants for inspection and ordering of full-size photographs. The patents in suit merely implement basic computer technology to perform the same process, with computer systems automating much of the work previously done manually: matching the photographs to participants and making the photographs available in a relatively undesirable (low-resolution or watermarked) form for inspection and ordering. Even considering the issue at the judgment on the pleadings stage, the Court finds that moving the selection and ordering of event photographs onto a computer server cannot transform this practice into a patentable invention.[3]

Plaintiff argues that the claimed process is non-abstract and distinct from "long prevalent" photography practices because in the claimed process, participants search for photographs online, whereas in the prior art, photographers matched and mailed the photographs. Therefore, he argues, although "it may seem commonplace now to search for event photographs on the internet . . . prior to Peter Wolf doing it for sporting event photography in 1999, it simply had not been done." Opp'n at 9–10. But this is of no moment. "The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." Diamond, 450 U.S. at 189.

---

[3]Plaintiff protests that defendants' arguments fail to analyze all of the claims as required. But the Supreme Court's precedents have not required a court deciding § 101 eligibility to parse each individual claim, instead finding an analysis of representative claims sufficient. See, e.g., Mayo, 132 S. Ct. at 1295 ("Like the Federal Circuit we take as typical claim 1 of the '623 Patent . . . . For present purposes we may assume that the other claims in the patents do not differ significantly from claim 1."); Bilski, 130 S. Ct. at 3223 (deciding the issue based primarily on two "key claims"); see also Planet Bingo, 2014 WL 4195188, at *2 ("[T]here is no meaningful distinction between the method and system claims or between the independent and dependent claims. The system claims recite the same basic process as the method claims, and the dependent claims recite only slight variations of the independent claims." (citation omitted)). Nor do defendants' arguments fail because they primarily "discuss bib numbers as the identifying data." Opp'n at 9. The other identification means claimed by the patents—"a participant's name, a code acquired from a component worn by a participant, and a date and time"—are similarly conventional means of identifying event participants.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|---|---|

What is relevant is whether the claimed subject matter is directed to an abstract idea, and if so, whether there is an inventive concept that sufficiently limits the claims to a patentable application thereof. Nor is the transfer of the matching process from a photographer to a computer sufficient to confer patent eligibility. In Bilski, the use of a computer intermediary allowed a consumer with a computer to do the "identifying [of] market participants that have a counterrisk for the same commodity" that would presumably have been done by a human broker in the prior art—but the Supreme Court still held that the Bilski claims were drawn to an abstract idea. See 120 S. Ct. at 3218.

Next, plaintiff argues that any alleged abstract idea involved in the patents in suit cannot be stated more narrowly than "a method for providing event photographs," and that when the abstract idea is properly framed, the patents claim only a patent-eligible application thereof. Opp'n at 12. The Court disagrees. Whether or not defendants' motion at times presents a "moving target," the Court's definition of the abstract idea as "providing event photographs organized by participant" does not; nor does it use improperly specific language (so as to stack the deck against patent eligibility) when compared to abstract ideas articulated by other courts. Cf. CyberSource, 654 F.3d at 1370 ("verifying the validity of a credit card transaction over the Internet"); Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc., --- F. Supp. ---, 2014 WL 4364848, at *6 (E.D. Tex. Sept. 2, 2014) (Bryson, J.) ("currency exchange, as applied to the exchange of currencies in the form of loyalty award credits of different vendors").

Plaintiff relies heavily on the reasoning of the Federal Circuit's since-vacated Ultramercial decision, which defined an abstract idea as "one that has no reference to material objects or specific examples–i.e., it is not concrete." 722 F.3d at 1343. In light of the Supreme Court's remand of Ultramercial for further consideration in light of Alice, this reliance is dubious, and defendants accurately point out that previously invalidated claims could similarly be argued to have had similarly "concrete" elements.[4] Nevertheless, plaintiff argues that "concrete" details in claim 1 of the '214 and '875 patents include (1) taking photographs, (2) using specific identifying details to match photographs to participants, (3) informing participants of the identifying data, (4)

---

[4]See, e.g., Alice, 134 S. Ct. at 2352 n.2 (reciting the steps of "creating" shadow credit and debit records, "obtaining" balances from each party, "allowing" only certain transactions, and "instructing" banks to exchange credits or debits).

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|----------|---------------|------|------------------|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|-------|---------------------------------------------------|

transferring photographs to a computer network server; (5) cataloging the photographs for access; and (6) displaying the photographs for inspection and ordering. But because even plaintiff's preferred abstract idea definition—"a method for providing event photographs"— references photographs, the fact that "taking photographs" is involved is of no help in narrowing the claims to patentable subject matter. And if the remaining "concrete" steps are sufficient to remove the patents in suit from the realm of an abstract idea, it seems any process involving computers would pass the test. Details (2) through (6) are fairly implied by the idea of providing via the internet event photographs organized by participant. Event photographs could not be usefully placed online for ordering without using identifying details made known to the participants, placing and cataloging the photographs on a network server, and making the photographs available for inspection and ordering. Therefore, the Court finds that the '214 and '875 patents are directed toward an abstract idea, and moves on to Alice's second step.

        b.    The Patents Do Not Contain a Sufficient "Inventive Concept"

At the second step of the Alice test, the Court finds that the '214 and '875 patents do not claim an "inventive concept" sufficient to confer patent eligibility by "ensur[ing] that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." Mayo, 132 S. Ct. at 1294.

First, taken individually and as a whole, the independent claims do nothing more than recite a series of conventional steps carried out using basic camera and computer functions and mostly essential to placing searchable event photographs online for inspection and ordering. Plaintiff asserts, however, that the dependent claims narrow the invention to a patentable application, providing something "significantly more" than the claimed abstract idea itself. For example, plaintiff argues that claim 3 "further narrows the claim by restricting the identifying data to a 'code from a component,' which is not in the prior art, and also requires triggering a camera when the component passes a predetermined point, yet another concrete step (camera trigger) that is not described in Defendants' prior art." Opp'n at 16. Similarly, plaintiff contends that claim 5 restricts the identifying data to a search of the approximate time. Id. But these claims simply incorporate various conventional (and alternative) methods of identifying race participants. They do not significantly limit the claims, leaving other viable applications of the abstract idea to event photography, and they do not "improve the functioning of" any incorporated technology. See Alice, 134 S. Ct. at 2359. The dependent claims are

akin to those considered in Bilski, which "advise[d] using well-known random analysis techniques" to determine the expected gains from a transaction. 130 S. Ct. At 3224. Here, the dependent claims "advise using well-known" techniques of taking photographs and identifying event participants in order to match them to photographs.

Instead of limiting the claimed invention to a narrow subset of the idea at issue, the dependent claims list several ways of identifying event participants, none of which involves new technology, and the combination of which effectively preempts the field. Moreover, the dependent claims recite generic technological categories such as a "computer network server," a "web-site server," and a "digital camera." The most specific piece of technology recited by the claims is still generic: a "component worn by the sporting event participant . . . [that] trigger[s] a camera to take a photograph" by interfacing with "a sensor" and can include "a passive component," a "bar code," an "inductive circuit," or an "active component." See '875 patent Col. 5:66–16. Under Alice, these recitations of generic technology are insufficient to confer patent eligibility. See Alice, 134 S. Ct. at 2358 ("Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself.'" (citation and brackets omitted)); Planet Bingo, 2014 WL 4195188, at *3 (finding no inventive concept even though the claims required "a computer with a central processing unit, a memory, an input and output terminal, a printer, in some cases a video screen, and a program . . . enabling the steps of managing a game of bingo" (internal quotation marks omitted)). And as in Alice, these steps can be "carried out by existing computers long in use." Id. at 2357.

Plaintiff analogizes to a district court's decision in Autoform Engineering GMBH v. Engineering Technology Assocs., Inc., No. 10-14141, 2014 WL 4385855 (E.D. Mich. Sept. 5, 2014), but that case involved a much narrower claimed invention. Specifically, the claims at issue revolved around the creation of one part of a tool used to form sheet metal into different objects, which the defendants argued covered "basic concepts in the field." Id. at *2. The court reasoned:

> While the patent may include or rely on some basic concepts in the design of sheet metal forming tools, the patents also include numerous limitations that narrow the scope of the patent. For example: (1) smoothing an irregular component edge; (2) filling in a fill surface;

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. | | |

(3) forming a smooth component edge; (4) where the fill surface runs into the predefined component geometry by a continuous tangent; (5) arranging sectional profiles along the smooth component edge; (6) avoiding an overlap or intersection condition between sectional profiles; (7) parameterizing the sectional profiles by the means of profile parameters; (8) the profile parameters being scalar values; (9) laterally interconnecting the sectional profiles by a continuous surface to form the geometry of the addendum zone of the tool; and (10) where the addendum zone complements the component geometry in the edge zone and runs into the component and the binder with a continuous tangent.

Id. at *3. Although the Autoform court did not provide a detailed explication of its reasoning in denying a motion for summary judgment, the Autoform claims –directed to the physical creation of a subset of a piece of hardware—are clearly more detailed and limited than those the '214 and '875 patents.[5]

Plaintiff further contends that the '214 and '875 patents cannot fail § 101's test because they do not monopolize the field of event photograph distribution. Plaintiff argues, for example, that "if Capstone were to select participant photos by bib number, and then distribute those photos by email to the participants to view and offer for purchase, that would not infringe" the patents in suit.[6] Opp'n at 23. But this argument

---

[5]Defendants correctly point out that the Autoform court addressed these limitations in finding that an abstract idea was not claimed (Alice step one), not in an analysis of whether claims recited an "inventive concept" and thus claimed "significantly more" than an abstract idea (step two). See Reply at 14. But as noted above, the line between the two steps can be less than clear. Regardless, Autoform does not persuade the Court that the patents in suit pass either step of the Alice test.

[6]Plaintiff's argument that competitors could "use facial recognition, jersey or helmet colors as identifying data" is even less persuasive given the obvious impracticability of these means of identification in the context of an event with many participants. Similarly, listing event photos "on a website without any search criteria" is not a viable business model for distributing photographs from events of any significant

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|
| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. | | |

misses the mark because absent computer technology, plaintiff could not patent the idea of distributing event photographs organized by participant in brick-and-mortar shops, merely because competitors would still be permitted to conduct a mail-order business. The addition of generic computers and a web site does not change that analysis and meaningfully limit the claimed subject material. Cf. Tuxis Techs., LLC v. Amazon.com, Inc., No. 13–1771–RGA, 2014 WL 4382446, at *4 (D. Del. Sept. 3, 2014) (invalidating patent claims relating to the practice of real-time electronic "upselling" and reserving to the public "narrow methods of upselling" which did not "meaningfully limit" the abstract idea claimed).

Finally, plaintiff argues that the patents' reliance on a computer "adds a meaningful limitation" because the claimed methods "could not be done on paper or in the mind." Opp'n at 24. But in the pre-internet days, an event photographer could have identified race participants in photographs by bib number, approximate time, or other identifying information and, instead of mailing thumbnail images to each participant, could have placed a physical catalog[7] of images in a certain location—say, at a local running or photography store. This would be the analog equivalent of plaintiff's claimed process, done painstakingly with pen, paper, and similarly low-tech tools. And it would have been a patent-ineligible abstract idea. That generic computer technology allows for a more efficient process does not confer patent eligibility. See, e.g., Bancorp Servs., 687 F.3d at 1278 ("[T]he fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter."). Overall, the claims simply do not add sufficient "additional features" to claim something "significantly more" than the abstract idea, and fail for that reason.

      2.   The '035 Patent

magnitude.

    [7]Or, as plaintiff's counsel urged at oral argument, a bulletin board. Contrary to plaintiff's argument at the hearing, the Court's conclusion is not based on reading Alice as rendering patent-ineligible any method claim involving a computer. Rather, the Court concludes that plaintiff's invention would not be patent-eligible without the use of computers, and that the addition of computers does not change that analysis.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|

| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. |
|---|---|

Next, the Court considers the '035 patent. Because many of its claims are the same as those discussed above, the Court incorporates its prior analysis into the discussion below.

      a.    The Patents Are Directed to an Abstract Idea

To the abstract idea claimed by the above patents, the '035 patent adds only the abstract idea of distributing free or reduced-price digital event photographs with embedded advertisements, again applied with basic computer technology.

As with the '214 and '875 patents, plaintiff argues that the '035 patent does not claim an abstract idea because the claims contain sufficient concrete details. But in addition to the limitations discussed above—which are directed to an abstract idea—the independent claims of the '035 patent add only the steps of "utilizing an electronic device to create a field in a corner or margin of the selected digital photograph and associate visual advertiser indicia" and "electronically transferring the selected digital photograph containing a visual field with advertiser indicia to a user's electronic device by downloading the photograph to the user's electronic device or sending the user an electronic message including the digital photograph . . . or a link to download [it]." Opp'n at 18. In the main, these steps are implied by the abstract idea of distributing free or reduced-price digital event photographs with embedded advertisements. Distributing event mementos containing advertising is a longstanding commercial practice, and moving the process online does not change that. The dependent claims are directed to the same abstract idea with only minor variations: for example, claim 2 reiterates the types of identifying details to be used, and claim 4 recites posting the photographs for inspection with "a low quality resolution or containing a watermark." '035 patent Col. 9:6–16. These details do not change the fact that the claims "as a whole" claim the abstract idea of distributing reduced-price digital event photographs with embedded advertisements.

      b.    The Patents Do Not Contain a Sufficient "Inventive Concept"

At step two of the Alice test, the '035 patent suffers from the same defect as the patents discussed above: the addition of generic computer functions is insufficient to supply an inventive concept conferring patent eligibility. Plaintiff's claims merely limit a longstanding practice to a particular technological environment.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:13-CV-09573 | Date | October 28, 2014 |
|---|---|---|---|
| Title | PETER WOLF v. CAPSTONE PHOTOGRAPHY, INC., ET AL. | | |

Plaintiff argues that the '035 patent's use of a computer supplies an inventive concept because "one could possibly put an advertisement onto a photograph by hand, but few would ever want a hand-drawn advertisement on their photo." Opp'n at 24. But as discussed above, this essential argument—that the use of a generic computer makes a process more efficient or desirable—has been rejected as insufficient to confer patent subject matter eligibility where the claims do not contain any new technology.

Plaintiff also asserts that the '035 patent "has a limitation that restricts it to sporting events, so any other type of event photograph would not infringe," and that competitors can still add advertising to printed photographs. Opp'n at 24. But the Supreme Court has held that "limiting an abstract idea to one field of use . . . [does] not make the concept patentable." Bilski v. Kappos, 130 S. Ct. 3218, 3231 (2010); see also buySafe, 765 F.3d at 1355 ("At best . . . [the claims] 'limit the use' of the abstract guarantee idea 'to a particular technological environment,' which has long been held insufficient to save a claim." (quoting Alice, 134 S. Ct. at 2358)).

Thus, the Court finds that all three of the patents in suit are directed to patent-ineligible abstract ideas, and lack an inventive concept that would make them patent-eligible applications of those ideas.

## V.    CONCLUSION

In accordance with the foregoing, the Court GRANTS defendants' motion for judgment on the pleadings.

IT IS SO ORDERED.

_____ : _____

Initials of
Preparer

VRV