IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-1581-LPS |
| | ) | |
| TREND MICRO INCORPORATED, and | ) | |
| TREND MICRO, INC. (USA), | ) | REDACTED - |
| | ) | PUBLIC VERSION |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF
TREND MICRO INCORPORATED AND TREND MICRO, INC. (USA)'S
MOTION FOR JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 101**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
kjacobs@mnat.com
mflynn@mnat.com

*Attorneys for Trend Micro Incorporated
and Trend Micro, Inc. (USA)*

OF COUNSEL:

Yar R. Chaikovsky
David L. Larson
D. Stuart Bartow
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
(650) 815-7400

Christopher Bright
MCDERMOTT WILL & EMERY LLP
4 Park Plaza, Suite 1700
Irvine, CA 92614
(949) 851-0633

March 13, 2015 - Original Filing Date
March 20, 2015 - Redacted Filing Date

TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF THE PROCEEDINGS ......................................................1

II.    SUMMARY OF THE ARGUMENT ........................................................................1

III.   STATEMENT OF FACTS .....................................................................................2

IV.   LEGAL STANDARDS ...........................................................................................2

V.    ARGUMENT ..........................................................................................................4

    A.    The Asserted Claims of the '050 Patent Are Invalid for Claiming
         Ineligible Subject Matter ...........................................................................4

         1.    The '050 Patent ...............................................................................4

         2.    The Asserted Claims Are Directed To An Abstract Idea ..........................5

         3.    The Computer-Related Limitations Of The '050 Patent Are
              Generic And Are Not Transformative ....................................................11

    B.    The Asserted Claims of the '142 Patent Are Invalid For Claiming
         Ineligible Subject Matter .........................................................................17

         1.    The '142 Patent .............................................................................17

         2.    The Asserted Claims Are Directed To An Abstract Idea ........................18

         3.    The Computer-Related Elements Of The '142 Patent Are Generic
              And Are Not Transformative ...............................................................21

    C.    The Asserted Claims of the '610 Patent Are Invalid For Claiming
         Ineligible Subject Matter .........................................................................23

         1.    The '610 Patent .............................................................................23

         2.    The Asserted Claims Are Directed To An Abstract Idea ........................24

         3.    The Computer-Related Elements Of The '610 Patent Are Generic
              And Are Not Transformative ...............................................................28

VI.   CONCLUSION ...................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accenture Global Svcs. GmbH v. Guidewire Software, Inc.*,
   728 F.3d 1336 (Fed. Cir. 2013).................................................................................3, 28

*Alice Corporation Pty. Ltd. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014) .................................................................................*passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
   No. 1:10-cv-910, 2014 WL 5430956 (E.D. Va. Oct. 24, 2014) .....................................14, 16

*Bancorp Servs. L.L.C. v. Sun Life Assurance Co. of Canada*,
   687 F.3d 1266 (Fed. Cir. 2012)...............................................................................3, 16-17

*Bilski v. Kappos*,
   561 U.S. 593 (2010) ..............................................................................................15

*buySAFE Inc. v. Google, Inc.*,
   765 F.3d 1350 (Fed. Cir. 2014)..................................................................................*passim*

*Comcast IP Holdings I, LLC v. Sprint Commc'ns Co.*,
   C.A. No. 12–205–RGA, 2014 WL 3542055 (D. Del. July 16, 2014)...............................1, 13

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
   776 F.3d 1343 (Fed. Cir. 2014)..................................................................................3, 8

*Cybersource v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011)................................................................................3, 7, 10

*Dealertrack v. Huber*,
   674 F.3d 1315 (Fed. Cir. 2012)..................................................................................3

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
   758 F.3d 1344 (Fed. Cir. 2014)..................................................................................15

*Fort Props., Inc. v. American Master Lease LLC*,
   671 F.3d 1317 (Fed. Cir. 2012)..................................................................................3

*Loyalty Conversion Systems Corp. v. American Airlines, Inc.*,
   No. 2:13-cv-00655, 2014 WL 4364848 (E.D. Tex. Sept. 3, 2014).................................7, 8, 10

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012) ..........................................................................................28

*MySpace, Inc. v. GraphOn Corp.*,
   672 F.3d 1250 (Fed. Cir. 2012)........................................................................... 16, 22

*Planet Bingo, LLC v. VKGS LLC*,
   576 Fed. App'x 1005 (Fed. Cir. 2014) ................................................................ 8, 10, 29

*SmartGene, Inc. v. Advanced Bio. Labs., SA*,
   555 Fed. App'x. 950 (Fed. Cir. 2014) ..................................................................... 12, 22

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014)....................................................................................3

*Vehicle Intelligence and Safety LLC v. Mercedes-Benz USA, LLC*,
   C.A. No. 13-C-4417, 2015 WL 394273 (N.D. Ill. Jan. 29, 2015) .........................................27

*Walker Digital, LLC, v. Google, Inc.*,
   C.A. No. 11-318-LPS, 2014 WL 4365245 (D. Del. Sept. 3, 2014) ..............................*passim*

*Wolf v. Capstone Photography, Inc.*,
   No. 2:13-cv-9573, 2014 WL 7639820 (C. D. Cal. Oct. 28, 2014) ............................. 9, 10, 13

**Statutes**

35 U.S.C. § 101.................................................................................................*passim*

## I.     NATURE AND STAGE OF THE PROCEEDINGS

Pursuant to the Court's oral order of March 4, 2015 (D.I. 171), Defendants Trend Micro Incorporated and Trend Micro, Inc. (USA) (collectively, "Trend Micro" or "Trend") respectfully move for judgment that all asserted claims of the three remaining patents-in-suit are invalid under 35 U.S.C. § 101 because they are not directed to patent-eligible subject matter.  A hearing on this motion has been set for April 10, 2015.[1]  The pretrial conference in this action is scheduled for April 24, 2015.  D.I. 155.  Trial is set to begin May 11, 2015.  *Id.*

## II.     SUMMARY OF THE ARGUMENT

In *Alice Corporation Pty. Ltd. v. CLS Bank Int'l*, the Supreme Court unanimously held that generic computer implementation of an abstract idea—even where hardware and software elements are recited—is insufficient to transform that abstract idea into a patent-eligible invention.  134 S. Ct. 2347, 2357-58 (2014).  *Alice* and its progeny issuing from various courts— including this Court—demonstrate that all the claims of the patents asserted in this litigation are ineligible for patent protection.  *See buySAFE Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014); *Walker Digital, LLC, v. Google, Inc.*, C.A. No. 11-318-LPS, 2014 WL 4365245 (D. Del. Sept. 3, 2014); *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co.*, C.A. No. 12–205–RGA, 2014 WL 3542055 (D. Del. July 16, 2014).  The claims should be held invalid as a matter of law.

The asserted claims of U.S. Patent No. 6,460,050 (the "'050 patent") are directed to the abstract idea of reviewing information that identifies an item to determine a characteristic of the item.  The computer-related portions of the claims add no inventive concepts, but merely recite well-understood, entirely conventional computer elements to implement the abstract idea.  That is insufficient to confer patent-eligibility.  *See Alice*, 134 S. Ct. at 2357 ("A claim that recites an

---

[1]     In the co-pending litigation involving Symantec Corporation ("Symantec"), the Court will entertain a motion from Symantec on the same briefing and hearing schedule.

abstract idea must include 'additional features' to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea.") (internal quotes omitted).

Both U.S. Patent No. 6,073,142 (the "'142 patent") and U.S. Patent No. 5,987,610 (the "'610 patent") are directed to trivial variations on the basic concept of screening messages in electronic form. The '142 patent claims methods of controlling the distribution of messages by applying rules to the messages as they are processed. The '610 patent claims methods of screening data in a network using conventional techniques. Neither the claims of the '142 patent nor the claims of the '610 patent recite any specialized hardware or programming to implement these abstract ideas. To the contrary, they recite only well-understood, entirely conventional computer processing elements.

Because none of asserted claims of the three patents-in-suit incorporates an "inventive concept" that would prevent IV from monopolizing the computer-implemented practice of the abstract ideas, the claims are invalid under 35 U.S.C. § 101.

## III.   STATEMENT OF FACTS

For clarity, the relevant facts are set forth in the Argument sections as appropriate.

## IV.   LEGAL STANDARDS

In *Alice*, the Supreme Court held that abstract ideas performed by generic computer components are not eligible for patent protection. Specifically, the Court held that "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." 134 S.Ct. at 2358.

The Supreme Court set forth a two-step analysis for determining eligibility for computer-implemented methods. First, the court must determine whether the claims are directed to an abstract idea. *Alice*, 134 S. Ct. at 2355. If they are, the court must then determine whether the computer-related limitations in each claim "transform the nature of the claim" into a patent-

eligible invention. *Id.* at 2357. The Supreme Court described this second step as the search for an "inventive concept"—that is, "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [idea] itself." *Id.* at 2355 (internal quotes omitted).

The Federal Circuit repeatedly has invalidated claims that cover generic computer implementation of abstract ideas. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1346-48 (Fed. Cir. 2014) (extracting data from documents such as checks using a scanner, recognizing certain information within the scanned data, and storing the recognized information); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (providing digital content in exchange for viewing an advertisement); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351-52, 1354-55 (guaranteeing Internet transactions); *Accenture Global Svcs. GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (generating tasks in an insurance organization); *Bancorp Servs. L.L.C. v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (managing a stable value protected life insurance policy); *Dealertrack v. Huber*, 674 F.3d 1315, 1333-34 (Fed. Cir. 2012) (providing an information clearinghouse to facilitate auto loans); *Fort Props., Inc. v. American Master Lease LLC*, 671 F.3d 1317, 1323 (Fed. Cir. 2012) (managing real estate investments for tax-deferred exchanges); *Cybersource v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) (detecting fraudulent Internet credit card transactions).

## V.    ARGUMENT

### A.    The Asserted Claims of the '050 Patent Are Invalid for Claiming Ineligible Subject Matter

#### 1.    The '050 Patent

The '050 patent, entitled "Distributed Content Identification System," is directed to methods for "identifying a characteristic of a data file." Ex. 1, '050 patent, at Abstract. The claimed methods therein involve receiving an identifier for a data file, matching it against previously-received identifiers to ascertain a characteristic of the data file, and outputting a result. *Id.* at col. 2:22-56. Figure 2 of the '050 patent (depicted below) shows the basic structure for the system associated with the claimed methods:



FIG. 2

In brief, each identifier ("Digital ID") received at Second Tier Systems 30 is matched against previously-received and stored identifiers. A "Reply" is output as a result of the matching.

IV asserts claims 9, 13, 16, 22, and 24—all method claims—in this lawsuit. Claim 9, which is exemplary for Section 101 purposes, recites:

> 9.   A method for identifying characteristics of data files, comprising:
>
> receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network,

> determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers; and
>
> outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining.

Ex. 1, '050 patent, at col. 8:13-27. Claims 16 and 22 are similar to claim 9, and the variations in claim language between these independent claims do not bear upon the Section 101 analysis. The asserted dependent claims (13 and 24) add limitations specifically requiring a "data file" to be an e-mail message, and the "characteristic of the data file" to be whether the e-mail is "spam." These additional limitations do not change the analysis under Section 101.

### 2. The Asserted Claims Are Directed To An Abstract Idea

All of the claims of the '050 patent asserted against Trend Micro are drafted such that the method steps (*e.g.*, receiving, determining, outputting) are performed by the Second Tier Systems 30, shown in the box at the right-hand side of Figure 2 (excerpted below):



Identifiers for computer files ("Digital IDs") are received at the Second Tier Systems 30 from multiple sources (*i.e.*, computers on the network). There, they are matched against previously-received identifiers to ascertain something about (*i.e.*, a characteristic of) the computer file, such as the frequency with which that identifier (and thus the file) has been seen. Ex. 1, col. 7:28-32. Based on the result of the matching step, Second Tier Systems 30 output a "Reply" including an indication of the characteristic of the computer file.

Claim 9 is exemplary for Section 101 purposes. In the following illustration of performance by a human, a license plate number is used as an identifier for an automobile:

| Claim 9 | Abstract Steps | Abstract Steps Performed By A Human |
|---|---|---|
| A method of identifying characteristics of data files, comprising: | Preamble | |
| receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network; | receiving an identifier for an item; | The Wilmington City Code provides that any vehicle whose owner has more than three unpaid parking tickets is subject to having a "boot" (i.e. immobilization device) applied to the vehicle. *See* http://www.wilmingtonde.gov/government/parkingtips<br><br>A parking enforcement dispatcher in Wilmington receives a radio call from one of several parking enforcement officers, asking about an illegally-parked car with license plate number "12345." |
| determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers; and | match the identifier against previously-received identifiers to ascertain something about (*i.e.*, a characteristic of) the item; and | The dispatcher looks down a list of license plate numbers having unpaid tickets, generated from all the city enforcement officers, and finds that four unpaid tickets show up for the entry "12345." |
| outputting, to at least one of the source systems responsive | output a result (*e.g.*, an indication of the | The dispatcher replies, "That vehicle has four outstanding |

6

| Claim 9 | Abstract Steps | Abstract Steps Performed By A Human |
|---|---|---|
| to a request from said source system, an indication of the characteristic of the data file based on said step of determining. | characteristic including whether the characteristic exists). | tickets." |

Combinations of computer-automated steps that readily can be performed by human beings without the aid of a computer, as in the above example, are not patentable. *See, e.g., Loyalty Conversion Systems Corp. v. American Airlines, Inc.*, No. 2:13-cv-00655, 2014 WL 4364848 at *10 (E.D. Tex. Sept. 3, 2014) ("As confirmation of the simplicity of the functions that the claims assign to computers, it is clear that each of the functions recited in the asserted claims . . . could be performed by a human being without the aid of a computer of any kind.").

In *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011), the Federal Circuit reviewed claims directed to "obtaining credit card information relating to [consumer] transactions," "verifying the credit card information . . . . based upon parameters . . . that may provide an indication whether the transaction is fraudulent," "constructing a map of credit card numbers," and then "utilizing the map of credit card numbers to determine if the credit card transaction is valid." 654 F.3d at 1368. The claims were held to be abstract ideas, because, *inter alia*, all of the claimed steps could be performed in the human mind. *Id.* at 1376. Here, the asserted claims of the '050 patent—which are directed to receiving an identifier for an item (*compare with* "obtaining credit card information relating to [consumer] transactions"), matching that identifier against other previously-received identifiers to ascertain a characteristic of the item (*compare with* "utilizing the map of credit card numbers to determine if the credit card transaction is valid"), and outputting an indication of the characteristic (*compare with*

"verifying the credit card information…based upon parameters…that may provide an indication whether the transaction is fraudulent")—can also be performed solely in the human mind, and are directed to an abstract idea.

In *Content Extraction*, the Federal Circuit held the steps of "1) collecting data; 2) recognizing certain data within the collected data set; and 3) storing that recognized data in a memory" to be abstract, in significant part because "humans have always performed these functions." 776 F.3d at 1347. The court determined that the claims were "drawn to the basic concept of data recognition and storage," and ultimately held them unpatentable. *Id.*

In *Planet Bingo v. VKGS*, the Federal Circuit reviewed claims directed to "selecting, storing, and retrieving two sets of numbers, assigning a player identifier and a control number, and then comparing a winning set of bingo numbers with a selected set of bingo numbers." *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. App'x 1005, 1007-08 (Fed. Cir. 2014). Such claims were held to be abstract, as not only could they be "carried out in existing computers long in use, but they also can be done mentally." *Id.* (internal quotes omitted).

Similarly, in *Loyalty Conversion Systems*, Federal Circuit Judge Bryson, sitting by designation in the Eastern District of Texas, considered claims regarding conversion of loyalty award credits and online purchasing. 2014 WL 4364848 at *6-7. The claims recited "basic functions of a generic computer, including storing and displaying information, performing simple arithmetic calculations, and enabling a customer to make e-commerce purchases from a vendor." *Id.* The court held the claims invalid, reasoning that "it [was] clear that each of the functions recited in the asserted claims . . . could be performed by a human being without the aid of a computer of any kind." *Id.* at *9.

Finally, *Wolf v. Capstone Photography* is yet another case in which a district court considered and held invalid claims similar to the claims of the '050 patent. *Wolf v. Capstone Photography, Inc.*, No. 2:13-cv-9573, 2014 WL 7639820 at *15 (C. D. Cal. Oct. 28, 2014). The claims at issue in *Wolf* were directed to cataloging photos of sporting event participants—such as marathon runners—on a central web server, so that such participants could search for their photos using identifying information (*e.g.*, by the number of the bib they wore during the race), and then download their photos. *See id.* at **2-5. The claims variously recited steps such as "associating identifying data [such as bib number] with each photograph taken []," "transferring the photographs to a computer network server," "cataloging each of the photographs in a web-site server according to identifying data," "storing the photographs in a database," "accessing the server [or database] and searching for a photograph [] utilizing the identifying data," "associating visual advertiser indicia [with the photograph]" and "transferring the selected photograph [] with advertiser indicia to a requestor." *Id.* The court held such steps to constitute an abstract idea, and ultimately held the claims invalid. *Id.* at **8-15.

As the *Wolf* court observed:

> [I]n the pre-internet days, an event photographer could have identified race participants in photographs by bib number, approximate time, or other identifying information and, instead of mailing thumbnail images to each participant, could have placed a physical catalog of images in a certain location—say, at a local running or photography store. This would be the analog equivalent of plaintiff's claimed process, done painstakingly with pen, paper, and similarly low-tech tools. And it would have been a patent ineligible abstract idea. That generic computer technology allows for a more efficient process does not confer patent eligibility.

*Id.* at *13.

Here, the steps of "determining" characteristics of computer files, or "characterizing" them by comparing their identifiers, are similar to the simple input, comparison and output steps

in *Cybersource*, *Planet Bingo*, *Loyalty Conversion Systems*, and *Wolf* that were held to be insufficient to confer patentability.  The asserted claims of the '050 patent are no more directed to patentable subject matter than the claims in those cases that were held to be invalid.

The '050 patent itself confirms that the "inventions" claimed therein are merely generic implementations of an abstract idea.  The '050 patent states the inventions are intended to identify "characteristics of data files."  Ex. 1, '050 patent, at col. 2:37-38.  This includes, for example, the frequency with which a file (such as an e-mail) has been received, which indicates whether it is "spam."  *Id.* at col. 6:2-8; col. 7:28-31; claims 8, 14.  Although the '050 patent purports to provide the benefit of identifying an e-mail as spam based solely on its frequency of receipt, thus eliminating the need to examine the *contents* of the file (by heuristic or human analysis), *see id.* at col. 1:30-48, the claims still comprise no more than simple steps a human could perform.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

In sum, the claims are directed to the abstract idea of reviewing information that identifies an item to determine a characteristic of the item.  As shown below, generic computer-related limitations do not transform this abstract idea into a patentable invention.

### 3. The Computer-Related Limitations Of The '050 Patent Are Generic And Are Not Transformative

In *Alice*, the Supreme Court held that computer-related patents claiming an abstract idea must include an "inventive concept" sufficient to "transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. Simply adding conventional computer processing steps to perform the abstract idea is insufficient to yield patent-eligibility. *See id*. For example, in *Alice*, the claims at issue related to a computerized method for mitigating settlement risk, in which an intermediary creates "shadow" credit and debit records that mirror balances in the parties' real-world accounts. *Id*. at 2352. The intermediary only updates the shadow records when sufficient resources are available to meet the obligations. *Id*. At the end of the day, the intermediary instructs the financial institutions to carry out the approved transactions. *Id*.

The Supreme Court determined that the claims did no more than instruct the practitioner to implement the abstract idea of intermediated settlement on a generic computer. *Id*. at 2359. Using a computer to create the records and maintain the shadow accounts was considered "purely conventional." *Id*. The same was true with respect to the functions of obtaining data, adjusting account balances, and issuing instructions to the financial institutions after analysis. *Id*. "[A]ll of these computer functions are well-understood, routine, conventional activities previously known to the industry." *Id*. (internal quotations omitted). Because the computer-related limitations did not add an inventive concept, the claims were held invalid. *Id*. at 2360.

Although the claims here recite computer-related limitations, such as "processing system," "server," "database," "agent", "algorithm" and "network," these are merely generic computer processing elements. They are used in a conventional way to perform rudimentary, well-understood functions. Nothing in these limitations adds an inventive concept to the abstract

idea.  A summary of the computer-related elements in the asserted claims is provided in the chart below:

| Abstract Steps | Added computer-related concepts |
| --- | --- |
| Preamble | |
| receive an identifier for an item; | 1) identifiers are received on a computer, from multiple other computers, over a computer network |
| match the identifier against previously-received identifiers to ascertain something about (*i.e.*, a characteristic of) the item; and | 2) identifiers are compared using a database lookup or similar computer storage feature |
| output a result (*e.g.*, an indication of the characteristic including whether the characteristic exists). | 3) a result based on the matching step is output over the computer network |

This well-understood, conventional computer processing does not transform a patent-ineligible abstract idea into a patent-eligible application.  *See, e.g., Alice*, 134 S. Ct. at 2357-58 ("Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself.'" (citations and brackets omitted)).  Similarly, "routine input, memory, look-up, comparison, and output capabilities" are conventional and not transformative  *SmartGene, Inc. v. Advanced Bio. Labs., SA*, 555 Fed. App'x. 950, 951 (Fed. Cir. 2014).

IV may try to argue that generic, computer-related limitations such as "via a network" or "on the Internet"; "on a processing system," "on the first computer," "on the server system"; "using a mathematical algorithm"; or "database" or "characteristic database"—taken either individually or in the aggregate—provide sufficient inventiveness to establish patentability.

*Alice* and other cases confirm that such an argument lacks merit. *See Alice*, 134 S. Ct. at 2357-58 (inclusion of generic computer implementation does not make an abstract idea patentable); *buySAFE Inc. v. Google, Inc.*, 765 F.3d at 1355 (same); *Wolf*, 2014 WL 7639820 at *12 ("[T]hese [dependent] claims simply incorporate various conventional (and alternative) methods of identifying race participants. They do not significantly limit the claims, leaving other viable applications of the abstract idea to event photography, and they do not 'improve the functioning of' any incorporated technology.").

        a.        *"receiving . . . via a network" / "files on the Internet"*

The requirement that the method steps be performed over a generic computer network does nothing to make the abstract idea patentable. *Alice*, 132 S. Ct. at 2359 (characterizing "the use of a computer to obtain data" as a well-understood, routine, conventional activity previously known to the industry). As the Federal Circuit reasoned in *buySAFE*:

> The computer functionality is generic—indeed, quite limited: a computer receives a request for a guarantee and transmits and offer of guarantee in return. There is no further detail. **That a computer receives and sends the information over a network— with no further specification—is not even arguably inventive.**

765 F.3d at 1355 (emphasis added). Such is the case here as well, where mere receipt of an input and output of a result are recited.

As yet another example, in *Comcast*, the claims-in-suit included steps of receiving a request from an application over a telephony network. 2014 WL 3542055, at *5. The court determined that the steps could be performed manually, and therefore were unpatentable. The court further noted, however, that even if it were to assume that (1) the claimed method had to be performed on a computerized telephony network; (2) a computer application made the request, and (3) a computer handled and responded to the request, the claim was still unpatentable because it "merely cover[ed] the application of what has for a long time been conducted solely in

the mind." *Id.*; *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 1:10-cv-910, 2014 WL 5430956 at *8 (E.D. Va. Oct. 24, 2014) ("Collecting, filtering, aggregating, and completing network information amounts to 'electronic recordkeeping,' which is 'one of the most basic functions of a computer.'" (quoting *Alice*, 134 S. Ct. at 2359)).

Further, as this Court has noted, "to be 'a meaningful limit on the scope of a claim,' the addition of a computer 'must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly.'" *Walker Digital*, 2014 WL 4365245 at *3 (quoting *Cybersource*, 654 F.3d at 1375). In *Walker Digital*, the patent claims required "receiving" and "storing" information prior to processing. *Id.* at *4. As this Court found, "these additional steps again add no inventive element to the mental processes claimed by the . . . patent." *Id.* at *6.

Indeed, the steps of receiving an identifier and outputting a reply over a network comprise entirely conventional, well-understood steps that do not support patentability for this abstract idea. *See Alice*, 134 S. Ct. at 2358. As in *Alice* and the other cases cited above, neither of these limitations adds any inventive concept to the abstract idea.

> b.      *"processing system" / "computer" / "server system"*

The asserted claims of the '050 patent recite the use of a "processing system" for receiving identifiers and comparing them. *See* '050 patent, claims 9, 22. Claim 16 recites a "second computer" for performing similar steps. *Id.*, claim 16. Claim 22 further recites a "server system" for storing and characterizing. Such generic components do not transform the abstract idea into patentable subject matter.

In *Alice*, the claims at issue recited a "data processing system," with a "communications controller" and "data storage unit." As the Supreme Court observed, "[n]early every computer will include a 'communications controller' and 'data storage unit' capable of performing the

basic calculation, storage, and transmission functions required by the method claims." *Alice*, 134 S. Ct. at 2360.  The generic "processing system" recited in the '050 patent claims is no more distinctive than in *Alice*.   The claims convey only that the processing system receives the identifiers, performs a comparison with stored identifiers (*i.e.*, performs a lookup), and provides an output.  These are basic functions of a generic computer, and add no inventive concept.[2]

c.      *"mathematical algorithm"*

Each of the asserted claims recites the use of a "mathematical algorithm" to create the content identifiers.  *See, e.g.*, Ex. 1, '050 patent, at claims 9, 16, and 22.  This limitation, too, is insufficient to confer patentability.  The '050 does not rely on any particular algorithm or process which even arguably imparts an inventive concept.  *See Bilski v. Kappos*, 561 U.S. 593, 599 (2010) (even recitation of specific mathematical algorithm does not confer patentability for an abstract idea); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible.").  The detailed description in the '050 patent states that, generally, "any hashing algorithm can be utilized."  Ex. 1, '050 patent, at col. 3:65-4:3.  The patent concedes that the use of a hashing algorithm (*e.g.*, MD5) to identify the contents of a computer file is admitted prior art, so that is

---

[2]      The recitations of "file content identifier generator agents" (claim 9) and "client agent" (claim 22) simply describe generic functions performed by a computer.  *See, e.g.*, the Court's construction of "file content identifier generator agent(s)" as "software running on a computer that creates and transmits file content identifiers to a second tier system." D.I. 426 at 2.  Neither term identifies specific computer equipment or particular software, or provides any inventive aspect to the performance of the claims.

not inventive, either.  *Id.* at col. 3:65-4:14.  Thus, there is nothing inventive about the use of an unspecified "mathematical algorithm."[3]  This limitation, too, supplies no inventive concept.

d.    *"characteristic database" / "database"*

Certain asserted claims of the '050 patent recite the use of a "database" or "characteristic database" to store the received identifiers.  *See* Ex. 1, '050 patent, at claims 16, 22.  This computer-related element is also insignificant to patent-eligibility.  First, the use of a database for storage is no more inventive a concept than the use of a file cabinet for storage.  *Walker Digital,* 2014 WL 4365245 at *8 (observing that "secure database" could indicate nothing more than a locked file-cabinet); *see also MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1255, 1257 (Fed. Cir. 2012) (stating a "database" means "a collection of data within a given structure that can be stored and retrieved," including a paper filing cabinet).

Second, as *Alice* and its progeny demonstrate, computer storage and lookup elements are entirely conventional.  *See Alice*, 134 S. Ct. at 2360.  Indeed, "storing and querying information in a database, and building reports based on that information, is one of the most basic functions of a computer."  *Amdocs*, 2014 WL 5430956 at *8.  Thus, reciting a computer storage element such as a database does nothing to transform the abstract idea into patentable subject matter.

e.    *Purported advantages of computers over humans*

Finally, even assuming that the use of a computer processor to match content identifiers enhanced speed or confidentiality over a human's performance of the claims, the Supreme Court, the Federal Circuit and this Court all have found that such advantages do not serve to transform an abstract idea into a valid patent claim.  *See Alice*, 134 S. Ct. at 2359 (referring to "electronic recordkeeping" as "one of the most basic functions of a computer"); *Bancorp Svcs., L.L.C. v. Sun*

---

[3]    *See also Walker Digital*, 2014 WL 4365245 at *8 (recitation of a cryptographic key insufficient to confer patentability).

16

*Life Assurance Co.*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible."); *Walker Digital*, 2014 WL 4365245, at \*6 ("Even accepting that the use of a computer increases speed and efficiency of performing the steps of the claims, and improves the likelihood of preserving the anonymity of the first and second parties, these characteristics do not save the claims.").

\* \* \* \*

In short, the conventional, generic computer-related limitations in the asserted claims of the '050 patent do not transform the abstract steps of receiving an identifier for an item, matching that identifier against previously-received identifiers to ascertain something about (*i.e.*, a characteristic of) the item, and outputting a result (*e.g.*, an indication of the characteristic including whether the characteristic exists), into patent-eligible subject matter.

**B.  The Asserted Claims of the '142 Patent Are Invalid For Claiming Ineligible Subject Matter**

     *1.  The '142 Patent*

The '142 patent, entitled "Automated Post Office Based Rule Analysis of E-mail Messages and Other Data Objects for Controlled Distribution in Network Environments," is directed to an apparatus and methods for "automatic deferral and review of e-mail messages and other data objects in a networked computer system."  Ex. 4, '142 patent, Abstract.  IV has asserted claims 1, 7, 17, 21, 22, 24 and 26 against Trend Micro.

The system and methods of the '142 patent work in a manner similar to the way any brick-and-mortar post office or corporate mailroom works, only in an e-mail environment.  As IV stated to the Court in its technology tutorial, submitted June 5, 2012:

> In a business email environment business rules are applied at the "post office."  In the typical environment, the post office resides on a mail server, where the company's emails are received, processed, and routed to recipients.  **Conceptually, this post office is not**

> **much different than a United States Postal Service office that processes letters and packages, except that the process is all computer-implemented and done electronically in a matter of seconds. The business rules are automatically applied to each incoming message, and the post office takes action on messages that trigger the business rules.** Other messages are simply routed normally to their designated recipients.

Ex. 5 (IV's Technology Tutorial) at 49.

The claimed methods in the '142 patent involve receiving e-mail messages (or "data objects"), applying business rules to the received messages, deferring delivery of selected messages by combining the message with the rule history and a new distribution list, and delivering the combined message/rule history/distribution list to a new destination post office. *Id.* at cols. 3-4. The '142 patent also includes system claims directed to similar functionality.

### 2.    The Asserted Claims Are Directed To An Abstract Idea

As explained above, the '142 patent describes a system and methods for handling and routing e-mail messages based upon stored business rules. The claimed inventions, however, amount to no more than the application of conventional "mailroom" procedures to electronic mail. The '142 patent specification observes that businesses have methods to control the flow of printed messages and documents, but conventional e-mail systems did not have similar capabilities. '142 patent, 1:15-34; 2:15-29. The '142 patent purports to apply the same solution for email that was well-known and conventional for printed messages. *Id.* at 3:1-6; *see also* ███ ████████████████████ Ex. 7 (Geiger Tr.) 272:5-21.

Upon violation of a "business rule"—for example, if the attachments to an e-mail are too large, or if the e-mail is sent to the president of the company by an employee lacking authorization to do so, etc. (*see* '142 patent, col. 3:45-52)—the post office enforcing the rules will deliver the e-mail to an administrator's post office for review, combined with an identification of the rule that was violated. After review, an administrator can take various

actions, including approving the message for delivery or returning the message to the sender.

The '142 patent claims the abstract idea of controlling the distribution of messages by applying rules to the messages as they are processed.  Claim 17, exemplary for Section 101 purposes, is comparable to actions performed by humans in a corporate mailroom:

| Claim 17 | Abstract Steps | Abstract Steps Performed By A Human |
|---|---|---|
| A process for controlling the delivery of e-mail message in a business, comprising: | Preamble | |
| providing to a post office a set of business rules derived from business communication policies, each business rule defining an action applied to an e-mail message based on the attribute of the message; | providing to a [mailroom] a set of business rules derived from business communication policies; | The central corporate mailroom at Acme Corporation has a set of business rules for handling correspondence addressed to people in the company.  The rules are posted on the mailroom wall for mailroom employees to consult. |
| receiving messages at the post office; | receiving messages at the [mailroom]; | The mailroom receives correspondence addressed to the corporation or its employees. |
| to at least one message received at the post office, applying the business rules to the attributes of the message | to at least one message received at the [mailroom], applying the business rules; | One of the business rules of the corporation is that correspondence addressed to the CEO is |

| Claim 17 | Abstract Steps | Abstract Steps Performed By A Human |
|---|---|---|
| to determine at least one action of deferring delivery to be applied to the message; | | always sent to an administrator for review unless it has been marked as "Personal" on the front of the envelope.  In one instance, the mailroom receives an incoming letter without such a marking. |
| automatically combining the e-mail message with a new distribution list specifying at least one destination post office for receiving the e-mail message for review by an administrator associated with the destination post office and a rule history specifying at least one business rule determined to be applicable to the e-mail message; and | automatically combining the [] message with a new distribution list specifying at least one destination mailroom for review by an administrator and a rule history; | A mailroom employee tasked with stamping incoming mail stamps the envelope, "Deliver to Administrator:  CEO, Not Personal" |
| automatically delivering the [] message to a destination post office on the distribution list instead of a specified recipient of the [] message. | automatically delivering the [] message to a destination [mailroom] on the new distribution list; | In the next round of hourly deliveries, mailroom staff delivers the letter to the administrator's mail drop instead of the CEO suite. |

As this example shows, claim 17 is no more than the application of conventional mailroom procedures to electronic mail.  The same is true of the other asserted claims.  Again, "[c]onceptually, this post office is not much different than a United States Postal Service office that processes letters and packages, except that the process is all computer-implemented and done electronically in a matter of seconds."  Ex. 5 (IV Tech. Tutorial) at 49.  Even the first-named inventor acknowledged that the claimed invention could be performed by humans using printed mail.  Ex. 7 (Geiger Tr.) 272:5-21.  Applying the same steps more quickly and efficiently on a computer does not make the combination of steps patent-eligible.  *See Walker Digital*, 2014 WL 4365245 at *3 (the addition of a computer "must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly.").  These claims represent no more than the practice of an abstract idea.

### 3. *The Computer-Related Elements Of The '142 Patent Are Generic And Are Not Transformative*

Replacing paper correspondence in the above example with "e-mail" and "data object(s)," as in the asserted claims, does not make rule-based processing of messages any more patent-eligible.  And limiting the claims to a particular technological environment (in this instance, networked computers) does not circumvent the prohibition against patenting abstract ideas.  *Alice*, 134 S.Ct. at 2358.

The system claims do not add anything inventive or transformative by their recitation of generic computer elements.  Claim 1 and dependent claim 7 add nothing but well-understood, routine, and conventional computer-related activity.  *See Alice*, 134 S. Ct. at 2359.  For example, claim 1 recites receipt and redistribution of messages on a computer network, through the use of a "receipt mechanism" and a "distribution mechanism".  The Supreme Court has characterized

"the use of a computer to obtain data" as well-understood, routine computer activity. *Alice*, 132 S. Ct. at 2359; *see also buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.").

Claim 1 also recites storage of a "database of business rules." As discussed above with respect to the '050 patent, database storage is entirely conventional and does not confer patentability. *See Walker Digital*, 2014 WL 4365245 at *8 (observing that a "secure database" could indicate nothing more than a locked file-cabinet); *see also MySpace,* 672 F.3d at 1255 and 1257 (a database means "a collection of data within a given structure that can be stored and retrieved," including a paper filing cabinet).

The recitation of a "rule engine" does not connote a particular machine or algorithm, but merely a generic computer configured with software to perform the claimed function—namely, applying rules. *See, e.g.,* '142 patent, 4:22-39; 6:26-35 ("A REPO 102 includes functional modules for receiving, processing, and distributing e-mail messages to and from e-mail client applications 110 and other post offices . . . . These functional modules are provided by a receipt engine 200, a rule engine 210 and a distribution engine 230, respectively."). Applying rules is a fundamental computer processing activity, and adds no "inventive concept" to the abstract idea. *See, e.g., SmartGene*, 555 Fed. App'x. at 954 (computerized claims that do " no more than call on a 'computing device,' with basic functionality for comparing stored and input data and rules, to do what doctors do routinely" were not patent eligible). Accordingly, the asserted claims add no more than well-understood, conventional computer processing to practice the claimed abstract ideas in an automated setting. That is insufficient to confer patentability, and the claims of the '142 patent should therefore be held invalid.

**C.    The Asserted Claims of the '610 Patent Are Invalid For Claiming Ineligible Subject Matter**

*1.    The '610 Patent*

The '610 patent, entitled "Computer Virus Screening Methods and Systems," is directed to methods and systems for screening computer data.  Ex. 8, '610 patent, at Abstract, 1:59-64. Figure 1 of the '610 patent (depicted below) is a block diagram in accordance with the alleged inventions:



*Fig. 1*

IV asserts only Claim 7, which depends from Claim 1.  Both claims are shown *seriatim*, below:

1.    A virus screening method comprising the steps of:

routing a call between a calling party and a called party of a telephone network;

receiving, within the telephone network, computer data from a first party selected from the group consisting of the calling party and the called party;

detecting, within the telephone network, a virus in the computer data; and

in response to detecting the virus, inhibiting communication of at least a portion of the computer data from the telephone network to a second party selected from the group consisting of the calling party and the called party.

7.    The virus screening method of claim 1 further comprising the step of determining that virus screening is to be applied to the call based upon at least one of an

23

identification code of the calling party and an identification code of the called party.

During prosecution of the '610 patent, the applicants distinguished their proposed claims over a Trend Micro patent—U.S. Patent No. 5,263,600 to Ji et al.   D.I. 214-14 at 4-47. According to the applicants—who were associated with original assignee Ameritech Corporation, a telephone company—the Trend Micro patent taught performing virus detection at "gateway" nodes of a network, not "within the telephone network." *Id.*  The **only** distinction the applicants made over the Trend Micro prior art was **where** the virus screening was to occur—*i.e.* "within the telephone network" as opposed to in a local area network.  The applicants did not argue that there was any difference in **how** the screening was to be performed.  *Id.*  To the contrary, the specification states that the known virus scanning methods disclosed in the Trend Micro prior art patent could be used in their purported invention, and even incorporates Trend Micro's patent by reference.  *See, e.g.*, Ex. 8, '610 patent, at col. 12:26-31.

### 2.  *The Asserted Claims Are Directed To An Abstract Idea*

Claim 1 of the '610 patent is directed to a method for screening information in a call.  As noted above, the '610 patent does not teach any specific method of virus detection.

Dependent claim 7, which is asserted against Trend Micro, merely conditions the performance of the virus screening in claim 1 on confirming the identity of the one of the parties to the call.  During his testimony at the Symantec trial, IV's expert, Dr. Patrick McDaniel, used the figure shown below to explain the operation of the '610 patent:



As Dr. McDaniel testified:

> Q.    [L]et's look at an example of Claim 7.  I see there is [sic] three different areas.  Will you explain these for us?
>
> A.    Sure.  This is—I tried to draw you a diagram that will help kind of visualize these three pieces. * * * We have a calling party network.  That is the person that is sending the email. * * * And we have a called party network.  And they have got their network that they are receiving their email on.  And everything in between them is within the telephone network.* * * **That email is going to go up into the cloud, somewhere within the telephone network, and then there is going to be a two-step process.  The first one is that the email is going to be checked…to see whether or not it should be processed. * * *  If that ID check is good, then we are going to apply a scanning of the email. * * * So if it does find a virus, it's going to block it, it's just going to say, no, that one isn't going to go through.**

Ex. 9 (Trial Tr., Vol. B) at 507:17 – 509:3 (emphasis added).

In Dr. McDaniel's words, a "two-step process" is applied to the data in transit:  1) an ID check to confirm the identity of the calling and/or called party; and 2) the content is scanned to see if some portion of the content needs to be blocked.  These two steps can be performed in a

standard voice telephone call.   In the following human-implemented illustration, psychologist

Bob Newhart has instructed his answering service to "hold all his non-emergency calls":

| Claim 1 [Claim 7 in Brackets] | Abstract Steps | Abstract Steps Performed By A Human |
|---|---|---|
| A virus screening method comprising the steps of: | Preamble | |
| routing a call between a calling party and a called party of a telephone network; | route a call between a calling party and a called party; | Bob is a subscriber to Acme Answering Service ("Acme"), which connects telephone calls through to Bob's various phone lines or takes messages pursuant to his instructions; |
| [determining that virus screening is to be applied to the call based upon at least one of an identification code of the calling party and an identification code of the called party;] | only screen the call if identity of calling party and/or called party is confirmed; | Acme confirms that the called party is Bob prior to screening the call; |
| receiving, within the telephone network, computer data from a first party selected from the group consisting of the calling party and the called party; | receive information from either the calling party of the called party; | Bob's patient Mary places a call to Bob; Acme receives the call; |
| detecting, within the telephone network, a virus | screen the information for a certain characteristic; | the operator on duty at Acme asks Mary if she has an |

| Claim 1 [Claim 7 in Brackets] | Abstract Steps | Abstract Steps Performed By A Human |
|---|---|---|
| in the computer data; and | | emergency; she says no; |
| in response to detecting the virus, inhibiting communication of at least a portion of the computer data from the telephone network to a second party selected from the group consisting of the calling party and the called party. | if a particular characteristic is detected in the information, stop at least some of the information from going through. | Acme does not forward the call to Bob, but instead takes down Mary's number and indicates that her call will be returned. |

The screening described above is performed by humans, without a computer.  In *Vehicle Intelligence and Safety LLC v. Mercedes-Benz USA, LLC*, C.A. No. 13-C-4417, 2015 WL 394273, *8 (N.D. Ill. Jan. 29, 2015), the patent-in-suit was directed to methods for screening equipment operators for impairment (*e.g.,* intoxication, physical impairment, medical impairment, or emotional impairment) to prevent their operation of moving equipment.  *Id.* at *1. The district court determined that the claimed inventions related to "the concept of testing operators of any kind of moving equipment for any kind of physical or mental impairment," and that screening for physical, medical, or emotional impairment "is a process that can be carried out by doctors, EMT's, police officers, and others."  *Id.* at *3.  The court concluded that the concept "qualifies as an abstract idea within the meaning of the cited Supreme Court precedents as well as Federal Circuit precedents."  *Id.*

Just as the patent in *Vehicle Intelligence* was not eligible to cover all automated methods of screening for impairment, the '610 patent cannot purport to cover all methods of screening information within a particular technological environment—*i.e.*, between networked computers.

27

These claims are directed to an abstract idea; without an added "inventive concept," they are not patent-eligible.

### 3.    The Computer-Related Elements Of The '610 Patent Are Generic And Are Not Transformative

The '610 patent adds no inventive concept to the well-known and generic idea of screening information in a communication network.  It merely purports to automate the process using well-understood, conventional computer processing.

Aside from reciting the computer-related terms "computer data" and "virus," claim 1 does not relate to computer technology at all—the steps can just as easily be performed with a conventional voice telephone call, as shown above.  The addition of these terms is not sufficient to make claim 7 eligible for patenting under § 101.  "Routing" communications, "receiving data," and "inhibiting" the transmission of data are all conventional and well-understood computer functions that do not make an abstract idea patentable.  *Alice*, 134 S.Ct. at 2359 ("obtain data" and "issue automated instructions"); *see also buySAFE*, 765 F.3d at 1355 ("receiving a request" and transmitting an offer in return" over a network is "not even arguably inventive"); *Accenture*, 728 F.3d at 1338, 1343-35 ("storing," "transmit[ing], and receiv[ing]" are non-inventive).  All of these terms merely limit the scope of the claim to the practice of a well-known, abstract idea in a particular technological environment (*i.e.*, networked computers), and do not constitute an advance over existing call screening methods.  This is not sufficient to confer patentability.  *Alice*, 134 S.Ct. at 2358.

Claim 7 conditions performance of the screening on an identification code and is "purely conventional or obvious [pre]solution activity."  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012).  The step described in claim 7 is intended to implement the screening recited in claim 1 as a subscription service, so that either the calling or called party

must be confirmed as a subscriber.  *See* Ex. 10 (Franczek Depo. Tr.) 60:24-62:4; Ex. 11 (Bretscher Depo. Tr.) 148:12-149:2; 151:5-15; 153:22-154:24; 157:19-158:10; *see also* Ex. 12 Trial Tr. 2317:5-14.  Using an identification code was not a meaningful transformation of any kind in computer technology.  As the Federal Circuit has previously held, using identifiers to represent human beings in a computer method is not inventive.  *See Planet Bingo*, 576 App'x. 1005, 1007-08 ("The steps of selecting, storing and retrieving two sets of numbers [and] assigning a player identifier and a control number" are not inventive).

## VI.    CONCLUSION

Because the asserted claims of the patents-in-suit are directed to abstract ideas, and because the added computer-related limitations are merely generic and do not add inventive concepts beyond the abstract ideas themselves, none of the asserted claims of the three patents-in-suit are eligible for patent protection.  For these reasons, Trend Micro's motion should be granted and the patents held invalid for failing to claim patent-eligible subject matter pursuant to 35 U.S.C. § 101.

|                                      | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
|--------------------------------------|--------------------------------------|
| OF COUNSEL:                          | */s/ Michael J. Flynn*               |

| Yar R. Chaikovsky                    | Karen Jacobs (#2881)                 |
| David L. Larson                      | Michael J. Flynn (#5333)             |
| D. Stuart Bartow                     | 1201 N. Market Street                |
| MCDERMOTT, WILL & EMERY LLP          | P.O. Box 1347                        |
| 275 Middlefield Road, Suite 100      | Wilmington, DE  19899-1347           |
| Menlo Park, CA  94025                | (302) 658-9200                       |
| (650) 815-7400                       | kjacobs@mnat.com                     |
|                                      | mflynn@mnat.com                      |
| Christopher Bright                   |                                      |
| MCDERMOTT WILL & EMERY LLP           | *Attorneys for Trend Micro Incorporated* |
| 4 Park Plaza, Suite 1700             | *and Trend Micro, Inc. (USA)*        |
| Irvine, CA 92614                     |                                      |
| (949) 851-0633                       |                                      |

March 13, 2015  - Original Filing Date
March 20, 2014 - Redacted Filing Date