## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTELLECTUAL VENTURES I LLC,

               Plaintiff,

v.

TREND MICRO INCORPORATED, et al.

               Defendants.

Case No. 12-cv-1581-LPS

JURY TRIAL DEMANDED

**FILED UNDER SEAL**

## PLAINTIFF INTELLECTUAL VENTURES I LLC'S
## RESPONSE TO
## DEFENDANTS' MOTION FOR INVALIDITY UNDER 35 U.S.C. § 101

Dated:  March 30, 2015

Parker C. Folse III *(admitted pro hac vice)*
Brooke A.M. Taylor *(admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone:    (206) 516-3880
Facsimile:    (206) 516-3883
pfolse@susmangodfrey.com
btaylor@susmangodfrey.com

Brian E. Farnan (Bar No. 4089)
FARNAN LLP
919 North Market Street
12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com

Richard W. Hess (admitted *pro hac vice*)
Weston O'Black (admitted *pro hac vice*)
John P. Lahad *(admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone:    (713) 653-7859
Facsimile:    (713) 654-3386
rhess@susmangodfrey.com
woblack@susmangodfrey.com
jlahad@susmangodfrey.com

*Counsel for Plaintiff*

Table of Contents

I.  Nature and Stage of the Proceedings ....................................................................1

II.  Summary of the Argument...................................................................................2

III.  Summary of Facts ...............................................................................................2

IV.  Legal Standard ...................................................................................................2

　　A.  Trend Must Prove Invalidity Under § 101 by Clear and Convincing Evidence...................................................................................................2

　　B.  The Supreme Court's Two-Part Test for Patent Eligibility .....................2

　　　　1.  *Mayo* Step One...........................................................................3

　　　　2.  *Mayo* Step Two ...........................................................................5

　　C.  Preemption is a Fundamental Part of the Analysis .................................5

　　D.  *DDR Holdings* Provides the Most Relevant Guidance .............................6

V.  Argument ...........................................................................................................8

　　A.  The Claims of the Patents-in-Suit Are Not Directed to Abstract Ideas .................8

　　　　1.  The Patents-in-Suit are Necessarily Rooted in Computer Technology ...........................................................................9

　　　　2.  The *Amici* Agree that the Patents-in-Suit Are Not Abstract .....................10

　　　　3.  The U.S. PTO Says that the Patents-in-Suit Are Not Abstract .................10

　　　　4.  Trend Mischaracterizes the Patents-in-Suit ............................................12

　　　　　　a.  The '050 Patent is Not Drawn to an Abstract Idea ........................12

　　　　　　b.  The '142 Patent is Not Drawn to an Abstract Idea ........................18

　　　　　　c.  The '610 Patent is Not Drawn to an Abstract Idea ........................19

　　B.  The Patents-in-Suit Include an "Inventive Concept"............................20

　　　　1.  The Claims of the Patents-in-Suit Do Not Raise Preemption Concerns ............................................................................21

　　　　　　a.  The '050 Patent Recites a Specific Way to Identify File Content........................................................................22

i

          b.       The '142 Patent Recites a Specific Way to Filter Email ...............26

          c.       The '610 Patent Recites a Specific Way to Perform
                 Virus Detection ............................................................................26

   C.      The Patents-in-Suit Improve the Function of a Computer....................................27

   D.      The Patents-in-Suit Pass the Machine-or-Transformation Test............................29

VI.   Conclusion ....................................................................................................................30

Table of Authorities

**Cases**

*Accenture Global Servs., GmBH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013)........................................................................ 8

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014)........................................................................... passim

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*,
  687 F.3d 1266 (Fed. Cir. 2012)...................................................................... 3, 4

*Bilski v. Kappos*,
  130 S.Ct. 3218 (2010)................................................................................ 3, 24

*buySAFE Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014)......................................................................... 4

*California Institute of Tech. v. Hughes Commc'ns Inc.*,
  2014 WL 5661290 (C.D. Cal. Nov. 3, 2014)................................................. passim

*Comcast IP Holdings I, LLC v. Sprint Commc'ns Co.*, L.P.,
  2014 WL 3542055 (D. Del. July 16, 2014) ........................................................ 2

*Content Extraction and Transmission LLC v. Wells Fargo Bank*,
  776 F.3d 1343 (Fed. Cir. 2014)...................................................................... 17

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011)...................................................................... 17

*DDR Holdings, LLC v. Hotels.com*,
  773 F.3d 1245 (Fed. Cir. 2014)................................................................. passim

*Diamond v. Chakrabarty*,
  100 S. Ct. 2204 (1980)................................................................................... 3

*Diamond v. Diehr*,
  101 S. Ct. 1048 (1981)....................................................................... 4, 25, 30

*East Coast Metal Fabricating Corp. v. Autodesk, Inc.*,
  2015 WL 226084 (D.N.H Jan. 15, 2015)............................................................ 28

*Fort Properties, Inc. v. American Master Lease LLC*,
  671 F.3d 1317 (Fed. Cir. 2012)......................................................................... 4

*Gottschalk v. Benson*,
     409 U.S. 63 (1972)............................................................................................. 4

*Helios Software, LLC v. SpectorSoft Corp.*,
     2014 WL 4796111 (D. Del. Sept. 25, 2014)..................................................... 29

*In re Bilski*,
     454 F.3d 943 (Fed. Cir. 2008).......................................................................... 29

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
     132 S. Ct. 1289 (2012)................................................................................ passim

*Parker v. Flook*,
     437 U.S. 584 (1978)........................................................................................... 4

*Planet Bingo, LLC v. VKGS LLC*,
     576 Fed App'x 1005 (Fed. Cir. 2014)......................................................... 4, 17

*SiRF Tech., Inc. v. Int'l Trade Com'n*,
     601 F.3d 1319 (Fed. Cir. 2010)................................................................. 29, 30

*Smartflash LLC v. Apple, Inc.*,
     2015 WL 661174 (E.D. Tex. Feb. 13, 2015)................................................... 21

*Synopsys, Inc. v. Mentor Graphics Corp.*,
     2015 WL 269116 (N.D. Cal. Jan. 20, 2015)..................................................... 2

*Tenon & Groove, LLC v. Plusgrade S.E.C.*,
     2015 WL 1133213 (D. Del. Mar. 11, 2015) ..................................................... 2

*Ultramercial, Inc. v. Hulu, LLC*,
     772 F.3d 709 (Fed. Cir. 2014)..................................................... 3, 24, 27, 29

*Wolf v. Capstone Photography, Inc.*,
     2014 WL 7639820 (C.D. Cal. Oct. 28, 2014)................................................. 16

**Statutes**

35 U.S.C. § 100............................................................................................... 24

35 U.S.C. § 101................................................................................................. 2

**Other Authorities**

Examples: Abstract Ideas,
     U.S. Patent and Trademark Office (Jan. 27, 2015)................................... 11, 12

"A claim that presents functional and palpable applications in the field of computer technology is not excluded by Section 101. … Such inventions should be patent-eligible because they disclose concrete technological applications and fall within patent law's traditional bailiwick of the scientific, technological, and industrial arts."

Symantec and Trend championed this view of software patent eligibility as part of BSA | The Software Alliance's March 6, 2015 Federal Circuit *Amicus* Brief filed in *McRo, Inc. v. Bandai Namco Games America, Inc.*, Appeal No. 2015-1080. *See* Ex. 1 at 14-15. In its present motion – filed one week later – Trend launched a broadside attack on *all* software patents, arguing that claims reciting "a generic computer configured with software" cannot meet § 101 standards. The Court should reject Trend's indictment of software patentability, especially when it comes to the Patents-in-Suit, which pass *every* test the Supreme Court and the Federal Circuit have articulated for patent eligibility.

## I.   Nature and Stage of the Proceedings

Intellectual Ventures filed this case on December 8, 2010 alleging infringement of U.S. Patent Nos. 6,460,050 ("the '050 Patent"), 6,973,142 ("the '142 Patent"), 5,987,610 ("the '610 Patent"), and 7,506,155 ("the '155 Patent") (collectively, "the Patents-in-Suit"). D.I. 1.

On June 14, 2013, Trend moved for summary judgment of invalidity of the '050 and '142 Patents under 35 U.S.C. §§ 102 and 103, non-infringement of the '142 and '610 Patents, no willful infringement (even though Intellectual Ventures did not assert willfulness), and no damages. D.I. 71. Trend did not move for summary judgment on § 101 eligibility grounds. On March 31, 2014, the Court denied Trend's motion for summary judgment. D.I. 133.

On November 6, 2014, nearly 18 months after the deadline for filing dispositive motions, Trend moved for leave to file a Rule 12(c) motion for judgment on the pleadings. D.I. 159.  The Court denied Trend's motion for leave on December 9, 2014. D.I.163.

## II.   Summary of the Argument

Trend cannot meet its burden to prove by clear and convincing evidence that the Patents-in-Suit are invalid under § 101. The Patents-in-Suit are not drawn to abstract ideas and provide solutions necessarily rooted in computer technology to problems specifically arising in the realm of computer technology. Even if they do fall into the judicial exception (they do not), the claims of the Patents-in-Suit "add enough" "meaningful limitations" to avoid monopolizing the supposed abstract idea. And, the Patents-in-Suit improve the function of a computer and thus pass the machine or transformation test, confirming they concern patent-eligible subject matter.

## III.   Summary of Facts

Intellectual Ventures incorporates the relevant facts into the sections below.

## IV.   Legal Standard

### A.   Trend Must Prove Invalidity Under § 101 by Clear and Convincing Evidence

Because the Patents-in-Suit are presumed to be valid, "an alleged infringer asserting an invalidity defense pursuant to § 101 bears the burden of proving invalidity by clear and convincing evidence." *Synopsys, Inc. v. Mentor Graphics Corp.*, 2015 WL 269116, at *3 (N.D. Cal. Jan. 20, 2015); *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co.*, L.P., 2014 WL 3542055 (D. Del. July 16, 2014) (using clear and convincing burden in § 101 analysis); *Tenon & Groove, LLC v. Plusgrade S.E.C.*, 2015 WL 1133213, at *3 (D. Del. Mar. 11, 2015) (same).

### B.   The Supreme Court's Two-Part Test for Patent Eligibility

Section 101 of 35 U.S.C. provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." "In choosing such expansive terms modified by the comprehensive 'any,' Congress

plainly contemplated that the patent laws would be given wide scope." *Bilski v. Kappos*, 130 S.

Ct. 3218, 3225 (2010) (quoting *Diamond v. Chakrabarty*, 100 S. Ct. 2204, 2207 (1980)).

In *Mayo Collaborative Services v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012) and

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the Supreme Court articulated a

two-part analytical framework for determining whether a patent satisfies § 101. "First, we

determine whether the claims at issue are directed to one of those patent-ineligible concepts. If

so, we then ask, 'what else is there in the claims before us?'" *Alice*, 134 S. Ct. at 2355.

1.    *Mayo* Step One

The law recognizes three "fundamental principle" exceptions to subject matter eligibility

requirements: laws of nature, physical phenomena, and abstract ideas. "The concepts covered by

these exceptions are part of the storehouse of knowledge of all men … free to all men and

reserved exclusively to none." *Bilski*, 130 S. Ct. at 3225.

Trend argues that the Patents-in-Suit fall into the "abstract idea" exception. The Supreme

Court and the Federal Circuit have not defined the boundaries of an abstract idea, but Supreme

Court and Federal Circuit precedent demonstrate that the vast majority of patents found to be

drawn to "abstract ideas" covered long-standing fundamental economic and business practices.

In *Bilski*, for example, the Court found that the patent at issue claimed "the basic concept

of hedging or protecting against risk," which "all members of the Court agree[d]" was an abstract

idea. 130 S. Ct. at 3230-31. In *Alice*, the Court held that the claims at issue "are drawn to the

concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk,"

which like hedging, "is a fundamental economic practice long prevalent in our system of

commerce." 134 S. Ct. at 2356. In *Ultramercial*, *Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir.

2014), the Federal Circuit held that claims reciting the use of advertising as a form of currency as

applied to the Internet were drawn to an abstract idea. *See also  Bancorp Servs., L.L.C. v. Sun*

3

*Life Assurance Co. of Can.,* 687 F.3d 1266, 1278 (Fed. Cir. 2012) (claims implemented the abstract idea of managing a stable-value protected life insurance policy); *Fort Properties, Inc. v. American Master Lease LLC*, 671 F.3d 1317, 1322 (Fed. Cir. 2012) (finding claims involving "aggregating real property into a portfolio, dividing the interests in the portfolio into a number of deedshares, and subjecting those shares to a master agreement" disclosed an abstract investment tool); *buySAFE Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("the claims are squarely about creating a contractual relationship—a 'transaction performance guaranty'—that is beyond question of ancient lineage"); *Planet Bingo, LLC v. VKGS LLC*, 576 Fed App'x 1005, 1007 (Fed. Cir. 2014) (finding claims drawn to "managing a bingo game" ineligible).

Other "abstract idea" cases generally involve attempts to patent a mathematical algorithm or formula. In *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972), the Supreme Court found that claims involving an algorithm for converting binary-coded decimal numbers to pure binary numbers was "in practical effect … a patent on the algorithm itself." In *Parker v. Flook*, 437 U.S. 584, 594-595 (1978), the Court held that a mathematical formula for computing "alarm limits" in a catalytic conversion process was also an ineligible abstract idea.

The case law also provides guidance on what is *not* an abstract idea. In *Diamond v. Diehr*, 101 S. Ct. 1048, 1057-58 (1981), for example, the Supreme Court held patent-eligible a computer-implemented process for curing rubber using the Arrhenius equation, finding that the patentees "seek only to foreclose from others the use of that equation in conjunction with the all of the other steps in their claimed process." The Supreme Court added that "when a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect," the requirements of § 101 are satisfied. *Id*. at 1060-61.

Critically, the Supreme Court cautions courts to "tread carefully in construing this exclusionary principle lest it swallow all of patent law. At some level, *all* inventions embody use, reflect, rest upon, or apply laws of nature, natural phenomena or abstract ideas." *Alice*, 134 S. Ct. 2354 (emphasis added).

2.      *Mayo* Step Two

If a court finds that the claims are *not* drawn to an abstract idea, the inquiry ends and the claims are eligible under § 101. Otherwise, the court applies *Mayo* step two, and "must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1294). "A claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Id.* (internal quotations omitted). In *Mayo*, the Supreme Court framed the inquiry as whether "the patent claims add *enough* to their statements" to qualify as patent-eligible processes. 132 S. Ct. at 1297.

As part of the second step, courts must disregard "well-understood, routine, conventional activity." *Mayo*, 132 S. Ct. at 1299. A *combination* of conventional elements, however, may be unconventional, and courts must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Alice*, 134 S. Ct. at 2355.

C.      Preemption is a Fundamental Part of the Analysis

In *Mayo*, the Supreme Court described the principle underlying eligibility as whether a claim "forecloses more future invention than the underlying discovery could reasonably justify." 132 S. Ct. at 1301. In *Alice*, the Supreme Court confirmed that *preemption is "the concern that drives this exclusionary principle."* 134 S. Ct. at 2354 (emphasis added).

5

In *California Institute of Tech. v. Hughes Communications, Inc.*, 2014 WL 5661290 at

*12 (C.D. Cal. Nov. 3, 2014),[1] the court identified preemption as § 101's main theme:

> *First,* the concern underlying § 101 is preemption. Preemption is the idea that
> allowing a patent on the invention will impede innovation rather than incentivize
> it. This preemption concern underlies both steps of the analysis. The court must
> be wary about overstating this concern. By definition, every patent preempts an
> area of technology. A patentee with a groundbreaking invention is entitled to
> monopolize a segment of technology, subject to the limits of the Patent Act.
> Moreover, the court must be wary of litigants who exaggerate preemption
> concerns in order to avoid developing innovative workarounds.

This view comports with the Supreme Court's admonition that courts "must distinguish

between patents that claim the building blocks of human ingenuity and those that integrate the

building blocks into something more. … The latter pose no comparable risk of preemption, and

therefore, remain eligible for the monopoly granted under our patents laws." *Alice*, 134 S. Ct. at

2354-55. Determining patent eligibility requires analyzing the claims' preemptive effect.

D.       *DDR Holdings* Provides the Most Relevant Guidance

The Federal Circuit's post-*Alice* opinion in *DDR Holdings, LLC v. Hotels.com*, 773 F.3d

1245 (Fed. Cir. 2014) provides helpful, relevant guidance. **Trend does not distinguish, discuss,**

**or even bury in a footnote *DDR Holdings***. There, the claims involved creating web pages that

permit a visitor essentially to be in two virtual places at once:

> On activation of the hyperlink on a host website – such as an advertisement for a
> third-party merchant – instead of taking the visitor to the merchant's website, the
> system generates and directs the visitor to a composite web page that displays
> product information from the third-party merchant, but retains the host website's
> "look and feel." Thus, the host website can display a third-party merchant's
> products, but retain its visitor traffic by displaying this product information from
> within a generated web page that "gives the viewer of the page the impression she
> is viewing pages served by the host" website.

---

[1] *Cal-Tech* provides one of the most comprehensive and cohesive reviews of §101 jurisprudence to date,
and nearly a dozen courts have cited the decision favorably since it issued in November 2014.

773 F.3d at 1248-49. The Federal Circuit acknowledged the *Mayo/Alice* framework, *id*. at 1255, and highlighted "plainly identifiable" abstract ideas in some of its precedents (*e.g.*, *Ultramercial*, *buySAFE*, *Bancorp.*), *id*. at 1256, but also recognized that "identifying the precise nature of the abstract idea is not as straightforward as in *Alice* or some of our other recent abstract idea cases." *Id*. at 1257.

> Ultimately, the Federal Court held:
>
> As an initial matter, it is true that the claims here are similar to the claims in the cases discussed above in the sense that the claims involve both a computer and the internet. But these claims stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. ***Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks***.

*Id*. at 1257 (emphasis added). The court found that the patent's claims "address the problem of retaining website visitors that, if adhering to the routine, conventional functioning of the Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on a hyperlink." *Id*. The court also rejected the dissent's "pre-Internet analog," highlighting "the ephemeral nature of an Internet 'location'" and the "near-instantaneous transport between those locations made possible by standard internet communication protocols, ***which introduces a problem that does not arise in the 'brick and mortar' context.*** *Id.* at 1258 (emphasis added).

The Federal Circuit also found that "under any characterizations of the abstract idea, the '399 patent's claims satisfy *Mayo/Alice* step two." *Id*. The court distinguished the claims before it from those in cases like *Ultramercial* because "the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result – a result that ***overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink***." *Id.* at 1258-59 (emphasis added). The court addressed preemption, saying:

It is also clear that the claims at issue do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same, or of any other variant suggested by NLG. Rather, they recite a specific way to automate the creation of a composite web page by an "outsource provider" that incorporates elements from multiple sources in order to solve a problem faced by websites on the Internet. As a result, the '399 patent's claims include "additional features" that ensure the claims are "more than a drafting effort designed to monopolize the [abstract idea]."

*Id.* at 1259 (quoting *Alice*, 134 S. Ct. at 2357), and ended its § 101 analysis finding that "the claimed solution amounts to an inventive concept for resolving this particular Internet-centric problem, rendering the claims patent-eligible." *Id.*

*DDR Holdings* shows that patent eligibility extends at least to (1) claims providing a solution "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks," (2) claims that specify interactions yielding results that "override[] the routine and conventional sequence" of Internet or computer events, and (3) claims that resolve a "particular Internet-centric problem." *Id.* at 1258-59.

## V.   Argument

### A.   The Claims of the Patents-in-Suit Are Not Directed to Abstract Ideas

The first step is to determine "whether the claim poses any risk of preempting an abstract idea. To do so the court must first identify and define whatever fundamental concept appears wrapped up in the claim." *Accenture Global Servs., GmBH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013); *see also Cal-Tech*, 2014 WL 5661290 at *15 ("First, the Court must ask what these claims are trying to achieve.").

In this case, the concepts "wrapped up" in the Patents-in-Suit—what the claims are trying to achieve—are not abstract ideas. The invention of the '050 Patent consists of determining the content of a computer data file, such as whether the file contains a computer virus, using a unique digital content identifier of that computer file. The invention of the '142 Patent consists

of deferring delivery of electronic mail through application of business rules and use of a quarantine. The invention of the '610 Patent consists of performing computer virus detection exclusive of the networks and gateway nodes of the called and calling parties, *i.e.*, "within the telephone network."

These claims do not cover basic tools of research and development, and do not merely recite non-patentable age-old truths, mathematical algorithms, or fundamental economic or commercial practices, such as converting binary-coded numbers to pure binary (*Benson*), calculating alarm limits (*Flook*), hedging (*Bilski*), intermediated settlement (*Alice*), managing life insurance (*Bancorp*), a real estate investment tool (*Fort*), a contractual guaranty (*buySAFE*), playing bingo (Planet Bingo), or using advertising as a form of currency (*Ultramercial*).

### 1. The Patents-in-Suit are Necessarily Rooted in Computer Technology

In *DDR Holdings*, the Federal Circuit distinguished the "plainly" abstract ideas in *Ultramercial*, *buySAFE*, and *Bancorp* from the case before it because the claim disclosed an invention "necessarily rooted in computer technology … to overcome a problem specifically arising in the realm of computer networks." 773 F.3d at 1257. The claims of the Patents-in-Suit here "plainly" are ***not*** abstract ideas.

Like the eligible claims in *DDR Holdings*, claims of the Patents-in-Suit "do not merely recite the performance of some business practice known from the pre-Internet world along with a requirement to perform it on the Internet." *Id*. The Patents-in-Suit have <u>no</u> pre-computer analogs, and provide solutions "necessarily rooted in computer technology" to overcome problems specifically arising in the realm of computers and computer networks. The claims specify interactions between networked (and even non-networked) computers to, among other things, identify the content of computer files using digital identifiers, avoid inundation with malicious or unwanted electronic mail messages, and prevent infection by malicious computer programs.

9

These problems do not pre-date computer technology or "arise in the 'brick and mortar' context." These problems have come about *because of* computer technology.

2.   The *Amici* Agree that the Patents-in-Suit Are Not Abstract

As *amici* to the Federal Circuit, Symantec and Trend agree that "***patent claims directed to a technological problem specific to the digital environment do not implement any abstract idea***" and that "when the digital environment introduces a problem that does not arise in the 'brick and mortar' context and the claim is directed at solving that particular problem, it typically is not an abstract idea." Ex. 1 at 14 (citing *DDR Holdings*, emphasis added). "For the same reason," say the *amici*, "a claim that presents functional and palpable applications in the field of computer technology is not excluded by Section 101." *Id*.

The *amici's* examples of "functional and palpable applications" include: (1) a software process that permits a user to quickly manipulate a digital photo by removing unwanted blemishes; (2) software that creates a means for tracking human gestures as an input mechanism for computers; and (3) user interface software that enables users to quickly and efficiently rearrange the user interface of a device. *Id*. at 15. The *amici* say "these innovations all are unique to the digital world" and "no further analysis under Section 101 is required to determine that the claim is patent-eligible." *Id*.

Like these examples, the Patents-in-Suit solve "problems specific to the digital environment" (*i.e.*, computer file content identification, filtering malicious and unwanted email using rules and a quarantine, and computer virus detection) and satisfy Symantec's and Trend's "functional and palpable" standard. No further analysis under § 101 is required.

3.   The U.S. PTO Says that the Patents-in-Suit Are Not Abstract

The Patent and Trademark Office's recently-issued subject matter examples confirm that the claims of the Patents-in-Suit are not directed to abstract ideas. *See* Examples: Abstract Ideas,

U.S. Patent and Trademark Office (Jan. 27, 2015), *available at* http://www.uspto.gov/ patents/law/exam/abstract_idea_examples.pdf (Ex. 2). The PTO's first exemplary patent eligible claim involves "isolating and removing malicious code from electronic messages," and states:

> A computer-implemented method for protecting a computer from an electronic communication containing malicious code, comprising executing on a processor the steps of:
>
> receiving an electronic communication containing malicious code in a computer with a memory having a boot sector, a quarantine sector and a non-quarantine sector;
>
> storing the communication in the quarantine sector of the memory of the computer, wherein the quarantine sector is isolated from the boot and the non-quarantine sector in the computer memory, where code in the quarantine sector is prevented from performing write actions on other memory sectors;
>
> extracting, via file parsing, the malicious code from the electronic communication to create a sanitized electronic communication, wherein the extracting comprises
>
> scanning the communication for an identified beginning malicious code marker,
>
> flagging each scanned byte between the beginning marker and a successive end malicious code marker,
>
> continuing scanning until no further beginning malicious code marker is found, and
>
> creating a new data file by sequentially copying all non-flagged data bytes into a new file that forms a sanitized communication file;
>
> transferring the sanitized electronic communication to the non-quarantine sector of the memory; and
>
> deleting all data remaining in the quarantine sector.

*Id*. at 2. The PTO described the exemplary invention as one that "relates to software technology for isolation and extraction of malicious code contained in an electronic communication," and pronounced the claim patent-eligible because:

> Such action does not describe an abstract concept, or a concept similar to those found by the courts to be abstract, such as a fundamental economic practice, a method of organizing human activity, an idea itself (standing alone), or a mathematical relationship. ***In contrast, the invention claimed here is directed***

11

> ***towards performing isolation and eradication of computer viruses, worms, and
> other malicious code, a concept inextricably tied to computer technology and
> distinct from the types of concepts found by the courts to be abstract.***

*Id*. at 3 (emphasis added).

The claims of the Patents-in-Suit are similarly directed to isolation and eradication of computer viruses and malicious code and describe inventions "inextricably tied to computer technology and distinct from the types of concepts found by the courts to be abstract."

- The claims of the '050 Patent are directed to characterizing or describing the content of computer files and emails, such as whether they include computer viruses. Like scanning for "malicious code markers" in the PTO's exemplary claim, the '050 Patent uses unique digital file content identifiers, *i.e.* hashes, to identify and characterize files.

- The '142 Patent contemplates identifying potentially malicious or unwanted emails using business rules and transferring them to quarantine for administrator review – an invention strikingly similar to the exemplary claim that the PTO says is patent-eligible.

- The computer virus detection method described in the '610 Patent relies on determining within in the telephone network whether a piece of computer data contains a virus, and if so, inhibiting all or a portion of the computer data. This is quintessentially "technology for isolation and extraction of malicious code contained in an electronic communication."

These concepts are clearly distinct from "a fundamental economic practice, a method of organizing human activity, an idea itself (standing alone), or a mathematical relationship" and are not "the types of concepts found by the courts to be abstract." *Id*.

4.      Trend Mischaracterizes the Patents-in-Suit

Trend completely divorces the Patents-in-Suit from their fundamental concepts and the technology they occupy and recasts the claims as something a human could perform. Under Trend's flawed approach, the subject matter of a patent, much less its claims, is largely irrelevant.

a.      *The '050 Patent is Not Drawn to an Abstract Idea*

Trend erroneously argues at 1 that the invention of the '050 Patent consists of "reviewing information that identifies an item to determine a characteristic of the item." Trend purposefully

ignores claim elements, and collapses the invention into an overbroad idea.[2] The name of the '050 Patent is "Distributed Content Identification System," and it is concerned with identifying the content of *a computer data* file or electronic mail message using a unique digital identifier – not identifying some indiscriminate "item."

As in *DDR Holdings*, the '050 Patent does *not* "generically claim 'use of the Internet' to perform an abstract business practice" and *does* provide solutions "necessarily rooted in computer technology" to problems specifically arising in the realm of computer networks. *DDR Holdings*, 773 F.3d at 1258-59. No analog to the '050 claims exists absent computers.

The '050 Patent highlights "certain downsides" of the Internet:

> One such downside, associated with the growth of e-mail in particular, is generally referred to as "spam" e-mail. Spam e-mail is unsolicited e-mail which is usually sent out in large volumes over a short period of time with the intent of inducing the recipient into availing themselves of sales opportunities or "get rich quick" schemes.

PX1 at 1:15-20; *see also id*. at 1:65-67 ("Another downside to the proliferation of the Internet is that it is a very efficient mechanism for delivering computer viruses to a great number of people."). The specification also identifies another computer-specific problem: "forwarding the entire e-mail including attachments to an outside service represents a high bandwidth issue…." *Id*. at 1:50-52. These problems have no pre-computer or "brick-and-mortar" equivalents, and the claims do not "recite the performance of some business practice known from the pre-Internet world … with the requirement to perform it on the Internet." *DDR Holdings*, 773 F.3d at 1257.

---

[2] As *amici*, Symantec and Trend Micro criticize the *McRo* district court for taking the same approach. According to Symantec and Trend Micro, "that approach would allow any process or method claim to be categorized as an 'abstract idea' because every process or method is—at bottom—the 'idea' of performing a series of steps to achieve a particular outcome. If section 101 excluded all such 'ideas,' any process claim could be rendered non-patentable." Ex. 1 at 17 (citing *Mayo*, 132 S. Ct. at 1293).

Trend's main attack on the '050 Patent is that the claimed steps "can be performed by human beings without the aid of a computer." Motion at 7. The plain language of the claims as construed by this Court disproves Trend's argument.

Claim 9 of the '050 Patent requires

A method for identifying characteristics of data files, comprising:

receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network;

determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers; and

outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining.

The human mind cannot perform the steps of the '050 Patent. The Court construed "data files" to mean "a collection of any type of *text or binary data* that retains cohesion when presented to a user." D.I. 425 at 5. Humans cannot read computer files. The parties *agreed* that "file content ID" means:

a *digital* content identifier reflecting at least a portion of the content of a data file, but not constituting merely an excised portion of that data file. For clarity, an excised portion of the content of a data file that has been encoded and/or compressed for transmission is not a file content ID. However, the presence of an excised portion of a data file (whether encoded, compressed or otherwise) does not prevent something other than that excised portion nom being classified as a file content ID.

*Id.* at 7 (emphasis added). The parties did not contemplate that the term would include human-decipherable content identifiers. A "file content identifier generator agent" is "software running on a computer that creates and transmits file content identifiers to a second tier system." *Id.* at 9. The human mind is not a stand-in for this claim element, and it would not be faithful to the goals

of invention to say that the human mind can "determine whether each received content identifier matches a characteristic of other identifiers." Further, the "indication of the characteristic" describes the content of the file, such as whether the file contains a virus or is spam. *Id*. at 11.

**The human mind cannot detect computer viruses**.[3]

In *Cal-Tech*, the court summarily rejected the defendant's argument that "calculating parity bit values involve mental steps that can be performed by a person with pencil and paper:"

> ***The Court finds this mode of analysis unhelpful for computer inventions.*** Many inventions could be theorized with pencil and paper, but ***pencil and paper can rarely produce the actual effect of the invention***. Likewise, with regard to software, a human could spend months or years writing on paper the 1s and 0s comprising a computer program and applying the same algorithms as the program. ***At the end of the effort, he would be left with a lot of paper that obviously would not produce the same result as the software***.

2014 WL 5661290 at *16 (emphasis added). The Court added that "it states the obvious to say that a pencil and paper cannot actually produce parity bits," and a "pencil and paper analysis can mislead courts into ignoring a key fact: although a computer performs the same math as a human, a human cannot always achieve the same results as a computer." *Id*.

As in *Cal-Tech*, Trend's "human mind" analysis is unhelpful and irrelevant to the Patents-in-Suit's computer inventions. Just as the human mind cannot actually produce *Cal-Tech's* parity bits, the human mind cannot actually create a digital "file content identifier" of a "data file" using a "mathematical algorithm," cannot actually determine whether the content identifier matches a characteristic of other identifiers, and cannot actually provide an "indication of the characteristic" or a "substance identifier." Ex. 3, 02/15/13 McDaniel Report, at ¶168.

---

[3] Trend will argue that the human mind can identify spam. If true, in some instances, it is not until it actually sees the email, reads the email, and then decides that the email really is spam, and that defeats the purpose of the invention and is not what the claims cover.

The '050 Patent is not identifying illegally-parked cars *on a computer*. Trend's automobile license plate analogy is off-track. Trend equates receiving a license plate number from an officer to the "receiving…" step. Trend does not account for the fact that the identifier must be a *digital* identifier and ignores that the '050 Patent is concerned exclusively with computer files, which can "stall" or "crash" a user's machine requiring a reboot, but do not curb unpaid parking tickets. Trend also overlooks that the invention generates its own digital content identifier using a computerized implementation of a mathematical algorithm – the car doesn't hammer out its own license plate. And, while license plates can be switched between cars, a digital identifier cannot be switched between files.

Trend also associates a response that the car has "four outstanding tickets" with "an indication of the characteristic." "Four outstanding tickets" sounds a lot like a "count," which does not tell you whether the car is illegally parked– the officer knew that *before* calling in the plate at the beginning of Trend's contrived scenario.

Trend relies heavily on *Wolf v. Capstone Photography, Inc*., 2014 WL 7639820 (C.D. Cal. Oct. 28, 2014), but that case highlights Trend's logical errors. In *Capstone*, the court found that claims directed to cataloging runners' photos on a web server were ineligible because

> in the pre-internet days, an event photographer … could have placed a physical catalog of images in a certain location—say, at a local running or photography store. This would be the analog equivalent of plaintiff's claimed process, done painstakingly with pen, paper, and similarly low-tech tools.

*Id*. at *13. Trend argues at 9 that the '050 Patent's claimed steps "are similar to the simple input, comparison, and output steps" in *Capstone*. Negative. Unlike *Capstone*, the '050 Patent does not have an "analog equivalent" dating back to "the pre-internet days." There is no catalog of "data files" available at the "computer virus" or "spam email" store in the mall. The invention of the

'050 Patent – as the Court's constructions confirm – is a purely digital, decidedly *not* low-tech series of steps "necessarily rooted in computer technology."

Trend's other cases are just as distinguishable. In *Content Extraction and Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1345 (Fed. Cir. 2014), the representative claim disclosed "receiving output representing a diversity of types of hard copy documents from an automated digitizing unit," storing that information, "recognizing portions of said hard copy documents," and storing that information. The Federal Circuit found that the claim was drawn to "the basic concept of data recognition and storage." *Id.* at 1347. This is merely filing documents *on a computer*, and not a solution "necessarily rooted in computer technology" that solves problems from the computer realm like the Patents-in-Suit.

In *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011), the Federal Circuit reviewed a claim involving verifying credit card transactions and found the claim invalid because it was "so broadly worded that it encompassed literally *any* method for detecting fraud based on the gathered transaction and Internet data" including "logical reasoning that can be performed entirely in the human mind." (Emphasis in original). Here, the claims are not so broadly worded as to encompass any method of file content identification and cannot be performed entirely in the human mind. *See supra.*

In *Planet Bingo*, the court held abstract claims involving "managing a bingo game while allowing a player to repeatedly play the same sets of numbers in multiple sessions" because managing a bingo game is a flavor of "organizing human activity" that "consists solely of mental steps which can be carried out by a pencil and paper." 576 Fed. App'x at 1007-08. In *Loyalty Conversion Systems Corp. v. American Airlines*, 2014 WL 4364848, at *6-7 (E.D. Tex. Sept. 3, 2014), the court found that claims involved "the unpatentable concept of currency exchange, as

applied to the exchange of currencies in the form of loyalty award credits of different vendors."

Using a digitally-created, 128-bit, collision-resistant hash of a data file to determine whether it

contains a computer virus or is a spam email message cannot plausibly be interpreted as

Mr. Smith playing the same 24 bingo numbers over and over again *on a computer* or swapping

Delta miles for Hilton points *on a computer*.

> b.     *The '142 Patent is Not Drawn to an Abstract Idea*

Trend argues that the '142 Patent is directed to "controlling the distribution of messages

by applying rules to the messages as they are processed," and says that invention works in the

same way as "any brick-and-mortar post office or corporate mailroom, *only in an email*

*environment*." Motion at 17, 19 (emphasis added).

Trend's argument concedes the point: *electronic* mail is not like paper correspondence.

The specification proves that email is different and presents problems not found in "paper

documents."

> The fundamental operating paradigm of conventional post offices and mail
> servers is unabated delivery, which is intended to deliver an e-mail message from
> its sender to its recipients as directly as possible, with no interference from other
> users or administrators. ***
>
> Conventionally, however, organizations have not had the ability to define and
> automatically enforce communication policies with respect to the handling of e-
> mail messages by post offices. This is because conventional post offices are
> designed to implement existing e-mail protocols, which are based on unabated
> delivery. As a result these post offices are not designed to apply business rules to
> e-mail messages which either intentionally delay or prohibit delivery of e-mail
> messages. Delayed, intercepted, or prohibited delivery is antithetical to the
> unabated delivery concept, and thus, conventional post offices do not provide this
> ability.

'142 Patent (PX2) at 1:57-63; 2:15-25. To address this "problem specifically arising in the realm

of computer networks," *DDR Holdings,* 773 F.3d at 1257, the inventors devised a solution to

override the "fundamental operating paradigm," which would "deliver an e-mail message from its sender to its recipients as directly as possible, with no interference from other users or administrators." Instead of unabated email delivery, the '142 Patent (unconventionally) defers delivery of email through application of business rules and use of a quarantine.

Trend's examples at 18 regarding email attachment size and employee authorization further undermine its argument. Email attachment size is not measured in pounds or pages, it is measured in bytes and megabytes, units that are "necessarily rooted in computer technology." Likewise, intercepting an unauthorized electronic mail has no brick-and-mortar equivalent.

At pages 19-20 of its Motion, Trend tries to prove that the claims are "comparable to actions performed by humans in a mail room." Putting aside the glaring difference between a physical mail room and an email server, the table is hardly illuminating because it does not account for several claim elements. For example, it is unclear what Trend considers to be the "rule history," which must "identif[y] each of the business rule(s) whose antecedent condition was satisfied by the email message." D.I. 425 at 16. Trend's table also does not discuss the "automatically reviewing" or "persistently storing" elements present in other claims.

c.    *The '610 Patent is Not Drawn to an Abstract Idea*

Trend argues that the '610 Patent is directed to the broad concept of "screening information in a call," but in its next sentence, Trend acknowledges that the '610 Patent is concerned with *computer virus screening* – not just "information" screening. Motion at 24. **Computer viruses did not exist before computers**, and Trend cannot legitimately dispute that computer viruses are "a problem specifically arising in the realm of computer networks" and computers.

The specification of the '610 Patent identifies the exclusively-digital problem:

19

> Many computer users have virus screening and detection software installed on their computers…. Subsequent revisions of virus screening software are created and released as additional computer viruses are discovered. Consequently, each computer user has to repeatedly upgrade the virus screening software installed on his/her computer to ensure protection from recently-discovered viruses.

PX3 at 1:10-11, 1:20-23, and the necessarily-rooted-in-computer-technology solution:

> Embodiments of the present invention advantageously screen computer data for viruses within a telephone network before communicating the computer data to an end user. As a result, end users can download computer data via the telephone network without concern of receiving various predetermined computer viruses.

*Id*. at 1:58-64. There is no pre-computer, brick-and-mortar equivalent for detecting a computer virus (let alone computer virus detection "within the telephone network").

Trend at 25 tries to pervert Dr. McDaniel's trial testimony about how Symantec's products screen *electronic* mail for *computer* viruses "within the telephone network" based on an identification code into support for its argument that the '610 Patent is nothing more than screening "a standard voice telephone call."  Even then, Trend's answering service analogy is disconnected from the concept and purpose of the claims, which is not taking phone messages.

Trend at 27 again claims that the patent can be performed by humans, arguing that the '610 Patent is equivalent to screening machine operators for physical, medical, or emotional impairment, which is "a process that can be carried out by doctors, EMT's, police officers, and others." (quoting *Vehicle Intelligence and Safety LLC v. Mercedes-Benz USA, LLC*, 2015 WL 394273, at *8 (N.D. Ill. Jan. 29, 2015)). Doctors and EMT's may be able to screen for biological viruses, but they cannot screen for *computer* viruses. **The human mind cannot screen for computer viruses** within the telephone network or elsewhere.

> B.     The Patents-in-Suit Include an "Inventive Concept"

Because the Patents-in-Suit are not directed to an abstract idea, they are patent eligible under § 101, and the Court need not proceed to *Mayo* step two. But even assuming the Patents-

in-Suit invoke supposed abstract ideas, the claims include something else – an "inventive concept" – that ensures that they do not preempt more than they should. *Mayo,* 132 S. Ct. at 1294.

> 1.    The Claims of the Patents-in-Suit Do Not Raise Preemption Concerns

In *DDR Holdings*, the Federal Circuit found that the claims at issue "do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same … . Rather, they recite ***a specific way*** to automate the creation of a composite web page by an 'outsource provider' that incorporates elements from multiple sources in order to solve a problem faced by websites on the Internet." 773 F.3d at 1259 (emphasis added). Accordingly, the court held that "the claimed solution amounts to an inventive concept for resolving this particular Internet-centric problem, rendering the claims patent-eligible." *Id*.

In *Cal-Tech*, the court concluded that meaningful limitations in the claims rendered the claims eligible:

> Although many of these limitations are mathematical algorithms, these algorithms are narrowly defined, and they are tied to a specific error correction process. ***These limitations are not necessary or obvious tools for achieving error correction, and they ensure that the claims do not preempt the field of error correction***. The continuing eligibility of this patent will not preclude the use of other effective error correction techniques.

2014 WL 5661290 at *15. The court found that the claimed formula "sets forth unconventional steps for achieving error correction" and that "either individually or in combination with the claim's other elements (including the scrambling of bits), these unconventional steps sufficiently limit preemption concerns." *Id*. at *17-*18; *see also Smartflash LLC v. Apple, Inc*., 2015 WL 661174, at *8 (E.D. Tex. Feb. 13, 2015) (claims eligible because they "do not risk preempting all future innovations related to exchanging access to data for payment on the Internet").

Like the claims in *DDR Holdings*, *Cal-Tech*, and *Smartflash*, the claims here include the "meaningful limitations," *i.e.*, the "inventive concept," that the case law requires, and do not preempt the entire field of email filtering, file content identification, or computer virus screening.

  *a.*  *The '050 Patent Recites a Specific Way to Identify File Content*

The '050 Patent leverages the ability of computers to generate unique file content identifiers, such as hashes, that allow computers to identify the same files without communication of personal information, and with a high degree of "collision resistance," meaning that each unique file will have its own hash with negligible chance that another non-identical file will have the same hash. Creation of the file content identifiers requires specialized software or programming, as proved by the requirement of a "file content identifier generator agent" in claim 9, "digital ID generator agents" in claim 16, and "a client agent generating digital content identifiers" in claim 22.

In the second step of claims 9, 16, and 22, the file content identifiers are compared on a *remote* processing system or second tier computer to a database of other identifiers to determine "whether each received content identifier matches a characteristic of other identifiers" or whether the message has a characteristic. To this, claims of the '050 Patent add returning, responsive to a query or request from a first tier, an "indication of the characteristic," a "substance identifier," or a piece of data to identify the existence or absence of a characteristic.

Taken as a whole, these claimed steps narrowly define a set of actions tied to a specific way of describing file content and classifying computer files. The innovative combination of a digitally-created unique file content identifier, a remotely-located database of content identifiers linked to content and characteristics, and a response describing the content or identifying a characteristic constitutes an unconventional and patentable approach for distributed file content identification and does not preempt the entire field of file content identification.

In their *amicus* brief, Symantec and Trend Micro agree with Intellectual Ventures that "claims that 'recite a specific way' of accomplishing a task," including those that resolve particular computer and Internet-centric problems, "do not broadly preempt any asserted abstract idea, and are therefore patent-eligible." Ex. 1 at 19 (citing *DDR Holdings*). They say that detailed claim language "strongly suggests that they amount to a practical application of an idea, rather than effectively claiming the idea itself." *Id*. at 21. Symantec and Trend Micro also criticize the district court for "working backward from the issued claim by selectively removing elements," and caution that this approach is "a recipe for unpredictable and inconsistent patent-eligibility decisions that are totally unrelated to the preemptive effect of the claim." *Id*. at 20.

In its Motion filed one week later in this Court, Trend completely abandons these preemption considerations – *"preemption" isn't even in its Motion* – works backwards by selectively removing elements, and then labels the amputated claim element as "conventional," "rudimentary," or "well-understood." Trend then compounds its error by failing to consider the claim elements "as an ordered combination."

Trend argues at 11 that the "computer-related limitations" of the '050 Patent "are merely generic computer processing elements" and "are used in a conventional way to perform rudimentary, well-understood functions." Trend's approach of isolating claim terms like "network," "agent," or "algorithm" without considering the entire limitation or the limittaions "as an ordered combination" runs afoul of Supreme Court guidance. In *Alice*, Supreme Court emphasized that claim must be "considered both individually and as an ordered combination," 134 S. Ct. at 2350, and reiterated:

> Because the approach we made explicit in *Mayo* considers all claim elements, both individually and in combination, it is consistent with ***the general rule that patent claims must be considered as a whole***.

*Alice*, 134 S. Ct. at 2361 n.3. Accordingly, the search for an inventive concept does not start with "agent," it starts with "receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network."  The step two analysis tries to delineate not whether "outputting" raises a preemption concern, but rather whether "outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining" adds *enough* to qualify the claim as a patent-eligible process. And these intermediate element-by-element analyses are performed as a predicate to determining whether the entire claim "as an ordered combination" of steps is sufficiently "inventive." *Cal-Tech*, 2014 WL 5661290 at *3 ("[C]ourts should remember that a series of conventional elements may together form an unconventional, patentable combination.").

Trend's argument reduces to one where receiving, routing, transmitting, storing, combining, reviewing, delivering, selecting, and gathering any piece of computer data – regardless of how it is done or how it is used – is a conventional step unworthy of patent protection. Under Trend's reasoning, no software is eligible. But software *is* patentable. *See* 35 U.S.C. § 100(b) (defining "process" in § 101 as "process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material"); *Ultramercial*, 772 F.3d at 715 ("[W]e do not purport to state that all software-based patents will necessarily be directed to an abstract idea."); *Cal-Tech*, 2014 WL 5661290, at *7 ("[S]oftware must be eligible under § 101."); *see also id.* (describing how the America Invents Act "contemplates the existence of software patents"); *Bilski*, 130 S. Ct. at 3221 ("Courts should not read into the patent laws limitations and conditions which the legislature has not expressed.").

Trend's alleged non-infringing alternatives powerfully disprove its conventional steps argument. Conventional steps are those that are ubiquitous or must be performed to implement an abstract idea. *Cal-Tech*, 2014 WL 5661290, at *14. For example, in *Mayo*, doctors needed to perform the claimed steps in order to apply the natural law:

> Anyone who wants to make use of these laws must first administer a thiopurine drug and measure the resulting metabolite concentrations, and so the combination amounts to nothing significantly more than an instruction to apply the applicable laws when treating their patients.

132 S. Ct. at 1298. In this case, Trend's expert Dr. Prakash describes two purported alternatives:

██████████████████████████████████████████████████████████

██████████████████████████████████████████ 03/20/13 Prakash Report,

Ex. 4, at ¶¶185-186. These alternatives, regardless of the questions about their feasibility, prove that the '050 Patent includes specific, unconventional "meaning limitations" that ensure the claims are "more than a drafting effort designed to monopolize the abstract idea."

Finally, Trend's references to "admitted prior art" at 15 and elsewhere are of no moment. In *Diehr*, the Supreme Court warned:

> It is inappropriate to dissect the claims into old and new elements, and then to ignore the presence of the old elements in the analysis. This is particularly true in a process claim because *a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made*.

101 S. Ct. at 1057-58 (emphasis added). Thus, "the 'novelty' of any element of steps in a process, or even of the process itself, is of *no relevance* in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Id.* As *amici*, Symantec and Trend Micro agree that §§ 102 and 103 principles "must remain separate from the Section 101 inquiry." Ex. 1 at 4.

b.      *The '142 Patent Recites a Specific Way to Filter Email*

The '142 Patent does not preempt every application of filtering email. To the contrary, taken as an ordered combination of elements, the claims recite "a specific way" to filter email that overrides email's conventional "unabated delivery" paradigm.

The Court construed "post office" to mean "an agent for receiving, storing, and distributing e-mail messages or data objects" and "rule engine" to mean "a mechanism that applies the business rules, in order to determine a set of actions (one or more) to be applied." D.I. 425 at 22. The Court's construction of the "combining" portion requires the email message to be combined with the new distribution list and a rule history "where a rule history identifies each of the business rule(s) whose antecedent condition was satisfied by the email message." D.I. 425 at 18. These meaningful limitations, as construed by the Court, shrink the preemptive footprint of the invention, and describe a way to filter email that requires, among other things, a post office, a rule engine, and a distribution mechanism that each perform a specific function.

As with the '050 Patent, Trend's experts betray its argument that the '142 Patent's claims are conventional activity and prove that the '142 Patent does not risk preempting all future inventions related to email filtering. Dr. Tygar admits that ███████████████████████████ ███████████████████████████████████████████████████ and then alleges no less than three purported non-infringing alternatives: ████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ Ex. 5, 03/20/13 Tygar Report, at ¶185 (emphasis added).  The '142 Patent does not preempt more than it should.

c.      *The '610 Patent Recites a Specific Way to Perform Virus Detection*

The claims of the '610 Patent likewise include meaningful limitations that trim the claimed invention to a specific way of screening for computer viruses within the telephone

network. The claim language, as construed by the Court, fixes the location of virus screening, *i.e.*, outside the gateway nodes and networks of the calling or called parties, and does not preempt all virus detection. Virus detection could occur on the networks and gateway nodes of the called and calling parties, *i.e.*, <u>not</u> "within the telephone network."

Additionally, virus detection "within the telephone network" would not be preempted if a call were not routed between the calling party and the called party or if computer data were not received within the telephone network, as required by the claim language. In short, the '610 Patent captures only one form of virus detection, and its continued eligibility will not preclude the use of other virus detection techniques – even if they occur "within the telephone network."

Trend misapplies the law in arguing at 28 that the claims of the '610 Patent limit its scope to "the practice of a well-known abstract idea in a particular technological environment (*i.e.,* networked computers)." This recent axiom applies to cases like *Alice and Ultramercial*, which involved claims that plainly could be described as an abstract idea (like escrow or using advertising as currency) *on a computer* or *on the Internet*. 134 S. Ct. at 2358; 772 F.3d at 716. This shorthand cannot be used with the '610 Patent because the entire claim is computer-driven and solves problems exclusive to computers – unlike Trend's inapt answering service analogy.

C.     The Patents-in-Suit Improve the Function of a Computer

In *Alice*, the Supreme Court recognized that claims that "purport to improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field" may be patentable under § 101. 134 S. Ct. at 2359. Symantec and Trend say it more succinctly and unequivocally in their *amicus* brief: "claims that **improve technology** are patent eligible." Ex. 1 at 22 (bold in original).

In his expert report, Intellectual Ventures' expert Dr. McDaniel describes (using Trend's own documents) the technological improvements provided by the Patents-in-Suit. The claimed

inventions of the '050 and '610 patents shrink the period of time between identification of a computer virus or other malicious or unwanted file and distributing that information to users and customers, *i.e.*, the "protection gap." The '050 and '610 patents also solve the so-called "volume problem" by offloading the database of file signatures from a user's personal computer to the network, thereby reducing the burden on the user's machine. Likewise, the '142 Patent addresses filtering and deferring delivery of malicious, unwanted, or suspicious email messages in a manner that permits efficient review by an administrator. This, too, reduces strain on computing resources and increases performance by unclogging user's inboxes and mail servers. A shorter protection gap and a reduced strain on computing resources (not to mention freedom from malware infection) necessarily result in increased performance and "improve the functioning of the computer itself." *See* 02/15/13 McDaniel Report, Ex. 3, at ¶¶ 50-51, 55-58, 65-74.

Trend incorrectly argues that the Patents-in-Suit simply provide "enhanced speed or confidentiality over a human's performance of the claims." Motion at 16; *see also id*. at 21 ("Applying steps more quickly and efficiently on a computer…"). In *East Coast Metal Fabricating Corp. v. Autodesk, Inc.,* 2015 WL 226084, at *9 (D.N.H Jan. 15, 2015), the court adroitly captured what it means to improve computer function:

> [T]he inventive concepts in [*Diehr, DDR Holdings,* and *Cal. Tech*] each involved an innovation that allowed a user of the invention to achieve a *better* result, rather than a result that was achieved more quickly due to the replacement of direct human activity with a computer. Those improved results are: (1) an increased ability to avoid overcuring and undercuring synthetic rubber products; (2) website connectivity that did not require a visitor to leave a host site in order to view the content of a third-party merchant's site; and (3) more efficient correction of errors in transmitted digital data.

(internal citations omitted). In this case, the "better results" are not achieved by "replacement of direct human activity with a computer," but include a shorter protection gap, reduced burden on computing resources, and deferring delivery of unwanted and potentially malicious email.

> D.      The Patents-in-Suit Pass the Machine-or-Transformation Test

The Federal Circuit's so-called "machine-or-transformation" test provides a "useful clue" in determining patent eligibility. *Ultramercial*, 772 F.3d at 716. Under the machine-or-transformation test, "a claimed process can be patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Id.* The Federal Circuit has warned, however, that "the use of a specific machine or transformation of an article must impose meaningful limits on the claim's scope to impart patent-eligibility." *In re Bilski*, 454 F.3d 943, 961 (Fed. Cir. 2008) (en banc).

In *SiRF Tech., Inc. v. Int'l Trade Com'n*, 601 F.3d 1319, 1332 (Fed. Cir. 2010), the Federal Circuit emphasized that a machine will only "impose a meaningful limit on the scope of a claim [when it plays] a significant part in permitting the claimed method to be performed." The court found that the claims at issue were tied to a GPS receiver, and held that "the presence of the GPS receiver in the claims places a meaningful limit on the scope of the claims," explaining:

> We are not dealing with a situation in which there is a method that can be performed without a machine. … [T]here is no evidence here that the calculations here can be performed entirely in the human mind. Here, as described, the use of GPS receiver is essential to the operation of the claimed methods.

*Id.* at 1333.

In *Helios Software, LLC v. SpectorSoft Corp.*, 2014 WL 4796111, at *17 (D. Del. Sept. 25, 2014), this Court found the claims eligible under the machine-or-transformation test, and noted that the "implementation of the '304 Patent by a computer inserts meaningful limitations by claiming exchanging data over different internet sessions to capture the content of

an ongoing Internet communication session," and "these meaningful limitations limit the scope of the claimed method to a machine." *Id*. "Importantly," this Court added, "none of these limitations could be performed by a human alone." *Id*.

In this case, a computer (the machine) is critical for implementing the claims of the Patents-in-Suit, and "none of these limitations could be performed by a human alone." *See supra*. A human cannot generate a hash or describe the content of file or identify whether a characteristic is present or absent within a computer file without a computer. Likewise, it is impossible to detect computer viruses without a computer, and *electronic* mail filtering using a database of business rules, a rule history, and a quarantine necessarily requires a computer. Thus, as in *SiRF Tech*, "we are not dealing with a situation in which there is a method that can be performed without a machine." 601 F.3d at 1333.

Trend peppers in references to "generic computers," "generic computer network," and "generic components" and appears to suggest that the Patents-in-Suit must disclose specialized computers and networks in order to be eligible under § 101. *See* Motion at 13, 14, and 22. That is not the law. Patents need not disclose unconventional technology, specific algorithms, or specialized computer components, and may be patent-eligible even if they rely on conventional technology and generic computers. *See, e.g.*, *Diehr*, 101 S. Ct. at 1057-58 (finding generic-computer-implemented process for curing rubber patent-eligible); *DDR Holdings*, 773 F.3d at 1258 (finding claims using "a computer and the Internet" and "***standard Internet communication protocols***" eligible under § 101) (emphasis added).

## VI.    Conclusion

The Patents-in-Suit are eligible under § 101, and Trend's motion should be denied.

Dated:  March 30, 2015

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
919 North Market Street
12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com

Parker C. Folse III *(admitted pro hac vice)*
Brooke A.M. Taylor *(admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone:     (206) 516-3880
Facsimile:     (206) 516-3883
pfolse@susmangodfrey.com
btaylor@susmangodfrey.com

Richard W. Hess (admitted *pro hac vice*)
Weston O'Black (admitted *pro hac vice*)
John P. Lahad *(admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone:     (713) 653-7859
Facsimile:     (713) 654-3386
rhess@susmangodfrey.com
woblack@susmangodfrey.com
jlahad@susmangodfrey.com

*Counsel for Plaintiff*