**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC, | § | |
| | § | |
| Plaintiff, | § | C.A. No. 12-cv-1581 (LPS) |
| | § | |
| V. | § | **JURY TRIAL DEMAND** |
| | § | |
| TREND MICRO INCORPORATED, et al. | § | **FILED UNDER SEAL** |
| | § | |
| Defendants. | § | |

**INTELLECTUAL VENTURES I LLC'S OBJECTIONS TO TREND MICRO'S**
**OPENING BRIEF IN SUPPORT OF ITS ACCOUNTING OF ATTORNEYS' FEES**

DATED: November 3, 2017

Parker C. Folse III *(admitted pro hac vice)*
Brooke A.M. Taylor *(admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone:    (206) 516-3880
Facsimile:    (206) 516-3883
pfolse@susmangodfrey.com
btaylor@susmangodfrey.com

Richard W. Hess (admitted *pro hac vice*)
John P. Lahad *(admitted pro hac vice)*
Weston O'Black *(admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone:    (713) 653-7859
Facsimile:    (713) 654-3386
jlahad@susmangodfrey.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street
12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

I.      The Court's Limited Grounds For Awarding Fees ........................................................ 2

II.     Specific Objections to Trend's Requested Fees ............................................................ 2

   A.   Trend Improperly Seeks Attorneys' Fees Regarding Certain Expert Reports ................... 3

      1.   Trend's Inflated Request for Dr. Rubin's Supplemental Invalidity Report ................... 3

      2.   Trend's Improper Fee Request for Dr. Prakash's Supplemental Non-Infringement
           Report ............................................................................................................. 6

      3.   Trend Should Not Obtain Attorneys' Fees for Vague References to ████████
           ████████████████████ ................................................................................. 7

   B.   Trend Is Not Entitled to Fees for Trying to Add "Frequency" to the Construction ........... 8

III.    General Objections to Trend's Requested Fees ........................................................... 12

   A.   There Is No Evidence To Show What Portion of Trend's Block Billing is Reasonable .. 13

   B.   Trend's Billing Includes Excessive Internal Correspondence and Communications ....... 14

   C.   Trend's Overstaffing Resulted in Duplicative and Repetitive Work ............................... 15

   D.   The Billing Rates of Trend's Attorneys Are Excessive .................................................. 16

   E.   Summary of Reductions ............................................................................................. 20

IV.     Conclusion ............................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Cox v. Council for Devel. Disabilities*, Inc.,
   2013 WL 1915066 (W.D. Okla. May 8, 2013) ........................................................... 17

*Eli Lilly & Co. v. Zenith Goldline Pharm., LLC*,
   264 F. Supp. 2d 753 (S.D. Ind. 2003) ..................................................................... 19

*Estate of Schultz v. Potter*,
   2010 WL 883710 (W.D. Pa. Mar. 5, 2010) ........................................................ 15, 16

*Evans v. Port Auth. of New York & New Jersey*,
   273 F.3d 346 (3d Cir. 2001) ................................................................................... 16

*Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*,
   2011 WL 4565494 (W.D. Pa. Sept. 29, 2011) ........................................................ 15

*Jepson, Inc. v. Makita USA, Inc.*,
   1994 WL 543226 (C.D. Cal. May 27, 1994) ........................................................... 19

*Lab. Skin Care, Inc. v. Ltd. Brands, Inc.*,
   757 F. Supp. 2d 431 (D. Del. 2010) ....................................................................... 14

*Maldonado v. Houston*,
   256 F.3d 181 (3d Cir. 2001) ................................................................................... 15

*Microsoft Corp. v. United Comp. Res. of New Jersey, Inc.*,
   216 F. Supp. 2d 383 (D.N.J. 2002) ......................................................................... 17

*Richardson v. City of Chicago*,
   2013 WL 2451107 (N.D. Ill. June 5, 2013) ............................................................ 17

*Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*,
   707 F. Supp. (N.D. Ohio 2010) .............................................................................. 19

*Staples v. Ruyter Bay Land Partners, LLC*,
   2008 WL 450265 (D. V.I. Feb. 6, 2008) ................................................................. 15

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*,
   208 F.3d 981 (Fed. Cir. 2000) ................................................................................ 19

*Walker v. Gruver*,
   2013 WL 5947623 (M.D. Pa. Nov. 5, 2013) ........................................................... 15

## Statutes

Patent Act §285 ................................................................................................ 1, 2, 3, 13

## Rules

District of Delaware Local Rule 7.1.3(c)(2) ............................................................ 1, 14

The request of Trend Micro Inc. and Trend Micro, Inc. (USA) (collectively "Trend") for over ███████ in attorneys' fees should either be denied outright or at least substantially reduced. IV's objections to Trend's accounting of attorney's fees fit into two categories: (1) objections to specific categories of work for which Trend seeks compensation; and (2) general objections that apply to all of the fee requests and supporting records.

In the category of specific objections, Trend improperly seeks fees for tasks unconnected to the conduct that was specifically identified by the Court as the basis to declare a limited portion of the case exceptional under §285 of the Patent Act. For example, Trend seeks attorneys' fees for supplementing its invalidity expert's report to assert, on the eve of trial, a new prior art reference against the '050 Patent that unquestionably has nothing to do with "bulk" or "spam." Trend also improperly inflates its request by seeking fees for trying to modify the Court's claim construction to add "frequency" as an indication of a "characteristic"—something that Trend previously admitted is unrelated to Dr. McDaniel's testimony in the Symantec trial.

These specific examples of overreaching are stacked on top of the inflationary effects, discussed in IV's general objections, from overstaffing and billing in indiscriminate blocks of time at unreasonable hourly rates.

The deficiencies in Trend's fee motion warrant rejection of the fee request in its entirety. At a minimum, IV's analysis shows that Trend's fees should be discounted by at least ███████, and consequently that Trend should be awarded no more than ███████[1] Any

---

[1] At 6:30 p.m. Eastern Time yesterday, Trend e-mailed IV two further invoices that it said it intends to submit with its reply brief, seeking approximately ███████ in additional fees. The email stated that Trend also intends to submit a third invoice in the amount of ███████, but did not provide that to IV "because it has not been finalized by our accounting department." The two invoices Trend furnished should be discounted for reasons discussed below in Section III.D. (excessive billing rates), and presumably the third invoice will be deficient for the same reason.

effort Trend might make in its reply brief to clean up its errors and overreaching with new evidence should be rejected pursuant to Local Rule 7.1.3(c)(2).

## I.     The Court's Limited Grounds For Awarding Fees

On August 31, 2017, the Court heard argument regarding Trend's exceptional case motion, and granted the motion in part, reaching the following conclusions:

- "[I]t would be wrong to say that IV's case was objectively unreasonable." Ex. 1 (Hrg. Tr.) at 56:24-25.
- The case overall was <u>not</u> exceptional. *Id*. at 57:1-6.
- The change in expert opinion was <u>not</u> "an intentional deliberate plan by IV." *Id*. at 57:15.
- Trend did not prove that "IV was motivated to deal with the Dr. McDaniel situation either because of something related to the ongoing PTO proceedings … [or] something to do with disappointment over how the Symantec trial ended." *Id*. at 59:11.

The Court found that relief under §285 was warranted "solely with respect to this collection of circumstances regarding Dr. McDaniel's changed testimony." *Id*. at 58:24-59:1. Nevertheless, having secured a narrow ruling, Trend ignores the Court's findings and its ultimate conclusions and instead takes the Court's ruling as license to seek fees for huge amounts of its trial preparations that it feels might have some relation to claim 9 of the '050 patent, but has nothing to do with Dr. McDaniel's testimony about whether bulk email is a characteristic under claim 9. Trend reasons as follows: the majority of the ▮▮▮▮▮ in damages that IV sought were attributable to the '050 patent, which (in one limited respect) was the subject of Dr. McDaniel's changed testimony; that cases like this usually cost many millions to defend; and therefore that the "relatively small proportion of those amounts being attributed to the relief sought" demonstrates that the request is reasonable. All of these arguments ignore the narrow grounds on which the Court granted the §285 motion, and none of them excuses the deficiencies and overreaching in Trend's fee request. Trend's attempt to inflate Dr. McDaniel's testimony also ignores that such testimony was in no way material to the outcome of its case, in which Trend only became the prevailing party after a late-filed and unrelated Section 101 motion and otherwise would have proceeded to trial.

## II.     Specific Objections to Trend's Requested Fees

Trend seeks attorneys' fees for time spent on tasks that did not result from Dr.

McDaniel's Symantec trial testimony that was the basis for the Court's §285 ruling.

A.    Trend Improperly Seeks Attorneys' Fees Regarding Certain Expert Reports

Trend improperly seeks attorneys' fees for preparing the supplemental expert reports of Dr. Rubin (invalidity) and Dr. Prakash (non-infringement). Also, Trend improperly seeks fees for vague billing records for ███████████████ that do not specify the particular expert, which could easily be for work on Trend's unrelated supplemental damages reports.

1.    Trend's Inflated Request for Dr. Rubin's Supplemental Invalidity Report

IV estimates that Trend seeks ████████ in fees for its attorneys ████████ Dr. Rubin's supplemental invalidity report that was served without leave on April 8, 2015, just weeks before trial. (Ex. 2, Fee Chart for Rubin Supp.). Trend did not separate the amount of fees that were attributable to preparing Dr. Rubin's supplemental report. IV estimated the fees at ████████ by performing two steps. First, IV totaled the fees for the bills that referred to ████████ Dr. Rubin's supplemental expert report. Second, IV found three billing entries that jointly recorded time for ████████████████████████████ (Ex. 3, Fee Chart for Rubin/Prakash Joint Billings). For these joint billing entries, IV allocated half of the fees to preparing Dr. Prakash's supplemental report and half to preparing Dr. Rubin's supplemental report. (Ex. 2, Fee Chart for Rubin Supp.).[2]

Trend's request for ████████ in fees for its attorneys ████████ Dr. Rubin's supplemental report should be reduced by at least half, if not altogether, because *most* of that report had nothing to do with Dr. McDaniel's testimony about whether claim 9 covered "bulk email." Dr. Rubin's supplemental report totaled 3,335 words and was divided into two substantive parts. (Ex. 5, 4/8/2015 Rubin Supp.). The first part was a 1,146 word discussion of

---

[2] The total of ████████ does not include the thirteen time entries that vaguely refer to ████████████████████████ because those time entries are discussed separately below and in Exhibit 4.

Dr. McDaniel's testimony in the Symantec trial about whether bulk email was a "characteristic" under claim 9 of the '050 patent, which Dr. Rubin grouped with "spam" as being "emails that have been seen in large volumes over a short period of time." *Id.* at ¶ 19. In paragraphs 3, 5–6, and 11–15, Dr. Rubin recapped Dr. McDaniel's testimony about whether bulk email was a "characteristic" under claim 9. In paragraphs 16–22, Dr. Rubin opined that bulk email should be a "characteristic" under claim 9. Those paragraphs—¶¶ 3, 5–6, 11–15, and 16–22—are the *only* portions of Dr. Rubin's supplemental report that actually relate to Dr. McDaniel's testimony about whether bulk email is a "characteristic" under claim 9.

The second part of Dr. Rubin's report (¶¶ 7 and 23–45) is <u>1,708 words</u> and has nothing to do with bulk email. In this part, Trend asserted for the first time that its own Chen '170 patent invalidates claim 9 of the '050 patent. The Chen '170 patent never mentions bulk email or even spam but is focused solely on detecting if a file has a ***virus***. As Dr. Rubin admitted, the Chen '170 patent is limited to a "two-tiered distributed ***virus scanning system*** where the 'virus detection server… resides on a wide area network (WAN) such as the network typically referred to as the Internet . . . .'" *Id.* at ¶26 (quoting Chen '170 at col. 5:39 – 42) (emphasis added)).

Dr. McDaniel's testimony about whether "bulk email" was a "characteristic" under claim 9 of the '050 patent was completely unrelated—and did not justify—Trend's brand new theory that its *virus detection* patent invalidated claim 9. "Virus" has been a "characteristic" of a file under claim 9 of the '050 patent (and under other asserted claims) since day one; indeed, claim 9's original construction explicitly provided that a "virus" was a "characteristic":

| Court's Construction | |
|---|---|
| "an indication of the characteristic" (claim 9) | "a descriptor of the content (e.g., spam, virus, junk email, copyrighted)" |
| "identify the existence or absence of said characteristic" (claim 16) | "identify whether or not the message is of a certain type or classification" |
| "indicating the presence or absence of a characteristic" (claim 22) | "indicating the presence or absence of a characteristic (e.g., spam, virus, copyright, bulk email)" |

(10-cv-1067, D.I. 425 at 11). Dr. Rubin even conceded that IV and Dr. McDaniel had always agreed that a "virus" was a "characteristic" under the asserted claims of the '050 patent. (Ex. 5 at 4, 4/8/2015 Rubin Supp.).

IV has repeatedly asked Trend to explain _why_ Dr. McDaniel's testimony in the Symantec trial that "bulk email" is not a "characteristic" in claim 9 justified Trend's completely new theory that its _virus_ screening patent invalidated the '050 patent. Trend had no answer to that question in April 2015 when it served Dr. Rubin's supplemental report. Trend had no answer in its Reply to its Motion to Declare This Case Exceptional. And critically, in Trend's pending Motion for Attorneys' Fees, Trend did not explain how its attempt to change its invalidity theory by asserting a _virus_-screening patent is related to Dr. McDaniel's testimony about "bulk email." Trend has the burden to show what fees were reasonable, and its silence speaks volumes.

The reality is that Trend decided while preparing for trial that it wanted to try a new invalidity theory after Symantec failed at trial to invalidate any asserted claim of any patent-in-suit. (Dr. Rubin was the invalidity expert for both Trend and Symantec). Up until that point, which was on the eve of Trend's trial, Trend had not asserted the Chen '170 patent as prior art for any asserted claim of the '050 patent. Trend obviously decided that it would have a more compelling trial story if it could argue that its own CEO—Eva Chen—invented and invalidated the claimed methods of '050 patent. Because Trend's work to prepare a report asserting the Chen '170 virus screening patent as prior art was completely unrelated to Dr. McDaniel's testimony about bulk email, Trend is not entitled to any fees for that work.

At the very least, Trend's fee request for preparing Dr. Rubin's supplemental report should be cut in half to ▮▮▮▮▮. More appropriately, Trend should get zero fees for Rubin's report because (1) Trend has maintained the pretext that Dr. Rubin's entire report responded to Dr. McDaniel's testimony about bulk email, and (2) Trend chose to lump together time spent on

both compensable and obviously uncompensable work (including not only the irrelevant portions of Dr. Rubin's supplemental report but also the underlined entirely irrelevant Prakash report discussed next), when it could have made an effort to separate them.

2. <u>Trend's Improper Fee Request for Dr. Prakash's Supplemental Non-Infringement Report</u>

Trend seeks ███████ [3] in attorneys' fees for ███████ Dr. Atul Prakash's supplemental non-infringement report. (Ex. 6, Fee Chart for Prakash Supp.). Trend's request for these fees should be rejected entirely.

Trend has never produced Dr. Prakash's "supplemental" report, though it could have in support of this motion. As a result, IV and the Court can only evaluate that report based on what *Trend has told us* it says. But what Trend says now—that Dr. Prakash's supplemental report arose from Dr. McDaniel's Symantec trial testimony about bulk email in claim 9—is contradicted by Trend's previous description in April 2015.

On April 20, 2015, Trend sought leave to serve Dr. Prakash's supplemental report. Trend represented that Dr. Prakash's supplement was necessary to respond to briefs that IV filed with the PTO during the '050 patent's reexamination proceeding (Dr. McDaniel was not an expert in the reexam). D.I. 214. Trend stated that "Dr. Prakash would simply provide an update to his existing opinions <u>to consider recent and anticipated statements that Intellectual Ventures ("IV")</u> <u>has made (and likely will make prior to trial) to the U.S. Patent and Trademark Office (the</u> <u>"PTO") in the ongoing reexamination proceedings</u> for the '050 patent." *Id.* at 1. Notably absent from Trend's motion for leave was any argument that Dr. Prakash's report related to Dr. McDaniel's testimony about whether bulk email was a "characteristic" under claim 9. Trend did

---

[3] IV calculated this total for preparing Dr. Prakash's supplemental report using the same method it used for calculating the fees for Dr. Rubin's supplemental report, again because Trend did not separate the work in its time records or declarations.

not even mention bulk email in its motion for leave.

Trend cannot recover fees to respond to IV's briefs to the PTO during reexamination. On August 31, 2017, the Court ruled that Trend did not prove its claim that "IV was motivated to deal with the Dr. McDaniel situation . . . because of something related to the ongoing PTO proceedings . . . ." Ex. 1 (Hrg. Tr.) at 59:11. Trend cannot now argue that Dr. Prakash's supplement also somehow related to Dr. McDaniel's testimony at the Symantec trial about bulk email. Trend has no evidence to support that argument—its pending motion does not discuss Dr. Prakash's report at all. Trend has provided no evidence that its fees for  Dr. Prakash's report are recoverable, and its prior statements prove those fees are not recoverable.

3.    Trend Should Not Obtain Attorneys' Fees for Vague References to

Trend seeks          in fees for tasks where its attorneys worked on without identifying the specific expert or subject matter of the work. (Ex. 4, Fee Chart for Vague Billing Records for Experts). This category of billing records includes vague statements like:                    or                    *See id.*

Trend prepared three supplemental reports in the weeks before trial: (1) Dr. Rubin's supplemental invalidity report, (2) Dr. Leonard's supplemental damages report (both served without leave on April 6, 2015), and (3) Dr. Prakash's supplemental non-infringement report that was never disclosed. Trend should not be able to recover 100% of fees for time entries that collectively refer to                    because those tasks are not specifically identified as related to Dr. McDaniel's technical testimony at the Symantec trial that bulk email was not a "characteristic." Trend had the burden to disaggregate these time entries.

For instance, Trend concedes that it is not entitled to fees for preparing Dr. Leonard's supplemental damages report. Also, as IV has shown above, Trend is not entitled to (1) any

attorneys' fees for preparing Dr. Prakash's supplement or (2) any fees for preparing the portions of Dr. Rubin's supplement about the Chen '170 patent on virus screening. Consequently, in the situations where Trend's billing records do not even specify which expert report was being worked on, the Court should disallow Trend's fee request based on a failure of reasonable proof.

At a minimum, the requested fees should be substantially discounted. Because Trend concurrently prepared these reports, there is a 66% chance that the time entries for █████████ █████████████████████████ relate to unrecoverable fees for Drs. Prakash's or Leonard's reports, which at a minimum justifies a reduction of 66%. The other supplemental report, from Dr. Rubin, was pretext for asserting a new invalidity theory based on the Chen '170 patent, so another reduction of at least 50% is necessary. As a result, Trend should be allowed, at most, 16.5% of its vague time entries for ██████████████████████████ which is ██████ .

B.  Trend Is Not Entitled to Fees for Trying to Add "Frequency" to the Construction

Trend argues it is entitled to fees for "activities relating to the letter briefing ordered by the Court regarding the potential inclusion of 'frequency' in the claim constructions" and contends this is "a direct result of Dr. McDaniel's new expert opinion and IV's subsequent opposition to the relief Trend Micro sought in view of the new opinion." Mot. at 4.

Trend's briefing and arguments confirm that its request to add "frequency" to the Court's construction of claims 9, 16, and 22 of the '050 patent had absolutely nothing to do with any change in expert opinion. In its March 3, 2015 brief in support of its motion for "clarification," Trend relied on Dr. McDaniel's change of opinion regarding "bulk," but as to "frequency," Trend relied primarily on the opinions of its own expert, Dr. Rubin, the '050 patent specification, and inventor testimony. D.I. 168. Indeed, Trend argued that Dr. McDaniel "appears to have ignored this [inventor] testimony." *Id*. at 19. In its March 30, 2015 Reply, Trend likewise did not raise any expert "flip-flop" in support of its argument for an amended construction, and instead

focused on the specification and inventor testimony. D.I. 185 at 9-10.

On April 10, 2015, the Court ordered supplemental briefing on whether it should "further clarify my construction to add 'frequency.'" Ex. 7 (Apr. 10, 2015 Hrg. Tr.) at 195:9-15; *see also* D.I. 206 (April 15, 2015 Order). The parties submitted competing letter briefs. In its brief, IV showed that Trend had been aware *for years* of IV's position that "frequency" did not qualify as an indication of the characteristic. None of IV's proposed constructions included the term frequency, and Dr. McDaniel had never opined that returning a "frequency" satisfies any of the claimed steps of the '050 Patent. To the contrary, during his April 15, 2013 deposition, Dr. McDaniel confirmed that "frequency" is not a characteristic as he reads the claims:

Q: But your opinion is that frequency is not an indication of a characteristic?

A: That's correct.

D.I. 207 at 3. IV took the same position during summary judgment. *Id.*; *see also* D.I. 208-3 (excerpts from July 12, 2013 summary judgment response). In its April 17, 2015 letter brief in response, Trend again did not mention Dr. McDaniel's trial testimony. D.I. 212. Rather, Trend framed it as a disagreement between the experts about the meaning of the claim term, arguing that "[t]his dispute is properly resolved now, prior to trial, to provide proper instruction on the scope of the claims and to avoid juror confusion." *Id.* at 1.

The Court recognized the distinction between Trend's request for modification based on "bulk" and its request regarding "frequency," and sought confirmation at the hearing on April 10, 2015. In response, counsel for Trend unequivocally disavowed any reliance on any kind of "flip-flop" to justify the addition of "frequency" to the construction:

> THE COURT: Now, we have mostly talked about bulk email, and bulk email was in the parenthetical for claim 22, but you are asking me now to expressly write in "frequency" into all three. … I understand you are going to tell me that is what you see in the patent, ***but do you have any flip-flop type of argument supporting that one as well***?

> MR. JACOBS: "Frequency" again has always been described as being a characteristic in that the frequency is what is used to determine the existence of spam, bulk email, and any of the information that is described in the patent. So to answer your question directly, ***there is no indication of flip-flopping regarding "frequency" in the record.*** It is the "bulk e-mail" issue.

Ex. 7 (Apr. 10, 2015 Hrg. Tr.) at 171:11-25 (emphasis added). Counsel for Trend couched its position in terms of "comprehensiveness," arguing "we ought to be ahead and make sure we're being as complete as possible" and that "frequency has become part of the issue because we want to clarify, we want to make sure that we have comprehensive claim construction." *Id*. at 173:6-7, 18-19; *see also id.* at 173:22-23 ("That strikes me as a traditional *O₂ Micro* situation.").[4]

The record proves that any "activities" related to the letter briefing on "frequency" were based on Trend's view that additional claim construction was necessary—*i.e.*, "a traditional *O₂ Micro* situation"—and not "a direct result of Dr. McDaniel's new expert opinion," as Trend now argues. Accordingly, IV objects to any fees sought for "activities relating to the letter briefing ordered by the Court regarding the potential inclusion of 'frequency' in the claim construction."

Exhibit 8 collects the time entries for work related to the claim construction briefing addressing ***both*** the "bulk"-related and "frequency"-related issues by its law firms McDermott Will & Emory, Paul Hastings, and Morris, Nichols, Arsht & Tunnel. These data are taken from Exhibit A to the Ou Declaration and Exhibit 1 to the Jacobs Declaration. The time entries show tasks dedicated to the claim construction issues and exclude time spent on expert reports and other work for which Trend also seeks fees.

Table 1 of Exhibit 8 shows that Trend seeks ███████ in fees paid to McDermott Will

---

[4] Trend's time entries further prove that its request for relief was more about addressing what it deemed to be a potential O2 Micro issue than an expert "flip-flop." *See* Exhibit A to Ou Decl. at Invoice 273933 at 16 ███████ Invoice 2748556 at 1 ███████ ); Invoice 2748556, at 4 ███████ ); Invoice 2748556 at 14 ███████ .

& Emory for its work on "bulk" and "frequency." Trend seeks an additional █████████ in legal fees paid McDermott Will & Emory for "frequency"-only work incurred after April 10, 2015, when the Court ordered supplemental briefing on the issue. *See* Ex. A to Ou Decl. at Invoice 2777030 at 10-11.

Trend seeks █████████ for work related to claim construction briefing addressing ***both*** the "bulk"-related and "frequency"-related issues by Paul Hastings. See Exhibit 8, Table 2. Trend seeks █████████ for legal fees paid to Paul Hastings for "frequency"-only work incurred after April 10, 2015, the date the Court ordered supplemental briefing on the issue. *Id*. at Table 3.

Based on Exhibit 1 to the Declaration of Karen Jacobs, Trend seeks █████████ for work related to the claim construction briefing addressing ***both*** the "bulk"-related and "frequency"-related issues from Morris, Nichols, Arsht & Tunnel. Exhibit 8, Table 4. Trend seeks an additional █████████ in legal fees paid Morris, Nichols, Arsht & Tunnel for "frequency"-only work incurred after April 10, 2015, the date the Court ordered supplemental briefing on the issue. *See* Ex. 1 to Jacobs Decl. at Invoice No. 969150 at 2.

Trend is not entitled to recover attorneys' fees for work done in furtherance of its attempt to add "frequency" to the Court's construction. That is not a close call, and because Trend nevertheless failed to disaggregate the billings (for example, by asking the timekeepers to revise the entries based on their memories or other indications of time spent between the two tasks), it should recover nothing based on a failure of proof. At a minimum, the requested fees should be discounted. Based on page counts, the "frequency" issue accounted for about 15-20% of the briefing and argument on claim construction matters before the April 10, 2015 hearing. The "frequency" issue accounts for 100% of the briefing and argument after April 10, 2015. The requested amount of fees should therefore at least be discounted as follows, if not eliminated:

| | Fees sought | Adjustment | Fees after adjustment |
|---|---|---|---|
| McDermott Will & Emery ("bulk" and "frequency") (Table 1) | ███████ | 15% | ███████ |
| McDermott Will & Emery ("frequency" only) | ██████ | 100% | $0 |
| Paul Hastings ("bulk" and "frequency") (Table 2) | ███████ | 15% | ███████ |
| Paul Hastings ("frequency" only) (Table 3) | ██████ | 100% | $0 |
| Morris Nichols ("bulk" and "frequency") (Table 4) | ██████ | 15% | ██████ |
| Morris Nichols ("frequency" only) | ██████ | 100% | $0 |
| **Totals** | ███████ | | ███████ |

### III.   General Objections to Trend's Requested Fees

In addition to the specific objections detailed above, the Court should impose an overall reduction in fees based on Trend's block billing and consequent failure to provide any basis from which the Court can determine what portion of its work actually fell within the scope of its motion for fees. These objections are in addition to the instances of block-billing identified in the preceding sections of this brief; here they concern instances in which Trend itself concedes that block billing included work on tasks that have nothing to do with the Court's §285 ruling.

Similarly, an overall reduction is warranted as a result of Trend's use of an excessive number of attorneys on the narrow portion of the litigation relevant to its instant motion, and the inefficiencies that resulted. And finally, a percentage reduction should be applied to all fees sought because the hourly billing rates that are the basis for Trend's request are excessive when measured against the same AIPLA surveys on which Trend relies.

Trend argues that its invoices include time entries for work it claims was within the scope of relief granted by the Court but for which its attorneys did not bill Trend, and that these substantial invoice deductions support "the reasonableness of the overall amount incurred and requested in this motion." Trend Br. at 5, 6. To the contrary, had Trend paid for and sought

reimbursement for even higher amounts it would have made an unreasonable situation even worse. The existence of unbilled work does not correct or offset the problems described below.

A.    There Is No Evidence To Show What Portion of Trend's Block Billing is Reasonable

Trend's block billing practices establish that a substantial portion of the entries for which it requests fees reflect tasks that are unrecoverable under the Court's §285 ruling. While Trend has annotated a number of these entries, purportedly to exclude time spent on irrelevant tasks, its method of implementing these reductions provides no basis from which the Court can determine the actual amount of time spent on compensable tasks.

Philip Ou states in his declaration that, where a description of time billed "included tasks falling outside the scope of the relief sought in Trend's motion," he "used [his] best judgment to allocate a portion of the time entry to the tasks that fell within the scope of relief . . . and to exclude the remainder of the time billed for that entry." Ou Decl. ¶ 9. Regardless of whether Mr. Ou used his "best judgment," his allocation of time to relevant-versus-irrelevant tasks is necessarily arbitrary for every entry where he himself was not the timekeeper, given that he lacked any actual knowledge of how the timekeeper divided his or her time. For example, Mr. Ou exercised his "best judgment" to determine that, where D. Bartow spent ▮▮▮▮ on two tasks—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—Bartow must have spent 50% of that time, or ▮▮▮▮▮, on ▮▮▮▮▮ (the only part of the entry for which Trend may seek fees). Ex. A to Ou Decl. at Invoice 2739331 at 17. Similarly, where Bartow spent a total of ▮▮▮▮▮▮▮▮▮▮▮ four separate things—demonstratives for trial, an expert report, the motion for clarification, and himself for mock trial—Mr. Ou guesses that half of that time, or ▮▮▮▮▮, was within the scope of Trend's motion for attorney's fees. Id. at Invoice 2748556 at 15. But Ou is not Bartow, and therefore cannot provide any real information regarding how much time Bartow actually spent

on each disparate task in Bartow's billing entry. Moreover, Ou provided no evidence that he questioned Bartow about this, and Bartow himself provided no declaration, nor has any other timekeeper whose entries Mr. Ou has divided based on his own guesses.

For every instance in which Mr. Ou himself was not the timekeeper, he has disclosed no greater basis than the Court has for knowing how an individual allocated time between tasks in a single billing entry—that is, he guessed. He annotated 150 billing entries with unsupported assumptions about the percentage of time spent on relevant tasks. These entries add up to ████████, an unknown quantity of which were actually spent on tasks within the scope of the Court's order. The Court should exclude entries for which Mr. Ou guessed at how other attorneys spent their time because they provide no basis from which to assess reasonable fees.[5] *See Estate of Schultz v. Potter*, No. CIV. A. 05-1169, 2010 WL 883710, at *5 n.9 (W.D. Pa. Mar. 5, 2010) (stating that a party "block bills at his own peril" and "disallowing the entire amount" for block entries where entries include both compensable and non-compensable tasks).

B.     Trend's Billing Includes Excessive Internal Correspondence and Communications

Fee requests for excessive time spent on internal communications should be reduced by the courts as unreasonable, and "particularly when attorneys charge for internal communications at senior counsel rates."[6]

---

[5] Trend cannot belatedly provide evidence in support of its requested hours, this Court has made clear that Local Rule 7.1.3(c)(2) prohibits such bolstering the record on reply. *See Lab. Skin Care, Inc. v. Ltd. Brands, Inc.*, 757 F. Supp. 2d 431, 439 (D. Del. 2010) (excluding new evidence on reply where Plaintiffs' response "raised no new facts which Defendants must rebut" and new evidence only "serve[d] to bolster Defendants' original argument").

[6] *Walker v. Gruver*, No. 1:11-CV-1223, 2013 WL 5947623, at *13 (M.D. Pa. Nov. 5, 2013); *see also Maldonado v. Houston*, 256 F.3d 181, 187 (3d Cir. 2001) (reducing hours billed for time spent on internal conferencing and other internal tasks); *Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, No. CIV. A. 08-1463, 2011 WL 4565494, at *17 (W.D. Pa. Sept. 29, 2011) (reducing hours by 50% for time spent on internal communications); *Staples v. Ruyter Bay Land Partners, LLC*, No. CIV. 2005-11, 2008 WL 450265, at *2 (D. V.I. Feb. 6, 2008) (excluding time spent on internal communications).

At least ▉ of Trend's billing entries contain internal correspondence relevant to the tasks for which Trend seeks fees. These entries represent a total of ▉▉▉▉▉. In some instances, the only portion of an entry relevant to Trend's fee petition consists of internal correspondence.[7] In other instances, entries include internal conferencing incident to every relevant task performed.[8] Finally, even where a conferencing entry contains an unrelated task for which Trend claims entitlement to fees, Trend's block billing makes it impossible to know how much of the billed time was spent on the included communications. Such entries can and should be excluded from an assessment of Trend's reasonable fees; at a *minimum*, they should be discounted by ▉▉▉▉, which is an estimate of the proportion of time spent on internal correspondence.[9] *Estate of Schultz*, 2010 WL 883710, at *5 n.9 (excluding billing entries in their entirety where a portion of that entry was not compensable).

C.     Trend's Overstaffing Resulted in Duplicative and Repetitive Work

Trend's billing reflects many attorneys working on the same tasks, resulting in duplicative efforts for which Trend cannot reasonably seek fees. *See Evans v. Port Auth. of New York & New Jersey*, 273 F.3d 346, 362 (3d Cir. 2001) (affirming district court's reduction of fees for time spent by multiple partners on same tasks). For example, on January 31, 2017, an attorney spent ▉▉▉▉▉▉ the motion for fees and to declare the case exceptional,

---

[7] *See, e.g.*, Ex. A to Ou Decl. at Invoice 2739331 at 16; Invoice 2755292 at 7; Invoice 2050455 at 23; Invoice 2052691 at 1, 2; Invoice 2114856 at 3; Invoice 2130530 at 1.

[8] *See, e.g.*, *id.* at Invoice 2050455 at 22 (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉; *see also id.* at Invoice 2748556 at 8, 10, 13, 27; Invoice 2755292 at 12, 19-20; Invoice 2761021 at 6; Invoice 2050455 at 1, 2, 3, 6, 8, 15, 18, 20, 23, 24, 25; Invoice 2052691 at 1, 2, 3; Invoice 2114856 at 3; Invoice 2118250 at 2; Invoice 2121574 at 2; Invoice 2130530 at 1.

[9] In the attached Exhibit 9, Fee Chart for Internal Communications, IV has compiled a table discounting Trend's billing entries by the proportionate share spent on internal conferencing and correspondence. This table does not include entries for which the correspondence was related to the "frequency" briefing or expert reports, as such correspondence has already been accounted for in IV's other proposed reductions.

while a second attorney spent ████████████ a draft of the same motion. Ex. A to Ou Decl. at Invoice 2114856 at 3. Then, on February 1, the first attorney spent ██████ preparing the fees motion, while the second spent ████████████ that motion, ████████████ ████████████—leaving one to wonder what the previous ██████ were spent preparing. *Id.* at Invoice 2118250 at 1. On February 3, the first attorney billed ████ ████████ that motion, and the second billed ████████████ the same. *Id.* at Invoice 2118250 at 2. This sort of duplicative effort reflects inefficient staffing, and renders the fee requests unreasonable: In total, five attorneys worked on the motion to declare the case exceptional, a 19-page motion containing *four pages* of argument. Trend is of course entitled to decide to pay for such tag team efforts, but precedent imposes a different standard when Trend seeks to shift those costs to someone else.

All told, Trend requests fees for time billed by sixteen individual attorneys, and a total of twenty individual timekeepers for tasks pertaining to only a *very narrow portion* of this litigation. *See* Ou Decl. Ex. A; Jacobs Decl. Ex. 1. Trend's overstaffing of the narrow part of this litigation for which the Court has permitted it to recover fees is unreasonable on its face and warrants an overall reduction, which IV conservatively estimates at 10%. *See Microsoft Corp. v. United Comp. Res. of New Jersey, Inc.*, 216 F. Supp. 2d 383, 385 (D.N.J. 2002) (reducing fees for overstaffing); *see also Richardson v. City of Chicago*, No. 08 C 4824, 2013 WL 2451107, at *5 (N.D. Ill. June 5, 2013) (reducing lodestar by 80% for overstaffing), *aff'd sub nom.*, 740 F.3d 1099 (7th Cir. 2014); *Cox v. Council for Devel. Disabilities*, Inc., No. CIV-12-0183-HE, 2013 WL 1915066, at *3 (W.D. Okla. May 8, 2013) (reducing lodestar by 30% for overstaffing).

D.  <u>The Billing Rates of Trend's Attorneys Are Excessive</u>

Trend's fees are inflated by its attorneys' unusually high hourly rates. Trend asserts that such rates—some as high as a ████████ per hour (████████████████████

██████—are "in line with prevailing market rates." Chaikovsky Decl. ¶ 8; Ou Decl. ¶ 15. Trend points to two economic surveys of IP lawyers' hourly rates, published by the AIPLA in 2015 and 2017 ("AIPLA Surveys"). *See* Trend Br. Exhs. C–D.

But Trend misuses those survey results in three important ways. First, Trend misidentifies the relevant data by citing ranges for associate and partner billing rates that do not exist in the survey. Even adopting Trend's preferred data, Trend omits that most of its timekeepers nonetheless billed at rates well above the surveys' mean rates. Also, Trend cherry-picks favorable data by using purported average rates based on firm size, instead of averages based on the relevant geographical legal market and individual attorneys' years of experience.

Trend's attorney billing records disclose rates for five partners at the two large law firms that worked on this litigation. ████████████████ those five partners (Chaikovsky, Larson, Jacobs, Bright and Bartow) charged ████████████████████████████████ per hour, respectively.[10] For associates, Trend seeks fees for eight timekeepers, who billed at rates ranging from ████ on the high end to ████ on the low.

Trend attempts to normalize these eye-popping rates by selecting favorable comparison data in the two AIPLA surveys. Trend points to the following chart on page 7 of its Opening Brief, a snapshot of which is pasted below, and argues that because some of its discounted rates fall near or within these ranges, the charged rates must be reasonable.

| Year | Billing Rates (Associates) Economic Survey 25% to 75% | Billing Rates (Partners) Economic Survey 25% to 75% |
|------|-------------------------------------------------------|-----------------------------------------------------|
| 2014 | $398 - $538 | $449 - $658 |
| 2016 | $594 - $868 | $669 - $984 |

There are numerous problems with Trend's selected ranges and its conclusions. First,

---

[10] Ex. B to Trend Br. The ████████████████ hourly rates range from ████ down to ████. Ex. A to Trend Br.

Trend asserts that these figures represent "average nationwide billing rates" for "partners and associates in large national law firms from 2014 and 2016."[11] Trend Br. at 7. These are not the "average" rates, but the rates that fall within the first and third quartiles. The AIPLA surveys in fact disclose the "average" rates as well as the median rates, but Trend omits those because they belie Trend's conclusions that their rates are "in line with prevailing market rates." AIPLA's mean or average rates are much lower than Trend's attorneys' rates.

| AIPLA Survey Mean (Average) Rates For Large Law Firms >150 Lawyers | | |
|---|---|---|
| Year | Billing Rates (Associates) *Mean* | Billing Rates (Partners) *Mean* |
| 2014 | $466 | $733 |
| 2016 | $544 | $837 |

Ex. 10; Trend Op. Br., Ex. C to Ou Decl. at I-25 & I-36 (last row); *id.* Ex. D at I-27 & I-39.

Obviously many of Trend's associates and partners billed well above the mean for large national law firms surveyed by AIPLA. ███████████████████████████████

████████████████████████████████████████████████████████

███████████ Thus, even correcting Trend's chart to input the correct survey data, and then employing true averages, many of Trend's partners and associates charged rates well above the "average," even for full-time intellectual property lawyers in large, national law firms.

Trend misuses the AIPLA survey in a final way. While reported and unreported decisions rely on AIPLA's survey to evaluate the reasonableness of lawyer billing rates, those decisions generally rely on *geographic markets* and *lawyer experience* to compare requested billing rates against survey data. Trend, on the other hand, uniformly points to national large law firm billing rates despite the fact that more granular data are available.

---

[11] Trend has flipped the data. Trend's 2016 associate range is actually the 2014 partner range for large national law firms. Trend's 2014 partner range is actually the 2016 associate range for the same-sized firms.

A district court may appropriately consider AIPLA survey data in evaluating the reasonableness of requested hourly rates. *See View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 988–89 (Fed. Cir. 2000) (affirming district court's *reduction* of Paul, Hastings attorney rates as "on the high-end of rates charged by other intellectual property attorneys with equivalent experience" based on comparison to AIPLA's 1995 survey). Courts generally evaluate attorney experience and relevant geographical market to find comparators in the AIPLA survey data.[12]

Here, Trend ignores attorney experience data (its own and AIPLA's survey) and picks the wrong geographic market (selecting "National" large law firms rather than Philadelphia CMSA). Regarding the proper geographic market, the AIPLA surveys attached to Trend's brief identifies the mean, median and quartile ranges for lawyers in the Philadelphia CMSA. Those attorney billing rates are much lower than those for which Trend seeks fees here. *See* Exh. 10 to Folse Decl.; Trend Op. Br., Ex. C to Ou Decl. at I-25 & I-36; *id.* Ex. D at I-27 & I-39.

The Court should discount Trend's entire fee request by 10% to align Trend's excessive billing rates with market rates identified in the AIPLA surveys. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮ Applying a 10 percent reduction across the board is a conservative because using the correct *Philadelphia* market averages would require a much

---

[12] *See Eli Lilly & Co. v. Zenith Goldline Pharm., LLC*, 264 F. Supp. 2d 753, 766 (S.D. Ind. 2003) (employing, for an "exceptional" case in Indianapolis, 2001 AIPLA data for the geographical market "Other Central (*i.e.,* other than Chicago and Minneapolis)" for assessing reasonableness of attorneys' billing rates); *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 737 (N.D. Ohio 2010) (finding AIPLA survey to be "not entirely persuasive on account of the incomplete information supplied by Saint Gobain" where fee petitioner failed to submit information on attorneys' years of experience); *Jepson, Inc. v. Makita USA, Inc.*, 1994 WL 543226, at *11 (C.D. Cal. May 27, 1994) (assessing billing rates by comparing against AIPLA years-of-experience data).

[13] The AIPLA survey's large firm averages for 2014 and 2016 are $733 and $837, which together average $785. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19

steeper discount.[14]

E.  Summary of Reductions

The Court should reduce Trend's requested fees based on these specific objections:

| Independent Reductions | Amount of Reduction | |
|---|---|---|
| Time Spent on Rubin Report | $ | |
| Time Spent on Prakash Report | $ | |
| Vague bills for "supplemental expert reports | $ | |
| Discounting time on "frequency" and "bulk" | $ | |
| Time Spent on Internal Communications | $ | |
| **Total of Independent Reductions** | **$** | **)** |

Furthermore, the Court should eliminate the billing entries for which Trend has provided only Mr. Ou's guess regarding how much of the time encompassed by that entry was spent on tasks within the scope of Trend's request for fees. After eliminating those entries and applying the independent reductions to the remaining entries such that the proposed reductions do not overlap, the total reduction becomes ▮▮▮▮. Additionally, Trend's overstaffing of this matter warrants an overall 10% decrease for the resulting duplicative and repetitive work, bringing the total reductions to ▮▮▮▮. Finally, applying a 10% reduction to account for Trend's excessive billing rates, the total reduction is ▮▮▮▮.[15] Trend may claim, at a maximum, ▮▮▮▮ in attorneys' fees.

IV.  **Conclusion**

IV respectfully requests that the Court deny Trend's motion, or, at a minimum, order the discounts outlined above.

---

[14] Alternatively, the Court should discount Trend's fees to the Philadelphia billing rate average. That partner average for 2014 and 2016 is $544 ($510 & $578, respectively). ▮▮▮▮▮ higher than $544.

[15] Alternatively, ▮▮▮▮▮ to the average Philadelphia partner rates results in a reduction of ▮▮▮▮ to ▮▮▮▮.

DATED:  November 3, 2017                    Respectfully submitted,

                                            FARNAN LLP

                                            /s/ Brian E. Farnan
                                            Brian E. Farnan (Bar No. 4089)
                                            Michael J. Farnan (Bar No. 5165)
                                            919 North Market Street
                                            12th Floor
                                            Wilmington, DE 19801
                                            (302) 777-0300
                                            (302) 777-0301
                                            bfarnan@farnanlaw.com
                                            mfarnan@farnanlaw.com

                                            Parker C. Folse III *(admitted pro hac vice)*
                                            Brooke A.M. Taylor *(admitted pro hac vice)*
                                            SUSMAN GODFREY L.L.P.
                                            1201 Third Avenue, Suite 3800
                                            Seattle, WA 98101-3000
                                            Telephone:      (206) 516-3880
                                            Facsimile:      (206) 516-3883
                                            pfolse@susmangodfrey.com
                                            btaylor@susmangodfrey.com

                                            Richard W. Hess (admitted *pro hac vice*)
                                            Weston O'Black (*admitted pro hac vice*)
                                            John P. Lahad *(admitted pro hac vice)*
                                            SUSMAN GODFREY L.L.P.
                                            1000 Louisiana Street, Suite 5100
                                            Houston, TX 77002
                                            Telephone:      (713) 653-7859
                                            Facsimile:      (713) 654-3386
                                            jlahad@susmangodfrey.com

                                            *Counsel for Plaintiff*